## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x

In re:                                              :    **Chapter 11**
                                                    :
**NE OPCO, INC., et al.,**                          :    **Case No. 13-_____ (_____)**
                                                    :
                          Debtors.[1]               :    **Joint Administration Pending**

------------------------------------------------------- x

### DECLARATION OF JAMES PINTO IN SUPPORT
### OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, James Pinto, being duly sworn, depose and say:

1.      I am the Chairman and Chief Executive Officer ("**CEO**") of NE Opco, Inc. ("**NE Opco**") and Chairman and President of NEV Credit Holdings, Inc. ("**NEV Credit**", and together with NE Opco, the "**Debtors**" or the "**Company**"), each of which are corporations organized under the laws of the state of Delaware and debtors and debtors-in-possession in the above-captioned Chapter 11 cases (collectively, the "**Chapter 11 Cases**"). I am authorized to submit this declaration (the "**First Day Declaration**") on behalf of the Debtors.

2.      I joined the Company as Chief Operations Officer in August 2012, and was appointed to CEO on January 1, 2013. Prior to joining the Company, I held executive roles at various industrial manufacturing companies. Most recently, I served as Global Vice President of Operations and Supply Chain Management with Atkore International ("**Atkore**"), a divestiture of Tyco International. Prior to joining Atkore, I was President and CEO at Clyde Union LLC, which supplies engineered industrial pump systems to the oil and gas, nuclear power and water industries globally. Additionally, I spent over twenty years in progressive roles within Textron Inc., a multi-industry business serving the aerospace, automotive, financial and industrial

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are NE Opco, Inc. (9830) and NEV Credit Holdings, Inc. (9596). The above-captioned Debtors' mailing address is c/o NE Opco, Inc., 3211 Internet Boulevard, Suite 200, Frisco, Texas 75034.

markets.

3.     As Chairman and CEO, I am responsible for managing the day to day operations of NE Opco and the financial results of the business.  Given my role as Chairman and CEO, my review of public and non-public documents, and discussions with other members of the Debtors' management team, I am familiar with the Company's business, financial condition, policies and procedures, day-to-day operations, and books and records.  Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees or retained advisers that report to me in the ordinary course of my responsibilities.  I am authorized by each of the Debtors to submit this First Day Declaration.  References to the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), the Chapter 11 process and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, the Company's counsel.  If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

4.     On June 9, 2013 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "**Court**").  The Debtors will continue to operate their businesses and manage their properties as debtors-in-possession.

5.     I submit this First Day Declaration on behalf of the Debtors in support of the Debtors' (a) voluntary petitions for relief under Chapter 11 of the Bankruptcy Code and (b) "first-day" motions, which are being filed concurrently herewith (collectively, the "**First Day Motions**").[2]  The Debtors seek the relief set forth in the First Day Motions with the goal of

---

[2]     Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the applicable First Day Motions.

minimizing the adverse effects of the commencement of the Chapter 11 Cases on their businesses. I have reviewed the Debtors' petitions and the First Day Motions, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' businesses and the success of the Debtors' reorganization.

6.     Part I of this First Day Declaration provides an overview of the Debtors' businesses, organizational structure; capital structure, and significant prepetition indebtedness, as well as a discussion of the Debtors' financial performance and the events leading to the commencement of these Chapter 11 Cases. Part II sets forth the relevant facts in support of the Debtors' First Day Motions.

## PART I

### A.     General Background

7.     The Company is the largest privately-held manufacturer of envelopes in North America. The Debtors are headquartered in Frisco, Texas and have eight manufacturing facilities, two distribution centers and approximately 1,600 employees in the United States. The Company is an environmental leader in the paper and envelope converting industries with certifications from the Forest Stewardship Counsel (FSC), Rainforest Alliance, Sustainable Forestry Initiative (SFI), Programme for the Endorsement of Forest Certification (PEFC), and Green Seal.

8.     Unlike most of its competitors, the Company sells its products through all three distribution channels (wholesale, consumer and retail). In total, the Company holds an approximately fifteen (15) percent share of the U.S. envelope market; its shares of the wholesale, consumer and retail markets are approximately fifty (50) percent, ten (10) percent and five (5)

3

percent, respectively. The Company offers over 9,000 unique products, including advanced eco-friendly and identity theft prevention envelopes, and is committed to product innovation. The Company's products include commodity and custom-made envelopes of all kinds, as well as business aids of various types including certificates, presentation folders, binders, specialty bags, and coin and currency bags. In addition, the Company maintains printing plants and presses which allow them to emboss, print, or foil stamp envelopes to provide custom products to meet the particular demands of the Company's customers.

**B.     Corporate Structure**

9.     Debtor NE Opco is a wholly-owned subsidiary of Debtor NEV Credit. NEV Credit is a direct subsidiary of NEV Parent Holdings, Inc. ("**NEV Parent**"), which is a wholly-owned subsidiary of NEV Holdings, LLC ("**NEV Holdings**"). NEV Parent also owns a 100 percent interest in NEV RE Holdings, Inc., which owns and leases a single parcel of real estate in City of Industry, California to Debtor NE Opco. NEV Parent, NEV Holdings and NEV RE Holdings, Inc. are not Debtors in these Chapter 11 Cases. NEV Holdings is a wholly-owned subsidiary of private equity funds managed by The Gores Group, LLC and certain of its affiliates (collectively, the "**Gores Group**"). An organizational chart depicting the Debtors' corporate structure is attached hereto as Exhibit A.

**C.     Company History**

10.     The Company was founded by William Ungar in 1952. The Company was first located only in New York, New York and grew rapidly in the post-war years. The Company began to expand through strategic acquisitions in 1991, when it acquired Aristocrat Envelope, and it has since acquired such nationally-known companies and brand names as Williamhouse and Atlantic Envelope. To facilitate these acquisitions, NEC Holdings Corp. was founded and

incorporated in 1994 under the laws of Delaware.

11.     As noted above, the Company is headquartered in Frisco, Texas.  Additionally, the Company has eight manufacturing facilities, in the following locations:  Appleton, Wisconsin; City of Industry, California; Ennis, Texas; Exton, Pennsylvania; Scottdale, Pennsylvania; Shelbyville, Kentucky; Smyrna, Georgia; and Westfield, Massachusetts.  In addition, the Company maintains warehouse facilities in Washington and Ontario, Canada.   In total, the Debtors employ approximately 1,600 employees, and their manufacturing facilities produce an estimated 37 billion envelopes per year.   Four of the Company's manufacturing facilities employ unionized employees.

**D.     The 2010 Chapter 11 Cases**

12.     On June 10, 2010, NEC Holdings Corp. and certain of its affiliates (including National Envelope Corporation, the "**2010 Debtors**") commenced cases (the "**2010 Chapter 11 Cases**") under Chapter 11 of the Bankruptcy Code in this Court.  The 2010 Chapter 11 Cases were filed in the midst of the global economic crisis which began in late 2008.  The global recession experienced during such period significantly affected the Company by reducing sales and constraining liquidity.  The 2010 Debtors engaged in a number of strategic restructuring efforts to reduce expenses (including company-wide wage reductions and a headcount reduction), increase competitiveness, strengthen customer relationships and enhance shareholder values.  Notwithstanding these efforts, the 2010 Debtors remained over-leveraged and in a severe liquidity crisis.

13.     On September 7, 2010, NEV Holdings acquired, pursuant to Section 363 of the Bankruptcy Code, substantially all of the assets of the 2010 Debtors for approximately $150 million, along with a $37.7 million note (which would become part of the Term B Loan under

the Second Lien Credit Agreement (as such terms are defined herein)) and the assumption of roughly $20 million in accounts payable owed to International Paper Company ("**International Paper**").  Following consummation of the 2010 Transaction, the 2010 Chapter 11 Cases converted to cases under Chapter 7 of the Bankruptcy Code (the "**Chapter 7 Cases**").  The Chapter 7 Cases remain pending in this Court before The Honorable Peter J. Walsh under the jointly administered Case Number 10-11890 (PJW).  The Debtors are in no way affiliated with the 2010 Debtors and these Chapter 11 Cases are separate and distinct from the Chapter 7 Cases.

E.    **Debtors' Capital Structure**

14.    As of the Petition Date, the Debtors had secured debt in the amount of approximately $148,380,700 and unsecured debt, consisting mostly of outstanding trade obligations, in the amount of approximately $20.3 million (exclusive of amounts owed to International Paper).  A detailed discussion of the Company's capital structure and the various tranches of secured debt is set forth below.

(ii.)    *Revolving Loan Facility and Term A Loan*

15.    On September 7, 2010, NEV Holdings, as parent, NE Opco along with NEV Holding's other subsidiaries from time to time party thereto, as borrowers (collectively, the "**NEV Borrowers**"), Wells Fargo Capital Finance, LLC (the "**First Lien Agent**"), as agent, Bank of America, N.A. as syndication agent, Wells Fargo Capital Finance, LLC and Bank of America, N.A. as the arrangers, and the other financial institutions from time to time party thereto as lenders (collectively, the "**First Lien Lenders**") entered into a credit agreement (as amended or restated, the "**First Lien Credit Agreement**"), which provided the NEV Borrowers with a revolving loan facility (the "**Revolving Loan Facility**") in an aggregate principal amount of up to the lesser of (i) $100 million or (ii) the lesser of (a) the maximum borrowing amount

permitted under the Revolving Loan Facility *less* the sum of (1) the value of certain issued letters of credit, *plus* certain required reserves for rental payments, *plus* certain required term loan reserves, and (b) the Borrowing Base (as defined in the First Lien Credit Agreement) at such time *less* the value of certain issued letters of credit. The First Lien Credit Agreement also provided a term loan facility in the amount of $23,879,000 (the "**Term A Loan**"). The First Lien Credit Agreement additionally provided a letter of credit sub-facility in an aggregate principal amount of up to $20 million and a swing-line loan sub-facility in an aggregate principal amount of up to $10 million. The maturity date for the borrowings under the First Lien Credit Agreement is September 7, 2014. All amounts outstanding under the Revolving Loan Facility and the Term A Loan are secured by a first priority security interest in substantially all of the NEV Borrowers' assets with certain exceptions as set forth in the First Lien Credit Agreement and related loan documents.

16.     On October 31, 2011, the parties amended the First Lien Credit Agreement to reduce the maximum amount available under the Revolving Credit Facility to $80 million, revise certain future covenant requirements and amend certain administrative matters. Moreover, on August 24, 2012, the parties amended the First Lien Credit Agreement and related documents to substitute NEV Credit for NEV Holdings as the Parent and Guarantor (as those terms are defined in the First Lien Credit Agreement). The parties further amended the First Lien Credit Agreement on December 24, 2012 to provide for an additional term loan in the amount of $6 million.

17.     As of the Petition Date, there was approximately $34,861,406 outstanding under the Revolving Loan Facility and $15,644,032 under the Term A Loan.

**(iii.)    *Subordinated Term B Loan Facility***

7

18.     On September 7, 2010, NEV Holdings, as Parent, and the NEV Borrowers entered into that certain Credit Agreement (as amended or restated, the "**Second Lien Credit Agreement**") with the General Electric Capital Corporation ("**GECC**"), as agent, and various financial institutions from time to time party thereto, as lenders, which provided the NEV Borrowers with a five-year term loan in the amount of $37,686,928.74 million (the "**Term B Loan**"), with a maturity date of September 7, 2015. The Second Lien Credit Agreement was subsequently amended on October 31, 2012 to increase the amount of the available borrowings thereunder to $67,686,928.74. All amounts outstanding under the Term B Loan are secured by a second lien security interest in substantially all of the NEV Borrowers' assets.

19.     On April 11, 2011, GECC resigned as agent under the Term B Loan and was subsequently replaced by LBC Credit Partners, L.P. ("**LBC Credit Partners**"). LBC Credit Partners was subsequently replaced as agent on October 31, 2012 by Galactic Holdings, LLC ("**Galactic**"), an affiliate of the Gores Group. Moreover, as was done under the First Lien Credit Agreement, on August 24, 2012, the parties amended the Second Lien Credit Agreement and related documents to substitute NEV Credit for NEV Holdings as the Parent and Guarantor (as those terms are defined in the Second Lien Agreement).

20.     As of the Petition Date, the aggregate amount outstanding under the Term B Loan (exclusive of the IP Term B Loan discussed below) was approximately $55,717,953. Galactic currently holds approximately eighty-two (82) percent of this Term B Loan debt (exclusive of the IP Term Loan B (as defined herein)).

**(iv.)** *International Paper Note*

21.     On September 7, 2010, NE Opco entered into a noninterest bearing, five-year promissory note (as the same has been amended and restated, the "**International Paper Note**")

RLF1 8631302v.9

with International Paper for $17.5 million. The International Paper Note was repayable at a rate of $296,610 per month with the final payment being due on September 30, 2015. On February 5, 2013, the parties entered into an amendment and restatement of the International Paper Note, which had an original principal amount of $9,491,525 and bears interest at a rate of 3.0 percent per annum, and extended the maturity date of the International Paper Note to February 5, 2016. NEV Credit is a guarantor of NE Opco's obligations under the International Paper Note. The International Paper Note is secured by a third priority security interest in substantially all of Debtors' assets. As of the Petition Date, there was approximately $9,535,028 outstanding under the International Paper Note.

### (v.)    *International Paper Supply Agreement and IP Term B Loan*

22.    Pursuant to that certain Paper Supply Agreement, dated September 7, 2010 (as amended from time to time, the "**Supply Agreement**") between International Paper and NE Opco, International Paper agreed to supply products to the Company upon the terms set forth therein. NE Opco's obligations under the Supply Agreement are guaranteed by NEV Credit. To induce International Paper to provide products in accordance with the terms of the Supply Agreement, the Company agreed to grant International Paper a security interest in and to substantially all of the Debtors' assets. The Supply Agreement provides that the first $24 million in accounts payable outstanding under the Supply Agreement (the "**Supply Agreement A/P**") shall be secured by a third priority security interest in substantially all of the Debtors' assets. In the event that the Supply Agreement A/P exceeds $24 million in the aggregate, the next $5 million in Supply Agreement A/P (the "**Second Lien Supply Agreement A/P**") shall be secured by a second priority security interest in substantially all of the Debtors' assets and therefore treated *pari passu* with the Debtors' obligations under the Term B Loan (in the event that Supply

Agreement A/P does not exceed $24 million on a given date, then the amount of Second Lien Supply Agreement A/P on such date shall be equal to zero). The outstanding Supply Agreement A/P owed to International Paper under the Supply Agreement was approximately $20.5 million as of the Petition Date.

23.     On February 5, 2013, NE Opco and International Paper entered into that certain Second Amendment to Paper Supply Agreement between International Paper Company and NE Opco, Inc. (the "**Second Amendment**"). Pursuant to the Second Amendment, the parties agreed to convert an aggregate amount of $10 million of the oldest outstanding Supply Agreement A/P (the "**Converted Accounts Payable**") into a term loan under the Second Lien Credit Agreement. Accordingly, the Converted Accounts Payable were immediately deemed to be Term Loans (as defined in the Second Lien Credit Agreement) (the "**IP Term B Loan**") extended by International Paper to NE Opco under Second Lien Credit Agreement and ceased being Supply Agreement A/P under the Supply Agreement. As of the Petition Date, the outstanding amount of the IP Term B Loan was approximately $10,122,281. The IP Term B Loan is secured by a second lien security interest in substantially all of the Debtors' assets and is *pari passu* with the rest of the Term B Loan under the Second Lien Credit Agreement.

**(vi.)**     ***Unsecured Trade Debt***

24.     In addition to the foregoing, as of the Petition Date, the Debtors had approximately $20.3 million (exclusive of amounts owed to International Paper) in unpaid ordinary course trade debt.

**(vii.)**     ***Equity Interests***

25.     As reflected in the corporate organizational chart attached hereto as Exhibit A, NEV Credit is a direct subsidiary of NEV Parent. NEV Parent is a wholly-owned subsidiary of

NEV Holdings, which is directly owned by certain affiliates within the Gores Group.

**F.**     **Events Leading to Chapter 11 Cases**

      **(i.)**     ***Efforts to Improve Business Following 2010 Transaction***

      26.     Following the 2010 Transaction, the Company implemented a number of initiatives intended to address many of the issues that lead to the commencement of the 2010 Chapter 11 Cases.  Among other things, the Company reorganized its operations, closing five (5) locations in late 2010 and early 2011 and a sixth location in early 2012, and launched a "Plan for Every Plant" initiative that was intended to focus on both operational efficiency and product and profit improvement.  These efforts to improve operational efficiency included completion of JD Edwards implementation across all facilities and the creation of a centralized customer database.  The Company also launched an industry-first line of tree-free envelopes.  Indeed, the Company increased its efforts on being an environmental leader in the paper and envelope converting industries, establishing a partnership with Resolute Forest Products to provide an exclusive new environmental product offering that included envelopes, rolls and folio sheets.

      27.     The Company also focused its efforts on improving its market share, particularly with respect to the "consumer" envelope segment. The Company has traditionally been the number two player in the consumer envelope segment with a fourteen (14) percent market share. The consumer segment is focused in the financial, direct mail, insurance, utilities, fulfillment, nonprofit and courier industries, along with large companies that use envelopes on a day-to-day basis (including envelopes used for business transactions, automated teller machines, payroll and direct mail).  In addition, the Company focused its efforts on penetrating new channels, such as the "retail" envelope segment.

      **(ii.)**     ***Continuing Decrease in Sales Volume***

11

28.     Notwithstanding these efforts, the Company's sales volume has continued to decrease on a year-to-year basis by almost twenty (20) percent. Indeed, the Company's net sales for the year ending on December 31, 2012 were approximately $427 million down from approximately $510 million for the previous year. This decrease in sales is primarily attributable to the competitiveness in the market place and a continuing decline in the volume of U.S. mail as the Company's customer base continues to encourage their customers to move towards an electronic flow of information (for example, online statements and bill paying). Given the decline in U.S. mail and continued migration to the online flow of information, many of the Debtors' competitors have driven down pricing to maintain their sales volume.

29.     While the Company has made price adjustments in an effort to remain competitive, current pricing in the market place has made it difficult for the Company to remain profitable given the fixed nature of their production costs. Approximately sixty (60) percent of the Company's production costs relate to paper provided by International Paper (the Debtors' sole source provider, except in certain limited circumstances) pursuant to the Supply Agreement. The pricing under Supply Agreement is locked in, thereby giving the Debtors little flexibility in reducing their overall costs. The Company, however, has attempted to reduce costs through other means. For example, the Company has reduced its production facility footprint and headcount at all of its facilities, with the total headcount changing from about 2,200 in 2012 down to about 1,600 currently. The Debtors have also attempted to negotiate voluntary prepetition cost reductions with certain of their unions under their respective collective bargaining agreements. The Debtors have also commenced discussions with certain of their key vendors, including International Paper, regarding possible cost reductions moving forward. The Company, however, has experienced net losses since 2007 and has continued to do so following

the 2010 Transaction. The Company's consolidated net income was a loss of approximately $60.1 million in 2012 and $44.1 million in 2011.

### (iii.) *Liquidity Issues and Default under First Lien Credit Agreement*

30.     The declining sales volume and other issues discussed above have created liquidity issues for the Company under the Revolving Credit Facility. While the Debtors anticipate that their restructuring efforts to date will lead to a positive EBITDA level during the third quarter of 2013, they currently anticipate a need for an additional $12 million for the second quarter and up to $2 million for the third quarter of 2013. The Debtors, however, have been unable to satisfy these cash needs given the restrictions on available borrowings under the Revolving Credit Facility.

31.     Accordingly, on May 15, 2013, the Debtors entered into a letter agreement (the "**May 15 Letter Agreement**") with the First Lien Lenders whereby they (i) requested an Advance (as defined in the First Lien Credit Agreement) of $2,302,452.76 (the "**May 15 Advance**") to, among other things, fund operating expenses during the week of May 13, 2013, (ii) acknowledged one or more Defaults and/or Events of Defaults (as such terms are defined in the First Lien Credit Agreement) in existence or that would result from the funding of the May 15 Advance (including, without limitation, an Event of Default for the breach of the minimum EBITDA covenant set forth in Section 7(c) of the First Lien Credit Agreement), (iii) agreed to modify certain reporting requirements with respect to the First Lien Lenders and the mechanism by which the Debtors deliver requests for future Advances and (iv) granted releases to the First Lien Agent, First Lien Lenders and certain related parties. Pursuant to the May 15 Letter Agreement, the Company also acknowledged that it was in the First Lien Lenders' sole discretion as to whether to satisfy any funding requests beyond the May 15 Advance.

RLF1 8631302v.9

## G.    Evaluation of Strategic Alternatives

32.    On May 14, 2013, the Company retained PricewaterhouseCoopers LLP ("**PwC**") as financial advisor to advise and assist the Company in, among other things, (i) advice and assistance with respect to cash flow projections and business restructuring plans, (ii) identifying and implementing short-term and long-term liquidity generating initiatives, (iii) advising the Company in connection with negotiations with secured lenders and key vendors, and (iv) assisting the company in pursuing both out-of-court and in-court restructuring alternatives, including a potential sale of the Company's assets or other proposed transactions.

33.    Immediately upon being retained, PwC facilitated a sales process for the Company and identified financial and strategic buyers to garner interest in pursuing a sale transaction.    Specifically, teasers were distributed to 149 parties, consisting of 88 potential financial buyers and 61 potential strategic buyers.  The Company established an electronic data room whereby interested parties could perform due diligence, subject to execution of an acceptable form of non-disclosure agreement (an "**NDA**") with the Company.  To date, the Company has executed at least eighteen (18) NDA's with interested parties (with several additional agreements still being negotiated) and has been actively responding to various due diligence requests from interested parties.  The Debtors believe that there has been significant interest to date from prospective purchasers of the Debtors' assets that will lead to a spirited and robust bidding process in connection with the sale of the Company's assets under Section 363 of the Bankruptcy Code.

## H.    Objectives of Chapter 11 Cases

34.    As discussed herein, the Debtors have entered into a Debtor-In-Possession Credit Agreement, dated as of June 9, 2013 (as the same may be amended, restated, supplemented or

RLF1 8631302v.9

otherwise modified from time to time in accordance with the terms of any interim or final DIP order, the "**DIP Credit Agreement**"), with Salus Capital Partners, LLC ("**Salus**") acting as administrative agent and collateral agent (in such capacity, the "**DIP Agent**"), for itself and such other lenders as are a party thereto (collectively, the "**DIP Lenders**"), which provides the Debtors with a $67.5 million facility (the "**DIP Facility**"), inclusive of $2.5 million in trade credit to be provided by International Paper as the Tranche B Lender, for purposes of these Chapter 11 Cases. The DIP Facility will allow the Debtors to, among other things, immediately pay down all amounts outstanding under the prepetition First Lien Credit Agreement (with the exception of certain "Surviving Obligations"), while providing the Debtors with sufficient liquidity to support their ongoing operations during the course of these Chapter 11 Cases. The Debtors believe that the DIP Facility will provide them with the necessary runway to maximize value for all creditors, vendors, employees and other stakeholders in these Chapter 11 Cases, either through a plan of reorganization or sale of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code.

## PART II

35.    In order to effectuate a smooth transition of the Company into Chapter 11 and to advance the overall objectives of these Chapter 11 Cases, the Debtors have sought approval of the First Day Motions and related orders (the "**Proposed Orders**"), and respectfully request that the Court consider entry of the Proposed Orders granting such First Day Motions. For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in any of the First Day Motions.

36.    I have reviewed each of the First Day Motions and Proposed Orders (including the exhibits thereto), and the facts set forth therein are true and correct to the best of my

knowledge, information, and belief. Moreover, I believe that the relief sought in each of the First Day Motions (a) is vital to enable the Debtors to make the transition to, and operate in, Chapter 11 with a minimum of interruption or disruption to their businesses or loss of productivity or value and (b) constitutes a critical element in achieving the Debtors' successful reorganization.

### A.      **Joint Administration Motion**

37.      The Debtors seek the joint administration of these Chapter 11 Cases, two in total, for procedural purposes only. Many of the motions, hearings, and other matters arising in the Chapter 11 Cases will affect each Debtor. Thus, I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders and other pleadings, thereby saving a considerable amount of time and expense for the Debtors resulting in substantial savings for their estates.

### B.      **Retention Applications**

38.      I am of the belief that the retention of Chapter 11 professionals is essential to the success of these Chapter 11 Cases. With this in mind, the Debtors filed a motion (the "**Section 156(c) Application**") contemporaneously herewith to retain Epiq Systems ("**Epiq**"), as claims, noticing, soliciting, and balloting agent pursuant to Sections 105(a), 156(c), and rule 2002-1(f) of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"). Epiq is one of the country's leading chapter 11 administrators, with significant experience in noticing, claims administration, solicitation, balloting, and other administrative aspects of chapter 11 cases. The Debtors' estimate that there will be in excess of 11,000 creditors; thus, appointing Epiq as the claims and noticing agent in the Chapter 11 Cases will relieve the Clerk of the Bankruptcy Court for the District of Delaware's (the "**Clerk**") administrative burden of processing what may be an overwhelming

number of claims.

39.     The Debtors' selection of Epiq to act as the claims and noticing agent has complied with the Court's Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c), in that the Debtors have obtained and reviewed engagement proposals from at least two (2) other court-approved claims and noticing agents to ensure selection through a competitive process.  Moreover, the Debtors submit, based on all engagement proposals obtained and reviewed, that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise.  The Section 156(c) Application pertains only to the work to be performed by Epiq under the Clerk's delegation of duties permitted by Judicial Code Section 156(c) and Local Rule 2002-1(f), and any work to be performed by Epiq outside of this scope is not covered by the Section 156(c) Application or by any order granting approval thereof.

40.     Further, the Debtors anticipate that during the filing of these Chapter 11 Cases they will request permission to retain, among others (a) Richards, Layton & Finger, P.A. as counsel; and (b) PwC, as restructuring advisor.  These professionals are well qualified to perform the services contemplated by their various retention applications.  What is more, I believe that the services these professionals provides are necessary for the success of these Chapter 11 Cases and that the professionals will coordinate their services to avoid duplication of efforts.   I understand that the Debtors may find it necessary to seek the retention of additional professionals as these Chapter 11 Cases progress.

## C.     Cash Management Motion

41.     The Debtors have also filed a motion (the "**Cash Management Motion**"), pursuant to sections 105(a), 345(b), and 363(c) of the Bankruptcy Code, requesting the entry of an order (i) authorizing, but not directing, the Debtors to continue to maintain and use their

existing cash management system, including maintenance of the Debtors' existing bank accounts, checks and business forms; (ii) granting the Debtors a waiver of certain bank account and related requirements of the Office of the United States Trustee to the extent that such requirements are inconsistent with (a) the Debtors' existing practices under the cash management system or (b) any action taken by the Debtors in accordance with any order granting this Motion or any other order entered in the Chapter 11 Cases; and (iii) granting the Debtors additional time to comply with Section 345 of the Bankruptcy Code.

42.     In the ordinary course of their businesses, the Debtors maintain a complex cash management system (the "**Cash Management System**") which includes a collections account, a concentration account, a disbursement account, and a payroll account. Those accounts are each held in the name of NE Opco at Wells Fargo Bank ("**Wells Fargo**") and are as follows:

a.     The Debtors maintain their concentration account at Wells Fargo, which is held in the name of NE Opco (Account No. XXXXXX5140) (the "**Master Account**"). Disbursements are made from the Master Account to the Controlled Disbursement Account and the Payroll Account. NE Opco daily requests drawdown funding in amounts necessary to fund disbursements from the controlled Disbursement and Payroll Accounts.

b.     The Debtors maintain one (1) deposit account at Wells Fargo which is held in the name of NE Opco, Inc. (Account No. XXXXXX5132) (the "**Collection Account**"). Payments from customers, including wire transfers, are deposited into the Collection Account. This account is swept into the revolver on a daily basis to pay down amounts owing under the Debtors' revolving credit facility.

c.     The Debtors maintain two (2) disbursement accounts, both of which are held in the name of NE Opco. The first is a controlled disbursement account (Account No.

XXXXXX0526) that is used to fund the Debtors' accounts payable other than with respect to payroll (the "**Controlled Disbursement Account**"). The second disbursement account (Account No. XXXXX5157) funds payroll and related expenses for the Debtors and is a zero balance account (the "**Payroll Account**").

43.    The Debtors' Accounting Department, located in Frisco, Texas, manages the Debtors' Cash Management System. The Accounting Department maintains control over the administration of the various bank accounts enables the Debtors to, among other things, monitor the collection and disbursement of funds.

44.    The Cash Management System is integral to the operation and administration of the Debtors' business. The Cash Management System is an ordinary course, customary and essential business practice and allows the Debtors to efficiently identify the Debtors' cash requirements and efficiently monitor and control all of the Debtors' cash receipts and disbursements. The Cash Management System is similar to those utilized by many other companies of comparable size and complexity to collect, transfer and disburse funds in a cost-effective and efficient manner.

45.    The continued use of the Debtors' cash management system during the pendency of the Chapter 11 Cases is essential to the Debtors' business operations and their goal of maximizing value for the benefit of all parties in interest. Requiring the Debtors to adopt new cash management systems at this early and critical stage would be expensive, impose needless administrative burdens and cause undue disruption. Any such disruption would adversely (and perhaps irreparably) affect the Debtors' ability to maximize estate value for the benefit of creditors and other parties in interest. Moreover, such a disruption would be wholly unnecessary insofar as the Debtors' cash management system provides a valuable and efficient means for the

19

Debtors to address their cash management requirements and, to the best of the Debtors' knowledge, the Debtors' bank accounts are held in an approved depository of the United States Trustee. Maintaining the Debtors' existing cash management system without disruption is both essential to the Debtors' ongoing operations and in the best interests of the Debtors, their estates and all interested parties. Accordingly, the Debtors request that they be allowed to maintain and continue to use their cash management system and bank accounts.

46.    To minimize expenses to their estates, the Debtors seek authorization to continue using all checks substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtors' status as debtors in possession; provided, however, that in the event that the Debtors generate new checks during the pendency of these cases other than from their existing stock of checks, such checks will include a legend referring to the Debtors as "Debtor in Possession." Most parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession as a result of the publicity of these cases, the press releases issued by the Debtors and additional press coverage. Moreover, the Debtors will provide notice of the commencement of the Chapter 11 Cases to creditors and other parties-in-interest. Moreover, changing the Debtors' existing checks, correspondence and other business forms would be expensive, unnecessary and burdensome to the Debtors' estates. Further, such changes would be disruptive to the Debtors' business operations and would not confer any benefit upon those dealing with the Debtors.

47.    The Debtors believe that the funds held in their bank accounts are secure and that obtaining bonds to secure those funds, as required by section 345(b) of the Bankruptcy Code, would be unnecessary and detrimental to the Debtors' estates and creditors. However, the Debtors need time to consult with the United States Trustee in order to determine whether their

cash management system is currently in compliance with the requirements of Section 345(b) of the Bankruptcy Code and/or whether the Debtors need to take any further action to bring their cash management system into compliance with the requirements of Section 345(b). The Debtors are therefore requesting a sixty (60) day extension of their time to comply with the requirements of Section 345(b) of the Bankruptcy Code.

48.    I believe that the continued operation of the Debtors' cash management system is in the best interests of the Debtors' estates and creditors, will avoid immediate and irreparable harm to the Debtors, and is both necessary and appropriate to further the reorganization policy of Chapter 11.

**D.    Employee Obligations Motion**

49.    The Debtors have also filed a motion (the "**Employee Obligations Motion**") seeking the entry of an order authorizing them, in their discretion, to pay, continue or otherwise honor various prepetition Workforce-related (as defined below) obligations (collectively, the "**Prepetition Workforce Obligations**") to or for the benefit of their (a) full-time regular employees who are not in a temporary status and who are typically scheduled to work thirty (30) hours per week (the "**Full-Time Employees**"), (b) part-time employees who are not in a temporary status and who are typically scheduled to work less than thirty (30) hours per week (the "**Part-Time Employees**" and, together with the Full-Time Employees, the "**Employees**"),[3] (c) employees who are hired as interim replacements, to temporarily supplement the workforce, or to assist in the completion of a specific project (the "**Temporary Employees**"[4]), and (d)

---

[3]    The Employees include one individual who is providing service as a board member on the board of Debtor NE Opco, Inc. As of the Petition Date, such Employee was owed only regular salary and wages by the Debtors. For the avoidance of doubt, the Debtors seek to compensate such individual in the ordinary course of business following the Petition Date and reimburse such individual for all reimbursable expenses regardless of whether such reimbursable expense were incurred prior to or following the Petition Date.

[4]    Nothing contained herein shall constitute an admission by the Debtors that the Temporary Employees are

certain independent contractors retained by the Debtors (the "**Independent Contractors**" and, together with the Employees and the Temporary Employees, the "**Workforce**"), for, among other things, (i) compensation to the Workforce, (ii) expenses and expense reimbursements to the Employees, (iii) continuation of benefits provided to the Employees under all plans, programs and policies maintained or contributed to, and agreements entered into, by the Debtors prior to the Petition Date (the foregoing collectively, and as described in greater detail below, the "**Workforce Programs**").  In addition, the Debtors request in the Employee Obligations Motion that the Court confirm their right to continue each of the Workforce Programs in the ordinary course of business during the pendency of these Chapter 11 Cases in the manner and to the extent that such Workforce Programs were in effect immediately prior to the filing of such cases and to make payments in connection with expenses incurred in the postpetition administration of any Workforce Program.

50.    The Workforce Programs under which the Prepetition Workforce Obligations arise are described more fully herein and include, without limitation, plans, programs, policies and agreements providing for (a) wages, salaries, holiday and vacation pay, sick pay and other accrued compensation; (b) reimbursement of business, travel, and other reimbursable expenses; and (c) benefits, with coverage as applicable for eligible spouses, domestic partners and dependents, in the form of medical and dental coverage, coverage continuation under COBRA,[5] pre-tax contribution flexible spending accounts and contributions relating thereto, basic term life, supplemental life, accidental death and dismemberment and business travel accident insurance, short-term disability, long-term disability, employee assistance, workers' compensation,

---

"employees" of the Debtors and the Debtors expressly reserve their right with respect to the proper designation of the Temporary Employees in any context or circumstance.

[5]    See 29 U.S.C. §§ 1161 et seq.

severance and miscellaneous other benefits provided to the Full-Time Employees in the ordinary course of business.[6]

51.    The Employee Obligations Motion also seeks authority for the Debtors to pay any and all local, state and federal withholding and payroll-related or similar taxes relating to the Prepetition Workforce Obligations including, but not limited to, all withholding taxes, social security taxes and medicare taxes.  In addition, the Debtors seek authorization to pay to third parties any and all amounts deducted from Employee paychecks by the Debtors for payments on behalf of Employees for savings programs, benefit plans, insurance programs and other similar programs, or by ADP (as defined below) for garnishments, charitable contributions, support payments and similar items.

52.    The Debtors also request in the Employee Obligations Motion that, with respect to any Workforce Programs and Prepetition Workforce Obligations that are administered, insured or paid through a third-party administrator or provider, the Debtors request authorization, in their discretion, to pay any prepetition claims of such administrator or provider in the ordinary course of business to insure the uninterrupted delivery of payments or other benefits to the Employees.

53.    As of the Petition Date, the Full-Time Employees included approximately 1,672 individuals, of which approximately 222 are salaried and approximately 1,450 are hourly Employees.  Additionally, as of the Petition Date, the Debtors employed approximately 7 Part-Time Employees. All of the Employees are employed by NE Opco, Inc.  Additionally, as further detailed below, the Workforce includes approximately 20 Temporary Employees and 3

---

[6]    The Debtors may separately seek authorization to implement new postpetition retention, severance or similar employment protection programs designed to preserve Employee morale, encourage continuing employment and otherwise ameliorate the effects on Employees of these Chapter 11 Cases.  Pending approval of any such postpetition programs, the prepetition programs will continue in the ordinary course, subject to the provisions of Section 503(c)(2) of the Bankruptcy Code.

Independent Contractors. Approximately 792 of the Debtors' Employees are covered by collective bargaining agreements.[7]

54.    I believe that the Debtors' ability to preserve their businesses and successfully maximize the value of the estates is dependent on the expertise and continued enthusiasm and service of their Workforce. Due to the disruption and uncertainty that typically accompanies a Chapter 11 filing, the Debtors believe that the morale and, thus, the performance of the Workforce may be adversely affected. If the Debtors fail to pay the Prepetition Workforce Obligations in the ordinary course, their Employees, Temporary Employees and Independent Contractors will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses. Such a result would have a highly negative impact on Workforce morale and likely would result in unmanageable performance issues or turnover, thereby resulting in immediate and irreparable harm to the Debtors and their estates. In addition, the Debtors have determined that continuation of the Workforce Programs is vital to preserving and rebuilding Workforce morale during the pendency of these Chapter 11 Cases and to reducing the level of attrition that might otherwise occur.

**(iv.)    *Prepetition Compensation For Employees, Temporary Employees and Independent Contractors***

a.    Employee Payroll and Miscellaneous Deductions

55.    The Debtors' Employees are classified as "hourly," "exempt" or "non-exempt." Those of the Debtors' Employees who meet specific tests established by applicable law and are, thus, exempt from overtime requirements are classified as "exempt." Those Employees whose positions do not meet exemption tests and who are entitled to overtime pay under the specific

---

[7]    Debtor NE Opco, Inc. is a party to collective bargaining agreements with: (i) the National Envelope Employees Independent Association of Appleton, Wisconsin; (ii) United Steelworkers (United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union) ("**USW**") (Scottdale, PA plant); (iii) Graphic Communications Conference/IBT/Local 527S (Smyrna, GA plant); and (iv) USW International Union 4-513 (Westfield, MA plant).

provisions of federal and state employment laws are classified as "hourly" or "non-exempt." Paychecks are distributed on a bi-weekly schedule for exempt Employees and a weekly schedule for non-exempt and hourly Employees. For non-exempt and hourly employees, each paycheck includes earnings for all work performed through the end of the previous payroll period, including overtime (if applicable). In the event that the regularly scheduled payroll date falls on a day off such as a weekend or holiday, employees receive pay on the last day of work before the regularly scheduled payroll date. The Debtors' average gross payroll,[8] for each pay period based on the twelve months prior to the Petition Date, is approximately $840,000 for Employees on the salaried payroll schedule and $500,637 for Employees on the hourly payroll schedule—or a total payroll of approximately $1,340,637 per pay period for all Employees. The Debtors manage and administer their payroll through an internal department located at their Frisco, Texas location. One or two days prior to a payroll disbursement date, the Debtors fund the payroll, net of all deductions relating to Employee Benefits (as defined below), to Automatic Data Processing, Inc. ("**ADP**") and ADP distributes payments to Employees on the payroll date.

56.    In addition, the Debtors are required to make matching payments from their own funds for, among other things, Social Security and Medicare taxes and to pay, based on a percentage of gross payroll, state and federal unemployment insurance, employment training taxes, and state disability insurance contributions (the "**Employer Payroll Tax Obligations**"). As of the Petition Date, the accrued and unpaid prepetition Employer Payroll Tax Obligations were approximately $500,000.

57.    Due to the timing of the Debtors' payroll in relation to the Petition Date, Employees are owed certain prepetition amounts for regular compensation earned through the

---

[8]    The Debtors' average payroll net of deductions for statutory withholdings, contributions to the 401(k) Plan, contributions to Employee Benefits and Miscellaneous Deductions, is, per pay period, approximately $591,563 for Employees on the salaried payroll schedule and $655,288 for Employees on the hourly payroll schedule.

Petition Date.  Where Employees are owed prepetition compensation amounts, the applicable miscellaneous deductions have not yet been taken by ADP nor have the Debtors deducted amounts owed for Employee Benefits, or such amounts may not yet have been forwarded to the various third parties to whom such funds should be remitted.

58.    The Debtors estimate that, as of the Petition Date, accrued but unpaid wages and other compensation, as well as company contributions for Employee Benefits, totaled approximately $2,705,833 (comprised of $1,650,000 owed to Employees for wages and compensation and $1,055,833 attributable to the Debtors' obligations on account of Employee Benefits).

    b. Employee Vacation Days, Paid Sick Leave Days, "Floating" Holidays and Other Paid Time Off

59.    As part of their overall compensation, Full-Time Employees are also entitled to receive a certain number of vacation days each year.[9]  While the amount varies for union Employees, Full-Time Employees earn up to 160 vacation hours per year, with certain union Employees eligible to earn up to 200 vacation hours per year, depending upon their length of service with the Debtors, with those Full-Time Employees who have been employed by the Debtors for a longer period of time being entitled to a greater number of vacation days than those Full-Time Employees who have been with the Debtors for a shorter period of time.[10]

60.    While the amount permitted varies by facility and union, the majority of Full-Time Employees may carry over from one calendar year to the next between three days and one week of unused vacation time with a manager's approval.  Upon termination or retirement, Full-

---

[9]    The Part-Time Employees and Temporary Employees are not eligible to receive paid vacation, holiday or sick days.

[10]    Vacation days are accrued on an annual basis measured from the date of hire.  Union Employees accrue the current year for vacation in the following year.  By way of example, Full-Time Employees who have been employed by the Debtors for (a) less than 6 years are entitled to 80 vacation hours per year, (b) at least 6 years are entitled to 120 vacation hours per year, and (c) at least 15 years are entitled to 160 vacation hours per year.

Time Employees receive payment of any accrued unused vacation days. This policy is consistent with the laws of most states, which provide that vacation benefits are vested and must be paid upon termination of employment. However, if the Debtors terminate employment for cause, the Full-Time Employee will forfeit any unused vacation time. The Debtors estimate that, as of the Petition Date, total accrued but unpaid vacation liability is approximately $1,857,000 million. This amount is not a current cash pay obligation, as Full-Time Employees are entitled to be paid for accrued and unused vacation time, as noted above, only in the event they are terminated or retire.

61.    Additionally, Employees are entitled to a certain number of sick days per year. Sick days are accrued in various ways, depending on facility and union; however, the majority of regular Full-Time Employees are entitled to take up to three (3) paid sick days per year, in addition to any days taken pursuant to the short-term disability policy (as described further below). Regular Full-Time Employees are not paid for earned but unused sick days while employed or upon termination or retirement. However, Full-Time Employees are permitted to carry over up to 16 hours of sick leave from one calendar year to the next for a maximum of 40 hours of sick leave in a calendar year. All Full-Time Employees are required to notify their immediate supervisor of any absence due to sickness before the start of their workday, if possible, and must also contact the direct supervisor on each additional day of absence. Verification may be requested for sick leave absences and may be required as a condition to receiving sick leave benefits. Before returning to work from sick leave absence of three (3) calendar days or more, an employee may be required to provide a physician's verification that he or she may safely return to work.[11]

62.    In addition to specific holidays observed by the Debtors, Full-Time and Part-Time

---

[11]    Part-Time Employees and Temporary Employees are not entitled to any paid leave.

RLF1 8631302v.9

Employees at certain locations are entitled to receive two (2) "floating" holidays that may be used at the Employees' discretion. Eligible Employees are eligible to receive pay during established holidays at their regular rate of pay. To be eligible for such holiday pay, such Employees must work their last scheduled day immediately preceding and first scheduled day immediately following the holiday. If a recognized holiday falls during an eligible employee's paid vacation, holiday pay will be provided instead of the paid vacation benefit that would otherwise have applied. If eligible non-exempt and hourly employees work on a recognized holiday, they receive holiday pay plus wages at their straight-time rate for the hours worked on the holiday, with higher rates available to union employees. Paid time off for holidays is counted as hours worked for purposes of determining overtime pay.

63.    All Employees may be given up to a maximum of three (3) work days off with pay in the event of death of a member of the Employee's immediate family. Employees may, with their supervisor's approval, use any available paid leave for additional time off as necessary. Employees may also be granted unpaid time off to vote in all national, state and local elections in accordance with applicable law where it is not possible for them to vote before or after their regular work schedule. Finally, Employees generally are paid for the first five (5) days of jury duty service. Thereafter, they may use any available paid time off or may request an unpaid jury duty leave of absence.

c.    Commissions/Bonus Plans

64.    The Debtors offer incentive bonuses to certain Employee constituencies through a variety of award plans and commissions (collectively, the "**Bonus Plans**"). Bonuses and commissions may be awarded pursuant to the Bonus Plans for, among other things, reaching sales goals. In 2012, the Debtors made approximately $3,754,647.07 in payments to

approximately 499 Employees pursuant to the Bonus Plans. As of the Petition Date, approximately 100 Employees were eligible to receive bonuses and/or commissions, and no amounts were owed under the Bonus Plans. The Debtors, by this Motion, seek authority, but not direction, to continue to honor and perform their obligations under the existing Bonus Plans set forth above, subject to the entry of a final order with respect to this Motion.

65.     Certain of the Debtors' senior management participate in the Bonus Plans and/or a corporate bonus plan (the "**Corporate Bonus Plan**") pursuant to which bonuses are determined based on corporate profitability. The Debtors do not seek authority to make payments under the Corporate Bonus Plan, or to otherwise make any bonus payments to insiders (as such term is defined in the Bankruptcy Code) under either the Bonus Plans, the Corporate Bonus Plan, or otherwise, by this Motion, and will not make any such payments without further order of the Court.

d.     Temporary Employees

66.     As noted above, the Workforce includes a small number of Temporary Employees who are hired (a) as interim replacements, (b) to temporarily supplement the work force, or (c) to assist in the completion of a specific project. Employment assignments in this category are usually of a limited duration. Employment beyond any initially stated period does not in any way imply a change in employment status. Temporary Employees retain this status unless and until notified of a change. The Temporary Employees are compensated directly by the Debtors.

67.     The Debtors pay certain amounts to the agencies that employ the Temporary Employees consisting primarily of (a) fees charged by the agency on account of the actual services that the Temporary Employee is rendering for the Debtors during the subject service period (the "**Service Fees**") and (b) conversion fees charged by the applicable agency which are

29

triggered upon conversion of a Temporary Employee to an Employee of the Debtors (the "**Conversion Fees**").

68.     The Temporary Employees provide a variety of services to the Debtors, including, but not limited to engineering services, operational services and support, office services, and technical services.  Such services are critical to the Debtors' operations.  Indeed, the Debtors' complex factory operations could not operate without the continued service of the Temporary Employees.  Moreover, the use of the Temporary Employees provides the Debtors great flexibility in managing their Workforce.  As the Debtors are part of an evolving industry, this flexibility has proven critical to maintaining efficient and cost-effective operations.

69.     As of the Petition Date, two agencies were providing, in the aggregate, approximately 20 Temporary Employees to the Debtors.  The Debtors estimate that, as of the Petition Date, approximately $7,500 was owed to such agencies on account of accrued but not yet invoiced Service Fees.  Further, any expenses incurred by the Temporary Employees in the course of performing services for the Debtors are included in the Service Fees the Debtors pay to the applicable agency.

    e.  Independent Contractors

70.     In addition to the Employees and Temporary Employees, the Debtors retain Independent Contractors to provide sales services to the Debtors' customers.  Such Independent Contractors are compensated by the Debtors in the ordinary course of business similar to the Employees.  To the extent the Independent Contractors incur expenses while providing services to the Debtors, the Independent Contractors include such amounts in the payment invoices submitted to the Debtors for the Independent Contractors' services.

71.     As of the Petition Date, approximately three (3) Independent Contractors were

providing services to the Debtors.  The Debtors estimate that, as of the Petition Date, the Debtors owed the Independent Contractors approximately $27,363.63 on account of accrued but unpaid compensation and expenses.

### (v.)    *Prepetition Employee Reimbursements*

72.    The Debtors, in the ordinary course of their business, reimburse Employees for a variety of ordinary, necessary and reasonable business related expenses that Employees incur. These include expenses for travel, including lodging, automobile rentals including fuel, meals, business-related entertainment expenses, transportation purchased by or for Employees, mileage and incidental expenses such as parking and tolls.  An expense report must be submitted to the Debtors' Corporate Accounts Payable Department in Frisco, Texas for each business trip or expense and all expenses must be supported by receipts.  The Debtors use expensewire.com to manage this process and request authority to continue to use expensewire.com in connection with their reimbursement of business expenses.  Certain Employees have not yet been reimbursed for such expenses previously incurred on behalf of the Debtors primarily because the Debtors filed their Chapter 11 petitions in the midst of their regular reimbursement cycle for such expenses. All of these expenses were incurred with the understanding that they would be reimbursed by the Debtors.  The Debtors' average monthly obligation under the expense reimbursement policy is approximately $150,000.  As of the Petition Date, the Debtors estimate that approximately $4,509 is due and owing to expensewire.com (through Paychex) and that approximately $1,614 in reimbursable business expenses have been submitted to expensewire.com but not yet reimbursed to Employees, with up to approximately $75,000 incurred by certain Employees but not yet submitted to expensewire.com and not yet reimbursed to Employees.

73.    The Debtors also use a company credit card for all airline travel booked through

Cain Travel ("**Cain**"). The credit card account is maintained by Wells Fargo and is paid on a monthly basis. As of the Petition Date, the Debtors do not owe any amounts on this credit card, but the Debtors estimate that they will need to pre-fund this credit card in the amount of approximately $40,000 for post-petition air travel by Employees. The Debtors request authority to pre-fund this credit card in order to continue to use Cain to book company-related airline travel.

74.    Additionally, in order to maximize the effectiveness of their Employees, the Debtors have in place a relocation policy (the "**Relocation Policy**") whereby Employees and their qualified dependents will be reimbursed for certain relocation expenses. In order to qualify for reimbursement Employees must have been assigned or relocated, on a temporary or permanent basis, at the request of the Debtors. Reimbursable expenses include, but are not limited to, travel expenses incurred in connection with "home finding trips," new home purchase and old home sale closing costs, miscellaneous expenses, storage expenses, tax assistance, temporary living expenses in the event a new residence is not available for occupancy at the time of the relocation and moving and other related expenses.

75.    It is imperative that the Debtors continue to reimburse newly hired and existing Employees who are asked to relocate in the ordinary course of the Debtors' business. Reimbursable expenses under the Relocation Policy may be submitted up to one year following the Employee's relocation, and as a result estimating exposure under the Relocation Policy is difficult. However, as of the Petition Date, the Debtors estimate that no amount is owing on account of relocation-related expenses incurred pursuant to the Relocation Policy.

### (vi.)    *Employee Benefits*

76.    Prior to the Petition Date, the Debtors offered Full-Time Employees and their

dependents various standard employee benefits, depending on location, including, without limitation, (a) health, dental and vision coverage, (b) flexible spending accounts, (c) coverage continuation under COBRA, (d) basic term life insurance, supplemental life, accidental death and dismemberment, (e) short-term and long-term disability insurance, (f) a retirement savings plan, (g) workers' compensation, (h) miscellaneous other benefits provided to the Full-Time Employees in the ordinary course of business and (i) a Severance Policy (as defined below) (collectively, the "**Employee Benefits**"). Although the majority of the Employee Benefits are paid monthly in advance, as of the Petition Date, the Debtors were obligated to pay certain contributions to or provide benefits under such plans, programs and policies.

> f.   Medical, Vision and Dental Programs for Full-Time Employees

77.    Non-union Full-Time Employees and Full-Time Employees in the union in Appleton and their families are offered a choice of three medical insurance plans through Anthem Blue Cross ("**Anthem**"): an EPO and two types of PPO. Full-Time Employees in California are also offered medical benefits through Kaiser Medical ("**Kaiser**"). Full-Time Employees and their families are also offered a prescription drug plan through Express Scripts ("**ESI**"). Under the "EPO" option, Full-Time Employees and their family members are required to use a provider within a broad network. Under the "PPO" options, Full-Time Employees and their family members have the choice to use providers within the network or to use providers outside the network (the latter option being subject to higher costs). The "high deductible" PPO also allows participants to open tax-free health savings accounts ("**HSAs**") from which to pay their medical expenses. The Debtors contribute funds to the HSAs on an annual basis. Full-Time Employees in the union in Scottdale are offered a health plan through Highmark. Full-Time Employees in the union in Westfield are offered a health plan through BCBS MA. Full-

Time Employees in the union in Smyrna are offered health benefits through the union plan, the Specialties & Paper Products Union No. 527 Health & Welfare Fund ("**Smyrna Health Insurance Fund**") and the company contributes to the premiums.

78.     Each of the foregoing health plans have different associated premiums, deductibles and coverage benefits.  However, on average, the Debtors contribute 70% to 83% of the premium for these medical plans, depending on the specific plan elected.  The remainder of the medical plan costs, if any, are funded by pre-tax deductions from Full-Time Employee payroll, which are deducted by the Debtors from the Full-Time Employee payroll prior to funding the payroll to ADP and are remitted monthly to the appropriate plan administrator.  The estimated monthly cost to the Debtors under all of the foregoing health plans (including premiums and claims) is approximately $1,530,320.

79.     Any Employee that enrolls in any medical plan has the option to receive vision insurance through EyeMed at a minimal charge to the Full-Time Employee.  Because this charge is paid entirely by the Employee, the Debtors do not incur a monthly cost under the EyeMed vision insurance plan.

80.     The obligations that the Debtors incur on behalf of the Full-Time Employees on account of health, vision and prescription drug coverage under each of the offered medical plans approximates, in the aggregate, $1,550,480 per month.  The Debtors pay these premiums directly to Anthem, EyeMed, BCBS MA, Highmark, Kaiser and the Smyrna Health Insurance Fund as applicable.

81.     The Debtors also offer Full-Time Employees dental benefits through a dental plan with MetLife. The Debtors pay approximately 50-100% of the premiums owed to MetLife.  As with the medical plans, the remainder of the premium expense, if any, is funded by pre-tax

deductions from Full-Time Employee payroll, which are remitted monthly to MetLife. The obligations that the Debtors incur on behalf of the Full-Time Employees on account of the dental plan with MetLife approximates, in the aggregate, $14,661 per month. The Debtors pay these premiums directly to MetLife.

82.     The estimated monthly cost to the Debtors under all health, vision, prescription drug and dental plans (including premiums and claims, but not including any administrator fees) is approximately $1,550,480. As of the Petition Date, the total amount accrued but unpaid on account of the health, vision, prescription drug and dental plans was approximately $726,953.49.

g.     COBRA Obligations

83.     The Debtors provide eligible Employees and their qualified beneficiaries the opportunity to continue health insurance coverage pursuant to the federal Consolidated Omnibus Budget Reconciliation Act (COBRA). Under COBRA, the Employee or beneficiary pays the full cost of coverage at the Debtors' group rates plus an administration fee. As of the Petition Date, there were approximately 32 former Employees receiving COBRA medical benefits and approximately 26 former Employees receiving COBRA dental benefits (the "**Continued Healthcare Benefits**"). Further, as of the Petition Date, there were approximately 260 former Employees that are eligible but have not yet elected Continued Healthcare Benefits. By the Employee Obligations Motion, the Debtors request authority to pay pre-petition and post-petition Continued Healthcare Benefits to former Employees that are eligible and elect to receive COBRA benefits. The Debtors estimate the amount outstanding under these programs is approximately $3,814. By the Employee Obligations Motion, the Debtors seek authority, but not direction, to pay amounts owed for Continued Healthcare Benefits as of the Petition Date and continue providing Continued Healthcare Benefits post-petition.

h.   Pre-Tax Contribution Flexible Spending Accounts

84.     The Debtors additionally offer most Full-Time Employees the opportunity to contribute through pre-tax compensation deductions to flexible spending accounts ("**FSAs**"), maintained in accordance with Section 125 of the Internal Revenue Code, to be used for healthcare related expenses and dependent care expenses.  FSAs and dependent care accounts are composed entirely of Employee contributions.   FSA deductions are made from Full-Time Employees' paychecks.    Those funds are, upon the participating Full-Time Employee's submission of a claim, remitted by ADP, which administers the claims under the FSAs and remits reimbursements to the Employees.  As of the Petition Date, the Debtors estimate that they are holding FSA deductions to be remitted to ADP of approximately $19,680.  The Debtors believe that such amounts are being held in trust for the benefit of the contributing Employees and, therefore, are not property of the Debtors' bankruptcy estates.   Nevertheless, out of an abundance of caution, the Debtors seek the approval of this Court to continue these programs and reimburse Employees in the ordinary course.

i.   Life Insurance and Accidental Death and Dismemberment Insurance

85.     The Debtors, at their own cost, provide non-executive Full-Time Employees with basic life insurance and accidental death and dismemberment ("**Life and AD&D**") insurance, administered by Minnesota Life Insurance Company ("**Minnesota Life**").   Life and AD&D coverage is provided in varying amounts by location, generally up to one-and-a-half times the Full-Time Employee's annual earnings, up to a maximum of $250,000.[12]  The Debtors' average

---

[12]     Employees may purchase supplemental life insurance through Minnesota Life, at their own cost, up to eight times their annual salary, with a maximum of $1,500,000.  In addition, Employees may purchase supplemental life insurance coverage for their spouses (in amounts ranging from $25,000 up to $100,000) or supplemental AD&D coverage for their spouses (in amounts ranging from one to five times their annual base salary).  Employees may also purchase supplemental life insurance coverage and AD&D coverage for their dependents and children (in amounts ranging from $2,500 to $10,000, not to exceed 50% of Employee optional life).  Additionally, Employees may purchase, at their own expense, additional life insurance, legal insurance, critical illness insurance, auto and

RLF1 8631302v.9

monthly expense attributable to life insurance programs and AD&D insurance is approximately $20,683 per month.  As of the Petition Date, the total amount accrued but unpaid on account of the Life and AD&D as of the Petition Date was approximately $34,459.35.

j.       Short-Term and Long-Term Disability Programs

86.     The Debtors provide, at their own cost, most Full-Time Employees with short-term disability ("**STD**") coverage if the Full-Time Employee is unable to work due to serious illness or injury.  The STD benefit results in the continuation of the Full-Time Employee's weekly earnings at sixty percent (60%) of such earnings, up to a maximum weekly benefit of $2,000 for a period of up to twenty-six (26) weeks.[13]  The Debtors also provide, at their own cost, most Full-Time Employees and non-union hourly Employees who have been disabled by illness or injury that results in a long-term absence from employment with long-term disability ("**LTD**") coverage.  There is no minimum length of service that is required for Employees to be eligible for this benefit.  The LTD coverage is equal to sixty percent (60%) of the Full-Time Employee's monthly earnings (which may be offset by sources of income such as social security and other disability benefits) up to a maximum monthly benefit of $6,000.

87.     As of the Petition Date, the average monthly premium for STD coverage for all Full-Time Employees is approximately $8,371.34, and the average monthly premium for LTD coverage for all Full-Time Employees is approximately $2,553.73.  As of the Petition Date, the total amount accrued but unpaid on account of STD and LTD coverage was approximately $47,529.

---

homeowners insurance and pet insurance.  For Employees electing to purchase such coverage, the Debtors will deduct the appropriate funds from Employee payroll prior to funding the payroll to ADP and remit such amounts to the appropriate provider.  Over the two years prior to the Petition Date, the Debtors, on average, withheld and remitted approximately $20,047 per month of account of such supplemental coverage purchased by Employees.

[13]     Full-Time Employees' short-term disability benefits begin on a Full-Time Employee's 8th consecutive day of sickness (or 5 work days) or immediately for work missed due to injury.

RLF1 8631302v.9

k.    Employee Assistance Program

88.    The Debtors additionally offer all Full-Time Employees services to help resolve personal issues, as well as assistance with challenges (including, but not limited to drug abuse, marital difficulties, alcoholism or alcohol abuse, financial and legal pressures, concerns about child or elder care, depression or divorce) that may arise in the Full-Time Employees' lives (the "**Employee Assistance Program**"). The Debtors utilize the Hartford Group to administer the Employee Assistance Program for all Full-Time Employees. The Debtors pay amounts on account of the Employee Assistance Program monthly in advance and, as a result, as of the Petition Date, the Debtors do not believe that there are any unpaid obligations on account of the Employee Assistance Program.

l.    401(k) Retirement Plan

89.    The Debtors maintain a retirement savings plans (the "**401(k) Plans**") that cover substantially all of the Employees. The 401(k) Plans are defined contribution plans in accordance with Section 401(k) of the Internal Revenue Code. An eligible Employee may contribute a portion of his or her compensation on a pre-tax basis, through voluntary payroll deductions, to the applicable 401(k) Plan.[14] These contributions are deducted from the paychecks of participating Employees and contributed by the Debtors to the 401(k) Plans. The 401(k) Plan provisions for non-union Employees allow for a discretionary match of up to 50% of the Employee's first 6% contribution. The Employees in the union in Smyrna are offered a 401(k) Plan through the union and the Debtors' collective bargaining agreement with the union in Smyrna provides for a discretional match on the same terms and conditions generally applicable to matches provided to non-bargaining unit employees. The 401(k) Plan provisions

---

[14]    An Employee is eligible to participate in the 401(k) Plan on the first day of the month following 90 days of employment.

RLF1 8631302v.9

for Employees in the United Steelworkers' Union provide for a mandatory 2% contribution of each Employee payroll. The 401(k) Plan provisions for union Employees who work at the Debtors' facility in Appleton, Wisconsin, provide for a mandatory match of up to 50% of the Employee's first 4% contribution. The Debtors estimate that their matching obligations under the 401(k) Plans is approximately $30,000 per month. As of the Petition Date, the Debtors estimate that approximately $70,000 is owed on account of the 401(k) Plans, which are administered by Putnam. As of the Petition Date, no amounts were outstanding on account of administration costs for the 401(k) Plans.

m.     Severance Policy

90.     Prior to the Petition Date, the Debtors maintained a severance policy (the "**Severance Policy**") pursuant to which Full-Time Employees typically received a severance payment calculated based primarily upon the Employee's base salary rate amount, amount of accrued but unused vacation, sick and personal days remaining at the time of termination, and length of service to the Debtors. The Severance Policy includes a policy with the USW in the case of a plant closing, in which eligible Employees are entitled to between one and six weeks of severance pay based on length of service. Although the policy, with the exception of the policy contained in the USW agreement, is not evidenced in writing, the Severance Policy is a critical component of the Debtors' Employees' compensation, and the Debtors believe that Employee morale would be severely impacted if the Debtors were not permitted to continue the Severance Policy in the ordinary course of business. Full-Time Employees terminated for "cause" are not eligible for severance benefits. As of the Petition Date, there are twenty-seven Employees receiving severance payments under the Severance Policy and the Debtors owe approximately $218,483.39 in severance payments to those Employees. By the Employee Obligations Motion,

the Debtors request authority, in their sole discretion and subject to the entry of a final order, to continue the Severance Policy and to provide any eligible Full-Time Employee, including any insider (as that term is defined in the Bankruptcy Code), severance benefits in the event such Full-Time Employee is terminated postpetition.

91.     I believe that it is imperative that the prepetition Severance Policy be permitted to continue postpetition.  Continuing the Severance Policy is necessary to preserve the goodwill and morale of the Employees.  The Debtors' Full-Time Employees rely on the expectation that the Severance Policy will provide them with income protection in the event they are terminated without cause, and, as such, the Severance Policy represents a key component of the Debtors' retention effort that is critical to maintaining staffing essential to the ongoing operation of the Debtors' business.  The Debtors' business relies heavily on their Employees, and a failure to continue the Severance Policy would inevitably result in decreased Employee morale and confidence, consequences that would thwart the Debtors' efforts to maximize value during these Chapter 11 Cases.

92.     The Severance Policy has historically applied to insiders (as that term is defined in the Bankruptcy Code) as well as rank and file employees. The Debtors seek to continue the Severance Policy with respect to insiders as well as rank and file employees, but seek to limit any Severance Policy payments to insiders to the amounts permitted in Section 503(c)(2) of the Bankruptcy Code.  With that limitation, the Severance Policy satisfies the requirements set forth in Section 503(c)(2) of the Bankruptcy Code for payments of severance to insiders.  First, the Severance Policy is generally applicable to all of the Employees who are terminated without a right of recall, and has been applied as such. All of the Full-Time Employees terminated in the 12 months prior to the Petition Date without a right of recall received offers of severance

payments pursuant to the Severance Policy.  Second, the Debtors do not seek authority to make any payment to any insider (as that term is defined in the Bankruptcy Code) that is in an amount greater than ten (10) times the amount of the mean severance pay given to nonmanagement Full-Time Employees during the calendar year in which the payment is made.

### (vii.)  *Continuation of Workforce Programs Postpetition*

93.    The Debtors also request confirmation of their right to continue to perform their obligations with respect to all Workforce Programs, except as otherwise indicated herein.  The Workforce Programs are essential to the Debtors' efforts to maintain Workforce morale and minimize attrition.  I believe that the expenses associated with the Workforce Programs are reasonable and cost-efficient in light of the potential attrition, loss of morale, and loss of productivity that would occur if the Workforce Programs were discontinued.

94.    Notwithstanding the foregoing, the Debtors reserve the right to evaluate all Workforce Programs and to make such modifications, including terminating any particular plan, program or policy, as may be necessary or appropriate during the pendency of these cases.  The Debtors do not at this time intend to assume any plan, program, policy or related agreement under Section 365(a) of the Bankruptcy Code and reserve all rejection and termination rights.

### (viii.)  *Payments to Administrators*

95.    With respect to the Employee compensation and benefits described above, the Debtors contract with certain vendors (the "**Administrators**") to administer and deliver payments or other benefits to their Employees.  The Administrators include, without limitation, Anthem, Eyemed, BCBS MA, Highmark, Kaiser and Smyrna Health Insurance Fund for medical benefits, ESI for prescription drugs, MetLife for dental benefits, ADP for payroll, employment taxes and FSAs, Mellon Bank for HSAs and Ceridian for COBRA.  The Debtors pay these

RLF1 8631302v.9

Administrators fees and expenses incurred in connection with providing such services.  In certain cases, disbursements made in the ordinary course of business are paid by the Administrators, which, in turn, invoice the Debtors for reimbursement of payments made.  For example, the Debtors, in the ordinary course of business, pay a third party, ADP, to maintain or provide record keeping and other administrative services with respect to their payroll and the tax deductions relating thereto.  ADP's services cost the Debtors approximately $20,000 per month.  The Debtors request that they be authorized, but not directed, to pay ADP to maintain and provide record keeping relating to their payroll and various Employee benefit programs identified in the Employee Obligations Motion that may be outstanding as of the Petition Date.  As of the Petition Date, the Debtors believe that accrued but unpaid administrative processing costs owed to ADP are approximately $28,000.

96.    In conjunction with the Debtors' payment of Prepetition Workforce Obligations and continued performance under Workforce Programs, I believe that it is necessary to obtain specific authorization to pay any claims of the Administrators on a postpetition basis, including prepetition claims to the extent necessary to ensure uninterrupted delivery of certain benefits to Employees.  The Debtors believe that the Administrators may fail to adequately and timely perform or may terminate their services to the Debtors unless the Debtors pay the Administrators' prepetition claims for administrative services rendered and expenses incurred.  A need to engage replacement Administrators postpetition likely would cause significant disruption to the payment of benefits and other obligations to the Employees.  Accordingly, the Debtors submit that the payment of claims owed to the Administrators is in the best interest of the Debtors' estates.

E.    **Customer Programs Motion**

RLF1 8631302v.9

97.     The Debtors request, pursuant to Sections 105(a), 363, 1107(A) and 1108 of the Bankruptcy Code, that this court enter an order authorizing the Debtors to honor certain prepetition obligations to continue their rebate programs in the ordinary course of business.

98.     Prior to the Petition Date, in the ordinary course of business and as is customary in the Debtors' industry, the Debtors instituted and engaged in certain activities to develop and sustain a positive reputation and relationship with their customers.  Specifically, the Debtors implemented rebate programs for certain of their customers (collectively, the "**Rebate Program**") designed to ensure customer satisfaction, drive sales, meet competitive pressures, develop and sustain customer relationships and loyalty and generate goodwill for the Debtors and their products.

99.     The Debtors' Rebate Program is similar to those offered by the Debtors' industry competitors.  I believe that the success and ultimate viability of the Debtors' business is dependent upon the Debtors' continuing relationships with their customers.  In order to maintain such relationships and to ensure customer loyalty, the Debtors must satisfy their obligations (the "**Customer Obligations**") under the Rebate Program.  In the Debtors' industry, the failure to honor the Customer Obligations arising from the Rebate Program is likely to have a material adverse impact on the Debtors' ability to attract new customers and maintain existing ones.

100.    Moreover, the Debtors believe that if the Court does not authorize them to continue the Rebate Program during the pendency of these Chapter 11 Cases, their valuable business relationships with their customers will be severely jeopardized.  Even a short delay by the Debtors in continuing their payments under the Rebate Program could cause serious and irreparable harm to the value of the Debtors' estates.

101.    Accordingly, I believe the Debtors should be granted authorization to continue,

RLF1 8631302v.9

renew, replace, implement, modify, and/or terminate the Rebate Program as they deem appropriate, and to honor their undisputed prepetition obligations in respect thereof, in the ordinary course of business, without interruption. This relief will avoid immediate and irreparable harm to the Debtors' business operations and maintain goodwill with their customers.

## F.    **Shippers and Warehousemen Motion**

102.    The Debtors have also filed a motion (the "**Shippers Motion**") seeking authority to pay, in their discretion, the  prepetition shipping, warehousing and related claims (all such claims, the "**Distribution Claims**") that are owed, either directly or indirectly, to (i) certain third-party shippers, haulers, common carriers, and other transporters (the "**Shippers**"), (ii) public warehousemen (the "**Warehousemen**"), and (iii) a third-party freight broker (the "**Freight Administrator**," and collectively with the Shippers and Warehousemen, the "**Distribution Vendors**"), to the extent the Debtors determine, in the exercise of their business judgment, that such payments are necessary or appropriate to (a) secure the delivery, distribution and sale of the Debtors' goods to customers throughout the United States and abroad, (b) ensure the delivery of goods and raw materials to the Debtors' facilities or (c) satisfy the liens, if any, in respect of amounts owed to such parties. I believe that the aggregate amount of Distribution Claims to be paid pursuant to this Motion is approximately $2,750,000.

103.    The Debtors also seek authority to pay, either directly or through the third party administrator, all or part of the prepetition U.S. customs duties, detention and demurrage fees, tariffs and excise taxes, freight forwarding or consolidation charges and other similar obligations (the "**Import/Export Claims**" and together with the Distribution Claims, the "**Subject Claims**") to applicable governmental agencies and authorities (the "**Import/Export Providers**," and together with the Distribution Vendors, the "**Subject Vendors**"), to the extent the Debtors

44

determine, in the exercise of their business judgment, that such payment is necessary or appropriate to secure the import or export of such goods. I believe that, as of the Petition Date, no amounts are due directly to the Import/Export Providers on account of such Import/Export Claims. However, it is my understanding that the Debtors are obligated to reimburse the Freight Administrator for amounts previously advanced in respect of Import/Export Claims and such amounts are incorporated in the amount of Distribution Claims to be paid under this Motion.

104.    In the ordinary course of their businesses, the Debtors (a) pay certain Shippers and the Freight Administrator in connection with (i) the delivery of goods and raw materials from the Debtors' suppliers to the Debtors' manufacturing facilities and (ii) the delivery of products from the Debtors' factories to the Debtors' customers and (b) pay the Warehousemen to store goods and raw materials, as necessary, during the distribution process.

105.    The Debtors rely heavily upon Shippers, including private trucking services, rail and air services, for domestic delivery of products from certain of the Debtors' suppliers to the Debtors' various facilities. Generally, the Debtors incur such obligations in instances in which the Debtors have determined that they are able to obtain more competitive shipping rates than certain of their suppliers are able to offer. The Debtors, to varying degrees, incur freight costs attributable to inbound freight from the Debtors' suppliers and also may incur obligations to Shippers, including private trucking services, rail and air services, for domestic delivery of products to the Debtors' customers.

106.    The Debtors do not incur any costs on account of international _inbound_ freight. With respect to international _outbound_ freight, the Debtors have customer-specific conditions and allocation of costs is negotiated by their sales department.

107.    Although the Debtors pay certain large Shippers directly, the Debtors

substantially rely upon the Freight Administrator, Mid-Indiana Transportation Experts ("**MITE**"), to manage their freight needs.   The specific services performed by the Freight Administrator include such things as paying Shippers, tracking cargo, booking transportation for freight, consolidating or forwarding freight, preparing and filing documentation associated with shipments and coordinating the pick-up and drop off of cargo.   The Freight Administrator also provides services related to international freight, including addressing scheduling issues and coordinating operational and financial aspects of the shipment process, such as ocean freight, customers clearing and inland transportation (i.e., shipment from the port of entry to one of the Debtors' facilities).   Furthermore, in connection with the Debtors' import and export of goods, the Freight Administrator routinely advances amounts owed to the Import/Export Providers and is reimbursed by the Debtors for such amounts.

108.    With respect to payment of Shippers (both with respect to domestic and international shipments), although the Debtors will generally contract directly with the individual Shippers, in many instances the Shippers periodically present their invoices on account of shipping services to the Freight Administrator, who performs freight payment processing.   It is my understanding that the Freight Administrator thereafter pays the Shippers on the Debtors' behalf and then regularly settles accounts with the Debtors' relevant businesses, generally on a weekly basis.   It is my understanding that the Freight Administrator has no obligation to the applicable Shippers and are not an alternative source of payment in the event of nonpayment by the Debtors.

109.    The Debtors operate their own warehouses.   However, the Debtors utilize public warehouses operated by Rogers Dedicated Warehouse (in the United States) and RR Donnelly Corp. (in Canada) to store certain inbound and outbound freight.   The Debtors depend upon these

warehouses because the warehouses that they operate either lack sufficient capacity and/or do not have appropriate storage capabilities for certain types of specialized goods and materials. The operators of such warehouses pick-up and store materials and goods from the Debtors' local facilities upon request; however, the Debtors are dependent upon such operators to access the property held in such warehouses. Thereafter, the Debtors are invoiced by the operators of such facilities for storage costs.

110.    The Debtors propose that all payments to the Distribution Vendors be subject to the conditions set forth in the Shippers Motion, including the Distribution Vendor's agreement to continue providing goods or services to the Debtors on customary terms and conditions as good or better than those that existed on February 9, 2013 (the "**Customary Terms**"), during the pendency of the bankruptcy case.

111.    The Debtors seek to pay the Distribution Claims for several reasons. First, many of the Distribution Vendors likely will assert possessory or other liens on goods currently in their possession if these entities' prepetition claims are not paid. See U.C.C. §§ 7-307(a) (lien of shipper), 7-209(a) (lien of warehouseman). It is my understanding that the perfection and maintenance of liens is, in most cases, dependent upon possession, so I believe the Distribution Vendors would likely refuse to deliver or release such goods until their claims have been satisfied and the liens released. The value of these goods generally exceed the amount of the outstanding Distribution Claims and, thus, the Debtors believe that most of the Distribution Vendors will ultimately be entitled to be paid in full for the Distribution Claims. Irrespective of the amount and validity of their liens, I believe that the mere assertion of possessory or other liens will delay delivery of goods both to the Debtors' factories and to their customers, thereby severely, if not irreparably, damaging the Debtors' businesses and prospects for a successful sale

or reorganization.

112.    It is my belief that if the prepetition Distribution Claims are not paid, many Distribution Vendors may refuse to perform additional services for the Debtors.  In such event, the Debtors will incur significant additional expenses (such as premium shipping, distribution and storage costs) to replace these parties, which amounts likely will exceed the amount of unpaid Distribution Claims that the Debtors request permission to pay hereunder.

113.    Further, I believe that locating entities to replace the Distribution Vendors will be difficult, if not impossible.  For example, as noted above, the Debtors rely upon the freight payment and negotiation services provided by MITE.  Absent these services, the Debtors would be required to negotiate with, and administer separate accounts with a variety of different Shippers.  I believe that integration with MITE has allowed the Debtors to maintain lean staffing levels and a low cost structure, which are essential in the competitive market in which the Debtors operate.  Further, the Debtors benefit from lower shipping prices obtained through MITE's negotiating power with Shippers.  If the Debtors were required to switch to another Freight Administrator, they would incur significant operational disruption and increased costs.

114.    At the very least, I believe that replacing a Distribution Vendor, in most cases, will delay the transport and delivery of goods to the Debtors' facilities and customers, including certain large customers that manage their inventory on a just-in-time basis.  Such delays could cause a material disruption in the Debtors' receipt of goods from suppliers and the delivery of products to customers and, thus, their ability to continue operating their business successfully.

115.    It is my understanding that in return for payment of the Distribution Claims as described herein, except in possessory lien situations described in paragraph 6(d) above, the Distribution Vendors would be required to continue to supply the Debtors on the Customary

Terms during the pendency of these Chapter 11 Cases. I believe that such Customary Terms will maintain the credit terms that the Debtors had prior to the Petition Date and may provide the Debtors with more favorable terms for unsecured credit than currently provided by the Distribution Vendors or available elsewhere. It is my understanding that by agreeing to provide the Customary Terms, the Distribution Vendors are extending unsecured postpetition credit to the Debtors for the benefit of all creditors. Accordingly, I believe that the payment of the Distribution Claims, on the terms and conditions proposed herein, in exchange for the Customary Terms is in the best interests of the Debtors and their estates.

116.    It is my understanding that, in the Shipping Motion, the Debtors propose that if any Distribution Vendor accepts payment and thereafter does not continue to provide services to the Debtors on such Customary Terms, then any payment of the Distribution Claims made under this Motion to such Distribution Vendor would be deemed an unauthorized postpetition transfer under Section 549 of the Bankruptcy Code and, therefore, would be avoidable and recoverable by the Debtors in cash upon written request, subject to a Distribution Vendor's right to contest such treatment and request that the Debtors schedule a hearing on such matter. Upon any recovery by the Debtors, the Distribution Vendor's claim would be reinstated as a prepetition claim in the amount so recovered, less the Debtors' reasonable costs in recovering such amounts.

117.    In addition to the Distribution Vendors discussed above, the Debtors may import goods from abroad (collectively, the "**Imported Goods**") or export various goods to their customers abroad (collectively, the "**Exported Goods**"). Many of these goods are critical to the continued manufacture and distribution of the Debtors' products.

118.    In connection with the import and export of goods, it is my understanding that the Debtors may be required to pay various Import/Export Claims, including, but not limited to,

customs duties, detention and demurrage fees, tariffs and excise taxes, freight forwarding or consolidation charges and other similar obligations. In some cases, the Import/Export Providers may present invoices to the Freight Administrator who has been engaged by the Debtors to take all actions necessary on the Debtors' behalf to facilitate the import or export of goods and are then reimbursed by the Debtors. However, I believe that the Freight Administrator has no obligation to the Import/Export Providers and is not an alternative source of payment for the Import/Export Providers in the event of nonpayment by the Debtors.

119.    In the Shipping Motion, the Debtors seek authority to pay any and all necessary and appropriate Import/Export Claims incurred on account of prepetition transactions. Payment of the Import/Export Claims is critical to ensure the uninterrupted flow of Imported Goods and/or Exported Goods. I believe that, absent such payment, parties to whom Import/Export Claims are owed may have the ability to interfere with the transportation of such Imported or Exported Goods. If the flow of any needed Imported Goods were to be interrupted, the Debtors would be deprived of the materials necessary to complete orders already placed by their customers, which orders are worth far more to the Debtors (both in terms of future receipts and the maintenance of valuable goodwill) than the aggregate amount of accrued, but unpaid, Import/Export Claims. Similarly, I believe that the Debtors must continue to deliver Exported Goods internationally in order to maintain valuable customer relationships abroad.

120.    Accordingly, I submit that payment of the Import/Export Claims is necessary to preserve and enhance the value of the Debtors' businesses for the benefit of all parties in interest.

## G.    **Tax Motion**

121.    Pursuant to the tax motion, the Debtors seek entry of an order pursuant to Sections 105(a), 506(a), 507(a)(8) and 541 of the Bankruptcy Code, and Rule 6003 of the

Federal Rules of Bankruptcy Procedure (each a "**Bankruptcy Rule**", and collectively the "**Bankruptcy Rules**"), authorizing the Debtors to pay, in their sole discretion, any prepetition tax and fee obligations, including, without limitation, sales, use and excise taxes, franchise taxes, real and personal property taxes, and any other types of taxes, fees or charges, penalty, interest, or similar charge (collectively, the "**Taxes and Fees**"), the Debtors may owe to various certain domestic federal, state and local governmental entities (the "**Governmental Units**"), listed in the tax motion filed on the date hereof.

122.    For the avoidance of doubt, the requested authorization would be completely discretionary, allowing the Debtors, among other things, to elect to pay Taxes and Fees as to which their officers and directors may have personal liability in the event of nonpayment by the Debtors, before other Taxes and Fees; would be without prejudice to the Debtors' rights to contest the amounts of any Taxes and Fees on any grounds they deem appropriate; and would extend to the payment of Taxes and Fees relating to tax audits that have been completed, are in progress, or that arise from prepetition periods.

123.    In addition, the Debtors request that the Court authorize and direct the Debtors' banks to receive, process, honor and pay all prepetition and postpetition checks and fund transfers on account of the Taxes and Fees that had not been honored and paid as of the Petition Date, and authorize the Debtors' banks and financial institutions to rely on the representations of the Debtors as to which checks and fund transfers should be honored and paid in respect of Taxes and Fees, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

124.    As set forth below, the Taxes and Fees at issue are appropriate for payment to the extent that they are priority or secured claims that are payable in full or, alternatively, under the

51

personal liability theory or the doctrine of necessity.  By paying the Taxes and Fees in the ordinary course of business, as and when due, the Debtors will avoid unnecessary disputes with Governmental Units — and expenditures of time and money resulting from such disputes — over myriad issues that are typically raised by such units as they attempt to enforce their rights to collect Taxes and Fees.

125.    Prior to the Petition Date, the Debtors incurred obligations to federal, state and local governments.  Although as of the Petition Date the Debtors were substantially current in the payment of assessed and undisputed Taxes and Fees, certain Taxes and Fees attributable to the prepetition period were not yet due. Certain prepetition Taxes and Fees will not be due until the applicable monthly, quarterly, or annual payment dates — in some cases immediately and in others not until next year.  The Debtors estimate that their Taxes and Fees accrued and unpaid liabilities for Taxes and Fees are approximately $375,000.

126.    The continued payment of the Taxes and Fees on their normal due dates will ultimately preserve the resources of the Debtors' estates, thereby promoting their prospects for a successful Chapter 11 process. If such obligations are not timely paid, the Debtors will be required to expend time and incur attorneys' fees and other costs to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Governmental Unit's applicable laws, including whether (a) the obligations are priority, secured or unsecured in nature, (b) the obligations are proratable or fully prepetition or postpetition and (c) penalties, interest, attorneys' fees and costs can continue to accrue on a postpetition basis, and, if so, whether such penalties, interest, attorneys' fees and costs are priority, secured or unsecured in nature.

127.    Nonpayment or delayed payment of Taxes and Fees may also subject the Debtors

to efforts by certain Governmental Units, whether or not permissible under the Bankruptcy Code, to revoke the Debtors' licenses and other privileges either on a postpetition or postconfirmation basis. Moreover, certain of the Taxes and Fees may be considered to be obligations as to which the Debtors' officers and directors may be held directly or personally liable in the event of nonpayment. In such events, collection efforts by the Governmental Units would provide obvious distractions to the Debtors and their officers and directors in their efforts to bring the Chapter 11 Cases to an expeditious conclusion.

128.    Certain of the Governmental Units have not been paid or have been sent checks and/or fund transfers for Taxes and Fees that may or may not have been presented or cleared as of the Petition Date. Similarly, in other cases, Taxes and Fees have accrued or are accruing, or are subject to audit or review, but have not yet become due and payable and, thus, any checks or fund transfers will be issued on a postpetition basis.  Accordingly, the Debtors seek entry of an order authorizing and directing their banks and other financial institutions to receive, process, honor and pay all prepetition and postpetition checks and fund transfers issued by the Debtors to the Governmental Units in payment of Taxes and Fees that had not been honored and paid as of the Petition Date, and authorizing the Debtors' banks and financial institutions to rely on the representations of the Debtors as to which checks and fund transfers should be honored and paid in respect of Taxes and Fees, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

## H.    Insurance Motion

129.    The Debtors have also moved for entry of an order, pursuant to Sections 105(a), 363, and 364 of the Bankruptcy Code, Bankruptcy Rules 4001 and 6003, and Local Rule 4001-2 and 9013-1(m), authorizing, but not directing, the Debtors to continue to maintain and administer

their prepetition insurance policies, to revise, renew, supplement or replace such policies, as needed, to pay or honor prepetition obligations outstanding on account of the Debtors' Insurance Obligations (as defined below), if any, and to maintain the Debtors' prepetition insurance financing agreement. In the ordinary course of the Debtors' business, the Debtors maintain a number of insurance policies that provide coverage for, among other things, cargo, property, general liability, business automotive, workers' compensation, printer's errors and omissions, pollution legal liability, and directors & officers liability (collectively, the "**Policies**"). A description of the current Policies, terms and annual insurance premiums is set forth below. For 2012-2013 year, the Debtors' annual insurance premiums for the Policies (collectively the "**Premiums**") total approximately $1,670,529. As of the Petition Date, the Debtors are past due on certain Premium payments and estimate that such past due amount is approximately $145,463 in Premium payments, brokerage payments, and financing payments.

130. Additionally, certain of the Policies may be due for renewal in the coming months. Although the Debtors are not obligated to renew such Policies, the Policies nevertheless are essential to the preservation of the value of the Debtors' businesses, property and assets. In many cases, the coverage provided under the Policies is required by various laws and contracts that govern the Debtors' commercial activities and as such are necessary to continue the Debtors' business operations. A description of the Policies is set forth below

### (i.) *Cargo Insurance*

131. In the ordinary course of the Debtors' business, the Debtors maintain insurance for cargo cover. The cargo insurance is provided by Beazley Insurance Company (Falvey), and carries a premium of $20,000 payable in quarterly installments. As of the Petition Date, the Debtors are past due on the final $5,000 premium payment owed under the cargo insurance

policy. The cargo insurance policy expires on September 6, 2013.

    **(ii.)**    ***Workers' Compensation Insurance***

    132.    Under the laws of the various states in which they operate, the Debtors are required to maintain workers' compensation policies and programs, or participate in workers' compensation programs administered by state governments, to provide their employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors.

    133.    Employees are covered under workers' compensation policies issued by QBE for the current policy term (September 6, 2012 to September 6, 2013) and the previous policy term (September 6, 2011 to September 6, 2012). From September 2010 to September 2011, Employees are covered under a workers' compensation policy issued by AIG (f/k/a Chartis). Depending on the date of the occurrence, an Employee's workers' compensation claim may be paid by either QBE or AIG. There is a $350,000 each accident deductible in connection with the QBE and AIG policies, which the Debtors are responsible for paying. QBE and AIG are responsible for claim amounts above the applicable deductible, and the Debtors are not responsible for reimbursing QBE or AIG for amounts above the deductible.

    134.    Under the AIG and QBE policies, the Debtors funded to the insurers a depleting cash fund (the "**Depleting Cash Fund**"), as required for each of the policy terms, for the payment of the Debtors' obligations for claims within the deductible under the policies. The Debtors have continued to make periodic payments to the insurers for the purpose of funding the Depleting Cash Funds, but as of the Petition Date, the balance for at least one such fund is negative. By the insurance motion, the Debtors request authority to continue to fund the Depleting Cash Funds as necessary for purposes of paying claims within the deductibles under

the workers' compensation policies.

135.    As of the May 31, 2013, there were 77 open workers' compensation claims under the QBE policies and 14 open workers' compensation claims under the AIG policy.  The aggregate amount of outstanding reserves within the deductible is approximately $1,129,532.38 under the QBE policies and approximately $638,742.50 under the AIG policy.  The Debtors' current annual insurance premiums in connection with their workers' compensation policies are approximately $364,199 in premiums and approximately $57,774 in surcharges, for a total of approximately $421,973.  As of the Petition Date, the Debtors are past due on the remaining $32,373.44 Premium owed for the workers' compensation policy.

### (iii.)    *Pollution Legal Liability Insurance*

136.    In connection with the Debtors' operations, the Debtors' maintain insurance coverage for pollution legal liability.  In connection with the pollution legal liability insurance, provided by Chartis Specialty Insurance Company ("**Chartis**"), the Debtors' pay a premium of approximately $256,053 with the policy expiring on September 6, 2020.  The pollution legal liability insurance policy premium is paid in full.

### (iv.)    *Directors and Officers and Employment Practices Liability  Insurance*

137.    Chartis also provides the Debtors with directors' and officers' and employment practices liability insurance (the "**Directors' and Officers' Policy**").    The Directors' and Officers' Policy runs until September 1, 2013, and the premium of approximately $67,234 is paid in full.

### (v.)    *Business Automotive, General Liability, Umbrella and Excess Liability Insurance*

138.    Further, the Debtors' carry a business automotive insurance policy.  The business automotive insurance policy is provided by the Federal Insurance Company (Chubb Group of

56

Insurance Companies) ("**Chubb**"), and carries a premium of $24,510 payable in monthly installments. The policy expires on September 6, 2013.

139.    To supplement the insurance maintained by the Debtors, described above, the Debtors' also maintain certain other insurance policies each provided by Chubb (together, along with the business automotive policy, the "**Chubb Policies**"). The Chubb Policies expire on September 6, 2013. The Chubb Policies include a general liability policy, with a premium of $68,608 payable in monthly installments; an umbrella policy, with $25M in limits, and a premium of $53,759 payable in monthly installments; and a second excess liability insurance policy, with limits of $25M in excess of $50M, and premiums of approximately $20,874 payable in monthly installments. As of the Petition Date, the Debtors are past due on the remaining $13,919 premium payment under the Chubb Policies.

### (vi.)    *The Financed Policies*

140.    Certain of the Debtors' Policies (the "**Financed Policies**") are financed by AFCO Credit Corporation ("**AFCO**" or the "**Finance Company**", as applicable) pursuant to a financing agreement (the "**Financing Agreement**"). The Debtors pay approximately $5,224 in interest on the Financed Polices. The Financed Policies are the property insurance policy (the "**Property Insurance**"), printer's errors and omissions policy (the "**P&E Policy**"), and the first excess liability policy (the "**First Excess Policy**"). The Debtors' Property Insurance is provided by FM Global and carries a premium of $386,330. The Property Insurance expires on September 6, 2013. The Debtors also carry the P&E Policy, as insurance for certain errors and/or omissions that could occur in their printing operations. The P&E Policy is provided by Axis Insurance Company and carries a premium of $25,042. It expires on September 6, 2013. The remaining Financed Policy that the Debtors' carry is the First Excess Policy with limits of $25M in excess

of umbrella policy limits, which is provided by The Travelers Companies. The policy carries a premium of $21,250 and also expires on September 6, 2013. AFCO has paid each insurer in connection with the Financed Policies in full on behalf of the Debtors. As of the Petition Date, the Debtors are past due in payments owed to AFCO under the Financing Agreement in the approximate amount of $37,295.36. Additionally the final, remaining payment under the Financing Agreement is $37,295.36, due on July 6, 2013.

141.    Further, brokerage services are provided to the Debtors by Aon Risk Services (the "**Broker**"). The annual fee for brokerage services is $227,500, due in quarterly installments to the Broker. The Debtors are past due on their remaining $56,875 payment owed to the Broker.

(vii.)    *The Additional Insurance Coverage Provided through the Gores Group*

142.    Additionally, the Debtors are covered under several additional insurance policies provided through The Gores Group. Specifically, the additional polices are: (a) a first excess director's and officers' insurance policy, provided by XL Specialty, which the Debtors' portion of the premium is approximately $25,306; (b) a second excess directors' and officers' insurance policy, provided by Houston Casualty Company, which the Debtors' portion of the premium is approximately $11,461; (c) a crime insurance policy, provided by Zurich American Insurance Company, which the Debtors' portion of the premium is approximately $29,207; and (d) fiduciary liability policies, provided by Travelers (St. Paul Mercury Insurance Company) and CNA, which the Debtors' portion of the premium is approximately $6,556. The premium for each policy is paid in full, and the policies expire on September 1, 2013.

**I.    Utilities Motion**

143.    The Debtors have also requested entry of both interim and final orders approving procedures that provide adequate assurance of payment to their utilitiy providers (the "**Utility**

**Companies**") under Section 366 of the Bankruptcy Code, while allowing the Debtors to avoid the threat of imminent termination of electricity, water, gas, hazardous waste removal, trash removal, telephone, telecommunications and similar utility products and services (collectively, the "**Utility Services**") from those Utility Companies. Specifically, the Debtors request entry of interim and final orders (a) approving the Debtors' deposit of $568,987.35 (which is approximately 50% of the estimated monthly cost of the Utility Services, based on historical averages over the prior twelve (12) months) into a newly-created segregated, interest-bearing account, as adequate assurance of postpetition payment to the Utility Companies pursuant to Section 366(b) of the Bankruptcy Code, (b) approving the additional adequate assurance procedures described below as the method for resolving disputes regarding adequate assurance of payment to Utility Companies, and (c) prohibiting the Utility Companies from altering, refusing or discontinuing services to the Debtors except as may be permitted by the proposed procedures.

144. As of the Petition Date, approximately 44 Utility Companies provide Utility Services to the Debtors at various locations through approximately 112 accounts. The Utility Companies service the Debtors' offices and facilities in 12 locations. On average, prior to the Petition Date, the Debtors were billed approximately $1,137,974.71 each month on utility costs.

145. The Debtors intend to pay all postpetition obligations owed to the Utility Companies in a timely manner. Nevertheless, to provide additional assurance of payment for future services to the Utility Companies, the Debtors will deposit $568,987.35, equal to approximately 50% of the estimated monthly cost of the Utility Services, based on a historical twelve month average, into a newly created, segregated, interest-bearing account within twenty (20) days of the Petition Date (the "**Adequate Assurance Deposit**"). The Adequate Assurance Deposit will be maintained during the Chapter 11 Cases with a minimum balance equal to 50%

of the Debtors' estimated monthly cost of Utility Services, which may be adjusted by the Debtors to account for the termination of Utility Services by the Debtors or other arrangements with respect to adequate assurance of payment reached with individual Utility Companies.

146.    The Utility Services are crucial to the continued operations of the Debtors. If the Utility Companies refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted, and the Debtors could be forced to cease operations.

**J.    DIP/Use of Cash Collateral Motion**

147.    Prior to Petition Date, the Debtors engaged in extensive good faith and arm's length negotiations with the DIP Agent (Salus) about financing the Chapter 11 Cases. Those discussions culminated with the Debtors' entry into the DIP Credit Agreement, whereby the DIP Lenders agreed to provide the Debtors with the $67.5 million DIP Facility, inclusive of $2.5 million in trade credit to be provided by International Paper (in such capacity, the "**Tranche B Lender**").[15] The Debtors' borrowings under the DIP Facility and their use of Cash Collateral (as such term is defined in Section 363 of the Bankruptcy Code) are subject to an agreed upon budget (the "**Approved Budget**"). The DIP Facility ensures the continuation of the Debtors' business as a going concern during the pendency of their Chapter 11 cases.

148.    The Debtors have filed a motion (the "**DIP Motion**") requesting that the Court (a) authorize the Debtors, on an interim basis pending a final hearing and entry of a final order, to obtain postpetition senior secured financing up to an aggregate principal amount of $67.5 million pursuant to the DIP Facility (which includes a payoff of the Debtors' prepetition First Lien Lenders upon the entry of the Interim Order), and $60 million prior to the entry of a final order, subject to the terms and conditions contained in the Interim Order and the Approved

---

[15]    The DIP Credit Agreement, together with the other Loan Documents (as defined in the DIP Credit Agreement), are collectively referred to herein as the "DIP Loan Documents".

RLF1 8631302v.9

Budget, (b) authorize the Debtors to use Cash Collateral, (c) grant priming liens and superpriority claims to the DIP Lenders, (d) provide adequate protection to the Debtors' prepetition secured creditors, (e) modify the automatic stay to permit the Debtors and other parties the ability to take all actions necessary to give effect to the DIP Loan Documents, (f) schedule the final hearing, and (g) grant related relief, in each case, on the terms and subject to the conditions described in the DIP Motion and set forth in the proposed interim and final orders (together, the "**DIP Orders**") and the DIP Credit Agreement.

### (i.)    *Need for Post-Petition Financing*

149.    An immediate need exists for the Debtors to obtain funds from the proposed financing arrangement under DIP Credit Agreement in order to continue operations and to administer and preserve the value of their estates.  The ability of the Debtors to finance their operations, to preserve and maintain the value of their assets and maximize a return for all creditors requires the availability of working capital from the DIP Facility.  As of the Petition Date, the Debtors were in default under the First Lien Credit Agreement, leaving the First Lien Lenders with complete discretion as to whether to honor requests for advances under Revolving Loan Facility.  Accordingly, without the relief requested in the DIP Motion, the Debtors would be required to commence an immediate shut down of their operations and piecemeal liquidation of their assets to the detriment of their creditors, vendors, employees and other stakeholders.

150.    The DIP Facility will provide the Debtors with the liquidity that they need to continue to operate through a reorganization or sale process under Section 363(b) of the Bankruptcy Code.  Providing the Debtors with the ability to continue operations through a sale process will provide for a competitive bidding process for a business operating as a going concern rather than a piecemeal liquidation of its assets and, thus, will maximize value for the Debtors' creditors, vendors, employees and other stakeholders.  Most significantly, the ability to

61

pursue a going-concern sale will provide the Debtors with an opportunity to save the jobs of the nearly 1,600 Company employees. Accordingly, the absence of the requested relief would immediately and irreparably harm the Debtors, their estates and creditors and the possibility for a successful reorganization or sale of the Debtors' assets as a going concern.

### (ii.)  *Background of the Post-Petition Financing Arrangement*

151.    In exploring financing options, the Debtors recognized that the obligations owed to their prepetition secured lenders are secured by virtually all of the Debtors' property, such that either (i) the liens of the prepetition secured lenders would have to be primed to obtain post-petition financing; (ii) a post-petition lender would be required to refinance the obligations owed to the prepetition lenders in full and provide additional loan availability; or (iii) the Debtors would have to find a post-petition lender willing to extend credit that would be junior to the prepetition lenders' liens.

152.    Owing to the fact that the Debtors had approximately $147 million in secured debt obligations as of the Petition Date, thereby, subjecting their assets to a first priority lien on all or substantially all of their assets as well as two additional layers of secured debt, the Debtors were unable to locate a financing source willing to fund based solely on the provision of a junior lien under Section 364(c)(3) of the Bankruptcy Code. Accordingly, it became necessary to pursue DIP financing with the First Lien Lenders, or an alternative source of financing, such as the DIP Lenders, that would be willing to take out the First Lien Lenders debt in full and provide the additional financing necessary to support these Chapter 11 Cases.

153.    Through the assistance of PwC, the Debtors were able to identify the DIP Lenders as a potential source of DIP financing. The Debtors immediately commenced arm's length negotiations with both the DIP Agent and the prepetition First Lien Lender regarding the

provision of DIP financing and the consensual use of Cash Collateral. During the course of those negotiations, International Paper, the Debtors' third lien secured lender, became a party to the DIP Facility as the Tranche B Lender. The Debtors ultimately determined that the DIP Facility offered by the DIP Lenders was on the most attractive terms and would provide the Debtors with the runway necessary to fund the Debtors' operations through a reorganization or orderly sale of the business.

      **(iii.)**   ***The DIP Facility***

154.    Under the DIP Facility, the DIP Lender will be granted priming liens under the terms of the DIP Orders, but they will be priming on a fully consensual basis the Prepetition Subordinated Secured Lenders[16] in accordance with the rights of the parties under an inter-creditor agreement and the terms of the interim order.

155.    Moreover, the Interim Order provides for the First Lien Agent or the lenders party to the First Lien Credit Agreement to receive Adequate Protection Liens and Adequate Protection Superpriority Claims to secure the "Surviving Obligations" which remain after the Prepetition Senior Obligations are paid off. The Prepetition Subordinated Secured Creditors will also receive Adequate Protection Liens and the Adequate Protection Superpriority Claims. The Adequate Protection Liens are perfected replacement and additional security interests in, and liens on all of the Debtors' right, title and interest in, to, and under all DIP Collateral that follow the priority scheme of the Debtors' prepetition secured debt. The Adequate Protection Superpriority Claims grant the Debtors' prepetition secured lenders allowed administrative claims against the Debtors' estates under Sections 503 and 507(b) of the Bankruptcy Code to the extent that the Adequate Protection Liens do not adequately protect against any diminution in the

---

[16]    Capitalized terms not otherwise defined in this Section have the meanings given to them in the DIP Orders or DIP Loan Documents. Salus was not a pre-petition lender to the Debtors.

value of the Debtors' prepetition secured lenders' interests in the Prepetition Collateral.

156.    Under the DIP Facility the Debtors will obtain postpetition senior secured financing up to an aggregate principal amount of $67.5 million, of which amount $2.5 million is being provided by the Tranche B Lender in trade credit.  The DIP Facility includes a payoff of the Debtors' Prepetition First Lien Lenders upon the entry of the Interim Order.  The DIP Facility also provides the Debtors with $60 million prior to the entry of a final order, subject to the terms and conditions contained in the Interim Order and the Approved Budget.

**(iv.)    *Use of Cash Collateral***

157.    In addition to the DIP Facility, the Debtors require the use of Cash Collateral in order to ensure that they have the liquidity necessary to implement a sale, and fund their ordinary course business operations and the administration of the Chapter 11 Cases.  Without authority to use Cash Collateral, the Debtors' liquidity needs will not be satisfied, jeopardizing the Debtors' ability to conduct an efficient and effective sale process, and, ultimately, their ability to maximize value for the benefit of all parties in interest.  Thus, the use of Cash Collateral is imperative to the success of the Chapter 11 Cases.

158.    Approval of the DIP Facility will provide the Debtors with immediate and ongoing access to borrowing availability to pay their current and ongoing operating expenses, including post-petition wages and salaries and utility and vendor costs.  Unless these expenses are paid, the Debtors will be forced to cease operations, which would likely (i) result in irreparable harm to their business, (ii) deplete going concern value, and (iii) jeopardize the Debtors' ability to maximize value.  The credit provided under the DIP Facility and the use of Cash Collateral will enable the Debtors to continue to satisfy their vendors, service their customers, pay their employees, and operate their business in the ordinary course and in an

orderly and reasonable manner to preserve and enhance the value of their estates for the benefit of all stakeholders.    The availability of credit under the DIP Credit Agreement will provide confidence to the Debtors' creditors that will enable and encourage them to continue their relationships with the Debtors.    Finally, the implementation of the DIP Facility will be viewed favorably by the Debtors' vendors, employees, and customers, thereby promoting a successful resolution of these Chapter 11 Cases.    Accordingly, the timely approval of the relief requested in the DIP Motion is imperative.

RLF1 8631302v.9

## III.

## CONCLUSION

159.    The Debtors' ultimate goal is to reorganize their financial affairs pursuant to the terms of a confirmed Chapter 11 plan or achieve a sale of their businesses if such a sale would be in the best interests of the Debtors' estates.  In the near term, however, to minimize any loss of value of their businesses during their restructuring, the Debtors' immediate objective is to maintain a business as usual atmosphere during the early stages of these Chapter 11 Cases, with as little interruption or disruption to the Debtors' operations as possible.  I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objectives and completing a successful reorganization or sale of the Debtors' businesses will be substantially enhanced.

160.    I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and farther relief as is just.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of June, 2013.

Respectfully Submitted,

James Pinto
*Chairman and President of NEV Credit Holdings, Inc. and Chairman and Chief Executive Officer of NE Opco, Inc.*

RLF1 8631302v.9

**EXHIBIT A**

**Corporate Organizational Chart**

