## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------- x
In re:                                       :   Chapter 11
                                             :
NE OPCO, INC., et al.,                       :   Case No. 13-_____ (____)
                                             :
                    Debtors.[1]              :   Joint Administration Pending
------------------------------------------------------- x
```

### MOTION OF DEBTORS FOR ORDER UNDER
### 11 U.S.C. §§ 105(a), 363(b), 363(c), 507(a), 541, 1107(a) AND 1108 AND
### FED. R. BANKR. P. 6003 (I) AUTHORIZING PAYMENT OF CERTAIN PREPETITION
### WORKFORCE OBLIGATIONS, INCLUDING COMPENSATION, BENEFITS,
### EXPENSE REIMBURSEMENTS AND RELATED OBLIGATIONS, (II) CONFIRMING
### RIGHT TO CONTINUE WORKFORCE PROGRAMS ON POSTPETITION BASIS,
### (III) AUTHORIZING PAYMENT OF WITHHOLDING AND PAYROLL-RELATED
### TAXES, (IV) AUTHORIZING PAYMENT OF PREPETITION CLAIMS OWING TO
### ADMINISTRATORS OF, OR THIRD PARTY PROVIDERS UNDER, WORKFORCE
### PROGRAMS AND (V) DIRECTING BANKS TO HONOR PREPETITION CHECKS
### AND FUND TRANSFERS FOR AUTHORIZED PAYMENTS

The debtors and debtors-in-possession in the above-captioned cases (collectively, the "**Debtors**") hereby move (the "**Motion**") for entry of an order, under Sections 105(a), 363(b), 363(c), 507(a), 541, 1107(a) and 1108 of Title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), (i) authorizing the Debtors to pay certain prepetition amounts owing to or for the benefit of current Employees, Temporary Employees and Independent Contractors (as such terms are defined herein), and for benefits and reimbursable expenses owed to or for the benefit of current Employees; (ii) confirming the Debtors' right to continue postpetition, in the ordinary course of business, the Employee-related plans, programs and policies in effect immediately prior to the filing of these cases; (iii) authorizing the Debtors to pay any and all local, state and federal

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are NE Opco, Inc. (9830) and NEV Credit Holdings, Inc. (9596). The above-captioned Debtors' mailing address is c/o NE Opco, Inc., 3211 Internet Boulevard, Suite 200, Frisco, Texas 75034.

withholding and payroll-related or similar taxes relating to prepetition periods; (iv) confirming the Debtors' right to continue to deduct and to transmit deductions from payroll checks as authorized by Employees, as required under any Employee-related plan, program or policy or as required by law; (v) authorizing the Debtors to pay any prepetition claims owing to the administrators of, or third party providers under, their Employee-related plans, programs and policies as necessary to ensure the delivery of compensation, benefits and expense reimbursements to their Employees; and (vi) authorizing and directing all banks to receive, process, honor and pay all of the Debtors' prepetition checks and fund transfers on account of any obligations authorized to be paid pursuant hereto. In support of the Motion, the Debtors rely upon and incorporate by reference the Declaration of James Pinto in Support of Chapter 11 Petitions and First Day Motions (the "**Pinto Declaration**"). In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are Sections 105(a), 363(b), 363(c), 507(a), 541, 1107(a) and 1108 of the Bankruptcy Code. Such relief is warranted under Bankruptcy Rule 6003.

## BACKGROUND

2.      On the date hereof (the "**Petition Date**"), the Debtors filed voluntary petitions in this Court commencing cases for relief under Chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**"). The factual background regarding the Debtors, including their business operations, their capital and debt structures and the events leading to the filing of the

Chapter 11 Cases, is set forth in detail in the Pinto Declaration and fully incorporated herein by reference.

3.    The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been requested in the Chapter 11 Cases and no committee has yet been appointed.

## RELIEF REQUESTED

4.    By this Motion, the Debtors seek entry of an order authorizing them, in their discretion, to pay, continue or otherwise honor various prepetition Workforce-related (as defined below) obligations (collectively, the "**Prepetition Workforce Obligations**") to or for the benefit of their (a) full-time regular employees who are not in a temporary status and who are typically scheduled to work thirty (30) hours per week (the "**Full-Time Employees**"), (b) part-time employees who are not in a temporary status and who are typically scheduled to work less than thirty (30) hours per week (the "**Part-Time Employees**" and, together with the Full-Time Employees, the "**Employees**"),[2] (c) employees who are hired as interim replacements, to temporarily supplement the workforce, or to assist in the completion of a specific project (the "**Temporary Employees**"[3]), and (d) certain independent contractors retained by the Debtors (the "**Independent Contractors**" and, together with the Employees and the Temporary Employees, the "**Workforce**"), for, among other things, (i) compensation to the Workforce, (ii) expenses and expense reimbursements to the Employees, (iii) continuation of benefits provided to the

---

[2]    The Employees include one individual who is providing service as a board member on the board of Debtor NE Opco, Inc.  As of the Petition Date, such Employee was owed only regular salary and wages by the Debtors.  For the avoidance of doubt, the Debtors seek to compensate such individual in the ordinary course of business following the Petition Date and reimburse such individual for all reimbursable expenses regardless of whether such reimbursable expense were incurred prior to or following the Petition Date.

[3]    Nothing contained herein shall constitute an admission by the Debtors that the Temporary Employees are "employees" of the Debtors and the Debtors expressly reserve their right with respect to the proper designation of the Temporary Employees in any context or circumstance.

3

Employees under all plans, programs and policies maintained or contributed to, and agreements entered into, by the Debtors prior to the Petition Date (the foregoing collectively, and as described in greater detail below, the "**Workforce Programs**").  In addition, the Debtors request that the Court confirm their right to continue each of the Workforce Programs in the ordinary course of business during the pendency of these Chapter 11 Cases in the manner and to the extent that such Workforce Programs were in effect immediately prior to the filing of such cases and to make payments in connection with expenses incurred in the postpetition administration of any Workforce Program.[4]

5.    The Workforce Programs under which the Prepetition Workforce Obligations arise are described more fully herein and include, without limitation, plans, programs, policies and agreements providing for (a) wages, salaries, holiday and vacation pay, sick pay and other accrued compensation; (b) reimbursement of business, travel, and other reimbursable expenses; and (c) benefits, with coverage as applicable for eligible spouses, domestic partners and dependents, in the form of medical and dental coverage, coverage continuation under COBRA,[5] pre-tax contribution flexible spending accounts and contributions relating thereto, basic term life, supplemental life, accidental death and dismemberment and business travel accident insurance, short-term disability, long-term disability, employee

---

[4]    By this Motion, the Debtors do not seek to modify the terms of any Workforce Program and do not seek to assume or reject any Workforce Program to the extent that such Workforce Program is deemed to be an executory contract within the meaning of Section 365 of the Bankruptcy Code.  Moreover, the Debtors do not waive their right to modify or terminate any Workforce Program to the extent that such right exists under the terms of the Workforce Program or as may be authorized or required by applicable law.

[5]    See 29 U.S.C. §§ 1161 et seq.

RLF1 8603012v.5

assistance, workers' compensation, severance and miscellaneous other benefits provided to the Full-Time Employees in the ordinary course of business.[6]

6.     The Debtors also seek authorization to pay any and all local, state and federal withholding and payroll-related or similar taxes relating to the Prepetition Workforce Obligations including, but not limited to, all withholding taxes, social security taxes and medicare taxes.  In addition, the Debtors seek authorization to pay to third parties any and all amounts deducted from Employee paychecks by the Debtors for payments on behalf of Employees for savings programs, benefit plans, insurance programs and other similar programs, or by ADP (as defined below) for garnishments, charitable contributions, support payments and similar items.

7.     With respect to any Workforce Programs and Prepetition Workforce Obligations that are administered, insured or paid through a third-party administrator or provider, the Debtors request authorization, in their discretion, to pay any prepetition claims of such administrator or provider in the ordinary course of business to insure the uninterrupted delivery of payments or other benefits to the Employees.

8.     In support of the requested relief, the Debtors move the Court (a) to authorize and direct all banks to receive, process, honor and pay any and all checks drawn on the payroll and other bank accounts used by the Debtors to satisfy their Prepetition Workforce Obligations whether presented before, on or after the Petition Date, upon receipt by each bank and institution of notice of such authorization, provided that sufficient funds are on deposit in the

---

[6]     The Debtors may separately seek authorization to implement new postpetition retention, severance or similar employment protection programs designed to preserve Employee morale, encourage continuing employment and otherwise ameliorate the effects on Employees of these Chapter 11 Cases.  Pending approval of any such postpetition programs, the prepetition programs will continue in the ordinary course, subject to the provisions of Bankruptcy Code Section 503(c)(2).

RLF1 8603012v.5

applicable accounts to cover such payments and (b) to prohibit the Debtors' banks from placing any holds on, or attempting to reverse, any automatic transfers to any account of any Prepetition Workforce Obligations. The Debtors additionally request that the Court authorize them to issue new postpetition checks to replace any checks that may nevertheless be dishonored and to reimburse any expenses that Employees may incur as a result of any bank's failure to honor a prepetition check.

### BASIS FOR RELIEF

9.      As of the Petition Date, the Full-Time Employees included approximately 1,672 individuals, of which approximately 222 are salaried and approximately 1,450 are hourly Employees. Additionally, as of the Petition Date, the Debtors employed approximately 7 Part-Time Employees. All of the Employees are employed by NE Opco, Inc. Additionally, as further detailed below, the Workforce includes approximately 20 Temporary Employees and 5 Independent Contractors. Approximately 792 of the Debtors' Employees are covered by collective bargaining agreements.[7]

10.      The Debtors' ability to preserve their businesses and successfully maximize the value of the estates is dependent on the expertise and continued enthusiasm and service of their Workforce. Due to the disruption and uncertainty that typically accompanies a Chapter 11 filing, the Debtors believe that the morale and, thus, the performance of the Workforce may be adversely affected. If the Debtors fail to pay the Prepetition Workforce Obligations in the ordinary course, their Employees, Temporary Employees and Independent

---

[7]      Debtor NE Opco, Inc. is a party to collective bargaining agreements with: (i) the National Envelope Employees Independent Association of Appleton, Wisconsin; (ii) United Steelworkers (United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union) ("USW") (Scottdale, PA plant); (iii) Graphic Communications Conference/IBT/Local 527S (Smyrna, GA plant); and (iv) USW International Union 4-513 (Westfield, MA plant).

Contractors will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses. Such a result would have a highly negative impact on Workforce morale and likely would result in unmanageable performance issues or turnover, thereby resulting in immediate and irreparable harm to the Debtors and their estates. In addition, the Debtors have determined that continuation of the Workforce Programs is vital to preserving and rebuilding Workforce morale during the pendency of these Chapter 11 Cases and to reducing the level of attrition that might otherwise occur.

A.    **Prepetition Compensation For Employees, Temporary Employees and Independent Contractors**

    i.    Employee Payroll and Miscellaneous Deductions

        11.    The Debtors' Employees are classified as "hourly," "exempt" or "non-exempt." Those of the Debtors' Employees who meet specific tests established by applicable law and are, thus, exempt from overtime requirements are classified as "exempt." Those Employees whose positions do not meet exemption tests and who are entitled to overtime pay under the specific provisions of federal and state employment laws are classified as "hourly" or "non-exempt." Paychecks are distributed on a bi-weekly schedule for exempt Employees and a weekly schedule for non-exempt and hourly Employees. For non-exempt and hourly employees, each paycheck includes earnings for all work performed through the end of the previous payroll period, including overtime (if applicable). In the event that the regularly scheduled payroll date falls on a day off such as a weekend or holiday, employees receive pay on the last day of work before the regularly scheduled payroll date. The Debtors' average gross payroll,[8] for each pay period based on the twelve months prior to the Petition Date, is approximately $840,000 for

---

[8]    The Debtors' average payroll net of deductions for statutory withholdings, contributions to the 401(k) Plan, contributions to Employee Benefits and Miscellaneous Deductions, is, per pay period, approximately $591,563.07 for Employees on the salaried payroll schedule and $655,288.41 for Employees on the hourly payroll schedule.

Employees on the salaried payroll schedule and $500,637 for Employees on the hourly payroll schedule—or a total payroll of approximately $1,340,637 per pay period for all Employees. The Debtors manage and administer their payroll through an internal department located at their Frisco, Texas location. One or two days prior to a payroll disbursement date, the Debtors fund the payroll, net of all deductions relating to Employee Benefits (as defined below), to Automatic Data Processing, Inc. ("**ADP**") and ADP distributes payments to Employees on the payroll date.

12.    In addition, the Debtors are required to make matching payments from their own funds for, among other things, Social Security and Medicare taxes and to pay, based on a percentage of gross payroll, state and federal unemployment insurance, employment training taxes, and state disability insurance contributions (the "**Employer Payroll Tax Obligations**"). As of the Petition Date, the accrued and unpaid prepetition Employer Payroll Tax Obligations were approximately $500,000.

13.    Due to the timing of the Debtors' payroll in relation to the Petition Date, Employees are owed certain prepetition amounts for regular compensation earned through the Petition Date. Where Employees are owed prepetition compensation amounts, the applicable miscellaneous deductions have not yet been taken by ADP nor have the Debtors deducted amounts owed for Employee Benefits, or such amounts may not yet have been forwarded to the various third parties to whom such funds should be remitted.

14.    The Debtors estimate that, as of the Petition Date, accrued but unpaid wages and other compensation, as well as company contributions for Employee Benefits, totaled approximately $2,705,833 (comprised of $1,650,000 owed to Employees for wages and compensation and $1,055,833 attributable to the Debtors' obligations on account of Employee Benefits).

ii.   Employee Vacation Days, Paid Sick Leave Days, "Floating" Holidays and Other
      Paid Time Off

15.     As part of their overall compensation, Full-Time Employees are also entitled to receive a certain number of vacation days each year.[9]  While the amount varies for union Employees, Full-Time Employees earn up to 160 vacation hours per year, with certain union Employees eligible to earn up to 200 vacation hours per year, depending upon their length of service with the Debtors, with those Full-Time Employees who have been employed by the Debtors for a longer period of time being entitled to a greater number of vacation days than those Full-Time Employees who have been with the Debtors for a shorter period of time.[10]

16.     While the amount permitted varies by facility and union, the majority of Full-Time Employees may carry over from one calendar year to the next between three days and one week of unused vacation time with a manager's approval.  Upon termination or retirement, Full-Time Employees receive payment of any accrued unused vacation days.  This policy is consistent with the laws of most states, which provide that vacation benefits are vested and must be paid upon termination of employment.  However, if the Debtors terminate employment for cause, the Full-Time Employee will forfeit any unused vacation time.  The Debtors estimate that, as of the Petition Date, total accrued but unpaid vacation liability is approximately $1,857,000 million.  This amount is not a current cash pay obligation, as Full-Time Employees are entitled to be paid for accrued and unused vacation time, as noted above, only in the event they are terminated or retire.

---

[9]     The Part-Time Employees and Temporary Employees are not eligible to receive paid vacation, holiday or sick days.

[10]    Vacation days are accrued on an annual basis measured from the date of hire.  Union Employees accrue the current year for vacation in the following year.  By way of example, Full-Time Employees who have been employed by the Debtors for (a) less than 6 years are entitled to 80 vacation hours per year, (b) at least 6 years are entitled to 120 vacation hours per year, and (c) at least 15 years are entitled to 160 vacation hours per year.

RLF1 8603012v.5

17.    Additionally, Employees are entitled to a certain number of sick days per year. Sick days are accrued in various ways, depending on facility and union; however, the majority of regular Full-Time Employees are entitled to take up to three (3) paid sick days per year, in addition to any days taken pursuant to the short-term disability policy (as described further below). Regular Full-Time Employees are not paid for earned but unused sick days while employed or upon termination or retirement. However, Full-Time Employees are permitted to carry over up to 16 hours of sick leave from one calendar year to the next for a maximum of 40 hours of sick leave in a calendar year. All Full-Time Employees are required to notify their immediate supervisor of any absence due to sickness before the start of their workday, if possible, and must also contact the direct supervisor on each additional day of absence. Verification may be requested for sick leave absences and may be required as a condition to receiving sick leave benefits. Before returning to work from sick leave absence of three (3) calendar days or more, an employee may be required to provide a physician's verification that he or she may safely return to work.[11]

18.    In addition to specific holidays observed by the Debtors, Full-Time and Part-Time Employees at certain locations are entitled to receive two (2) "floating" holidays that may be used at the Employees' discretion. Eligible Employees are eligible to receive pay during established holidays at their regular rate of pay. To be eligible for such holiday pay, such Employees must work their last scheduled day immediately preceding and first scheduled day immediately following the holiday. If a recognized holiday falls during an eligible employee's paid vacation, holiday pay will be provided instead of the paid vacation benefit that would otherwise have applied. If eligible non-exempt and hourly employees work on a recognized

---

[11]    Part-Time Employees and Temporary Employees are not entitled to any paid leave.

holiday, they receive holiday pay plus wages at their straight-time rate for the hours worked on the holiday, with higher rates available to union employees. Paid time off for holidays is counted as hours worked for purposes of determining overtime pay.

19.    All Employees may be given up to a maximum of three (3) work days off with pay in the event of death of a member of the Employee's immediate family. Employees may, with their supervisor's approval, use any available paid leave for additional time off as necessary. Employees may also be granted unpaid time off to vote in all national, state and local elections in accordance with applicable law where it is not possible for them to vote before or after their regular work schedule. Finally, Employees generally are paid for the first five (5) days of jury duty service. Thereafter, they may use any available paid time off or may request an unpaid jury duty leave of absence.

iii.    Commissions/Bonus Plans

20.    The Debtors offer incentive bonuses to certain Employee constituencies through a variety of award plans and commissions (collectively, the "**Bonus Plans**"). Bonuses and commissions may be awarded pursuant to the Bonus Plans for, among other things, reaching sales goals. In 2012, the Debtors made approximately $3,754,647.07 in payments to approximately 499 Employees pursuant to the Bonus Plans. As of the Petition Date, approximately 100 Employees were eligible to receive bonuses and/or commissions, and no amounts were owed under the Bonus Plans. The Debtors, by this Motion, seek authority, but not direction, to continue to honor and perform their obligations under the existing Bonus Plans set forth above, subject to the entry of a final order with respect to this Motion.

21.    Certain of the Debtors' senior management participate in the Bonus Plans and/or a corporate bonus plan (the "**Corporate Bonus Plan**") pursuant to which bonuses are determined based on corporate profitability. The Debtors do not seek authority to make

11

payments under the Corporate Bonus Plan, or to otherwise make any bonus payments to insiders (as such term is defined in the Bankruptcy Code) under either the Bonus Plans, the Corporate Bonus Plan, or otherwise, by this Motion, and will not make any such payments without further order of the Court.

        iv.    <u>Temporary Employees</u>

        22.    As noted above, the Workforce includes a small number of Temporary Employees who are hired (a) as interim replacements, (b) to temporarily supplement the work force, or (c) to assist in the completion of a specific project. Employment assignments in this category are usually of a limited duration. Employment beyond any initially stated period does not in any way imply a change in employment status. Temporary Employees retain this status unless and until notified of a change. The Temporary Employees are compensated directly by the Debtors.

        23.    The Debtors pay certain amounts to the agencies that employ the Temporary Employees consisting primarily of (a) fees charged by the agency on account of the actual services that the Temporary Employee is rendering for the Debtors during the subject service period (the "**Service Fees**") and (b) conversion fees charged by the applicable agency which are triggered upon conversion of a Temporary Employee to an Employee of the Debtors (the "**Conversion Fees**").

        24.    The Temporary Employees provide a variety of services to the Debtors, including, but not limited to engineering services, operational services and support, office services, and technical services. Such services are critical to the Debtors' operations. Indeed, the Debtors' complex factory operations could not operate without the continued service of the Temporary Employees. Moreover, the use of the Temporary Employees provides the Debtors

great flexibility in managing their Workforce. As the Debtors are part of an evolving industry, this flexibility has proven critical to maintaining efficient and cost-effective operations.

25.     As of the Petition Date, two agencies were providing, in the aggregate, approximately 20 Temporary Employees to the Debtors. The Debtors estimate that, as of the Petition Date, approximately $7,500 was owed to such agencies on account of accrued but not yet invoiced Service Fees. Further, any expenses incurred by the Temporary Employees in the course of performing services for the Debtors are included in the Service Fees the Debtors pay to the applicable agency.

     v.     <u>Independent Contractors</u>

26.     In addition to the Employees and Temporary Employees, the Debtors retain Independent Contractors to provide sales services to the Debtors' customers. Such Independent Contractors are compensated by the Debtors in the ordinary course of business similar to the Employees. To the extent the Independent Contractors incur expenses while providing services to the Debtors, the Independent Contractors include such amounts in the payment invoices submitted to the Debtors for the Independent Contractors' services.

27.     As of the Petition Date, approximately five (5) Independent Contractors were providing services to the Debtors. The Debtors estimate that, as of the Petition Date, the Debtors owed the Independent Contractors approximately $27,363.63 on account of accrued but unpaid compensation and expenses.

**B.    Prepetition Employee Reimbursements**

     i.     <u>Business Expenses</u>

28.     The Debtors, in the ordinary course of their business, reimburse Employees for a variety of ordinary, necessary and reasonable business related expenses that Employees incur. These include expenses for travel, including lodging, automobile rentals

13

including fuel, meals, business-related entertainment expenses, transportation purchased by or for Employees, mileage and incidental expenses such as parking and tolls. An expense report must be submitted to the Debtors' Corporate Accounts Payable Department in Frisco, Texas for each business trip or expense and all expenses must be supported by receipts. The Debtors use expensewire.com to manage this process and request authority to continue to use expensewire.com in connection with their reimbursement of business expenses. Certain Employees have not yet been reimbursed for such expenses previously incurred on behalf of the Debtors primarily because the Debtors filed their Chapter 11 petitions in the midst of their regular reimbursement cycle for such expenses. All of these expenses were incurred with the understanding that they would be reimbursed by the Debtors. The Debtors' average monthly obligation under the expense reimbursement policy is approximately $150,000. As of the Petition Date, the Debtors estimate that approximately $4,509 was due and owing to expensewire.com (through Paychex) and that approximately $1,614 in reimbursable business expenses have been submitted to expensewire.com but not yet reimbursed to Employees, with up to approximately $75,000 incurred by certain Employees but not yet submitted to expensewire.com and not yet reimbursed to Employees.

29.    The Debtors also use a company credit card for all airline travel booked through Cain Travel ("**Cain**"). The credit card account is maintained by Wells Fargo and is paid on a monthly basis. As of the Petition Date, the Debtors do not owe any amounts on this credit card, but the Debtors estimate that they will need to pre-fund this credit card in the amount of approximately $40,000 for post-petition air travel by Employees. The Debtors request authority to pre-fund this credit card in order to continue to use Cain to book company-related airline travel.

14

30.    It is essential to the continued operation of the Debtors' business that the Debtors be permitted to continue reimbursing Employees for such business expenses.  By this Motion, the Debtors seek authority, but not direction, to pay all reimbursable business expenses in the ordinary course of business, including those incurred prior to the Petition Date.

ii.    Relocation Expenses

31.    Additionally, in order to maximize the effectiveness of their Employees, the Debtors have in place a relocation policy (the "**Relocation Policy**") whereby Employees and their qualified dependents will be reimbursed for certain relocation expenses.  In order to qualify for reimbursement Employees must have been assigned or relocated, on a temporary or permanent basis, at the request of the Debtors.  Reimbursable expenses include, but are not limited to, travel expenses incurred in connection with "home finding trips," new home purchase and old home sale closing costs, miscellaneous expenses, storage expenses, tax assistance, temporary living expenses in the event a new residence is not available for occupancy at the time of the relocation and moving and other related expenses.

32.    It is imperative that the Debtors continue to reimburse newly hired and existing Employees who are asked to relocate in the ordinary course of the Debtors' business. Reimbursable expenses under the Relocation Policy may be submitted up to one year following the Employee's relocation, and as a result estimating exposure under the Relocation Policy is difficult.  However, as of the Petition Date, the Debtors estimate that no amount is owing on account of relocation-related expenses incurred pursuant to the Relocation Policy.

**C.    Employee Benefits**

33.    Prior to the Petition Date, the Debtors offered Full-Time Employees and their dependents various standard employee benefits, depending on location, including, without limitation, (a) health, dental and vision coverage, (b) flexible spending accounts, (c) coverage

15

continuation under COBRA, (d) basic term life insurance, supplemental life, accidental death and dismemberment, (e) short-term and long-term disability insurance, (f) a retirement savings plan, (g) workers' compensation, (h) miscellaneous other benefits provided to the Full-Time Employees in the ordinary course of business and (i) a Severance Policy (as defined below) (collectively, the "**Employee Benefits**"). Although the majority of the Employee Benefits are paid monthly in advance, as of the Petition Date, the Debtors were obligated to pay certain contributions to or provide benefits under such plans, programs and policies.

i.    Medical, Vision and Dental Programs for Full-Time Employees

34.    Non-union Full-Time Employees and Full-Time Employees in the union in Appleton and their families are offered a choice of three medical insurance plans through Anthem Blue Cross ("**Anthem**"): an EPO and two types of PPO. Full-Time Employees in California are also offered medical benefits through Kaiser Medical ("**Kaiser**"). Full-Time Employees and their families are also offered a prescription drug plan through Express Scripts ("**ESI**"). Under the "EPO" option, Full-Time Employees and their family members are required to use a provider within a broad network. Under the "PPO" options, Full-Time Employees and their family members have the choice to use providers within the network or to use providers outside the network (the latter option being subject to higher costs). The "high deductible" PPO also allows participants to open tax-free health savings accounts ("**HSAs**") from which to pay their medical expenses. The Debtors contribute funds to the HSAs on an annual basis. Full-Time Employees in the union in Scottdale are offered a health plan through Highmark. Full-Time Employees in the union in Westfield are offered a health plan through BCBS MA. Full-Time Employees in the union in Smyrna are offered health benefits through the union plan, the Specialties & Paper Products Union No. 527 Health & Welfare Fund ("**Smyrna Health Insurance Fund**") and the company contributes to the premiums.

RLF1 8603012v.5

35.     Each of the foregoing health plans have different associated premiums, deductibles and coverage benefits.  However, on average, the Debtors contribute 70% to 83% of the premium for these medical plans, depending on the specific plan elected.  The remainder of the medical plan costs, if any, are funded by pre-tax deductions from Full-Time Employee payroll, which are deducted by the Debtors from the Full-Time Employee payroll prior to funding the payroll to ADP and are remitted monthly to the appropriate plan administrator.  The estimated monthly cost to the Debtors under all of the foregoing health plans (including premiums and claims) is approximately $1,530,320.

36.     Any Employee that enrolls in any medical plan has the option to receive vision insurance through EyeMed at a minimal charge to the Full-Time Employee.  Because this charge is paid entirely by the Employee, the Debtors do not incur a monthly cost under the EyeMed vision insurance plan.

37.     The obligations that the Debtors incur on behalf of the Full-Time Employees on account of health, vision and prescription drug coverage under each of the offered medical plans approximates, in the aggregate, $1,550,480 per month.  The Debtors pay these premiums directly to Anthem, EyeMed, BCBS MA, Highmark, Kaiser and the Smyrna Health Insurance Fund as applicable.

38.     The Debtors also offer Full-Time Employees dental benefits through a dental plan with MetLife. The Debtors pay approximately 50-100% of the premiums owed to MetLife.  As with the medical plans, the remainder of the premium expense, if any, is funded by pre-tax deductions from Full-Time Employee payroll, which are remitted monthly to MetLife. The obligations that the Debtors incur on behalf of the Full-Time Employees on account of the

RLF1 8603012v.5

dental plan with MetLife approximates, in the aggregate, $14,661 per month. The Debtors pay these premiums directly to MetLife.

39.     The estimated monthly cost to the Debtors under all health, vision, prescription drug and dental plans (including premiums and claims, but not including any administrator fees) is approximately $1,550,480. As of the Petition Date, the total amount accrued but unpaid on account of the health, vision, prescription drug and dental plans was approximately $726,953.49.

      ii.     COBRA Obligations

40.     The Debtors provide eligible Employees and their qualified beneficiaries the opportunity to continue health insurance coverage pursuant to the federal Consolidated Omnibus Budget Reconciliation Act (COBRA). Under COBRA, the Employee or beneficiary pays the full cost of coverage at the Debtors' group rates plus an administration fee. As of the Petition Date, there were approximately 32 former Employees receiving COBRA medical benefits and approximately 26 former Employees receiving COBRA dental benefits (the "**Continued Healthcare Benefits**"). Further, as of the Petition Date, there were approximately 260 former Employees that are eligible but have not yet elected Continued Healthcare Benefits. By this Motion, the Debtors request authority to pay pre-petition and post-petition Continued Healthcare Benefits to former Employees that are eligible and elect to receive COBRA benefits. The Debtors estimate the amount outstanding under these programs is approximately $3,814. By this Motion, the Debtors seek authority, but not direction, to pay amounts owed for Continued Healthcare Benefits as of the Petition Date and continue providing Continued Healthcare Benefits post-petition.

iii.    Pre-Tax Contribution Flexible Spending Accounts

41.    The Debtors additionally offer most Full-Time Employees the opportunity to contribute through pre-tax compensation deductions to flexible spending accounts ("**FSAs**"), maintained in accordance with Section 125 of the Internal Revenue Code, to be used for healthcare related expenses and dependent care expenses.  FSAs and dependent care accounts are composed entirely of Employee contributions.    FSA deductions are made from Full-Time Employees' paychecks.    Those funds are, upon the participating Full-Time Employee's submission of a claim, remitted by ADP, which administers the claims under the FSAs and remits reimbursements to the Employees.  As of the Petition Date, the Debtors estimate that they are holding FSA deductions to be remitted to ADP of approximately $19,680.   The Debtors believe that such amounts are being held in trust for the benefit of the contributing Employees and, therefore, are not property of the Debtors' bankruptcy estates.   Nevertheless, out of an abundance of caution, the Debtors seek the approval of this Court to continue these programs and reimburse Employees in the ordinary course.

iv.    Life Insurance and Accidental Death and Dismemberment Insurance

42.    The Debtors, at their own cost, provide non-executive Full-Time Employees with basic life insurance and accidental death and dismemberment ("**Life and AD&D**") insurance, administered by Minnesota Life Insurance Company ("**Minnesota Life**"). Life and AD&D coverage is provided in varying amounts by location, generally up to one-and-a-

half times the Full-Time Employee's annual earnings, up to a maximum of $250,000.[12]  The

Debtors' average monthly expense attributable to life insurance programs and AD&D insurance

is approximately $20,683 per month.  As of the Petition Date, the total amount accrued but

unpaid on account of the Life and AD&D as of the Petition Date was approximately $34,459.35.

> v.    Short-Term and Long-Term Disability Programs

43.    The Debtors provide, at their own cost, most Full-Time Employees with

short-term disability ("**STD**") coverage if the Full-Time Employee is unable to work due to

serious illness or injury.  The STD benefit results in the continuation of the Full-Time

Employee's weekly earnings at sixty percent (60%) of such earnings, up to a maximum weekly

benefit of $2,000 for a period of up to twenty-six (26) weeks.[13]  The Debtors also provide, at

their own cost, most Full-Time Employees and non-union hourly Employees who have been

disabled by illness or injury that results in a long-term absence from employment with long-term

disability ("**LTD**") coverage.  There is no minimum length of service that is required for

Employees to be eligible for this benefit.  The LTD coverage is equal to sixty percent (60%) of

the Full-Time Employee's monthly earnings (which may be offset by sources of income such as

social security and other disability benefits) up to a maximum monthly benefit of $6,000.

---

[12]    Employees may purchase supplemental life insurance through Minnesota Life, at their own cost, up to eight times their annual salary, with a maximum of $1,500,000.  In addition, Employees may purchase supplemental life insurance coverage for their spouses (in amounts ranging from $25,000 up to $100,000) or supplemental AD&D coverage for their spouses (in amounts ranging from one to five times their annual base salary).  Employees may also purchase supplemental life insurance coverage and AD&D coverage for their dependents and children (in amounts ranging from $2,500 to $10,000, not to exceed 50% of Employee optional life).  Additionally, Employees may purchase, at their own expense, additional life insurance, legal insurance, critical illness insurance, auto and homeowners insurance and pet insurance.  For Employees electing to purchase such coverage, the Debtors will deduct the appropriate funds from Employee payroll prior to funding the payroll to ADP and remit such amounts to the appropriate provider.  Over the two years prior to the Petition Date, the Debtors, on average, withheld and remitted approximately $20,047 per month of account of such supplemental coverage purchased by Employees.

[13]    Full-Time Employees' short-term disability benefits begin on a Full-Time Employee's 8th consecutive day of sickness (or 5 work days) or immediately for work missed due to injury.

RLF1 8603012v.5

44.     As of the Petition Date, the average monthly premium for STD coverage for all Full-Time Employees is approximately $8,371.34, and the average monthly premium for LTD coverage for all Full-Time Employees is approximately $2,553.73. As of the Petition Date, the total amount accrued but unpaid on account of STD and LTD coverage was approximately $47,529.

vi.     Employee Assistance Program

45.     The Debtors additionally offer all Full-Time Employees services to help resolve personal issues, as well as assistance with challenges (including, but not limited to drug abuse, marital difficulties, alcoholism or alcohol abuse, financial and legal pressures, concerns about child or elder care, depression or divorce) that may arise in the Full-Time Employees' lives (the "**Employee Assistance Program**"). The Debtors utilize the Hartford Group to administer the Employee Assistance Program for all Full-Time Employees. The Debtors pay amounts on account of the Employee Assistance Program monthly in advance and, as a result, as of the Petition Date, the Debtors do not believe that there are any unpaid obligations on account of the Employee Assistance Program.

vii.     401(k) Retirement Plan

46.     The Debtors maintain a retirement savings plan (the "**401(k) Plans**") that covers substantially all of the Employees. The 401(k) Plans are defined contribution plans in accordance with Section 401(k) of the Internal Revenue Code. An eligible Employee may contribute a portion of his or her compensation on a pre-tax basis, through voluntary payroll deductions, to the applicable 401(k) Plan.[14]    These contributions are deducted from the

---

[14]     An Employee is eligible to participate in the 401(k) Plan on the first day of the month following 90 days of employment.

paychecks of participating Employees and contributed by the Debtors to the 401(k) Plans. The 401(k) Plan provisions for non-union Employees allow for a discretionary match of up to 50% of the Employee's first 6% contribution. The Employees in the union in Smyrna are offered a 401(k) Plan through the union and the Debtors' collective bargaining agreement with the union in Smyrna provides for a discretional match on the same terms and conditions generally applicable to matches provided to non-bargaining unit employees. The 401(k) Plan provisions for Employees in the United Steelworkers' Union provide for a mandatory 2% contribution of each Employee payroll. The 401(k) Plan provisions for union Employees who work at the Debtors' facility in Appleton, Wisconsin provide for a mandatory match of up to 50% of the Employee's first 4% contribution. The Debtors estimate that their matching obligations under the 401(k) Plans is approximately $30,000 per month. As of the Petition Date, the Debtors estimate that approximately $70,000 is owed on account of the 401(k) Plans, which are administered by Putnam. As of the Petition Date, no amounts were outstanding on account of administration costs for the 401(k) Plans.

    viii.   <u>Severance Policy</u>

    47.    Prior to the Petition Date, the Debtors maintained a severance policy (the "**Severance Policy**") pursuant to which Full-Time Employees typically received a severance payment calculated based primarily upon the Employee's base salary rate amount, amount of accrued but unused vacation, sick and personal days remaining at the time of termination, and length of service to the Debtors. The Severance Policy includes a policy with the USW in the case of a plant closing, in which eligible Employees are entitled to between one and six weeks of severance pay based on length of service. Although the policy, with the exception of the policy contained in the USW agreement, is not evidenced in writing, the Severance Policy is a critical component of the Debtors' Employees' compensation, and the Debtors believe that Employee

morale would be severely impacted if the Debtors were not permitted to continue the Severance Policy in the ordinary course of business. Full-Time Employees terminated for "cause" are not eligible for severance benefits. As of the Petition Date, there are twenty-seven Employees receiving severance payments under the Severance Policy and the Debtors owe approximately $218,483.39 in severance payments to those Employees. By this Motion, the Debtors request authority, but not direction, in their sole discretion and pursuant to the Final Order, to continue the Severance Policy and to provide any eligible Full-Time Employee, including any insider (as that term is defined in the Bankruptcy Code), severance benefits in the event such Full-Time Employee is terminated postpetition.

48.    The Debtors believe that it is imperative that the prepetition Severance Policy be permitted to continue postpetition. Continuing the Severance Policy is necessary to preserve the goodwill and morale of the Employees. The Debtors' Full-Time Employees rely on the expectation that the Severance Policy will provide them with income protection in the event they are terminated without cause, and, as such, the Severance Policy represents a key component of the Debtors' retention effort that is critical to maintaining staffing essential to the ongoing operation of the Debtors' business. The Debtors' business relies heavily on their Employees, and a failure to continue the Severance Policy would inevitably result in decreased Employee morale and confidence, consequences that would thwart the Debtors' efforts to maximize value during these Chapter 11 Cases.

49.    The Severance Policy has historically applied to insiders (as that term is defined in the Bankruptcy Code) as well as rank and file employees. The Debtors seek to continue the Severance Policy with respect to insiders as well as rank and file employees, but seek to limit any Severance Policy payments to insiders to the amounts permitted in Section

503(c)(2) of the Bankruptcy Code.   With that limitation, the Severance Policy satisfies the requirements set forth in Section 503(c)(2) of the Bankruptcy Code for payments of severance to insiders.   First, the Severance Policy is generally applicable to all of the Employees who are terminated without a right of recall, and has been applied as such.   All of the Full-Time Employees terminated in the 12 months prior to the Petition Date without a right of recall received offers of severance payments pursuant to the Severance Policy.   Second, the Debtors do not seek authority to make any payment to any insider (as that term is defined in the Bankruptcy Code) that is in an amount greater than ten (10) times the amount of the mean severance pay given to nonmanagement Full-Time Employees during the calendar year in which the payment is made.

ix.     Honoring of Prepetition Benefits

50.     As described above, certain of the Employee Benefits remained unpaid or unprovided as of the Petition Date because certain obligations of the Debtors under the applicable plan, program or policy accrued either in whole or in part prior to the commencement of these Chapter 11 Cases, but will not be required to be paid or provided in the ordinary course of the Debtors' business until a later date.   The Debtors seek authority to pay or provide as they become due all prepetition Employee Benefits that have already accrued and that are described above.   The Debtors estimate that the aggregate amount of such prepetition Employee Benefits is approximately $1,055,833.

**D.     Continuation of Workforce Programs Postpetition**

51.     The Debtors also request confirmation of their right to continue to perform their obligations with respect to all Workforce Programs, except as otherwise indicated herein. The Workforce Programs are essential to the Debtors' efforts to maintain Workforce morale and minimize attrition.   The Debtors believe that the expenses associated with the Workforce

24

Programs are reasonable and cost-efficient in light of the potential attrition, loss of morale, and loss of productivity that would occur if the Workforce Programs were discontinued.

52.      Notwithstanding the foregoing, the Debtors reserve the right to evaluate all Workforce Programs and to make such modifications, including terminating any particular plan, program or policy, as may be necessary or appropriate during the pendency of these cases. The Debtors do not at this time intend to assume any plan, program, policy or related agreement under Bankruptcy Code Section 365(a) and reserve all rejection and termination rights.

**E.      Payments to Administrators**

53.      With respect to the Employee compensation and benefits described above, the Debtors contract with certain vendors (the "**Administrators**") to administer and deliver payments or other benefits to their Employees.  The Administrators include, without limitation, Anthem, EyeMed, BCBS MA, Highmark, Kaiser and Smyrna Health Insurance Fund for medical benefits, ESI for prescription drugs, MetLife for dental benefits, ADP for payroll, employment taxes and FSAs, Mellon Bank for HSAs and Ceridian for COBRA.  The Debtors pay these Administrators fees and expenses incurred in connection with providing such services.  In certain cases, disbursements made in the ordinary course of business are paid by the Administrators, which, in turn, invoice the Debtors for reimbursement of payments made.  For example, the Debtors, in the ordinary course of business, pay a third party, ADP, to maintain or provide record keeping and other administrative services with respect to their payroll and the tax deductions relating thereto.  ADP's services cost the Debtors approximately $20,000 per month.  The Debtors request that they be authorized, but not directed, to pay ADP to maintain and provide record keeping relating to their payroll and various Employee benefit programs identified in this Motion that may be outstanding as of the Petition Date.  As of the Petition Date, the Debtors

25

believe that accrued but unpaid administrative processing costs owed to ADP are approximately $28,000.

54.    In conjunction with the Debtors' payment of Prepetition Workforce Obligations and continued performance under Workforce Programs, the Debtors believe that it is necessary to obtain specific authorization to pay any claims of the Administrators on a postpetition basis, including prepetition claims to the extent necessary to ensure uninterrupted delivery of certain benefits to Employees. The Debtors believe that the Administrators may fail to adequately and timely perform or may terminate their services to the Debtors unless the Debtors pay the Administrators' prepetition claims for administrative services rendered and expenses incurred. A need to engage replacement Administrators postpetition likely would cause significant disruption to the payment of benefits and other obligations to the Employees. Accordingly, the Debtors submit that the payment of claims owed to the Administrators is in the best interest of the Debtors' estates.

## F.    Honoring of Prepetition Checks

55.    Prior to the Petition Date, the Debtors paid certain of their Prepetition Workforce Obligations with checks that had not been presented for payment as of the Petition Date. In order to ensure the orderly payment of the Prepetition Workforce Obligations, the Debtors request that the Court enter an order requiring the Debtors' banks to honor any such checks which are drawn on the Debtors' accounts, and authorizing the banks to rely on the representations of the Debtors as to which checks are subject to this Motion. To the extent that any such checks are nevertheless refused payment, the Debtors additionally request authority to issue replacement checks and to reimburse their Employees, Temporary Employees or Independent Contractors for any loss resulting from the dishonoring.

RLF1 8603012v.5

## APPLICABLE AUTHORITY

**A.     PAYMENT OF THE PRIORITY PORTION OF PREPETITION WORKFORCE OBLIGATIONS SHOULD BE AUTHORIZED UNDER SECTION 507(A) OF THE BANKRUPTCY CODE**

56.     Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code require that certain claims for prepetition wages, salaries, commissions, vacation, sick leave, sales commissions and employee benefit contributions be accorded priority in payment in an amount not to exceed $12,475 for each individual.

57.     Because of the number of Employees working for the Debtors, and because some Employee benefit amounts are unknown pending submission of claims, the Debtors do not know the exact amount due each Employee for the prepetition period.  However, the Debtors believe that the vast majority of their Employees are owed amounts under the $12,475 cap of Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, to the extent such cap is applicable.  As to wages and salaries only, as of the Petition Date, only two Employees are owed more than $12,475, and no Employee is owed more than $15,901.24.

58.     In order to confirm a plan in Chapter 11, priority claims must be paid in full.  Accordingly, granting the relief requested with respect to the priority portion of the Prepetition Workforce Obligations will not adversely affect the Debtors' other unsecured creditors.

59.     To the extent that Employees are owed aggregate amounts in excess of the priority cap, or amounts that are otherwise not entitled to priority status, the Debtors submit that payment of the Prepetition Workforce Obligations in such higher amounts or otherwise non-priority amounts is nonetheless justified under the authority discussed below.

RLF1 8603012v.5

**B.    THE PROPOSED PAYMENTS ARE APPROPRIATE UNDER SECTION 363 OF THE BANKRUPTCY CODE**

60.    Under Section 363 of the Bankruptcy Code, a bankruptcy court is empowered to authorize a Chapter 11 debtor to expend funds in the bankruptcy court's discretion outside the ordinary course of business. See 11 U.S.C. § 363. In order to obtain approval for the use of estate assets outside the ordinary course of business, the debtor must articulate a valid business justification for the requested use. See In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). To the extent the payment of prepetition wage, salary and benefit claims were deemed to be outside the ordinary course of business, the preservation and protection of a debtor's business, the retention of a debtor's currently working employees and the maintenance of positive employee morale provide a sufficient business justification for such payment. See id.

61.    Accordingly, this Court should grant the requested relief under Section 363 of the Bankruptcy Code.

**C.    PAYMENT OF CERTAIN OF THE PREPETITION WORKFORCE OBLIGATIONS IS APPROPRIATE UNDER SECTION 541 OF THE BANKRUPTCY CODE**

62.    The payment of the Employee contribution component of the 401(k) Plan or payment of garnished wages or other Miscellaneous Deductions will not prejudice the Debtors' estates because such withholdings are derived from Employee funds and held in trust for the benefit of the related payees and, thus, do not constitute property of the Debtors' estates under Bankruptcy Code Section 541. See Begier v. IRS, 496 U.S. 53, 58-59 (1990). See also In re Columbia Gas Sys., Inc., 997 F.2d 1039, 1059 (3d Cir. 1993) (concluding that property which a debtor holds in trust – either express or constructive – for another does not become property of the estate when the debtor files for bankruptcy, and stating that "Congress clearly intended the

28

exclusion by section 541(d) to include not only funds held in express trust, but also funds held in constructive trust."); EBS Pension L.L.C. v. Edison Bros. Stores, Inc. (In re Edison Bros., Inc.), 243 B.R. 231 (Bankr. D. Del. 2000) (same).  Moreover, payments which are critical to the retention and morale of the Debtors' workforce actually add value to the estates because an unplanned reduction in Employee retention or productivity could have disastrous effects on any potential recoveries to unsecured creditors.

**D.    PAYMENT OF THE PREPETITION WORKFORCE OBLIGATIONS IS AUTHORIZED UNDER SECTIONS 1107(A) AND 1108 OF THE BANKRUPTCY CODE**

63.     The Debtors, operating their businesses as debtors-in-possession under Sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners."  In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the duties of a chapter 11 debtor-in-possession is the duty "to protect and preserve the estate, including an operating business's going-concern value."  Id.

64.     According to the CoServ court, there are instances in which a debtor in possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim."  See id.  The CoServ court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate."  Id.  The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant.  Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim.

Third, there is no practical or legal alternative by which the debtor can deal with
the claimant other than by payment of the claim.

Id. at 498.

65.    Payment of the Prepetition Workforce Obligations meets each element of
the CoServ court's standard.  First, any failure by the Debtors to pay the Prepetition Workforce
Obligations would have a severe negative impact on the morale of the Debtors' Workforce at a
critical time for the Debtors and their businesses.  Moreover, as described above, the Employees
likely maintain priority claims against the Debtors for the majority of the Prepetition Workforce
Obligations.

66.    Second, the potential harm and economic disadvantage that would stem
from the failure to pay the Prepetition Workforce Obligations is grossly disproportionate to the
amount of any prepetition claim that may be paid.  Absent payment of the Prepetition Workforce
Obligations, the aforementioned dramatic decrease in Workforce morale would likely lead to the
loss of key Employees, Temporary Employees or Independent Contractors, lower production and
sales, and other severe business disruptions costing far in excess of the amount of such
obligations.

67.    Third, the Debtors have examined other options short of payment of the
Prepetition Workforce Obligations and have determined that, to avoid significant disruption of
the Debtors' business operations there exists no practical or legal alternative to payment of such
obligations.

68.    Therefore, the Debtors can only meet their fiduciary duties as debtors in
possession under Sections 1107(a) and 1108 of the Bankruptcy Code by payment of the
Prepetition Workforce Obligations.

E.      **SECTION 105 OF THE BANKRUPTCY CODE AND THE DOCTRINE OF NECESSITY SUPPORT PAYMENT OF THE PREPETITION WORKFORCE OBLIGATIONS**

69.     The proposed payments of the Prepetition Workforce Obligations should be authorized pursuant to Section 105 of the Bankruptcy Code and under the "doctrine of necessity."

70.     Section 105 of the Bankruptcy Code authorizes this Court "to issue any order . . . necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105.  For the reasons set forth herein, and in light of the critical need for the Debtors to preserve the going concern value of their businesses in order to maximize the value of the Debtors' estates through, among other things, preservation of the Debtors' workforce and its morale and productivity, payment of the Prepetition Workforce Obligations as requested herein is proper in accordance with Section 105 of the Bankruptcy Code.

71.     Payment of the Prepetition Workforce Obligations is further supported by the doctrine of necessity.  The doctrine of necessity is a well-settled doctrine that permits a bankruptcy court to authorize payment of certain prepetition claims prior to the completion of the reorganization process where the payment of such claims is necessary to the achievement of the objectives of the chapter 11 case.  See In re Just for Feet, Inc., 242 B.R. 821, 826 (D. Del. 1999) (stating that where the debtor "cannot survive" absent payment of certain prepetition claims, the

doctrine of necessity should be invoked to permit payment);[15] see also In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("[T]he court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor."); In re Eagle-Picher Indus., Inc., 124 B.R. 1021, 1023 (Bankr. S. D. Ohio 1991) ("[T]o justify payment of a pre-petition unsecured creditor, a debtor must show that the payment is necessary to avert a serious threat to the Chapter 11 process.").

72.    The doctrine of necessity is a widely accepted component of modern bankruptcy jurisprudence.  See Just For Feet, 242 B.R. at 826 (approving payment of key inventory suppliers' prepetition claims when such suppliers could destroy debtor's business by refusing to deliver new inventory on eve of debtor's key sales season); In re Payless Cashways, Inc., 268 B.R. 543, 546-47 (Bankr. W.D. Mo. 2001) (authorizing payment of critical prepetition suppliers' claims when such suppliers agree to provide postpetition trade credit); see also In re Columbia Gas Sys., Inc., 171 B.R. 189, 191-92 (Bankr. D. Del. 1994); Ionosphere Clubs, 98 B.R. at 175-76.

73.    For the reasons discussed herein, it is evident that payment of the Prepetition Workforce Obligations is necessary to the achievement of the Debtors' Chapter 11 objectives.  In particular, without payment of the Prepetition Workforce Obligations the Debtors' businesses and operations will be detrimentally impacted through the reduction in Workforce

---

[15]    The Court's power to utilize the doctrine of necessity in chapter 11 cases derives from the Court's inherent equity powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  The United States Supreme Court first articulated the doctrine of necessity over a century ago, in Miltenberger v. Logansport C & Sw. Ry. Co., 106 U.S. 286 (1882), in affirming the authorization by the lower court of the use of receivership funds to pay pre-receivership debts owed to employees, vendors and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership.  See id. at 309-14.  The modern application of the doctrine of necessity is largely unchanged from the Court's reasoning in Miltenberger.  See In re Lehigh & New Eng. Ry., 657 F.2d 570, 581-82 (3d Cir. 1981) ("[I]n order to justify payment under the 'necessity of payment' rule, a real and immediate threat must exist that failure to pay will place the [debtor's] continued operation . . . in serious, jeopardy.")

morale and the potential loss of key members of the Workforce during a critical time for the Debtors and their businesses. Hence, this Court should exercise its equitable powers to grant the relief requested in this Motion.

## F.   BANKRUPTCY RULE 6003 HAS BEEN SATISFIED AND BANKRUPTCY RULE 6004 SHOULD BE WAIVED

74.    Certain aspects of the relief requested herein are subject to Bankruptcy Rule 6003. Pursuant to Bankruptcy Rule 6003, a court may grant such relief on an expedited basis if it is necessary to avoid immediate and irreparable harm. The Debtors submit that the facts set forth herein demonstrate that the relief requested is necessary to avoid immediate and irreparable harm to the Debtors and, thus, Bankruptcy Rule 6003 has been satisfied.

75.    Additionally, with respect to any aspect of the relief sought herein that constitutes a use of property under Section 363(b) of the Bankruptcy Code, the Debtors seek a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h). As described above, the relief that the Debtors seek in this Motion is immediately necessary in order for the Debtors to be able to continue to operate their businesses and preserve the value of their estates. The Debtors thus submit that the requested waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h) is appropriate.

## NOTICE

76.    Notice of this Motion will be given to: (a) the United States Trustee for the District of Delaware; (b) counsel to the agent for the Debtors' postpetition secured lenders; (c) counsel to Wells Fargo Capital Finance, LLC, as agent under the First Lien Credit Agreement; (d) counsel to Galactic Holdings, LLC, as agent under the Second Lien Credit Agreement; (e) counsel to International Paper Company; (f) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; and (g) all parties that have requested or that are

33

required to receive notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Initial Notice Parties**"). The Debtors will serve copies of the Motion and any order entered in respect of the Motion as required by Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"). The Debtors submit that, under the circumstances, no other or further notice is required.

77.    In the event the Court enters an interim order granting this Motion (the "**Interim Order**"), the Debtors propose to serve notice of such entry on the Initial Notice Parties and all parties that have filed prior to such service date requests for notice pursuant to Bankruptcy Rule 2002. The notice will provide that any objections to the relief granted in the Interim Order must be filed with the Court and served upon counsel for the Debtors no later than seven days prior to the final hearing to be held on the Motion (the "**Objection Deadline**"). If an objection is timely filed and served prior to the Objection Deadline, such objection will be heard at the final hearing on the Motion. If no objections are timely filed and served, the Debtors' counsel will file a certification of counsel to that effect attaching a final form of order.

RLF1 8603012v.5

**WHEREFORE**, the Debtors respectfully request that the Court enter interim and final orders, substantially in the forms attached hereto as <u>Exhibit A</u> and <u>Exhibit B</u>, respectively, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: June 9, 2013
      Wilmington, Delaware

RICHARDS, LAYTON & FINGER, P.A.

_____

Mark D. Collins (No. 2981)
John H. Knight (No. 3848)
Michael J. Merchant (No. 3854)
Paul N. Heath (No. 3704)
920 N. King Street
Wilmington, Delaware 19801
Telephone: 302-651-7700
Facsimile: 302-651-7701
Email: collins@rlf.com
      knight@rlf.com
      merchant@rlf.com
      heath@rlf.com

Proposed Counsel for Debtors and Debtors
in Possession

35

# EXHIBIT A

## Proposed Interim Order

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------ x
In re:                                    :   Chapter 11
                                          :
NE OPCO, INC., et al.,                    :   Case No. 13-_____  (____)
                                          :
                 Debtors.¹                :   Joint Administration Pending
------------------------------------------------------------ x
```

**INTERIM ORDER (I) AUTHORIZING PAYMENT OF CERTAIN PREPETITION
WORKFORCE OBLIGATIONS, INCLUDING COMPENSATION, BENEFITS,
EXPENSE REIMBURSEMENTS AND RELATED OBLIGATIONS, (II) CONFIRMING
RIGHT TO CONTINUE WORKFORCE PROGRAMS ON POSTPETITION BASIS,
(III) AUTHORIZING PAYMENT OF WITHHOLDING AND PAYROLL-RELATED
TAXES, (IV) AUTHORIZING PAYMENT OF PREPETITION CLAIMS OWING TO
ADMINISTRATORS OF, OR THIRD PARTY PROVIDERS UNDER, WORKFORCE
PROGRAMS AND (V) DIRECTING BANKS TO HONOR PREPETITION CHECKS
AND FUND TRANSFERS FOR AUTHORIZED PAYMENTS**

Upon the motion (the "**Motion**")² of the Debtors for an order under Sections

105(a), 363(b), 363(c), 507(a), 541, 1107(a) and 1108 of the Bankruptcy Code and Bankruptcy

Rule 6003(i) authorizing the Debtors to pay certain prepetition amounts owing to or for the

benefit of current Employees, Temporary Employees and Independent Contractors, and for

benefits and reimbursable expenses owed to or for the benefit of current Employees; (ii)

confirming the Debtors' right to continue postpetition, in the ordinary course of business, the

Employee-related plans, programs and policies in effect immediately prior to the filing of these

cases; (iii) authorizing the Debtors to pay any and all local, state and federal withholding and

payroll-related or similar taxes relating to prepetition periods; (iv) confirming the Debtors' right

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are NE Opco, Inc. (9830) and NEV Credit Holdings, Inc. (9596).  The above-captioned Debtors' mailing address is c/o NE Opco, Inc., 3211 Internet Boulevard, Suite 200, Frisco, Texas 75034.

[2]     Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Motion.

to continue to deduct and to transmit deductions from payroll checks as authorized by Employees, as required under any Employee-related plan, program or policy or as authorized or required by law; (v) authorizing the Debtors to pay any prepetition claims owing to the administrators of, or third party providers under, their Employee-related plans, programs and policies as necessary to ensure the delivery of compensation, benefits and expense reimbursements to their Employees; and (vi) authorizing and directing all banks to receive, process, honor and pay all of the Debtors' prepetition checks and fund transfers on account of any obligations authorized to be paid pursuant hereunder; and the Court having reviewed the Motion and the Pinto Declaration; and the Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and upon the record herein; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

### ORDERED, ADJUDGED AND DECREED THAT:

1.  The Motion is GRANTED as set forth herein.

2.  The Debtors are authorized to pay or otherwise honor the Prepetition Workforce Obligations to, or for the benefit of, the Employees, the Temporary Employees and the Independent Contractors under the Workforce Programs.  Amounts paid pursuant to this Order shall not exceed $2,750,000 in the aggregate absent further order of this Court.

3.  The Debtors are authorized to continue each of the Workforce Programs, including but not limited to maintaining the Employee Benefits, in the ordinary course of business during the pendency of these cases in the manner and to the extent that such Workforce Programs were in effect immediately prior to the filing of these cases and to continue to fund and

to make payments in connection with the costs of and the expenses incurred in the administration of any Workforce Program, provided however, that the Debtors shall not make any distributions on account of any severance obligations, including under the Severance Policy, until entry of a final order.

4.      The Debtors are authorized to reimburse the Employees for business related expenses incurred prior to the Petition Date.  In addition, the Debtors are authorized to reimburse the Employees for prepetition relocation expenses and to make direct payments to third parties involved in the relocation process for otherwise reimbursable expenses incurred by or on behalf of the Employees.

5.      The Debtors are authorized to pay any and all local, state and federal withholding and payroll-related or similar taxes related to the Prepetition Workforce Obligations including, but not limited to, all withholding taxes, social security taxes and medicare taxes, whether such taxes relate to the period before or after the Petition Date.

6.      The Debtors are authorized to pay claims of the Administrators, in connection with administering and delivering payments or other benefits to Employees for prepetition services rendered and claims for reimbursement based on prepetition disbursements made by the Administrators.

7.      Debtors are authorized, but not directed, to pay prepetition amounts owed to agencies on behalf of the Service Fees relating to the Temporary Employees.

8.      The Debtors are authorized, but not directed, to pay prepetition amounts owed to Independent Contractors.

9.      Notwithstanding any other provision of this Order, pending entry of a final order, payments to or on behalf of any one person on account of wages and other compensation

3

obligations in the interim period shall be limited by Sections 507(a)(4) and (5) of the Bankruptcy Code and capped at the amount afforded priority by those statutory subsections.

10.    The banks upon which any checks or wire transfers are drawn in payment of the Prepetition Workforce Obligations or any other obligations authorized to be paid hereunder, either before, on or after the Petition Date, are authorized and directed to receive, process, honor and pay any such checks or wire transfers; and such banks are authorized and directed to rely on the representations of the Debtors as to which checks and wire transfers are in payment of such obligations.  Further, the Debtors are authorized to issue new postpetition checks to replace any checks that may be dishonored and to reimburse any expenses that Employees, Temporary Employees, Independent Contractors or other persons may incur as a result of any bank's failure to honor a prepetition check.

11.    Any person receiving payment from the Debtors is authorized to rely upon the representations of the Debtors as to which payments are authorized by this Order.

12.    Neither the provisions of this Order, nor any payments made or not made by the Debtors pursuant to this Order, shall be deemed an assumption or rejection of any Workforce Program, agreement or contract, or otherwise affect the Debtors' rights under Section 365 of the Bankruptcy Code to assume or reject any executory contract between the Debtors and any Employee, Temporary Employee or agency providing such Temporary Employee, Independent Contractor or other person.

13.    Notwithstanding the relief granted herein or any actions taken hereunder, nothing contained in this Order shall create any rights in favor of, or enhance the status of any claim held by, any Employee, Temporary Employee or agency providing such Temporary Employee, Independent Contractor or other person.

4

14.    The Debtors shall serve notice of the Motion (to the extent not already provided) and entry of this order on the Initial Notice Parties and all parties that have filed prior to such service date requests for notice pursuant to Bankruptcy Rule 2002 in accordance with Local Rule 9013-1(m).  The notice shall provide that any objections to the relief granted in this Order must be filed with the Court and served on counsel for the Debtors no later than seven days prior to the final hearing with respect to the Motion (the "**Objection Deadline**").  In the event that no objections to this Order are received by the Objection Deadline, the Debtors' counsel shall file a certification of counsel to that effect attaching a final form of order.  The final hearing with respect to the Motion shall be held on _____, 2013, at _:___ _.m.

15.    Notwithstanding the relief granted herein, no action by any Debtor is permitted to the extent that it would be inconsistent with any cash collateral and/or postpetition financing order entered by this Court.

16.    Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this Order shall be effective and enforceable immediately upon entry hereof.

17.    This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation and/or interpretation of this Order.

Dated: _____, 2013
      Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

5

## EXHIBIT B

**Proposed Final Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------- x
In re:                                    :   Chapter 11
                                          :
NE OPCO, INC., et al.,                    :   Case No. 13-_____  (_____)
                                          :
            Debtors.¹                     :   Jointly Administered
------------------------------------------------------- x   Re: Docket Nos. ___ & ___
```

**FINAL ORDER (I) AUTHORIZING PAYMENT OF CERTAIN PREPETITION
WORKFORCE OBLIGATIONS, INCLUDING COMPENSATION, BENEFITS,
EXPENSE REIMBURSEMENTS AND RELATED OBLIGATIONS, (II) CONFIRMING
RIGHT TO CONTINUE WORKFORCE PROGRAMS ON POSTPETITION BASIS,
(III) AUTHORIZING PAYMENT OF WITHHOLDING AND PAYROLL-RELATED
TAXES, (IV) AUTHORIZING PAYMENT OF PREPETITION CLAIMS OWING TO
ADMINISTRATORS OF, OR THIRD PARTY PROVIDERS UNDER, WORKFORCE
PROGRAMS AND (V) DIRECTING BANKS TO HONOR PREPETITION CHECKS
AND FUND TRANSFERS FOR AUTHORIZED PAYMENTS**

Upon the motion (the "**Motion**")² of the Debtors for an order under Sections

105(a), 363(b), 363(c), 507(a), 541, 1107(a) and 1108 of the Bankruptcy Code and Bankruptcy

Rule 6003(i) authorizing the Debtors to pay certain prepetition amounts owing to or for the

benefit of current Employees, Temporary Employees and Independent Contractors, and for

benefits and reimbursable expenses owed to or for the benefit of current Employees; (ii)

confirming the Debtors' right to continue postpetition, in the ordinary course of business, the

Employee-related plans, programs and policies in effect immediately prior to the filing of these

cases; (iii) authorizing the Debtors to pay any and all local, state and federal withholding and

payroll-related or similar taxes relating to prepetition periods; (iv) confirming the Debtors' right

---

¹       The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax
identification number, are NE Opco, Inc. (9830) and NEV Credit Holdings, Inc. (9596).  The above-captioned
Debtors' mailing address is c/o NE Opco, Inc., 3211 Internet Boulevard, Suite 200, Frisco, Texas 75034.

²       Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in
the Motion.

to continue to deduct and to transmit deductions from payroll checks as authorized by Employees, as required under any Employee-related plan, program or policy or as authorized or required by law; (v) authorizing the Debtors to pay any prepetition claims owing to the administrators of, or third party providers under, their Employee-related plans, programs and policies as necessary to ensure the delivery of compensation, benefits and expense reimbursements to their Employees; and (vi) authorizing and directing all banks to receive, process, honor and pay all of the Debtors' prepetition checks and fund transfers on account of any obligations authorized to be paid pursuant hereunder; and the Court having reviewed the Motion and the Pinto Declaration; and the Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and upon the record herein; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

### ORDERED, ADJUDGED AND DECREED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      The Debtors are authorized to pay or otherwise honor the Prepetition Workforce Obligations to, or for the benefit of, the Employees, the Temporary Employees and the Independent Contractors under the Workforce Programs.

3.      The Debtors are authorized to continue each of the Workforce Programs, including but not limited to maintaining the Employee Benefits, in the ordinary course of business during the pendency of these cases in the manner and to the extent that such Workforce Programs were in effect immediately prior to the filing of these cases and to continue to fund and

2

to make payments in connection with the costs of and the expenses incurred in the administration of any Workforce Program.

4.      The Debtors are authorized to reimburse the Employees for business related expenses incurred prior to the Petition Date.  In addition, the Debtors are authorized to reimburse the Employees for prepetition relocation expenses and to make direct payments to third parties involved in the relocation process for otherwise reimbursable expenses incurred by or on behalf of the Employees.

5.      The Debtors are authorized to pay any and all local, state and federal withholding and payroll-related or similar taxes related to the Prepetition Workforce Obligations including, but not limited to, all withholding taxes, social security taxes and medicare taxes, whether such taxes relate to the period before or after the Petition Date.

6.      The Debtors are authorized to pay claims of the Administrators, in connection with administering and delivering payments or other benefits to Employees for prepetition services rendered and claims for reimbursement based on prepetition disbursements made by the Administrators.

7.      Debtors are authorized, but not directed, to pay prepetition amounts owed to agencies on behalf of the Service Fees relating to the Temporary Employees.

8.      The Debtors are authorized, but not directed, to pay prepetition amounts owed to Independent Contractors.

9.      The banks upon which any checks or wire transfers are drawn in payment of the Prepetition Workforce Obligations or any other obligations authorized to be paid hereunder, either before, on or after the Petition Date, are authorized and directed to receive, process, honor and pay any such checks or wire transfers; and such banks are authorized and

3

directed to rely on the representations of the Debtors as to which checks and wire transfers are in payment of such obligations. Further, the Debtors are authorized to issue new postpetition checks to replace any checks that may be dishonored and to reimburse any expenses that Employees, Temporary Employees, Independent Contractors or other persons may incur as a result of any bank's failure to honor a prepetition check.

10. Any person receiving payment from the Debtors is authorized to rely upon the representations of the Debtors as to which payments are authorized by this Order.

11. Neither the provisions of this Order, nor any payments made or not made by the Debtors pursuant to this Order, shall be deemed an assumption or rejection of any Workforce Program, agreement or contract, or otherwise affect the Debtors' rights under Section 365 of the Bankruptcy Code to assume or reject any executory contract between the Debtors and any Employee, Temporary Employee or agency providing such Temporary Employee, Independent Contractor or other person.

12. Notwithstanding the relief granted herein or any actions taken hereunder, nothing contained in this Order shall create any rights in favor of, or enhance the status of any claim held by, any Employee, Temporary Employee or agency providing such Temporary Employee, Independent Contractor or other person.

13. Notwithstanding the relief granted herein, no action by any Debtor is permitted to the extent that it would be inconsistent with any cash collateral and/or postpetition financing order entered by this Court.

14. Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this Order shall be effective and enforceable immediately upon entry hereof.

4

15.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation and/or interpretation of this Order.

Dated: _____, 2013
        Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE