## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------ x
In re:                                                 :    Chapter 11
                                                       :
NE OPCO, INC., et al.,                                 :    Case No. 13-_____  (_____)
                                                       :
                 Debtors.¹                             :    Joint Administration Pending
------------------------------------------------------ x
```

## MOTION OF DEBTORS FOR ORDER UNDER 11 U.S.C. §§ 105(a), 363(b), 364(b), 1107(a) AND 1108 AND FED. R. BANKR. P. 6003 AUTHORIZING PAYMENT OF (I) CERTAIN PREPETITION SHIPPING, WAREHOUSING AND RELATED CLAIMS AND (II) CERTAIN PREPETITION IMPORT AND EXPORT CLAIMS

The debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**") hereby move (the "**Motion**") for entry of an order under Sections 105(a), 363(b), 364(b), 1107(a) and 1108 of Title 11 of the United States Code (as amended, the "**Bankruptcy Code**") and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), authorizing, but not directing, the Debtors to pay (i) certain prepetition shipping and warehousing claims and (ii) certain prepetition import and export obligations. In support of this Motion, the Debtors rely upon and incorporate by reference the Declaration of James Pinto in Support of Chapter 11 Petitions and First Day Motions, filed with the Court concurrently herewith (the "**Pinto Declaration**"). In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

### JURISDICTION

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this

---

¹       The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are NE Opco, Inc. (9830) and NEV Credit Holdings, Inc. (9596). The above-captioned Debtors' mailing address is c/o NE Opco, Inc., 3211 Internet Boulevard, Suite 200, Frisco, Texas 75034.

Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. The predicates for the relief requested herein are Sections 105(a), 363(b), 364(b), 1107(a) and 1108 of the Bankruptcy Code. Such relief is warranted under Bankruptcy Rule 6003.

## BACKGROUND

2.     On the date hereof (the "**Petition Date**"), the Debtors filed voluntary petitions in this Court commencing cases (the "**Chapter 11 Cases**") for relief under Chapter 11 of the Bankruptcy Code. The factual background regarding the Debtors, including their business operations, their capital and debt structures and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the Pinto Declaration.

3.     The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been requested in the Chapter 11 Cases and no committees have yet been appointed.

## RELIEF REQUESTED

4.     By this Motion, the Debtors seek authority to pay, in their discretion, the prepetition shipping, warehousing and related claims (all such claims, the "**Distribution Claims**") that are owed, either directly or indirectly, to (i) certain third-party shippers, haulers, common carriers, and other transporters (the "**Shippers**"), (ii) public warehousemen (the "**Warehousemen**"), and (iii) a third-party freight broker (the "**Freight Administrator**," and collectively with the Shippers and Warehousemen, the "**Distribution Vendors**"), to the extent the Debtors determine, in the exercise of their business judgment, that such payments are necessary or appropriate to (a) secure the delivery, distribution and sale of the Debtors' goods to customers throughout the United States and abroad, (b) ensure the delivery of goods and raw materials to the Debtors' facilities or (c) satisfy the liens, if any, in respect of amounts owed to

such parties.  The Debtors estimate that the aggregate amount of Distribution Claims to be paid pursuant to this Motion is approximately $2,750,000.

5.     By this Motion, the Debtors also seek authority to pay, either directly or through the third party administrator, all or part of the prepetition U.S. customs duties, detention and demurrage fees, tariffs and excise taxes, freight forwarding or consolidation charges and other similar obligations (the "**Import/Export Claims**" and together with the Distribution Claims, the "**Subject Claims**") to applicable governmental agencies and authorities (the "**Import/Export Providers**," and together with the Distribution Vendors, the "**Subject Vendors**"), to the extent the Debtors determine, in the exercise of their business judgment, that such payment is necessary or appropriate to secure the import or export of such goods.  The Debtors believe that, as of the Petition Date, no amounts are due directly to the Import/Export Providers on account of such Import/Export Claims.  However, the Debtors are obligated to reimburse the Freight Administrator for amounts previously advanced in respect of Import/Export Claims and such amounts are incorporated in the amount of Distribution Claims to be paid under this Motion.

6.     The Debtors propose that all payments to the Distribution Vendors made under this Motion be subject to the following conditions:

(a)    The Debtors, in their sole discretion, will determine which obligations, if any, are entitled to payment under this Motion;

(b)    If a party accepts payment under this Motion, such party is deemed to have agreed to (i) release any liens it may have on the Debtors' goods or property and (ii) subject to subparagraph (d) below, continue to provide goods or services to the Debtors on terms and conditions (including credit terms) as good or better than those that

existed on February 9, 2013 (the "**Customary Terms**"),[2] during the pendency of these Chapter 11 Cases;

(c)     Subject to subparagraph (d), if a party accepts payment under this Motion and thereafter does not continue to provide goods or services to the Debtors (or terms on the Customary Terms (or terms more favorable to the Debtors) during the pendency of these Chapter 11 Cases, then (i) any payment on a prepetition claim received by such party shall be deemed to be an unauthorized voidable postpetition transfer under Bankruptcy Code Section 549 and, therefore, recoverable by the Debtors in cash upon written request and (ii) subject to subparagraph (f) below, upon recovery by the Debtors, any such prepetition claim shall be reinstated as if the payment had not been made, less the Debtors' reasonable costs in recovering such amounts;

(d)     In the event of the assertion of a possessory lien against the Debtors' property that prevents the Debtors from accessing their property without payment of the prepetition claim giving rise to the lien, the Debtors may pay the claim without regard to subparagraphs (b)(ii) and (c) above;

(e)     Prior to paying a prepetition claim under this Motion, the Debtors may, in their absolute discretion, settle all or part of such claim for less than its face amount, in their absolute discretion, without further notice or hearing.  In any event, the Debtors may elect to only pay part of a prepetition claim under the authorization requested, leaving the remainder of the claim to be addressed pursuant to their plan of reorganization; and

(f)     If the Debtors seek to recover payments under subparagraph (c) above, nothing shall preclude a party from contesting such treatment by making a written request (the "**Request**") to the Debtors to schedule a hearing before this Court.  If such a request is made, the hearing on the request will be the next scheduled hearing date not less than thirty (30) days after the Debtors received the Request, of which hearing the Debtors will provide notice to the requesting party and other interested parties in accordance with the Bankruptcy Code and the orders of the Court.

---

[2]     In the event the relationship between the party accepting payment under this Motion and the Debtors does not extend to February 9, 2013, the Customary Terms shall mean the terms that the party generally extends to its customers or such terms as are acceptable to the Debtors in the reasonable exercise of their business judgment.

7.    The Debtors further request that all applicable banks and other financial institutions be authorized to rely on the Debtors' direction to pay amounts sought hereunder.

## BASIS FOR RELIEF

### A.    Payment of Distribution Claims.

8.    As more particularly described below, in the ordinary course of their businesses, the Debtors (a) pay certain Shippers and the Freight Administrator in connection with (i) the delivery of goods and raw materials from the Debtors' suppliers to the Debtors' manufacturing facilities and (ii) the delivery of products from the Debtors' factories to the Debtors' customers and (b) pay the Warehousemen to store goods and raw materials, as necessary, during the distribution process.[3]

9.    <u>Domestic Freight.</u>  The Debtors rely heavily upon Shippers, including private trucking services, rail and air services, for domestic delivery of products from certain of the Debtors' suppliers to the Debtors' various facilities.  Generally, the Debtors incur such obligations in instances in which the Debtors have determined that they are able to obtain more competitive shipping rates than certain of their suppliers are able to offer.  The Debtors, to varying degrees, incur freight costs attributable to inbound freight from the Debtors' suppliers and also may incur obligations to Shippers, including private trucking services, rail and air services, for domestic delivery of products to the Debtors' customers.

10.    <u>International Freight.</u>  The Debtors do not incur any costs on account of international <u>inbound</u> freight.  With respect to international <u>outbound</u> freight, the Debtors have customer-specific conditions and allocation of costs is negotiated by their sales department.

---

[3]    Certain of the Debtors' Distribution Vendors do not have contracts with the Debtors for the services provided or have contracts that are terminable for any reason upon short notice.

RLF1 8596362v.4

11.    <u>Freight Administrator</u>. Although the Debtors pay certain large Shippers directly, the Debtors substantially rely upon the Freight Administrator, Mid-Indiana Transportation Experts ("**MITE**"), to manage their freight needs. The specific services performed by the Freight Administrator include such things as paying Shippers, tracking cargo, booking transportation for freight, consolidating or forwarding freight, preparing and filing documentation associated with shipments and coordinating the pick-up and drop off of cargo. The Freight Administrator also provides services related to international freight, including addressing scheduling issues and coordinating operational and financial aspects of the shipment process, such as ocean freight, customers clearing and inland transportation (i.e., shipment from the port of entry to one of the Debtors' facilities). Furthermore, in connection with the Debtors' import and export of goods, the Freight Administrator routinely advances amounts owed to the Import/Export Providers and is reimbursed by the Debtors for such amounts.

12.    With respect to payment of Shippers (both with respect to domestic and international shipments), although the Debtors will generally contract directly with the individual Shippers, in many instances the Shippers periodically present their invoices on account of shipping services to the Freight Administrator, who performs freight payment processing. The Freight Administrator thereafter pays the Shippers on the Debtors' behalf and then regularly settles accounts with the Debtors' relevant businesses, generally on a weekly basis. Importantly, the Freight Administrator has no obligation to the applicable Shippers and are not an alternative source of payment in the event of nonpayment by the Debtors.

13.    <u>Warehousemen</u>. The Debtors operate their own warehouses. However, the Debtors utilize public warehouses operated by Rogers Dedicated Warehouse (in the United States) and RR Donnelly Corp. (in Canada) to store certain inbound and outbound freight. The

Debtors depend upon these warehouses because the warehouses that they operate either lack sufficient capacity and/or do not have appropriate storage capabilities for certain types of specialized goods and materials. The operators of such warehouses pick-up and store materials and goods from the Debtors' local facilities upon request; however, the Debtors are dependent upon such operators to access the property held in such warehouses. Thereafter, the Debtors are invoiced by the operators of such facilities for storage costs.

14. <u>Basis for Paying Distribution Claims.</u>   The Debtors seek to pay the Distribution Claims for several reasons. First, many of the Distribution Vendors likely will assert possessory or other liens on goods currently in their possession if these entities' prepetition claims are not paid. See U.C.C. §§ 7-307(a) (lien of shipper), 7-209(a) (lien of warehouseman). The perfection and maintenance of liens is, in most cases, dependent upon possession, so the Distribution Vendors would likely refuse to deliver or release such goods until their claims have been satisfied and the liens released. The value of these goods generally exceed the amount of the outstanding Distribution Claims and, thus, the Debtors believe that most of the Distribution Vendors will ultimately be entitled to be paid in full for the Distribution Claims. Irrespective of the amount and validity of their liens, the mere assertion of possessory or other liens will delay delivery of goods both to the Debtors' factories and to their customers, thereby severely, if not irreparably, damaging the Debtors' businesses and prospects for a successful reorganization.

15. Furthermore, if the prepetition Distribution Claims are not paid, many Distribution Vendors may refuse to perform additional services for the Debtors. In such event, the Debtors will incur significant additional expenses (such as premium shipping, distribution and storage costs) to replace these parties, which amounts likely will exceed the amount of unpaid Distribution Claims that the Debtors request permission to pay hereunder.

7

16.     More importantly, locating entities to replace the Distribution Vendors will be difficult, if not impossible.  For example, as noted above, the Debtors rely upon the freight payment and negotiation services provided by MITE.  Absent these services, the Debtors would be required to negotiate with, and administer separate accounts with a variety of different Shippers.  Integration with MITE has allowed the Debtors to maintain lean staffing levels and a low cost structure, which are essential in the competitive market in which the Debtors operate.  Further, the Debtors benefit from lower shipping prices obtained through MITE's negotiating power with Shippers.  If the Debtors were required to switch to another Freight Administrator, they would incur significant operational disruption and increased costs.

17.     At the very least, replacing a Distribution Vendor, in most cases, will delay the transport and delivery of goods to the Debtors' facilities and customers, including certain large customers that manage their inventory on a just-in-time basis.  Such delays could cause a material disruption in the Debtors' receipt of goods from suppliers and the delivery of products to customers and, thus, their ability to continue operating their business successfully.

18.     Finally, it is important to stress that in return for payment of the Distribution Claims as described herein, except in possessory lien situations described in paragraph 6(d) above, the Distribution Vendors would be required to continue to supply the Debtors on the Customary Terms during the pendency of these Chapter 11 Cases.  Such Customary Terms will maintain the credit terms that the Debtors had prior to the Petition Date and may provide the Debtors with more favorable terms for unsecured credit than currently provided by the Distribution Vendors or available elsewhere.  By agreeing to provide the Customary Terms, the Distribution Vendors are extending unsecured postpetition credit to the Debtors for the benefit of all creditors.  Accordingly, the payment of the Distribution Claims, on

8

the terms and conditions proposed herein, in exchange for the Customary Terms is in the best interests of the Debtors and their estates and should be approved in accordance with Section 364(b) of the Bankruptcy Code.

19.    Further, the Debtors propose that if any Distribution Vendor accepts payment and thereafter does not continue to provide services to the Debtors on such Customary Terms, then any payment of the Distribution Claims made under this Motion to such Distribution Vendor would be deemed an unauthorized postpetition transfer under Section 549 of the Bankruptcy Code and, therefore, would be avoidable and recoverable by the Debtors in cash upon written request, subject to a Distribution Vendor's right to contest such treatment and request that the Debtors schedule a hearing on such matter.    Upon any recovery by the Debtors, the Distribution Vendor's claim would be reinstated as a prepetition claim in the amount so recovered, less the Debtors' reasonable costs in recovering such amounts.

**B.    Payment of Import/Export Claims.**

20.    In the ordinary course of their businesses, the Debtors may import goods from abroad (collectively, the "**Imported Goods**") or export various goods to their customers abroad (collectively, the "**Exported Goods**").    Many of these goods are critical to the continued manufacture and distribution of the Debtors' products.

21.    In connection with the import and export of goods, the Debtors may be required to pay various Import/Export Claims, including, but not limited to, customs duties, detention and demurrage fees, tariffs and excise taxes, freight forwarding or consolidation charges and other similar obligations.    In some cases, the Import/Export Providers may present invoices to the Freight Administrator who has been engaged by the Debtors to take all actions necessary on the Debtors' behalf to facilitate the import or export of goods and are then reimbursed by the Debtors.    However, the Freight Administrator has no obligation to the

9

Import/Export Providers and is not an alternative source of payment for the Import/Export Providers in the event of nonpayment by the Debtors.

22.     The Debtors seek authority to pay any and all necessary and appropriate Import/Export Claims incurred on account of prepetition transactions.    Payment of the Import/Export Claims is critical to ensure the uninterrupted flow of Imported Goods and/or Exported Goods.    Absent such payment, parties to whom Import/Export Claims are owed may have the ability to interfere with the transportation of such Imported or Exported Goods.    If the flow of any needed Imported Goods were to be interrupted, the Debtors would be deprived of the materials necessary to complete orders already placed by their customers, which orders are worth far more to the Debtors (both in terms of future receipts and the maintenance of valuable goodwill) than the aggregate amount of accrued, but unpaid, Import/Export Claims.    Similarly, the Debtors must continue to deliver Exported Goods internationally in order to maintain valuable customer relationships abroad.    Accordingly, the Debtors submit that payment of the Import/Export Claims is necessary to preserve and enhance the value of the Debtors' businesses for the benefit of all parties in interest.

## APPLICABLE AUTHORITY

**A.     Payment of the Subject Claims is Appropriate Under Sections 363(b) and 364 of the Bankruptcy Code**

23.     To the extent that payment of the Subject Claims would be deemed to constitute a use of property outside the ordinary course of business, a basis for authorizing such payment is found under Section 363 of the Bankruptcy Code.    Section 363(b)(1) of the Bankruptcy Code authorizes the trustee to use property of the estate other than in the ordinary course of business after notice and a hearing. 11 U.S.C. § 363(b)(1).    Courts in this and other jurisdictions have relied on such subsection to authorize the payment of prepetition claims held

by vendors. See, e.g., In re MPC Computers, LLC, Case No. 08-12667 (PJW) (Bankr. D. Del. Nov. 10, 2008) (authorizing, pursuant to Section 363, the payment of prepetition claims of some suppliers); In re Conseco, Inc., Case No. 02-49672 (CAD) (Bankr. N.D. Ill. Jan. 14, 2003); Armstrong World Indus., Inc. v. James A. Phillips, Inc., 29 B.R. 391, 397 (S.D.N.Y. 1983) (district court affirmed bankruptcy court's decision under Section 363 authorizing contractor to pay prepetition claims of some suppliers who were potential lien claimants).  Courts in this and other circuits have indicated that the use of property of the estate outside of the ordinary course of business is proper where the debtor in possession has articulated a good business reason for such use. See Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.), 780 F.2d 1223, 1226 (5th Cir. 1986) (holding that Section 363(b) requires that "there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business"); United States Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.), 2003 WL 21738964, at *12 (S.D.N.Y. July 28, 2003) ("To approve a transaction under § 363(b), the bankruptcy court must find that there is a good business reason to allow the transaction"); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under [Section 363(b)], courts require the debtor to show that a sound business purpose justifies such actions."); In re Terrace Gardens Park P'ship, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989) (applying Continental to require "articulated business justification" for section 363 transaction); In re Global Crossing Ltd., 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) ("[A] § 363 application requires a showing that there is a 'good business reason to grant such an application.'") (quoting Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983)).

24.     Where a debtor has articulated a valid business justification for a proposed transaction, courts generally apply the business judgment rule in evaluating such transaction. Lange v. Schropp (In re Brook Valley VII, Joint Venture), 496 F.3d 892, 900 (8th Cir. 2007) ("In general, courts do not second-guess business decisions made in good faith."); In re ALH Holdings LLC, 675 F. Supp. 462, 477 (D. Del. 2009) ("a court will not disturb the business decisions of loyal and informed directors 'if they can be attributed to any rational business purpose.'") (citing Sinclair Oil Corp. v. Levien, 280 A.2d 717, 720 (Del. 1971)); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999) ("In evaluating whether a sound business purpose justifies the use, sale or lease of property under Section 363(b), courts consider a variety of factors, which essentially represent a 'business judgment test'"); Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) ("The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'") (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)); see also Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a Debtor's management decisions."). Here, as discussed above, it is the Debtors' business judgment that the failure to pay the Subject Claims could have a material adverse impact on the day-to-day operations of their businesses.

25.     Additionally, where, as here, the relief at issue involves a request impacting the trade terms among the Debtors and the vendor, the relief may, where the appropriate showing has been made, be approved pursuant to Section 364 of the Bankruptcy

Code. See In re UAL Corp., Case No. 02-48191 (Bankr. N.D. Ill. Dec. 11, 2002) (essential trade motion relying upon Section 363 of the Bankruptcy Code is "completely consistent with the Bankruptcy Code;" payments to critical trade vendors have further support when debtor seeks "the extension of credit under section 364 on different than usual terms, terms that might include the payment of a prepetition obligation").

**B.    Payment of the Subject Claims is Warranted Under Sections 506(b) and 1129(b)(2) of the Bankruptcy Code**

26.    In addition, the Debtors believe that their failure to pay the Subject Claims may result in the assertion of possessory liens by many of the Subject Vendors under applicable state law with respect to any goods in their possession (collectively, the "**Liens**").  Moreover, to protect any asserted Lien rights, the Subject Vendors may refuse to release goods or property in their possession unless and until their prepetition Subject Claims have been satisfied.  Therefore, notwithstanding the automatic stay imposed by Section 362 of the Bankruptcy Code, many of these parties: (a) may be entitled to assert and perfect Liens against the Debtors' property, which would entitle them to payment ahead of other general unsecured creditors in any event; and (b) may hold the property subject to the asserted Liens pending payment, to the direct detriment of the Debtors and their estates.

27.    Moreover, since the amount of the Subject Claims is likely less than the value of any property securing those claims, any such party holding a Lien arguably is a fully secured creditor.    For those Subject Claims that are deemed secured claims, Section 1129(b)(2)(A) of the Bankruptcy Code requires that they be satisfied through deferred cash payments totaling at least the allowed amount of each such claim, of a value as of the effective date of the plan equal to the value of the collateral securing the claim, with a continuation of the Liens against the collateral; or if the collateral is to be sold, that the Lien securing the claim

RLF1 8596362v.4

attach to the proceeds of sale; or that the holder realize the indubitable equivalent of the claim. 11 U.S.C. § 1129 (b)(2)(A). Additionally, under Section 506(b) of the Bankruptcy Code, fully secured creditors are entitled to receive postpetition interest accruing on their claims to the extent that such claims are oversecured. Consequently, payment of those of the Subject Claims that are subject to valid Liens should give the Subject Vendors no more than that to which they otherwise would be entitled under a plan; and save the Debtors the interest costs that otherwise may accrue on the Subject Claims during these Chapter 11 Cases.

**C.     Payment of the Subject Claims is Authorized Under Sections 1107(a) and 1108 of the Bankruptcy Code**

28.     Authority for payment of the Subject Claims may also be found in Sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors, operating their businesses as debtors in possession under Sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the duties of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." Id.

29.     The CoServ court has noted that there are instances in which a debtor in possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." Id.; see also In re Mirant Corp., 296 B.R. 427, 429-30 (Bankr. N.D. Tex. 2003) (allowing debtors to pay claims "reasonably believe[d]" to be authorized under the CoServ test or whose payment was necessary "in the exercise of their business judgment . . . in order for [the d]ebtors to continue their respective businesses"). That court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate," id., and also when

the payment was to "sole suppliers of a given product." Id. at 498. The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

Id. at 498.

30.     Payment of the Subject Claims meets each element of the CoServ court's standard. First, as described above, alternative providers would be difficult, and in certain instances, nearly impossible to find. Any disruption in the Debtors' interdependent transportation network would significantly disrupt the Debtors' businesses. Second, the curtailment of the Debtors' operations would cost the Debtors' estates millions of dollars in lost revenues. The harm and economic disadvantage that would stem from the failure to pay any of the Subject Vendors is grossly disproportionate to the amount of the prepetition claims that would have to be paid. Therefore, the Debtors can only meet their fiduciary duties as debtors in possession under Sections 1107(a) and 1108 of the Bankruptcy Code by payment of the Subject Claims.

**D.     Section 105 of the Bankruptcy Code and the Doctrine of Necessity Support Payment of the Subject Claims**

31.     Additionally, the Debtors' proposed payment of the Subject Claims should be authorized under Section 105(a) of the Bankruptcy Code, which permits this court to "issue any order . . . that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a). For the reasons set forth above, and in light of the need for the

Debtors to preserve the going concern value of their businesses, the relief requested herein is proper and should be granted.

32.    The relief sought is further supported by the doctrine of necessity. The doctrine of necessity is a well-settled doctrine that permits a bankruptcy court to authorize payment of certain prepetition claims prior to the completion of the chapter 11 case where the payment of such claims is necessary to the restructuring efforts. See In re Lehigh & New England Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981) (payment of creditors' claims authorized under "necessity of payment" doctrine); In re Penn Central Transp. Co., 467 F.2d 100, 102 n.1 (3d Cir. 1972) (the necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or materials essential to the conduct of the business until their pre-reorganization claims have been paid"); See In re Just for Feet, Inc., 242 B.R. 821, 826 (D. Del. 1999) (stating that where the debtor "cannot survive" absent payment of certain prepetition claims, the doctrine of necessity should be invoked to permit payment);[4] In re Columbia Gas Sys., Inc., 171 B.R. 189, 191-192 (Bankr. D. Del. 1994) (noting that the debtors "may pay pre-petition claims that are essential to continued operation of business"); see also In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("[T]he court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor.").

---

[4]    The Court's power to utilize the doctrine of necessity in chapter 11 cases derives from the Court's inherent equity powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The United States Supreme Court first articulated the doctrine of necessity over a century ago, in Miltenberger v. Logansport, C. & S.W. R. Co., 106 U.S. 286 (1882), in affirming the authorization by the lower court of the use of receivership funds to pay pre-receivership debts owed to employees, vendors and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership. See id. at 309-14. The modern application of the doctrine of necessity is largely unchanged from the Court's reasoning in Miltenberger. See Lehigh & New Eng. Ry., 657 F.2d at 581-82 ("[I]n order to justify payment under the 'necessity of payment' rule, a real and immediate threat must exist that failure to pay will place the [debtor's] continued operation . . . in serious jeopardy.").

16

33.    The doctrine of necessity is a widely accepted component of modern bankruptcy jurisprudence.  See Just For Feet, 242 B.R. at 826 (approving payment of key inventory suppliers' prepetition claims when such suppliers could destroy debtor's business by refusing to deliver new inventory on eve of debtor's key sales season); In re Payless Cashways, Inc., 268 B.R. 543, 546-47 (Bankr. W.D. Mo. 2001) (authorizing payment of critical prepetition suppliers' claims when such suppliers agree to provide postpetition trade credit); In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).

34.    For the reasons discussed herein, it is evident that payment of the Subject Claims is necessary to the Debtors' effective reorganization.  In particular, absent payment of the Subject Claims, the Subject Vendors may refuse to continue doing business with the Debtors, thereby severely disrupting the Debtors' businesses.  The resulting reduction in or shutdown of the Debtors' operations would cost the Debtors' estates millions of dollars in lost revenues. Indeed, without the uninterrupted provision of such services, the Debtors may suffer irreparable harm: the Debtors' going concern value will be diminished, their reputation tarnished, and their viability as a going concern and ability to emerge successfully from Chapter 11 significantly undercut.  Accordingly, the relief requested herein is necessary and critical to maintaining the Debtors' going concern value and emerging successfully from Chapter 11.  Hence, this Court should exercise its equitable powers to grant the relief requested in this Motion.

## RESERVATION OF RIGHTS

35.    Nothing contained herein is or should be construed as: (a) an admission as to the validity of any claim against the Debtor or the existence of any lien against the Debtors' properties; (b) a waiver of the Debtors' rights to dispute any claim or lien on any grounds; (c) a promise to pay any claim; (d) an implication or admission that any particular claim would constitute a Subject Claim; (e) an assumption or rejection of any executory contract or unexpired

lease pursuant to Section 365 of the Bankruptcy Code; or (f) otherwise affecting the Debtors' rights under Section 365 of the Bankruptcy Code to assume or reject any executory contract with any party subject to the proposed Order once entered.  Further, none of the Debtors or their officers, directors, attorneys or agents will have any liability on account of any decision by the Debtors not to pay a Distribution Claim or an Import/Export Claim, and nothing contained in this order shall be deemed to increase, reclassify, elevate to an administrative expense status or otherwise affect a Distribution Claim or an Import/Export Claim to the extent it is not paid.

36.    Additionally, nothing in this Motion is intended to modify or waive any of the Debtors' rights with respect to services performed by the Distribution Vendors, including the Debtors' rights to (a) cancel or contest any invoice on any grounds or (b) decline the acceptance of goods and services.

## SATISFACTION AND WAIVER OF BANKRUPTCY RULES

37.    Certain aspects of the relief requested herein are subject to Bankruptcy Rule 6003.  Pursuant to Bankruptcy Rule 6003, a court may grant such relief on an expedited basis if it is necessary to avoid immediate and irreparable harm.  The Debtors submit that the facts set forth herein demonstrate that the relief requested is necessary to avoid immediate and irreparable harm to the Debtors and, thus, Bankruptcy Rule 6003 has been satisfied.

38.    Additionally, with respect to any aspect of the relief sought herein that constitutes a use of property under Section 363(b) of the Bankruptcy Code, the Debtors seek a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h).  As described above, the relief that the Debtors seek in this Motion is immediately necessary in order for the Debtors to be able to continue to operate their businesses and preserve the value of their estates.  The Debtors thus

submit that the requested waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h) is appropriate.

**NOTICE**

39.      Notice of this Motion will be given to: (a) the United States Trustee for the District of Delaware; (b) counsel to the Debtors' postpetition secured lender; (c) counsel to Wells Fargo Capital Finance, LLC, as agent under the First Lien Credit Agreement; (d) counsel to Galactic Holdings, LLC, as agent under the Second Lien Credit Agreement; (e) counsel to International Paper Company; (f) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; and (g) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Initial Notice Parties**"). The Debtors will serve copies of the Motion and any order entered in respect of the Motion as required by Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"). The Debtors submit that, under the circumstances, no other or further notice is required.

**WHEREFORE,** the Debtors respectfully request that the Court enter an order substantially in the form attached hereto as <u>Exhibit A</u>, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: June 9, 2013
      Wilmington, Delaware

RICHARDS, LAYTON & FINGER, P.A.

_____
Mark D. Collins (No. 2981)
John H. Knight (No. 3848)
Michael J. Merchant (No. 3854)
Paul N. Heath (No. 3704)
920 N. King Street
Wilmington, Delaware 19801
Telephone: 302-651-7700
Facsimile: 302-651-7701
Email: collins@rlf.com
      knight@rlf.com
      merchant@rlf.com
      heath@rlf.com

Proposed Counsel for Debtors and Debtors in Possession

20

# EXHIBIT A

## Proposed Order

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------- x
In re:                                                  :     Chapter 11
                                                        :
NE OPCO, INC., et al.,                                  :     Case No. 13-_____  (_____)
                                                        :
            Debtors.[1]                                 :     Jointly Administered
                                                        :
------------------------------------------------------- x     Re: Docket No. ____
```

### ORDER UNDER 11 U.S.C. §§ 105(a), 363(b), 364(b), 1107(a)
### AND 1108 AND FED. R. BANKR. P. 6003 AUTHORIZING PAYMENT OF
### (I) CERTAIN PREPETITION SHIPPING, WAREHOUSING AND RELATED CLAIMS,
### AND (II) CERTAIN PREPETITION IMPORT AND EXPORT CLAIMS

Upon the motion (the "**Motion**")[2] of the Debtors for entry of an order, under Sections 105(a), 363(b), 364(b), 1107(a) and 1108 of the Bankruptcy Code and Bankruptcy Rule 6003 authorizing the Debtors to pay (i) certain prepetition shipping, warehousing and related claims (the "**Distribution Claims**"), and (ii) certain prepetition customs duties, detention and demurrage fees, tariffs and excise taxes, freight forwarding or consolidation charges and other similar obligations (the "**Import/Export Claims**"); and the Court having reviewed the Motion and the Pinto Declaration; and the Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and upon the record herein; and after due deliberation thereon; and good and sufficient cause appearing therefore, it is hereby

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are NE Opco, Inc. (9830) and NEV Credit Holdings, Inc. (9596).  The above-captioned Debtors' mailing address is c/o NE Opco, Inc., 3211 Internet Boulevard, Suite 200, Frisco, Texas 75034.

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is GRANTED as set forth herein.

2.      Subject to paragraph 4, the Debtors are authorized, but not directed, to make payments, either directly or indirectly, to the Distribution Vendors for obligations owing in respect of the Distribution Claims to the extent the Debtors determine, in the exercise of their business judgment, that such payments are necessary or appropriate to (a) secure the delivery, distribution and sale of the Debtors' goods to customers throughout the United States and abroad, (b) ensure the delivery of goods and raw materials to the Debtors' facilities or (c) satisfy the liens, if any, in respect of amounts owed to such parties. Payments made pursuant to this Order shall not exceed $2,750,000 in the aggregate without further order of this Court.

3.      The Debtors are authorized, but not directed, to make payments directly or indirectly to the Import/Export Providers for obligations owing in respect of the Import/Export Claims to the extent the Debtors determine, in the exercise of their business judgment, that such payments are necessary or appropriate to secure the import or export of goods.

4.      The Debtors are authorized, in their sole discretion, to pay the Distribution Claims on the following terms and conditions:

>           (a)      The Debtors, in their sole discretion, shall determine which obligations, if any, are entitled to payment under this Order;
>
>           (b)      If a party accepts payment under this Order, such party is deemed to have agreed to (i) release any liens it may have on the Debtors' goods or property and (ii) subject to subparagraph (d) below, continue to provide goods or services to the Debtors on terms and conditions (including credit terms) as good or better than those that

existed on February 9, 2013 (the "**Customary Terms**"),[3] during the pendency of these Chapter 11 Cases;

(c)    Subject to subparagraph (d), if a party accepts payment under this Order and thereafter does not continue to provide goods or services to the Debtors on the Customary Terms (or terms more favorable to the Debtors) during the pendency of these Chapter 11 Cases, then (i) any payment on a prepetition claim received by such party shall be deemed to be an unauthorized voidable postpetition transfer under Bankruptcy Code Section 549 and, therefore, recoverable by the Debtors in cash upon written request and (ii) subject to paragraph 5 below, upon recovery by the Debtors, any such prepetition claim shall be reinstated as if the payment had not been made, less the Debtors' reasonable costs in recovering such amounts;

(d)    In the event of the assertion of a possessory lien against the Debtors' property that prevents the Debtors from accessing their property without payment of the prepetition claim giving rise to the lien, the Debtors may pay the claim without regard to subparagraphs (b)(ii) and (c) above; and

(e)    Prior to paying a prepetition claim under this Order, the Debtors may, in their absolute discretion, settle all or part of such claim for less than its face amount without further notice or hearing. In any event, the Debtors may elect to only pay part of a prepetition claim under the authorization granted, leaving the remainder of the claim to be addressed pursuant to their plan of reorganization.

5.    Should the Debtors seek to recover payments under paragraph 4(c) of this Order, nothing in this Order shall preclude a party from contesting such treatment by making a written request (the "**Request**") to the Debtors to schedule a hearing before this Court. If such a request is made, the hearing on the request will be the next scheduled hearing date not less than thirty (30) days after the Debtors received the Request, of which hearing the Debtors will provide notice to the requesting party and other interested parties in accordance with the Bankruptcy Code and the orders of this Court.

---

[3]    In the event the relationship between the party accepting payment under this Order and the Debtors does not extend to February 9, 2013, the Customary Terms shall mean the terms that the party generally extends to its customers or such terms as are acceptable to the Debtors in the reasonable exercise of their business judgment.

6.      All applicable banks and other financial institutions are authorized to rely on the Debtors' direction to pay amounts in accordance with this Order.

7.      The authority granted by this Order to pay certain claims shall not be construed as: (a) an admission by the Debtors as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise by the Debtors to pay any claim; (d) an implication or admission by the Debtors that any particular claim would constitute a Subject Claim; (e) an assumption or rejection of any executory contract or unexpired lease pursuant to Section 365 of the Bankruptcy Code; or (f) otherwise affect the Debtors' rights under Section 365 of the Bankruptcy Code to assume or reject any executory contract with any party subject to this Order.

8.      None of the Debtors or their officers, directors, attorneys or agents shall have any liability on account of any decision by the Debtors not to pay a Subject Claim, and nothing contained in this order shall be deemed to increase, reclassify, elevate to an administrative expense status or otherwise affect a Subject Claim to the extent it is not paid.

9.      Nothing in the Motion or this Order, nor the Debtors' implementation of the relief granted in this Order, shall be deemed to modify or waive any of the Debtors' rights with respect to goods and services requested or received from the Distribution Vendors or the Import/Export Provides, including the Debtors' rights to (a) cancel or contest any invoice on any grounds, or (b) decline the acceptance of goods and services.

10.     Notwithstanding the relief granted herein or any actions taken hereunder, no payments authorized hereunder shall be permitted to the extent they are violative of any cash collateral or postpetition financing documents or orders entered by the Court.

11.     The requirements of Bankruptcy Rule 6003 are hereby satisfied.

4

12.    Notwithstanding Bankruptcy Rule 6004(h) or any other applicable Bankruptcy Rule, this Order shall take effect immediately upon approval.

13.    This Court shall retain jurisdiction with respect to all matters relating to the interpretation or implementation of this Order.

Dated: _____, 2013
        Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE