**Exhibit "A"**
**(Budget)**

PRIVILEGED & CONFIDENTIAL
DRAFT - SUBJECT TO CHANGE

REFLECT COST SAVING INITIATIVES

**NATIONAL ENVELOPE: 13-WEEK CASH FLOW FORECAST (CURRENT VERSION)**

| Week / Week Ended | 26-May Actual | 2-Jun Actual | 9-Jun Fct | Sum | Week 1 16-Jun Fct | Week 2 23-Jun Fct | Week 3 30-Jun Fct | Sum | Week 4 7-Jul Fct | Week 5 14-Jul Fct | Week 6 21-Jul Fct | Sum | Week 7 28-Jul Fct | Week 8 4-Aug Fct | Week 9 11-Aug Fct | Sum | Week 10 18-Aug Fct | Week 11 25-Aug Fct | Week 12 1-Sep Fct | Week 13 8-Sep Fct | 13-wk Total Fct | Total Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales | 6,530 | 6,701 | 5,694 | | 6,558 | 7,309 | 4,753 | | 6,072 | 5,823 | 6,490 | | 5,661 | 6,100 | 6,216 | | 5,184 | 6,670 | 8,710 | | | 83,003 |
| Sales per Day | 1,306 | 1,340 | 1,139 | | 1,316 | 1,462 | 1,188 | | 1,298 | 1,298 | 1,298 | | 1,132 | 1,208 | 1,208 | | 1,194 | 1,334 | 1,740 | | | 1,348 |
| **Sources:** | | | | | | | | | | | | | | | | | | | | | | |
| Cash Collections - A/R | 8,011 | 6,325 | 5,524 | | 6,078 | 6,137 | 6,072 | | 6,072 | 5,823 | 5,820 | | 6,126 | 6,216 | 6,530 | | 6,184 | 5,911 | 6,523 | | | 78,430 |
| Non A/R cash | | 502 | | | | 400 | | | | | 400 | | 400 | | | | | 500 | | | | 3,200 |
| Total Sources | 8,011 | 6,828 | 5,524 | | 6,078 | 6,637 | 6,072 | | 6,072 | 5,823 | 5,820 | | 6,526 | 6,216 | 6,530 | | 6,184 | 5,911 | 7,023 | | | 81,630 |
| - Vendor Offsets | | | | | | | | | | | | | | | | | | | | | | |
| **Total Sources** | 8,011 | 6,828 | 5,524 | | 6,078 | 6,637 | 6,072 | | 6,072 | 5,823 | 5,820 | | 6,526 | 6,216 | 6,530 | | 6,184 | 5,911 | 7,023 | | | 81,630 |
| **Uses:** | | | | | | | | | | | | | | | | | | | | | | |
| Other Operating Costs | 770 | 644 | 339 | | 728 | 752 | 877 | | 737 | 737 | 737 | | 851 | 711 | 711 | | 721 | 742 | 731 | | | 9,797 |
| Contractors / Temps | 2 | 2 | 11 | | 11 | 19 | 19 | | 16 | 16 | 16 | | 16 | 16 | 16 | | 16 | 16 | 15 | | | 338 |
| Specialty Paper | 516 | 406 | 12 | | 361 | 361 | 353 | | 353 | 353 | 353 | | 353 | 353 | 353 | | 353 | 370 | 360 | | | 4,292 |
| Commodity Paper (I/P, Quartar) | 2,347 | 1,679 | 1,324 | | 2,400 | 2,400 | 2,250 | | 2,250 | 2,350 | 2,350 | | 2,350 | 2,250 | 2,250 | | 2,250 | 2,400 | 2,500 | | | 30,750 |
| Plastics (Packaging, Adhesive) | 514 | 63 | 420 | | 294 | 374 | 365 | | 365 | 365 | 365 | | 365 | 365 | 365 | | 365 | 380 | 380 | | | 4,724 |
| Other Trade | 950 | 911 | 241 | | 776 | 817 | 799 | | 799 | 799 | 799 | | 799 | 799 | 799 | | 799 | 832 | 810 | | | 9,643 |
| Trade Credits | | | | | (450) | (750) | (350) | | (125) | (125) | (113) | | (125) | | | | | | | | | (3,000) |
| Utility Deposit | | | | | | | | | | | | | | | | | | | | | | 750 |
| Reply Card Usage | | | | | | | | | | | | | | | | | | | | | | |
| Initiatives - cost of sales | | | | | | | | | | | | | | | | | | | | | | |
| **Total Check Runs** | 4,110 | 3,524 | 3,101 | | 3,745 | 3,973 | 4,110 | | 4,495 | 4,495 | 4,495 | | 4,508 | 4,491 | 4,543 | | 4,543 | 4,840 | 4,807 | 4,652 | | 57,599 |
| Sales Tax | 28 | | | | 223 | | | | 260 | | | | | 260 | | | | | | | | 743 |
| Payroll - Base | 1,022 | 1,602 | 937 | | 1,580 | 1,480 | 975 | | 1,480 | 975 | 1,480 | | 975 | 1,480 | | 975 | 1,378 | 1,073 | 1,480 | | | 16,505 |
| Payroll - Commissions | | 60 | | | 180 | | | | 185 | | | | | | | | 190 | | | | | 555 |
| Added Severance | | | | | | | | | | | | | | | | | | | | | | |
| 401K | 74 | 12 | 81 | | 32 | 46 | 78 | | 46 | 78 | | | 68 | 36 | 68 | | 38 | 75 | 35 | | | 731 |
| ADP Medical Premium | 280 | | | | | | | | | | 950 | | | | | | | 950 | | | | 2,668 |
| Medical Claims | 245 | 194 | 245 | | 158 | 158 | 233 | | 233 | 233 | 233 | | 158 | 158 | 158 | | 158 | 158 | 158 | | | 2,348 |
| Medical FSA / WC PrePond | 7 | 7 | 442 | | 208 | 110 | 12 | | 12 | 10 | 12 | | 112 | 12 | 13 | | 12 | 13 | 112 | | | 653 |
| Rent - Spirit / NEV RE | 7 | | | | | 29 | 659 | | 659 | | 29 | | 659 | | | | | | 659 | | | 2,064 |
| Other / Credit / Property Taxes | 2 | 2 | 98 | | 127 | | | | | | | | | 30 | | | | | | | | 327 |
| **Total Operating Costs** | 6,292 | 3,449 | 4,905 | | 6,253 | 5,922 | 6,066 | | 6,708 | 5,732 | 7,244 | | 6,480 | 6,439 | 5,816 | | 5,855 | 6,816 | 7,106 | 7,107 | | 84,583 |
| **Total Operating Cash Flow** | 1,718 | 1,378 | 619 | | 211 | (845) | 6 | | (786) | 28 | (728) | | 50 | (223) | 328 | | 328 | (905) | (81) | (869) | | (2,553) |
| Capital Expenditures | | | | | | | | | | | | | | | | | | | | | | |
| Professional Fees | 290 | 75 | | | 474 | | | | | | (2) | (710) | (1,490) | | (353) | | 328 | | (905) | (81) | | (8,732) |
| Professional Fees Carveout Reserve | | | | | 500 | | | | | | | | | | | | | | | | | 474 |
| Counsel fees | | | 150 | | | | | | | | | | 400 | | | | | | | 400 | | 500 |
| FA fees | | | 100 | | | | | | | | | | 400 | | | | | | | 400 | | 800 |
| UST fees | | | | | | | | | | | | | | 50 | | | | | | | | 50 |
| Committee Professional fees | | 100 | | | | | | | | | | | | 200 | | | | | | 200 | | 400 |
| DIP Fees | | | | | 913 | | | | | | | | | | | | | | | | | 913 |
| Claims Agent Fees | | | | | | | | | | | 30 | | | | | | | | | | | 90 |
| Cash Payments - Term A | | 158 | | | | 30 | | | | | | | | 480 | | | | | | 503 | | 1,754 |
| Interest / Fees - Revolver & TA | 290 | 17 | 530 | | 281 | | 478 | | 478 | | 30 | | 30 | 1,540 | | | 30 | | | 1,509 | | 5,780 |
| **Total Other** | 290 | 175 | 530 | | 2,157 | 30 | 478 | | 478 | | 30 | 8,020 | (1,490) | 2,020 | (353) | | 5,469 | 328 | (905) | 8,610 | | 90,262 |
| **Total Uses** | 6,583 | 3,624 | 5,436 | | 8,420 | 6,952 | 6,545 | | 6,708 | 5,822 | 7,244 | | 8,020 | 6,439 | 5,855 | | 5,855 | 6,816 | 7,104 | 8,610 | | (8,732) |
| **Net Cash Inflow / (Outflow)** | 1,428 | 1,203 | 89 | | (1,556) | (875) | (472) | | (786) | (2) | (710) | | (1,490) | 50 | (353) | | 328 | (905) | (81) | (1,283) | | |
| Beginning Revolver Balance | 37,689 | 36,261 | 35,058 | | 34,969 | 37,801 | 36,599 | | 36,539 | 37,432 | 38,219 | | 38,397 | 40,427 | 40,680 | | 40,352 | 40,552 | 41,258 | 41,339 | 41,339 | | 41,702 |
| Ending Revolver Balance | 36,261 | 35,058 | 34,969 | | 36,526 | 37,801 | 36,599 | | 37,432 | 38,217 | 38,397 | | 40,427 | 40,680 | 40,352 | | 40,352 | 41,258 | 41,339 | 42,797 | 42,797 | | |
| **Collateral Base:** | | | | | | | | | | | | | | | | | | | | | | |
| Available A/R | 30,624 | 29,733 | 20,175 | | 34,576 | 35,492 | 36,773 | | 35,703 | 36,164 | 16,706 | | 37,081 | 36,377 | 36,283 | | 36,677 | 37,527 | 39,288 | | | |
| Available Inventory | 14,594 | 14,075 | 14,105 | | 12,803 | 12,954 | 12,270 | | 12,733 | 12,552 | 12,391 | | 12,197 | 12,320 | 12,292 | | 11,748 | 10,830 | | | | |
| Availability before Liquidity Trigger | 45,217 | 43,808 | 41,279 | | 47,378 | 48,508 | 49,042 | | 48,716 | 48,716 | (5,900) | | 49,278 | 48,896 | 48,575 | | 48,747 | 49,275 | 50,130 | | | |
| Less: Liquidity Trigger | (8,000) | (8,000) | (5,900) | | (5,900) | (5,900) | (5,900) | | (5,900) | (5,900) | 43,197 | | (5,900) | (5,900) | | | (5,900) | (5,900) | | | | |
| Availability before burn balance | 37,217 | 35,808 | 35,251 | | 41,479 | 42,506 | 43,152 | | 42,537 | 42,816 | 43,197 | | 43,378 | 44,736 | 42,675 | | 42,847 | 43,375 | 44,220 | | | |
| Availability above $50M / $5.9M | 956 | 750 | 281 | | 4,553 | 4,705 | 5,766 | | 5,720 | 4,300 | 4,260 | | 2,950 | 2,116 | 2,333 | | 1,589 | 2,038 | 518 | | | |
| check: | 955 | 750 | 281 | | 4,553 | | | | | | | | | | | | | | | | | |
| check: | (0) | (0) | (0) | | 0 | | | | | | | | | | | | | | | | | |

## Exhibit B

**Debtor-In-Possession Loan Agreement,
dated as of June 10, 2013**

*Execution Copy*

---

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Dated as of June 10, 2013

among

### NE OPCO, INC.,

as the Lead Borrower

For

The Borrowers Named Herein

The Guarantors Named Herein

### SALUS CAPITAL PARTNERS, LLC

as Administrative Agent and Collateral Agent,

and

The Other Lenders Party Hereto

---

Table of Contents

Page

Article I DEFINITIONS AND ACCOUNTING TERMS.................................................2
    1.01   Defined Terms. ...............................................................................2
    1.02   Other Interpretive Provisions.....................................................45
    1.03   Accounting Terms Generally......................................................46
    1.04   Rounding......................................................................................47
    1.05   Times of Day...............................................................................47
    1.06   Reserved......................................................................................47
    1.07   Currency Equivalents Generally. ................................................47

Article II THE COMMITMENTS AND CREDIT EXTENSIONS ...............................47
    2.01   Committed Loans; Reserves. ......................................................47
    2.02   Borrowings of Committed Loans................................................49
    2.03   Tranche B Advances....................................................................50
    2.04   [Reserved]....................................................................................51
    2.05   Prepayments................................................................................51
    2.06   Termination or Reduction of Commitments.................................52
    2.07   Repayment of Loans. ..................................................................52
    2.08   Interest.........................................................................................53
    2.09   Fees. ............................................................................................53
    2.10   Computation of Interest and Fees. ..............................................54
    2.11   Evidence of Debt.........................................................................54
    2.12   Payments Generally; Agent's Clawback. ....................................55
    2.13   Sharing of Payments by Lenders. ...............................................57
    2.14   Settlement Amongst Lenders. .....................................................57
    2.15   [Reserved]....................................................................................58
    2.16   Defaulting Lenders......................................................................58
    2.17   Super Priority Nature of Obligations and Agent's Liens..............59
    2.18   Payment of Obligations...............................................................60
    2.19   No Discharge; Survival of Claims. .............................................60
    2.20   Release.........................................................................................60
    2.21   Waiver of any Priming Rights. ...................................................61

Article III TAXES, YIELD PROTECTION AND ILLEGALITY;  APPOINTMENT OF
    LEAD BORROWER.................................................................................61
    3.01   Taxes. ..........................................................................................61
    3.02   Reserved......................................................................................63
    3.03   Reserved......................................................................................63
    3.04   Increased Costs. ..........................................................................63
    3.05   Reserved......................................................................................64
    3.06   Mitigation Obligations; Replacement of Lenders.......................64
    3.07   Survival.......................................................................................65
    3.08   Designation of Lead Borrower as Borrowers' Agent. .................65

Article IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS .......................65
    4.01   Conditions of Initial Credit Extension. .......................................65
    4.02   Conditions to all Credit Extensions. ...........................................69

i

Table of Contents

| | | Page |
|---|---|---|
| Article V REPRESENTATIONS AND WARRANTIES | | 70 |
| 5.01 | Existence, Qualification and Power. | 70 |
| 5.02 | Authorization; No Contravention. | 70 |
| 5.03 | Governmental Authorization; Other Consents. | 71 |
| 5.04 | Binding Effect. | 71 |
| 5.05 | Financial Statements; No Material Adverse Effect. | 71 |
| 5.06 | Litigation. | 72 |
| 5.07 | No Default. | 72 |
| 5.08 | Ownership of Property; Liens. | 72 |
| 5.09 | Environmental Compliance. | 73 |
| 5.10 | Insurance. | 73 |
| 5.11 | Taxes. | 73 |
| 5.12 | ERISA Compliance. | 74 |
| 5.13 | Subsidiaries; Equity Interests. | 74 |
| 5.14 | Margin Regulations; Investment Company Act. | 75 |
| 5.15 | Disclosure. | 75 |
| 5.16 | Compliance with Laws. | 75 |
| 5.17 | Intellectual Property; Licenses, Etc. | 76 |
| 5.18 | Labor Matters. | 76 |
| 5.19 | Security Documents. | 76 |
| 5.20 | [Reserved]. | 77 |
| 5.21 | Deposit Accounts; Credit Card Arrangements. | 77 |
| 5.22 | Brokers. | 77 |
| 5.23 | Customer and Trade Relations. | 77 |
| 5.24 | Material Contracts. | 77 |
| 5.25 | Casualty. | 78 |
| 5.26 | Bankruptcy Matters. | 78 |
| 5.27 | Personally Identifiable Information. | 79 |
| Article VI AFFIRMATIVE COVENANTS | | 79 |
| 6.01 | Financial Statements. | 79 |
| 6.02 | Certificates; Other Information. | 80 |
| 6.03 | Notices. | 82 |
| 6.04 | Payment of Obligations. | 83 |
| 6.05 | Preservation of Existence, Etc. | 84 |
| 6.06 | Maintenance of Properties. | 84 |
| 6.07 | Maintenance of Insurance. | 84 |
| 6.08 | Compliance with Laws. | 85 |
| 6.09 | Books and Records; Accountants. | 86 |
| 6.10 | Inspection Rights. | 86 |
| 6.11 | Use of Proceeds. | 87 |
| 6.12 | Additional Loan Parties. | 87 |
| 6.13 | Cash Management. | 88 |
| 6.14 | Information Regarding the Collateral. | 89 |
| 6.15 | Physical Inventories. | 90 |
| 6.16 | Environmental Laws. | 90 |

ii

Table of Contents

Page

6.17   Further Assurances..................................................................................91
6.18   Compliance with Terms of Leaseholds.......................................................92
6.19   Material Contracts..................................................................................92
6.20   [Reserved].............................................................................................92
6.21   Approved Budget. ...................................................................................92
6.22   Employee Benefit Plans............................................................................92
6.23   Retention. ..............................................................................................92
6.24   Sale Pleadings; Notices to Agent. .............................................................93
6.25   Leases....................................................................................................93
6.26   Bankruptcy Milestones. ...........................................................................93
6.27   Financing Orders.....................................................................................94

Article VII NEGATIVE COVENANTS ........................................................................94
7.01   Liens......................................................................................................94
7.02   Investments. ...........................................................................................95
7.03   Indebtedness; Disqualified Stock...............................................................95
7.04   Fundamental Changes...............................................................................95
7.05   Dispositions............................................................................................95
7.06   Restricted Payments.................................................................................95
7.07   Prepayments of Indebtedness.....................................................................96
7.08   Change in Nature of Business.....................................................................96
7.09   Transactions with Affiliates.......................................................................96
7.10   Burdensome Agreements...........................................................................96
7.11   Use of Proceeds.......................................................................................96
7.12   Amendment of Material Documents.............................................................97
7.13   Fiscal Year. ............................................................................................97
7.14   Deposit Accounts; Credit Card Processors. .................................................97
7.15   Financial Covenant...................................................................................97
7.16   Designation of Senior Lien Debt. ..............................................................97
7.17   Credit Card Agreements. ..........................................................................97
7.18   Foreign Inventory.....................................................................................97
7.19   Repayment of Indebtedness. ......................................................................97
7.20   Reclamation Claims..................................................................................98
7.21   Chapter 11 Claims....................................................................................98
7.22   Bankruptcy Actions. .................................................................................98

Article VIII EVENTS OF DEFAULT AND REMEDIES .................................................98
8.01   Events of Default. ....................................................................................98
8.02   Remedies Upon Event of Default. ............................................................103
8.03   Application of Funds...............................................................................105

Article IX THE AGENT............................................................................................107
9.01   Appointment and Authority. ....................................................................107
9.02   Rights as a Lender...................................................................................107
9.03   Exculpatory Provisions. ..........................................................................107
9.04   Reliance by Agent...................................................................................108
9.05   Delegation of Duties. ..............................................................................109

iii

Table of Contents

|  |  | Page |
|---|---|---|
| 9.06 | Resignation of Agent. | 109 |
| 9.07 | Non-Reliance on Agent and Other Lenders. | 109 |
| 9.08 | [Reserved]. | 110 |
| 9.09 | Agent May File Proofs of Claim. | 110 |
| 9.10 | Collateral and Guaranty Matters. | 111 |
| 9.11 | Notice of Transfer. | 111 |
| 9.12 | Reports and Financial Statements. | 111 |
| 9.13 | Agency for Perfection. | 112 |
| 9.14 | Indemnification of Agent. | 112 |
| 9.15 | Relation among Lenders. | 113 |
| **Article X MISCELLANEOUS** | | 113 |
| 10.01 | Amendments, Etc. | 113 |
| 10.02 | Notices; Effectiveness; Electronic Communications. | 115 |
| 10.03 | No Waiver; Cumulative Remedies. | 116 |
| 10.04 | Expenses; Indemnity; Damage Waiver. | 117 |
| 10.05 | Payments Set Aside. | 118 |
| 10.06 | Successors and Assigns. | 119 |
| 10.07 | Treatment of Certain Information; Confidentiality. | 123 |
| 10.08 | Right of Setoff. | 124 |
| 10.09 | Interest Rate Limitation. | 124 |
| 10.10 | Counterparts; Integration; Effectiveness. | 124 |
| 10.11 | Survival. | 125 |
| 10.12 | Severability. | 125 |
| 10.13 | Replacement of Lenders. | 125 |
| 10.14 | Governing Law; Jurisdiction; Etc. | 126 |
| 10.15 | Waiver of Jury Trial. | 127 |
| 10.16 | No Advisory or Fiduciary Responsibility. | 127 |
| 10.17 | USA PATRIOT Act Notice. | 128 |
| 10.18 | Foreign Asset Control Regulations. | 128 |
| 10.19 | Time of the Essence. | 129 |
| 10.20 | [Reserved]. | 129 |
| 10.21 | Press Releases. | 129 |
| 10.22 | Additional Waivers. | 129 |
| 10.23 | No Strict Construction. | 131 |
| 10.24 | Attachments. | 131 |

5775719v4

**SCHEDULES**

| | |
|---|---|
| 1.01 | Borrowers |
| 1.02 | Guarantors |
| 2.01 | Commitments and Applicable Percentages |
| 5.01 | Loan Parties Organizational Information |
| 5.06 | Litigation |
| 5.07 | Defaults |
| 5.08(b)(1) | Owned Real Estate |
| 5.08(b)(2) | Leased Real Estate |
| 5.10 | Insurance |
| 5.11 | Taxes |
| 5.13 | Subsidiaries; Other Equity Investments; Equity Interests in the Borrower |
| 5.17 | Intellectual Property Matters |
| 5.18(a) | Labor Matters |
| 5.18(b) | Collective Bargaining Agreements |
| 5.21(a) | DDAs |
| 5.21(b) | Credit Card Arrangements |
| 5.24 | Material Contracts |
| 6.02 | Financial and Collateral Reporting |
| 7.01 | Existing Liens |
| 7.02 | Existing Investments |
| 7.03 | Existing Indebtedness |
| 7.09 | Affiliate Transactions |
| 10.02 | Agent's Office; Certain Addresses for Notices |

**EXHIBITS**

*Form of*

| | |
|---|---|
| A | Committed Loan Notice |
| B-1 | Tranche A Note |
| B-2 | Tranche A-1 Note |
| B-3 | Tranche B Note |
| C | Compliance Certificate |
| D | Assignment and Assumption |
| E | Borrowing Base Certificate |
| F | Credit Card Notification |
| G | DDA Notification |
| H-1 | Cash Management Order |
| H-2 | Interim Financing Order |

DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This DEBTOR-IN-POSSESSION CREDIT AGREEMENT ("Agreement") is entered into as of June 10, 2013, among NE OPCO, INC., a Delaware corporation, as debtor and debtor-in-possession (the "Lead Borrower"), the Persons named on Schedule 1.01 hereto (collectively, the "Borrowers"), the Persons named on Schedule 1.02 hereto (collectively, the "Guarantors"), each Lender from time to time party hereto, and SALUS CAPITAL PARTNERS, LLC, as Administrative Agent and Collateral Agent.

On June 10, 2013 (the "Petition Date") the Lead Borrower and the other Loan Parties commenced cases under Chapter 11 of the Bankruptcy Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code"), case numbers [_____] and [_____] (collectively, the "Chapter 11 Case") by filing voluntary petitions for relief under Chapter 11 with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Lead Borrower and the other Loan Parties continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

The Borrowers have requested, and the Agent and the Tranche A Lenders and the Tranche A-1 Lenders have agreed, upon the terms and conditions set forth in this Agreement, to make available to the Borrowers a senior secured super-priority revolving credit facility in an aggregate principal amount not to exceed $65,000,000 in order to (a) repay the Pre-Petition Facility on the Closing Date, (b) fund the Chapter 11 Case in accordance with the Approved Budget, (c) make certain other payments on the Closing Date as more fully provided in this Agreement, and (d) provide working capital for the Borrowers and the other Loan Parties during the pendency of the Chapter 11 Case.

In addition, the Borrowers have requested, and the Tranche B Lender has agreed, upon the terms and conditions set forth in this Agreement, to make available to the Borrowers a senior secured super-priority trade credit facility in an aggregate principal amount not to exceed $2,500,000 in order to enable the Borrowers to purchase "Products" (as defined in the Paper Supply Agreement) from the Tranche B Lender.

The Borrowers and the other Loan Parties desire to secure the Obligations under the Loan Documents by granting to the Agent, on behalf of itself and the other Credit Parties, a security interest in and liens upon substantially all of their assets, whether now existing or hereafter acquired, in each instance as more fully set forth in the Loan Documents and in the Interim Financing Order (or the Final Financing Order when applicable).

All Obligations of the Loan Parties to the Agent and the Lenders hereunder and under the other Loan Documents shall be full recourse to each of the Loan Parties and secured by the Agent's security interest in and liens on all or substantially all of the assets of the Loan Parties included in the Collateral.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

**1.01    Defined Terms**. As used in this Agreement, the following terms shall have the meanings set forth below:

"ACH" means automated clearing house transfers.

"Accommodation Payment" as defined in <u>Section 10.22(d)</u>.

"Account" means "accounts" as defined in the UCC, and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a policy of insurance issued or to be issued, (d) for a secondary obligation incurred or to be incurred, (e) for energy provided or to be provided, (f) for the use or hire of a vessel under a charter or other contract, (g) arising out of the use of a credit or charge card or information contained on or for use with the card, or (h) as winnings in a lottery or other game of chance operated or sponsored by a state, governmental unit of a state, or person licensed or authorized to operate the game by a state or governmental unit of a state. The term "Account" includes health-care-insurance receivables.

"Acquisition" means, with respect to any Person (a) an investment in, or a purchase of, a Controlling interest in the Equity Interests of any other Person, (b) a purchase or other acquisition of all or substantially all of the assets or properties of, another Person or of any business unit of another Person, or (c) any merger or consolidation of such Person with any other Person or other transaction or series of transactions resulting in the acquisition of all or substantially all of the assets, or a Controlling interest in the Equity Interests, of any Person, in each case in any transaction or group of transactions which are part of a common plan.

"Act" shall have the meaning provided in <u>Section 10.17</u>.

"Administrative Agent" means Salus in its capacity as administrative agent under any of the Loan Documents, or any successor thereto in such capacities.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Agent.

"Affiliate" means, with respect to any Person, (i) another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified, (ii) any director, officer, managing member, partner, trustee, or beneficiary of that Person, (iii) any other Person directly or indirectly holding ten percent (10%) or more of any class of the Equity Interests of that Person, and (iv) any other Person ten percent (10%) or more of any class of whose Equity Interests is held directly or indirectly by that Person.

"Agent" means Salus in its capacity as Administrative Agent and Collateral Agent under any of the Loan Documents, or any successor thereto in such capacities.

-2-

"Agent's Office" means the Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Agent may from time to time notify the Lead Borrower and the Lenders.

"Agent Party" shall have the meaning specified in Section 10.02(c).

"Aggregate Commitments" means the sum of the Aggregate Tranche A Commitments, the Aggregate Tranche A-1 Commitments and the Tranche B Commitment of all of the Lenders. As of the Closing Date, the Aggregate Commitments are $67,500,000.

"Aggregate Revolving Commitments" means the sum of the Aggregate Tranche A Commitments and the Aggregate Tranche A-1 Commitments of all of the Lenders.  As of the Closing Date, the Aggregate Revolving Commitments are $65,000,000.

"Aggregate Tranche A Commitments" means the sum of the Tranche A Commitment(s) of all the Tranche A Lenders.  As of the Closing Date, the Aggregate Tranche A Commitments are $47,500,000.

"Aggregate Tranche A-1 Commitments" means the sum of the Tranche A-1 Commitment(s) of all of the Tranche A-1 Lenders.  As of the Closing Date, the Aggregate Tranche A-1 Commitments are $17,500,000.

"Agreement" means this Credit Agreement, as the same may be amended, restated, supplemented, or modified from time to time.

"Allocable Amount" has the meaning specified in Section 10.22(d).

"Allowed Professional Fees" means incurred and allowed unpaid professional fees and expenses of the Case Professionals, to the extent such fees and expenses are incurred and allowed and payable pursuant to an order of the Court (which order has not been reversed, vacated or stayed).

"Applicable Interest Rate" means (i) with respect to Tranche A Loans, the Base Rate plus 5.25% per annum, (ii) with respect to Tranche A-1 Loans, the Base Rate plus 9.25% per annum, and (iii) with respect to Tranche B Advances, 10% per annum.

"Applicable Lenders" means the Required Lenders, all affected Lenders, or all Lenders, as the context may require.

"Applicable Percentage" means, in each case as the context requires, (a) with respect to each Credit Extension under the Tranche A Commitments, the Tranche A Applicable Percentage, (b) with respect to each Credit Extension under the Tranche A-1 Commitments, the Tranche A-1 Applicable Percentage and (c) with respect to all Lenders at any time, the percentage of the sum of the Aggregate Commitments represented by the sum of such Lender's Tranche A Commitment and Tranche A-1 Commitment and the outstanding principal balance of such Lender's Tranche B Advances at such time.  If the Tranche A Commitments or the Tranche A-1 Commitments have been terminated pursuant to Section 2.06 or Section 8.02 or if the Aggregate Commitments have expired, then the Applicable Percentage of each Tranche A Lender and each

-3-

Tranche A-1 Lender shall be determined based on the Applicable Percentage of such Lender most recently in effect, giving effect to any subsequent assignments. The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Appraisal Percentage" means (a) during the period commencing on the Closing Date and ending on the date that is ninety (90) days thereafter, eighty percent (80%), and (b) at all times thereafter, a percentage determined by the Agent in its Permitted Discretion based on the most-recent inventory appraisal conducted in accordance with Section 6.10.

"Appraised Value" means (a) with respect to Eligible Inventory, the appraised orderly liquidation value, net of costs and expenses to be incurred in connection with any such liquidation, which value is expressed as a percentage of Cost of Eligible Inventory as set forth in the inventory stock ledger of the Borrowers, which value shall be determined from time to time by the most recent appraisal undertaken by an independent appraiser engaged by the Agent, or (b) with respect to Eligible Equipment, the appraised forced liquidation value of Eligible Equipment as set forth in the most recent appraisal of Eligible Equipment as determined from time to time by an independent appraiser engaged by the Agent.

"Appropriate Lender" means a Tranche A Lender or a Tranche A-1 Lender, as applicable.

"Approved Budget" shall mean the debtor-in-possession thirteen (13) week budget prepared by the Lead Borrower and furnished to the Agent on or before the Closing Date and thereafter weekly in accordance with this Agreement, as the same may be updated, modified and/or supplemented thereafter from time to time as provided in such Section 6.01(b) which shall include a weekly cash budget, including information on a line item basis as to (x) projected cash receipts, (y) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees and expenses), capital expenditures, asset sales and fees and expenses of the Agent (including counsel therefor) and any other fees and expenses relating to the Loan Documents), and (z) a calculation of Availability.

"Approved Budget Variance Report" shall mean a weekly report provided by the Lead Borrower to the Lender in accordance with Section 6.01(b): (i) showing by line item actual receipts for both inventory and revenues, actual disbursement amounts, cash on hand, actual professional fees (other than counsel for the Agent) and Availability as of the last day of the Cumulative Four Week Period and the Cumulative Period, noting therein all variances, on a line-item basis, from amounts set forth for such period in the Approved Budget, and shall include explanations for all material variances, and (ii) certified by a Responsible Officer of the Lead Borrower. The calculation of any variance for purposes of determining the Borrowers' compliance with Section 7.15 shall be set forth on the Approved Budget Variance Report.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, (c) an entity or an Affiliate of an entity that administers or manages a Lender or (d) the same investment advisor or an advisor under common control with such Lender, Affiliate or advisor, as applicable.

-4-

"Approved Liquidator" shall mean a nationally recognized liquidator of recognized standing approved by the Agent in Permitted Discretion.

"Assignee Group" means two or more assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 10.06(b)), and accepted by the Agent, in substantially the form of Exhibit D or any other form approved by the Agent.

"Attributable Indebtedness" means, on any date, (a) in respect of any Capital Lease Obligation of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease, agreement or instrument were accounted for as a capital lease.

"Audited Financial Statements" means the audited consolidated balance sheet of the Parent and its Subsidiaries for the Fiscal Year ended December 31, 2011, and the related consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Year of the Parent and its Subsidiaries, including the notes thereto.

"Availability" means, as of any date of determination thereof by the Agent, the result, if a positive number, of:

(a)    the Maximum Loan Amount,

minus

(b)    the Total Revolving Outstandings.

In calculating Availability at any time and for any purpose under this Agreement, the Lead Borrower shall certify to the Agent that all Post-Petition Obligations are being paid within fifteen (15) days after the due date thereof (or are being contested in good faith with adequate reserves established by the Borrower, and the applicable due date calculated with regard to any negotiated arrangements with any applicable trade vendor or creditor) and outstanding accounts payable as of the date of this Agreement will be paid as contemplated under the Approved Budget.

"Availability Block" means an amount equal to (a) $4,000,000, or (b) so long as no Default or Event of Default exists and the Borrowers pay to the Agent for its own account a non-refundable fee in the amount of $100,000, $3,000,000, or (c) if a Default or Event of Default exists, such other amount established by the Agent.

"Availability Period" means the period from and including the Closing Date to the earliest of (a) the Maturity Date, (b) the date of termination of the Aggregate Commitments

pursuant to <u>Section 2.06</u>, and (c) the date of termination of the commitment of each Lender to make Committed Loans and Tranche B Advances pursuant to <u>Section 8.02</u>.

"Availability Reserves" means, the Tranche A-1 Reserve and, without duplication of any other Reserves or items to the extent such items are otherwise addressed or excluded through eligibility criteria, such reserves as the Agent from time to time determines in its Permitted Discretion as being appropriate (a) to reflect the impediments to the Agent's ability to realize upon the Collateral, (b) to reflect claims and liabilities that the Agent determines will need to be satisfied in connection with the realization upon the Collateral, (c) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Tranche A Borrowing Base or the Tranche A-1 Borrowing Base, or the assets, business, financial performance or financial condition of any Loan Party, or (d) to reflect that a Default or an Event of Default then exists. Without limiting the generality of the foregoing, Availability Reserves may include, in the Agent's Permitted Discretion, (but are not limited to) reserves based on: (i) rent; (ii) customs duties, and other costs to release Inventory which is being imported into the United States; (iii) outstanding Taxes and other governmental charges, including, without limitation, ad valorem, real estate, personal property, sales, claims of the PBGC and other Taxes which may have priority over the interests of the Agent in the Collateral; (iv) salaries, wages and benefits due to employees of any Loan Party, (v) Customer Credit Liabilities; (vi) Customer Deposits; (vii) reserves for reasonably anticipated changes in the Appraised Value of Eligible Inventory or Eligible Equipment between appraisals; (viii) warehousemen's or bailee's charges and other Permitted Encumbrances which may have priority over the interests of the Agent in the Collateral; (ix) amounts due to vendors on account of consigned goods; (x) Cash Management Reserves; (xi) Bank Product Reserves and; (xii) royalties payable in respect of licensed merchandise; and (xiii) claims under Section 503(b)(9) of the Bankruptcy Code.

"Bankruptcy Code" has the meaning specified in the Recitals hereto.

"Bankruptcy Court" has the meaning specified in the Recitals hereto.

"Bank Products" means any services of facilities provided to any Loan Party by the Agent or any of its Affiliates (but excluding Cash Management Services) including, without limitation, on account of (a) Swap Contracts, (b) merchant services constituting a line of credit, (c) leasing, (d) Factored Receivables, and (e) supply chain finance services including, without limitation, trade payable services and supplier accounts receivable purchases.

"Bank Product Reserves" means such reserves as the Agent from time to time determines in its Permitted Discretion as being appropriate to reflect the liabilities and obligations of the Loan Parties with respect to Bank Products then provided or outstanding.

"Base Rate" means a variable rate of interest per annum equal to the prime rate of interest from time to time published by www.bankrate.com. The applicable prime rate for any date not set forth therein shall be the rate set forth the immediately preceding date. In the event that www.bankrate.com ceases to publish a prime rate or its equivalent, the term "Base Rate" shall mean a variable rate of interest per annum equal to the highest of the "prime rate", "reference rate", "base rate", or other similar rate announced from time to time by any of the three largest banks (based on combined capital and surplus) headquartered in New York, New York and

-6-

published in The Wall Street Journal (with the understanding that any such rate may merely be a reference rate and may not necessarily represent the lowest or best rate actually charged to any customer by any such bank or by the Agent or any Lender).

"Blocked Account" has the meaning provided in Section 6.13(a)(ii).

"Blocked Account Agreement" means with respect to an account established by a Loan Party, an agreement, in form and substance satisfactory to the Agent, establishing control (as defined in the UCC) of such account by the Agent and whereby the bank maintaining such account agrees to comply only with the instructions originated by the Agent without the further consent of any Loan Party.

"Blocked Account Bank" means each bank with whom deposit accounts are maintained in which any funds of any of the Loan Parties from one or more DDAs are concentrated and with whom a Blocked Account Agreement has been, or is required to be, executed in accordance with the terms hereof.

"Borrower Materials" means any Tranche A Borrowing Base and Tranche A-1 Borrowing Base information, reports, financial statements and other materials delivered by the Borrowers hereunder, as well as other Reports and information provided by the Agent to the Lenders.

"Borrowers" has the meaning specified in the introductory paragraph hereto.

"Borrowing Base Certificate" means a certificate substantially in the form of Exhibit E hereto (with such changes therein as may be required by the Agent to reflect the components of and reserves against the Tranche A Borrowing Base and the Tranche A-1 Borrowing Base as provided for hereunder from time to time), executed and certified as accurate and complete by a Responsible Officer of the Lead Borrower which shall include appropriate exhibits, schedules, supporting documentation, and additional reports as reasonably requested by the Agent.

"Business" means manufacturing and selling envelopes and similar products.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Agent's Office is located.

"Capital Expenditures" means, with respect to any Person for any period, (a) all expenditures made (whether made in the form of cash or other property) or costs incurred for the acquisition or improvement of fixed or capital assets of such Person (excluding normal replacements and maintenance which are properly charged to current operations), in each case that are (or should be) set forth as capital expenditures in a Consolidated statement of cash flows of such Person for such period, in each case prepared in accordance with GAAP, and (b) Capital Lease Obligations incurred by a Person during such period.

"Capital Lease Obligations" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations

-7-

are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve-Out" means, collectively, the following expenses: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. §1930(a) and Section 3717 of title 31 of the United States Code and (ii) upon the occurrence of any Event of Default and delivery of a Carve-Out Trigger Notice, an aggregate amount equal to the Carve-Out Amount, which amount may be used subject to the terms of the Interim or Final Financing Orders, as applicable, to pay (A) Allowed Professional Fees and the reimbursement of expenses of the Statutory Committee, in each case, incurred after the delivery of a Carve-Out Trigger Notice, and (B) any Allowed Professional Fees of Case Professionals incurred but unpaid prior to the receipt of the Carve-Out Trigger Notice.  No portion of the Carve-Out, any cash collateral or proceeds of the Loans may be used in violation of the Interim Financing Order or Final Financing Order, as applicable.  So long as the Carve-Out Trigger Notice has not been delivered, the Loan Parties shall be permitted to pay, as the same may become due and payable, budgeted fees and expenses of Case Professionals payable under 11 U.S.C. § 330 and § 331 pursuant to court order, and the same shall not reduce the Carve-Out Amount.

"Carve-Out Amount" means $500,000.

"Carve-Out Trigger Notice" means a written notice by the Agent to lead bankruptcy counsel for the Loan Parties, any Statutory Committee by its counsel and the U.S. Trustee following the occurrence of an Event of Default, expressly stating that the Carve-Out Amount is invoked.

"Case Professionals" means the Loan Parties' and any Statutory Committee's professionals, retained by either of them by final order of the Bankruptcy Court (which order has not been reversed, vacated or stayed unless such stay is no longer effective) under Sections 327 or 1103(a) of the Bankruptcy Code.

"Cash Management Bank" means another institution as approved by Agent in its Permitted Discretion.

"Cash Management Order" means the order of the Bankruptcy Court entered in the Chapter 11 Case, together with all extensions, modifications and amendments that are in form and substance acceptable to the Agent in its Permitted Discretion, which, among other matters, authorizes the Loan Parties to use their cash management system, substantially in the form of Exhibit H-1.

"Cash Management Reserves " means such reserves as the Agent, from time to time, determines in its Permitted Discretion as being appropriate to reflect the reasonably anticipated liabilities and obligations of the Loan Parties with respect to Cash Management Services then provided or outstanding.

"Cash Management Services" means any cash management services or facilities provided to any Loan Party by the Cash Management Bank or any of its Affiliates, including, without

-8-

limitation: (a) ACH transactions, (b) controlled disbursement services, treasury, depository, overdraft, and electronic funds transfer services, (c) credit or debit cards, (d) credit card processing services, and (e) purchase cards.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq.

"CERCLIS" means the Comprehensive Environmental Response, Compensation, and Liability Information System maintained by the United States Environmental Protection Agency.

"CFC" means a Person that is a controlled foreign corporation under Section 957 of the Code.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided, however, for the purposes of this Agreement: (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which:

(a)      Gores Capital Partners and its Affiliates shall cease to own and control legally and beneficially (free and clear of all Liens), either directly or indirectly, equity securities in the Parent representing more than fifty percent (50%) of the combined voting power of all of Equity Interests entitled to vote for members of the board of directors or equivalent governing body of the Parent on a fully-diluted basis (and taking into account all such securities that Gores Capital Partners have the right to acquire pursuant to any option right (as defined in clause (b) below));

(b)      any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "option right")), directly or indirectly, of twenty-five percent (25%) or more of the Equity Interests of the Parent entitled to vote for members of the board of directors or equivalent governing body of the Parent on a fully-diluted basis (and taking into account all such Equity

Interests that such "person" or "group" has the right to acquire pursuant to any option right); or

(c)    during any period of twelve (12) consecutive months, a majority of the members of the board of directors or other equivalent governing body of the Parent cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body (excluding, in the case of both clause (ii) and clause (iii), any individual whose initial nomination for, or assumption of office as, a member of that board or equivalent governing body occurs as a result of an actual or threatened solicitation of proxies or consents for the election or removal of one or more directors by any person or group other than a solicitation for the election of one or more directors by or on behalf of the board of directors); or

(d)    any Person or two or more Persons acting in concert shall have acquired by contract or otherwise, or shall have entered into a contract or arrangement that, upon consummation thereof, will result in its or their acquisition of the power to exercise, directly or indirectly, a controlling influence over the management or policies of the Parent, or control over the Equity Interests of the Parent entitled to vote for members of the board of directors or equivalent governing body of the Parent on a fully-diluted basis (and taking into account all such securities that such Person or Persons have the right to acquire pursuant to any option right) representing twenty-five percent (25%) or more of the combined voting power of such securities; or

(e)    any "change in control" or "sale" or "disposition" or similar event as defined in any Organizational Document of any Loan Party or in any Material Contract, or any document governing Material Indebtedness of any Loan Party; or

(f)    the Parent fails at any time to own, directly or indirectly, one-hundred percent (100%) of the Equity Interests of the Lead Borrower and each other Loan Party free and clear of all Liens (other than the Liens in favor of the Agent), except where such failure is as a result of a transaction permitted by the Loan Documents; or

(g)    any Loan Party sells a material portion of its assets pursuant to a sale under Section 363 of the Bankruptcy Code, a plan of reorganization or liquidation or otherwise.

"Chapter 11 Case" has the meaning specified in the Recitals hereto.

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01.

"Code" means the Internal Revenue Code of 1986, and the regulations promulgated thereunder, as amended and in effect.

"Collateral" means any and all "Collateral" or "Mortgaged Property" as defined in any applicable Security Document and all other property that is or is intended under the terms of the Security Documents to be subject to Liens in favor of the Agent.

"Collateral Access Agreement" means an agreement reasonably satisfactory in form and substance to the Agent executed by (a) a bailee or other Person in possession of Collateral, and (b) any landlord of Real Estate leased by any Loan Party, pursuant to which such Person (i) acknowledges the Agent's Lien on the Collateral, (ii) releases or subordinates such Person's Liens in the Collateral held by such Person or located on such Real Estate, (iii) provides the Agent with access to the Collateral held by such bailee or other Person or located in or on such Real Estate, (iv) as to any landlord, provides the Agent with a reasonable time to sell and dispose of the Collateral from such Real Estate, and (v) makes such other agreements with the Agent as the Agent may reasonably require.

"Collateral Agent" means Salus in its capacity as collateral agent under any of the Loan Documents, or any successor thereto in such capacities.

"Combined Borrowing Base" means the sum of the Tranche A Borrowing Base plus the Tranche A-1 Borrowing Base.

"Commitment" means, as to each Lender, its Tranche A Commitment, Tranche A-1 Commitment and/or Tranche B Commitment, as applicable.

"Committed Borrowing" means a borrowing consisting of simultaneous Committed Loans made by each of the Lenders pursuant to Section 2.01.

"Committed Loan" means individually, a Tranche A Loan or a Tranche A-1 Loan, and collectively, all Tranche A Loans and all Tranche A-1 Loans.

"Committed Loan Notice" means a notice of a Committed Borrowing, pursuant to Section 2.02, which, if in writing, shall be substantially in the form of Exhibit A.

"Compliance Certificate" means a certificate substantially in the form of Exhibit C.

"Concentration Account" has the meaning provided in Section 6.13(c).

"Consent" means actual consent given by a Lender from whom such consent is sought; or the passage of five (5) Business Days from receipt of written notice to a Lender from the Agent of a proposed course of action to be followed by the Agent without such Lender giving the Agent written notice of that Lender's objection to such course of action.

"Consolidated" means, when used to modify a financial term, test, statement, or report of a Person, the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

-11-

"Consultant" shall have the meaning specified in Section 6.23.

"Contractual Obligation" means, as to any Person, any provision of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Cost" means the lower of cost or market value of Inventory, based upon the Borrowers' accounting practices, known to the Agent, which practices are in effect on the Closing Date as such calculated cost is determined from invoices received by the Borrowers, the Borrowers' purchase journals or the Borrowers' stock ledger. "Cost" does not include inventory capitalization costs or other non-purchase price charges (such as freight) used in the Borrowers' calculation of cost of goods sold.

"Credit Card Issuer" shall mean any person (other than a Borrower or other Loan Party) who issues or whose members issue credit cards, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, Carte Blanche and other non-bank credit or debit cards, including, without limitation, credit or debit cards issued by or through American Express Travel Related Services Company, Inc., and Novus Services, Inc. and other issuers approved by the Agent.

"Credit Card Processor" shall mean any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to any Borrower's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"Credit Card Notifications" has the meaning provided in Section 6.13(a)(i).

"Credit Extensions" means a Committed Borrowing.

"Credit Party" or "Credit Parties" means (a) individually, (i) each Lender and its Affiliates, (ii) the Agent, (iii) the Cash Management Bank, (iv) each beneficiary of each indemnification obligation undertaken by any Loan Party under any Loan Document, (v) any other Person to whom Obligations under this Agreement and other Loan Documents are owing, and (vi) the successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"Credit Party Expenses" means, without limitation, (a) all reasonable out-of-pocket expenses incurred by the Agent and its Affiliates, in connection with this Agreement and the other Loan Documents, including without limitation (i) the reasonable fees, charges and disbursements of (A) counsel for the Agent, (B) outside consultants for the Agent, (C) appraisers, (D) commercial finance examinations, and (E) all such out-of-pocket expenses

-12-

5775719v4

incurred during any workout, restructuring or negotiations in respect of the Obligations, (ii) in connection with (A) the syndication or financing of the credit facilities provided for herein, including any fees or expenses incurred in connection with obtaining a rating for such credit facilities, (B) the preparation, negotiation, administration, management, execution and delivery of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), or (C) the enforcement or protection of the rights of the Credit Parties in connection with this Agreement or the Loan Documents or efforts to monitor, preserve, protect, collect, or enforce the Collateral; (b) all customary fees and charges (as adjusted from time to time) of the Agent with respect to access to online Loan information, compliance with applicable Laws and regulations, the disbursement of funds (or the receipt of funds) to or for the account of Loan Parties (whether by wire transfer or otherwise), together with any out-of-pocket costs and expenses incurred in connection therewith; (c) all reasonable out-of-pocket expenses incurred by the Tranche B Lender solely in its capacity as such; and (d) upon the occurrence and during the continuance of an Event of Default or upon any increase in the amount of the Aggregate Commitments after the Closing Date, all reasonable out-of-pocket expenses incurred by the Credit Parties who are not the Agent or an Affiliate of the Agent or the Tranche B Lender, provided that such Credit Parties shall be entitled to reimbursement for no more than one counsel representing all such Credit Parties (absent a conflict of interest in which case the Credit Parties may engage and be reimbursed for additional counsel).

"Cumulative Period" means the period from the Petition Date through the most recent week ended.

"Cumulative Four Week Period" shall mean the four-week period up to and through the Sunday of the most recent week then ended, or if a four-week period has not then elapsed from the Petition Date, such shorter period since the Petition Date through the Sunday of the most recent week then ended.

"Customer Credit Liabilities" means at any time, the aggregate remaining value at such time of (a) outstanding gift certificates and gift cards of the Borrowers entitling the holder thereof to use all or a portion of the certificate or gift card to pay all or a portion of the purchase price for any Inventory, (b) outstanding merchandise credits of the Borrowers, and (c) liabilities in connection with frequent shopping programs of the Borrowers.

"Customer Deposits" means at any time, the aggregate amount at such time of (a) deposits made by customers with respect to the purchase of goods or the performance of services and (b) layaway obligations of the Borrowers.

"Customs Broker/Carrier Agreement" means an agreement in form and substance satisfactory to the Agent among a Borrower, a customs broker, freight forwarder, consolidator or carrier, and the Agent, in which the customs broker, freight forwarder, consolidator or carrier acknowledges that it has control over and holds the documents evidencing ownership of the subject Inventory for the benefit of the Agent and agrees, upon notice from the Agent, to hold and dispose of the subject Inventory solely as directed by the Agent.

-13-

5775719v4

"DDA" means each checking, savings or other demand deposit account maintained by any of the Loan Parties. All funds in each DDA shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agent and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in any DDA.

"DDA Notification" has the meaning provided therefor in Section 6.13(a)(iii).

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means an interest rate equal to (i) the Applicable Interest Rate, plus (iii) 4.00% per annum.

"Defaulting Lender" means, subject to Section 2.16(b), any Tranche A Lender or Tranche A-1 Lender that (a) has failed to (i) fund all or any portion of its Committed Loans within two Business Days of the date such Committed Loans were required to be funded hereunder, or (ii) pay to the Agent or any other Tranche A Lender or Tranche A-1 Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Lead Borrower or the Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect, (c) has failed, within three Business Days after written request by the Agent or the Lead Borrower, to confirm in writing to the Agent and the Lead Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Agent and the Lead Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that such a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Agent that a Tranche A Lender or Tranche A-1 Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.16(b)) as of the date established therefor by the Agent in a written notice of such determination, which shall be

-14-

delivered by the Agent to the Borrower, and each other Tranche A Lender and Tranche A-1 Lender promptly following such determination.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (whether in one transaction or in a series of transactions, and including any sale and leaseback transaction and any sale, transfer, license or other disposition) of any property (including, without limitation, any Equity Interests) by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is ninety-one (91) days after the date on which the Loans mature; provided, however, that (i) only the portion of such Equity Interests which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock and (ii) with respect to any Equity Interests issued to any employee or to any plan for the benefit of employees of the Loan Parties or by any such plan to such employees, such Equity Interest shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Loan Parties in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, resignation, death or disability and if any class of Equity Interest of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of an Equity Interest that is not Disqualified Stock, such Equity Interests shall not be deemed to be Disqualified Stock. Notwithstanding the preceding sentence, any Equity Interest that would constitute Disqualified Stock solely because the holders thereof have the right to require a Loan Party to repurchase such Equity Interest upon the occurrence of a change of control or an asset sale shall not constitute Disqualified Stock. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that the Loan Parties may become obligated to pay upon maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock or portion thereof, plus accrued dividends.

"Dollars" and "$" mean lawful money of the United States.

"Eligible Equipment" means, as of the date of determination thereof, without duplication, items of Equipment owned by a Borrower and deemed by the Agent in its Permitted Discretion to be eligible for inclusion in the calculation of the Tranche A-1 Borrowing Base, in each case that, except as otherwise agreed by the Agent, (A) complies with each of the representations and warranties respecting Equipment made by the Loan Parties in the Loan Documents, and (B) is not excluded as ineligible by virtue of one or more of the criteria set forth below. Except as otherwise agreed by the Agent, in its Permitted Discretion, the following items of Equipment shall not be included in Eligible Equipment:

-15-

5775719v4

(a)    Equipment that is not solely owned by a Borrower or a Borrower does not have good, valid and marketable title thereto, free and clear of any Lien (other than Liens granted to the Agent pursuant to the Security Documents and statutory landlord Liens);

(b)    Equipment that has not been appraised by a third party appraiser acceptable to Agent, utilizing procedures and criteria acceptable to Agent;

(c)    Equipment that is leased by a Borrower or which is leased by a Borrower to a Person which is not a Borrower;

(d)    Equipment that is not located in the United States of America (excluding territories or possessions of the United States);

(e)    Equipment that is not located at a location that is owned or leased by a Borrower (other than rolling stock and motor vehicles);

(f)    Equipment that is located in a facility leased by a Borrower unless the applicable lessor has delivered to the Agent a Collateral Access Agreement;

(g)    Equipment that is not subject to a perfected first priority security interest in favor of the Agent;

(h)    Equipment that is or is expected to become idle, discontinued or non-operational;

(i)    Equipment that is not insured in compliance with the provisions of Section 6.07 hereof; or

(j)    Equipment that has been sold but not yet delivered or as to which a Borrower has accepted a deposit.

"Eligible Inventory" means Inventory consisting of first quality finished goods or raw materials held for sale in the ordinary course of a Borrower's business, that complies in all material respects (except that such materiality qualifier shall not be applicable to the portion of any representations and warranties warranty that is already are qualified or modified by materiality in the text thereof) with each of the applicable representations and warranties respecting Eligible Inventory made in the Loan Documents, and that is not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, however, that such criteria may be revised from time to time by the Agent in its Permitted Discretion to address the results of any audit or appraisal performed by the Agent from time to time after the Closing Date. An item of Inventory shall not be included in Eligible Inventory if:

(a)    a Borrower does not have good and valid title thereto,

(b)    a Borrower does not have actual and exclusive possession thereof (either directly or through a bailee or agent of such Borrower),

(c)     it is not located at one of the locations in the continental United States set forth on Schedule 5.08(b)(1) or Schedule 5.08(b)(2) (or in-transit from one such location to another such location),

(d)     it is in-transit to or from a location of a Borrower (other than in-transit from one location set forth on Schedule 5.08(b)(1) or Schedule 5.08(b)(2) to another location set forth on Schedule 5.08(b)(1) or Schedule 5.08(b)(2)),

(e)     it is segregated or otherwise separately identifiable from goods of non-Loan Parties, if any, stored on the premises,

(f)     it is the subject of a bill of lading or other documents of title,

(g)     it is not subject to a valid and perfected first priority Agent's Lien,

(h)     it consists of goods returned or rejected by the applicable Borrower's customers, to the extent the Borrowers are not able to sell such goods to other customers of the Borrowers,

(i)     it consists of goods that are obsolete or slow moving or custom items, work-in-process, or goods that constitute spare parts, packaging and shipping materials not intended for resale, supplies used or consumed in a Borrower's business that are not also sold by the Borrowers in the ordinary course of business, bill and hold goods, defective goods, "seconds," or Inventory acquired on consignment, or Inventory being held by a Person (other than a Loan Party) on consignment, or

(j)     it is subject to third party trademark, licensing or other proprietary rights, unless the Agent is reasonably satisfied that such Inventory can be freely sold by the Agent on and after the occurrence of an Event of Default despite such third party rights.

"Eligible Trade Receivables" means those Accounts created by a Borrower in the ordinary course of its business, that arise out of such Borrower's sale of goods or rendition of services, that comply in all material respects (except that such materiality qualifier shall not be applicable to the portion of any representation and warranty that is already qualified or modified by materiality in the text thereof) with each of the applicable representations warranties respecting Eligible Trade Receivables made in the Loan Documents, and that are not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, however, that such criteria may be revised from time to time by the Agent in its Permitted Discretion to address the results of any commercial finance examination performed by the Agent from time to time after the Closing Date. Eligible Trade Receivables shall not include the following:

(a)     Accounts that the account debtor has failed to pay within 120 days of original invoice date or 60 days past due date,

(b)     Accounts with selling terms of more than 61 days,

(c)     Accounts owed by an account debtor (or its Affiliates) where 50% or more of all Accounts owed by that account debtor (or its Affiliates) are deemed ineligible under clause (a) above,

(d)     Accounts with respect to which the account debtor is an Affiliate of any Borrower or an employee or agent of any Borrower or any Affiliate of any Borrower,

(e)     Accounts arising in a transaction wherein goods are placed on consignment or are sold pursuant to a guaranteed sale, a sale or return, a sale on approval, a bill and hold, or any other terms by reason of which the payment by the account debtor may be conditional,

(f)     Accounts that are not payable in (i) Dollars or (ii) Canadian dollars if owed by a Canadian account debtor with respect to Accounts that comply with the provisions of clause (g) below; provided, however, that in the case of this clause (ii), (A) the aggregate amount of Accounts payable in Canadian dollars eligible for inclusion in the Tranche A Borrowing Base shall not exceed more than $1,300,000 at any given time, and (B) the amount of such Accounts payable in Canadian dollars shall, for the purposes of this Agreement, be determined in Dollars using such currency exchange methodology as is customary for the Agent in calculating such amount,

(g)     Accounts with respect to which the account debtor either (i) does not maintain its chief executive office in the United States or Canada (so long as such Accounts for account debtors maintaining a chief executive office in Canada are billed entirely and exclusively in the United States), or (ii) is not organized under the laws of the United States or any state thereof or Canada or any province thereof (so long as such Accounts for account debtors organized under the laws of Canada or any province thereof are billed entirely and exclusively in the United States), or (iii) is the government of any foreign country or sovereign  state, or of any state, province, municipality, or other political subdivision thereof, or of any department, agency, public corporation, or other instrumentality thereof, unless (y) the Account is supported by an irrevocable letter of credit reasonably satisfactory to the Agent (as to form, substance, and issuer or domestic confirming bank) that has been delivered to Agent and is directly drawable by the Agent (acting on its own behalf or under power of attorney), or (z) the Account is covered by credit insurance in form, substance, and amount, and by an insurer, reasonably satisfactory to Agent,

(h)     Accounts with respect to which the account debtor is either (i) the United States or any department, agency, or instrumentality of the United States (exclusive, however, of Accounts with respect to which the applicable Borrower has complied, to the reasonable satisfaction of Agent, with the Assignment of Claims Act, 31 USC §3727), or (ii) any state of the United States; provided, however, that notwithstanding the foregoing, Accounts with respect to which the applicable Borrower has not complied with the Assignment of Claims Act shall be eligible for inclusion in the Tranche A Borrowing Base (subject to the other eligibility criteria set forth in this Agreement) provided that the aggregate amount of such Accounts shall not exceed more than $500,000 at any given time,

-18-

(i)     Accounts with respect to which the account debtor is a creditor of any Borrower (including accounts with respect to International Paper or any of its Affiliates as the account debtor) (unless the account debtor has provided Agent a "non-offset" letter in form and substance reasonably satisfactory to Agent), has or has asserted a right of setoff, or has disputed its obligations to pay all or any portion of the Account, solely to the extent of such claim, right of setoff, or dispute,

(j)     Accounts with respect to an account debtor whose total obligations owing to the Borrowers exceed 10% (such percentage, as applied to a particular account debtor, being subject to reduction by the Agent in its Permitted Discretion if the creditworthiness of such account debtor deteriorates) of all Eligible Trade Receivables, to the extent of the obligations owing by such account debtor in excess of such percentage; provided, however, that, in each case, the amount of Eligible Trade Receivables that are excluded because they exceed the foregoing percentage shall be determined by the Agent based on all of the otherwise Eligible Trade Receivables prior to giving effect to any eliminations based upon the foregoing concentration limit,

(k)     Accounts with respect to which the account debtor is subject to a proceeding under any Debtor Relief Laws, is not-Solvent, has gone out of business, or as to which any Borrower has received notice of an imminent proceeding under any Debtor Relief Laws or a material impairment of such account debtor; provided, however, that notwithstanding the foregoing provisions of this clause (k), the Agent may, in its Permitted Discretion, include as Eligible Trade Receivables (i) Accounts that are post-petition accounts payable of an account debtor that is a debtor. in-possession under the Bankruptcy Code, and (ii) Accounts owing by an account debtor that has been reorganized or restructured following one of the events described in this clause (j) and has a credit quality reasonably satisfactory to Agent,

(l)     Accounts, the collection of which, the Agent, in its Permitted Discretion, believes to be doubtful by reason of the account debtor's financial condition or the Chapter 11 Case,

(m)     Accounts that are not subject to a valid and perfected first priority Agent' s Lien,

(n)     Accounts with respect to which (i) the goods giving rise to such Account have not been shipped and billed to the account debtor, or (ii) the services giving rise to such Account have not been performed and billed to the account debtor,

(o)     Accounts with respect to which the account debtor is a Sanctioned Person or Sanctioned Entity,

(p)     Accounts that represent the right to receive progress payments or other advance billings that are due prior to the completion of performance by the applicable Borrower of the subject contract for goods or services, or

(q)     Accounts that are subject to a contractual condition in which money is withheld until a specified event occurs.

-19-

"Enforcement Action" means the exercise by the Agent in good faith of any of its enforcement rights and remedies hereunder or under the other Loan Documents, applicable law or otherwise at any time upon the occurrence and during the continuance of an Event of Default (including, without limitation, the solicitation of bids from third parties to conduct the liquidation of the Collateral, the engagement or retention of sales brokers, marketing agents, investment bankers, accountants, appraisers, auctioneers or other third parties for the purposes of valuing, marketing, promoting and selling the Collateral, the commencement of any action to foreclose on the security interests or Liens of Agent in or on all or any material portion of the Collateral, notification of account debtors to make payments to the Agent, any action to take possession of all or any portion of the Collateral or commencement of any legal proceedings or actions against or with respect to all or any portion of the Collateral).

"Environmental Laws" means any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, obligation, damage, loss, claim, action, suit, judgment, order, fine, penalty, fee, expense, or cost, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal or presence of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" has the meaning set forth in the UCC.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with any Loan Party within the meaning of Section 414(b) or (c) of the Code

-20-

(and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 and 4971 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a plan amendment as a termination of a Pension Plan or a Multiemployer Plan under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon a Borrower or any ERISA Affiliate; or (g) the determination that any Pension Plan is considered to be an "at-risk" plan or that any Multiemployer Plan is considered to be in "endangered" or "critical" status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA.

"Event of Default" has the meaning specified in Section 8.01. An Event of Default shall be deemed to be continuing unless and until that Event of Default has been duly waived as provided in Section 10.01 hereof.

"Excluded Taxes" means, with respect to the Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Loan Parties hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) pursuant to the laws of the jurisdiction under which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, (b) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which any Loan Party is located, (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Lead Borrower under Section 10.13), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new Lending Office) or is attributable to such Foreign Lender's failure or inability (other than as a result of a Change in Law) to comply with Section 3.01(e), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Loan Parties with respect to such withholding tax pursuant to Section 3.01(a), (d) any U.S. federal, state or local backup withholding tax, and (e) any U.S. federal withholding tax imposed under FATCA.

"Executive Order" has the meaning set forth in Section 10.18.

"Extraordinary Receipt" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including tax refunds, pension plan reversions,

-21-

proceeds of insurance (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), condemnation awards (and payments in lieu thereof), indemnity payments and any purchase price adjustments.

"Facility Guaranty" means any Guarantee made by a Guarantor in favor of the Agent and the other Credit Parties, in form and substance reasonably satisfactory to the Agent, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"FATCA" means current Section 1471 through 1474 of the Code or any amended version or successor provision that is substantively similar to and, in each case, any regulations promulgated thereunder and any interpretation and other guidance issued in connection therewith.

"Factored Receivables" means any Accounts originally owed or owing by a Loan Party to another Person which have been purchased by or factored with Salus or any of its Affiliates pursuant to a factoring arrangement or otherwise with the Person that sold the goods or rendered the services to the Loan Party which gave rise to such Account.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to money center banks on such day on such transactions as determined by the Agent.

"Final Financing Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be satisfactory in form and substance to the Agent, and from which no appeal or motion to reconsider has been filed, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Agent, which, among other matters but not by way of limitation, authorizes the Borrowers to obtain credit, incur the Obligations, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super priority of the Agent's claims.

"Financing Orders" means, collectively, the Interim Financing Order and the Final Financing Order.

"FIRREA" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended from time to time.

"Fiscal Month" means any fiscal month of any Fiscal Year, which month shall generally end on the last day of each calendar month in accordance with the fiscal accounting calendar of the Loan Parties.

-22-

"Fiscal Quarter" means any fiscal quarter of any Fiscal Year, which quarters shall generally end on the last day of each March, June, September and December of such Fiscal Year in accordance with the fiscal accounting calendar of the Loan Parties.

"Fiscal Year" means any period of twelve (12) consecutive months ending on December 31st of any calendar year.

"Foreign Asset Control Regulations" has the meaning set forth in Section 10.18.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Lead Borrower is resident for tax purposes. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any

-23-

assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor" has the meaning specified in the introductory paragraph hereto, and each other Subsidiary of the Parent that shall be required to execute and deliver a Facility Guaranty pursuant to Section 6.12.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)     the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)     net obligations of such Person under any Swap Contract;

(d)     all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and, in each case, not past due for more than sixty (60) days after the date on which such trade account payable was created);

(e)     indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)     all Attributable Indebtedness of such Person;

(g)     all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person (including, without limitation, Disqualified Stock, or any warrant, right or option to acquire such Equity Interest), valued, in the case of a redeemable preferred interest, at

-24-

the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(h)     all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Indemnitees" has the meaning specified in Section 10.04(b).

"Information" has the meaning specified in Section 10.07.

"Intellectual Property" means all present and future: trade secrets, know-how and other proprietary information; trademarks, trademark applications, internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing) indicia and other source and/or business identifiers, and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights and copyright applications; (including copyrights for computer programs) and all tangible and intangible property embodying the copyrights, unpatented inventions (whether or not patentable); patents and patent applications; industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; books, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source codes, object codes, executable code, data, databases and other physical manifestations, embodiments or incorporations of any of the foregoing; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

"Intercreditor Agreement" means that certain Amended and Restated Intercreditor Agreement dated as of February 5, 2013, by and among Wells Fargo Capital Finance, LLC, the agent under the Subordinated Lien Credit Agreement and International Paper, as ratified by the Ratification Agreement.

"Interest Payment Date" means the first day after the end of each month and the Termination Date.

"Interim Financing Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing, together with all extension, modifications, and amendments thereto, in form and substance satisfactory to the Agent in its Permitted Discretion, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Loan Parties to execute and perform under the terms of this Agreement and the other Loan Documents, substantially in the form of Exhibit H-2.

-25-

"Internal Control Event" means a material weakness in, or fraud that involves management or other employees who have a significant role in, the Parent's and/or its Subsidiaries' internal controls over financial reporting, in each case as described in the Securities Laws.

"International Paper" means International Paper Company, a New York corporation.

"International Paper Note" means that certain Amended and Restated Secured Promissory Note, dated February 5, 2013, issued by the Lead Borrower to International Paper, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement.

"International Paper Purchase Agreement" means that certain Agreement to Purchase dated as of the date hereof, among International Paper, the Lead Borrower and the Agent.

"Inventory" has the meaning given that term in the UCC, and shall also include, without limitation, all: (a) goods which (i) are leased by a Person as lessor, (ii) are held by a Person for sale or lease or to be furnished under a contract of service, (iii) are furnished by a Person under a contract of service, or (iv) consist of raw materials, work in process, or materials used or consumed in a business; (b) goods of said description in transit; (c) goods of said description which are returned, repossessed or rejected; and (d) packaging, advertising, and shipping materials related to any of the foregoing.

"Inventory Reserves" means such reserves as may be established from time to time by the Agent in its Permitted Discretion with respect to the determination of the saleability, at retail, of the Eligible Inventory, which reflect such other factors as affect the market value of the Eligible Inventory or which reflect claims and liabilities that the Agent determines will need to be satisfied in connection with the realization upon the Inventory. Without limiting the generality of the foregoing, Inventory Reserves may, in the Agent's Permitted Discretion, include (but are not limited to) reserves based on:

        (a)    Obsolescence;

        (b)    Seasonality;

        (c)    Shrink;

        (d)    Imbalance;

        (e)    Change in Inventory character;

        (f)    Change in Inventory composition;

        (g)    Change in Inventory mix; and

        (h)    Out-of-date and/or expired Inventory.

-26-

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) any Acquisition, or (d) any other investment of money or capital in order to obtain a profitable return. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"IRS" means the United States Internal Revenue Service.

"Joinder" means an agreement, in form and substance satisfactory to the Agent pursuant to which, among other things, a Person becomes a party to, and bound by the terms of, this Agreement and/or the other Loan Documents in the same capacity and to the same extent as either a Borrower or a Guarantor, as the Agent may determine.

"Landlord Lien State" means such state(s) in which a landlord's claim for rent may have priority over the Lien of the Agent in any of the Collateral.

"Laws" means each international, foreign, Federal, state and local statute, treaty, rule, guideline, regulation, ordinance, code and administrative or judicial precedent or authority, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and each applicable administrative order, directed duty, request, license, authorization and permit of, and agreement with, any Governmental Authority, in each case whether or not having the force of law.

"Lead Borrower" has the meaning assigned to such term in the preamble of this Agreement.

"Lease" means any agreement, whether written or oral, no matter how styled or structured, pursuant to which a Loan Party is entitled to the use or occupancy of any space in a structure, land, improvements or premises for any period of time.

"Lender" each Tranche A Lender, Tranche A-1 Lender and Tranche B Lender.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Lead Borrower and the Agent.

"Lien" means (a) any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale, Capital Lease Obligation, Synthetic Lease Obligation, or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing) and (b) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

-27-

"Liquidation" means the exercise by the Agent of those rights and remedies accorded to the Agent under the Loan Documents and applicable Law as a creditor of the Loan Parties with respect to the realization on the Collateral, including (after the occurrence and during the continuation of an Event of Default) the conduct by the Loan Parties acting with the consent of the Agent, of any public, private or "going out of business", "store closing", or other similarly themed sale or other disposition of the Collateral for the purpose of liquidating the Collateral. Derivations of the word "Liquidation" (such as "Liquidate") are used with like meaning in this Agreement.

"Loan" means any extension of credit by a Lender to the Borrowers under Article II in the form of a Committed Loan or otherwise (but excluding, for the avoidance of doubt, any Tranche B Advance).

"Loan Account" has the meaning assigned to such term in Section 2.11(a).

"Loan Documents" means this Agreement, each Note, all Borrowing Base Certificates, the Intercreditor Agreement, the Ratification Agreement, the International Paper Purchase Agreement, the Blocked Account Agreements, the DDA Notifications, the Credit Card Notifications, the Security Documents, each Facility Guaranty, and any other instrument or agreement now or hereafter executed and delivered in connection herewith, or in connection with any transaction arising out of any Cash Management Services and Bank Products provided by the Agent or any of its Affiliates, each as amended and in effect from time to time.

"Loan Parties" means, collectively, the Borrowers and each Guarantor.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent), condition (financial or otherwise) or prospects of any Loan Party or the Parent and its Subsidiaries taken as a whole; (b) a material impairment of the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party; or (c) a material impairment of the rights and remedies of the Agent or any Lender under any Loan Document or a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party. In determining whether any individual event would result in a Material Adverse Effect, notwithstanding that such event in and of itself does not have such effect, a Material Adverse Effect shall be deemed to have occurred if the cumulative effect of such event and all other then existing events would result in a Material Adverse Effect. Notwithstanding the foregoing, (i) the filing of the Chapter 11 Case and (ii) the events specifically stated in the Declaration of James Pinto in Support of Chapter 11 Petitions and First Day Motions, dated on or about the date hereof, will not be deemed to have a Material Adverse Effect.

"Material Contract" means (a) the Paper Supply Agreement and (b) with respect to any Person, each contract to which such Person is a party (i) involving aggregate consideration payable to or by such Person of $2,000,000 or more in any Fiscal Year (other than purchase orders in the ordinary course of business of such Person and contracts that by their terms may be terminated by such Person in the ordinary course of business upon less than 61 days' notice

without penalty or premium) or (ii) the breach or termination of which could reasonably be expected to have a Material Adverse Effect.

"Material Indebtedness" means Indebtedness (other than the Obligations) of the Loan Parties in an aggregate principal amount exceeding $250,000. For purposes of determining the amount of Material Indebtedness at any time, (a) the amount of the obligations in respect of any Swap Contract at such time shall be calculated at the Swap Termination Value thereof, (b) undrawn committed or available amounts shall be included, and (c) all amounts owing to all creditors under any combined or syndicated credit arrangement shall be included.

"Maturity Date" means June 10, 2014.

"Maximum Loan Amount" means, at any time of determination, the lesser of (a) the Aggregate Revolving Commitments or (b) the sum of the Tranche A Loan Cap and the Tranche A-1 Loan Cap.

"Maximum Rate" has the meaning provided therefor in <u>Section 10.09</u>.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgages" means each and every fee and leasehold mortgage or deed of trust, security agreement and assignment by and between the Loan Party owning or holding the leasehold interest in the Real Estate encumbered thereby in favor of the Agent.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Lead Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Net Proceeds" means:

(a) with respect to any Disposition by any Loan Party or any of its Subsidiaries, or any Extraordinary Receipt received or paid to the account of any Loan Party or any of its Subsidiaries, the excess, if any, of (i) the sum of cash and cash equivalents received in connection with such transaction (including any cash or cash equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by the applicable asset by a Lien permitted hereunder which is senior to the Agent's Lien on such asset and that is required to be repaid (or to establish an escrow for the future repayment thereof) in connection with such transaction (other than Indebtedness under the Loan Documents), and (B) the reasonable and customary out-of-pocket expenses incurred by such Loan Party or such Subsidiary in connection with such transaction (including, without limitation, appraisals, and brokerage, legal, title and recording or transfer tax expenses and commissions) paid by any Loan Party to third parties (other than Affiliates)); and

(b) with respect to the sale or issuance of any Equity Interest by any Loan Party or any of its Subsidiaries, or the incurrence or issuance of any Indebtedness by any

Loan Party or any of its Subsidiaries, the excess of (i) the sum of the cash and cash equivalents received in connection with such transaction over (ii) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by such Loan Party or such Subsidiary in connection therewith.

"Non-Defaulting Lender" means, at any time, each Tranche A Lender and Tranche A-1 Lender that is not a Defaulting Lender at such time.

"Note" means (a) a Tranche A Note, (b) a Tranche A-1 Note, and (c) a Tranche B Note, as each may be amended, supplemented or modified from time to time.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means (a) all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan and any Tranche B Advance, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs, expenses and indemnities that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees, costs, expenses and indemnities are allowed claims in such proceeding, and (b) any Other Liabilities.

"OFAC" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity, and (d) in each case, all shareholder or other equity holder agreements, voting trusts and similar arrangements to which such Person is a party or which is applicable to its Equity Interests and all other arrangements relating to the Control or management of such Person.

"Other Liabilities" means (a) any obligation on account of (i) any Cash Management Services furnished to any of the Loan Parties or any of their Subsidiaries and/or (ii) any transaction with the Agent or any of its Affiliates that arises out of any Bank Product entered into with any Loan Party and any such Person, as each may be amended from time to time.

"Other Taxes" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

-30-

"Outstanding Amount" means with respect to any Committed Loans or Tranche B Advances on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of such Committed Loans or Tranche B Advances, as applicable, occurring on such date.

"Overadvance" means a Credit Extension to the extent that, immediately after its having been made, Availability is less than zero.

"Paper Supply Agreement" means that certain Paper Supply Agreement, dated as of September 7, 2010, by and between International Paper and the Lead Borrower, as amended by the Amendment to Paper Supply Agreement dated June 21, 2012, and the Second Amendment to Paper Supply Agreement dated February 5, 2013, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement.

"Parent" means NEV Credit Holdings, Inc., a Delaware corporation.

"Participant" has the meaning specified in Section 10.06(d).

"Participation Register" has the meaning provided therefor in Section 10.06(d).

"PBGC" means the Pension Benefit Guaranty Corporation.

"PCAOB" means the Public Company Accounting Oversight Board.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Lead Borrower or any ERISA Affiliate or to which the Lead Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Perfection Certificate" means that certain perfection certificate dated as of the date hereof, executed and delivered by the Loan Parties in favor of the Agent, for the benefit of the Credit Parties, and each other Perfection Certificate (which shall be in form and substance reasonably acceptable to the Agent) executed and delivered by the applicable Borrower or Guarantor in favor of the Agent for the benefit of the Credit Parties contemporaneously with the execution and delivery of Joinder executed in accordance with Section 6.12, in each case, as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance herewith.

"Permitted Discretion" means a determination made in good faith and in the exercise of reasonable business judgment from the perspective of a secured, asset-based commercial lender.

"Permitted Disposition" means any of the following:

      (a)     Dispositions of inventory in the ordinary course of business;

-31-

(b)     [Reserved];

(c)     [Reserved];

(d)     as long as no Default or Event of Default then exists or would arise therefrom, and all Net Proceeds are remitted directly to the Concentration Account, Dispositions of Equipment in the ordinary course of business that is substantially worn, damaged, obsolete or, in the judgment of a Loan Party, no longer useful or necessary in its business or that of any Subsidiary and is replaced with similar property having at least equivalent value;

(e)     sales, transfers and Dispositions among the Loan Parties or by any Subsidiary to a Loan Party; and

(f)     sales, transfers and Dispositions by any Subsidiary which is not a Loan Party to another Subsidiary that is not a Loan Party.

"Permitted Encumbrances" means:

(a)     Liens imposed by law for Taxes that are not yet due or are being contested in compliance with Section 6.04;

(b)     carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by applicable Law, arising in the ordinary course of business and securing obligations that are not overdue or are being contested in compliance with Section 6.04;

(c)     pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, other than any Lien imposed by ERISA;

(d)     deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)     Liens in respect of judgments that would not constitute an Event of Default hereunder;

(f)     easements, covenants, conditions, restrictions, building code laws, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of a Loan Party and such other minor title defects or survey matters that are disclosed by current surveys that, in each case, do not materially interfere with the current use of the real property;

(g)     Liens existing on the Closing Date and listed on Schedule 7.01 and any Permitted Refinancings thereof;

·  -32-

(h)     Liens on fixed or capital assets acquired by any Loan Party which are permitted under clause (c) of the definition of Permitted Indebtedness so long as (i) such Liens and the Indebtedness secured thereby are incurred prior to or within ninety (90) days after such acquisition, (ii) the Indebtedness secured thereby does not exceed the cost of acquisition of such fixed or capital assets and (iii) such Liens shall not extend to any other property or assets of the Loan Parties;

(i)     Liens in favor of the Agent;

(j)     statutory Liens of landlords and lessors in respect of rent not in default;

(k)     possessory Liens in favor of brokers and dealers arising in connection with the acquisition or disposition of Investments owned as of the Closing Date and Permitted Investments, provided that such liens (a) attach only to such Investments and (b) secure only obligations incurred in the ordinary course and arising in connection with the acquisition or disposition of such Investments and not any obligation in connection with margin financing;

(l)     Liens arising solely by virtue of any statutory or common law provisions relating to banker's liens, liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions or securities intermediaries;

(m)     Liens arising from precautionary UCC filings regarding "true" operating leases or, to the extent permitted under the Loan Documents, the consignment of goods to a Loan Party;

(n)     Liens created under or securing obligations under the Subordinated Lien Loan Documents (subject to the Intercreditor Agreement);

(o)     Liens created under or securing obligations under the International Paper Note and the Paper Supply Agreement (subject to the Intercreditor Agreement); and

(p)     Liens in favor of customs and revenues authorities imposed by applicable Law arising in the ordinary course of business in connection with the importation of goods and securing obligations that are (A) being contested in good faith by appropriate proceedings, (B) the applicable Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (C) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation.

"Permitted Indebtedness" means each of the following as long as no Default or Event of Default exists or would arise from the incurrence thereof:

(a)     Indebtedness outstanding on the Closing Date and listed on Schedule 7.03 and any Permitted Refinancing thereof;

(b)     Indebtedness of any Loan Party to any other Loan Party;

(c)     purchase money Indebtedness of any Loan Party to finance the acquisition of any personal property consisting solely of fixed or capital assets, including Capital Lease Obligations, and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, and Permitted Refinancings thereof; provided, however, that the incurrence of such Indebtedness shall be contemplated in the Approved Budget most recently delivered pursuant to Section 6.01(b) hereof and accepted by the Agent in its Permitted Discretion; provided further that, if requested by the Agent, the Loan Parties shall cause the holders of such Indebtedness to enter into a Collateral Access Agreement on terms reasonably satisfactory to the Agent;

(d)     obligations (contingent or otherwise) of any Loan Party or any Subsidiary thereof existing or arising under any Swap Contract, provided that such obligations are (or were) entered into by such Person in the ordinary course of business for the purpose of directly mitigating risks associated with fluctuations in interest rates or foreign exchange rates, and not for purposes of speculation or taking a "market view;" provided that the aggregate Swap Termination Value thereof shall not exceed $100,000 at any time outstanding;

(e)     [Reserved];

(f)     Indebtedness incurred for the construction or acquisition or improvement of, or to finance or to refinance, any Real Estate owned by any Loan Party (including therein any Indebtedness incurred in connection with sale-leaseback transactions permitted hereunder and any Synthetic Lease Obligations), provided that, (A) all Net Proceeds received in connection with any such Indebtedness are applied to the Obligations, and (B) the Loan Parties shall cause the holders of such Indebtedness and the lessors under any sale-leaseback transaction to enter into a Collateral Access Agreement on terms reasonably satisfactory to the Agent;

(g)     the Obligations;

(h)     Indebtedness of the Loan Parties incurred pursuant to the Subordinated Lien Loan Documents in a principal amount not to exceed $55,717,953; and

(i)     Indebtedness evidenced by the International Paper Note.

"Permitted Investments" means each of the following as long as no Default or Event of Default exists or would arise from the making of such Investment:

(a)     readily marketable obligations issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof having maturities of not more than 360 days from the date of acquisition thereof; provided that the full faith and credit of the United States of America is pledged in support thereof;

(b)     commercial paper issued by any Person organized under the laws of any state of the United States of America and rated at least "Prime-1" (or then equivalent

-34-

grade) by Moody's or at least "A-1" (or then equivalent grade) by S&P, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(c)    time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) is organized under the laws of the United States of America, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States of America, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (c) of this definition and (iii) has combined capital and surplus of at least $1,000,000,000, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(d)    fully collateralized repurchase agreements with a term of not more than thirty (30) days for securities described in clause (a) above (without regard to the limitation on maturity contained in such clause) and entered into with a financial institution satisfying the criteria described in clause (c) above or with any primary dealer and having a market value at the time that such repurchase agreement is entered into of not less than one hundred percent (100%) of the repurchase obligation of such counterparty entity with whom such repurchase agreement has been entered into;

(e)    Investments, classified in accordance with GAAP as current assets of the Loan Parties, in any money market fund, mutual fund, or other investment companies that are registered under the Investment Company Act of 1940, as amended, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and which invest solely in one or more of the types of securities described in clauses (a) through (d) above;

(f)    Investments existing on the Closing Date, and set forth on Schedule 7.02, but not any increase in the amount thereof or any other modification of the terms thereof;

(g)    (i) Investments by any Loan Party and its Subsidiaries in their respective Subsidiaries outstanding on the Closing Date, and (ii) additional Investments by any Loan Party and its Subsidiaries in Loan Parties;

(h)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(i)    Guarantees constituting Permitted Indebtedness;

(j)    Investments by any Loan Party in Swap Contracts entered into in the ordinary course of business and for bona fide business (and not speculative) purposes to protect against fluctuations in interest rates in respect of the Obligations;

(k)    Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(l)    advances to officers, directors and employees of the Loan Parties and Subsidiaries in the ordinary course of business in an amount not to exceed $50,000 to any individual at any time or in an aggregate amount not to exceed $100,000 at any time outstanding, for travel, entertainment, relocation and analogous ordinary business purposes;

(m)    Capital contributions made by any Loan Party to another Loan Party; and

(n)    Other Investments not otherwise specifically described herein and not exceeding $25,000 in the aggregate at any time outstanding.

provided, however, that notwithstanding the foregoing, no such Investments specified in clauses (a) through (e) shall be permitted unless (i) no Loans are then outstanding, and (ii) such Investments shall be pledged to the Agent as additional collateral for the Obligations pursuant to such agreements as may be reasonably required by the Agent.

"Permitted Overadvance" means an Overadvance made by the Agent, in its Permitted Discretion, which:

(a)    is made to maintain, protect or preserve the Collateral and/or the Credit Parties' rights under the Loan Documents or which is otherwise for the benefit of the Credit Parties;

(b)    is made to enhance the likelihood of, or to maximize the amount of, repayment of any Obligation;

(c)    is made to pay any other amount chargeable to any Loan Party hereunder;

provided, however, that the foregoing shall not result in any claim or liability against the Agent (regardless of the amount of any Overadvance) for Unintentional Overadvances and such Unintentional Overadvances shall not reduce the amount of Permitted Overadvances allowed hereunder; provided further that in no event shall the Agent make an Overadvance, if after giving effect thereto, the principal amount of the Credit Extensions would exceed the Aggregate Revolving Commitments (as in effect prior to any termination of the Commitments pursuant to Section 2.06 hereof).

"Permitted Refinancing" means, with respect to any Person, any Indebtedness issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund (collectively, to "Refinance"), the Indebtedness being Refinanced (or previous refinancings thereof constituting a Permitted Refinancing); provided, that (a) the principal amount (or accreted value, if applicable) of such Permitted Refinancing does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so Refinanced (plus unpaid accrued interest and premiums thereon and underwriting discounts, defeasance costs, fees, commissions and expenses), (b) the weighted average life to maturity of such Permitted

-36-

Refinancing is greater than or equal to the weighted average life to maturity of the Indebtedness being Refinanced, (c) such Permitted Refinancing shall not require any scheduled principal payments due prior to the Maturity Date in excess of, or prior to, the scheduled principal payments due prior to such Maturity Date for the Indebtedness being Refinanced, (d) if the Indebtedness being Refinanced is subordinated in right of payment to the Obligations under this Agreement, such Permitted Refinancing shall be subordinated in right of payment to such Obligations on terms at least as favorable to the Credit Parties as those contained in the documentation governing the Indebtedness being Refinanced, (e) no Permitted Refinancing shall have direct or indirect obligors who were not also obligors of the Indebtedness being Refinanced, or greater guarantees or security, than the Indebtedness being Refinanced, (f) such Permitted Refinancing shall be otherwise on terms not materially less favorable to the Credit Parties than those contained in the documentation governing the Indebtedness being Refinanced, including, without limitation, with respect to financial and other covenants and events of default, (g) the interest rate applicable to any such Permitted Refinancing shall not exceed then applicable market interest rate, and (h) at the time thereof, no Default or Event of Default shall have occurred and be continuing.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"Petition Date" has the meaning specified in the Recitals to this Agreement.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by the Lead Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"Post-Petition Obligations" means liabilities, indebtedness and other obligations, in each case incurred or due and payable on or after the Petition Date, which may from time to time be owing by any Loan Party to any Person, including without limitation all accounts payable, professionals fees and Taxes (including sales Taxes).

"Prepayment Event" means:

(a)     any Disposition (including pursuant to a sale and leaseback transaction) of any property or asset of a Loan Party;

(b)     any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of (and payments in lieu thereof), any property or asset of a Loan Party in an amount in excess of $50,000, unless the proceeds therefrom are required to be paid to the holder of a Lien on such property or asset having priority over the Lien of the Agent;

(c)     the issuance by a Loan Party of any Equity Interests, other than any such issuance of Equity Interests (i) to a Loan Party, or (ii) as a compensatory issuance to any employee, director, or consultant (including under any option plan);

-37-

<div style="margin-left:2em">

(d)     the incurrence by a Loan Party of any Indebtedness for borrowed money; or

(e)     the receipt by any Loan Party of any Extraordinary Receipts.

</div>

"Pre-Petition" means prior to the Petition Date.

"Pre-Petition Facility" means that certain Credit Agreement dated as of September 7, 2010, by and among, other others, the Lead Borrower, the lenders from time to time party thereto, and Wells Fargo Capital Finance, LLC, as agent, as amended prior to and in effect on the Petition Date.

"Pre-Petition Indebtedness" shall mean Indebtedness of any Loan Party that was incurred or accrued prior to the commencement of the Chapter 11 Case.

"Ratification Agreement" means that certain Ratification of Amended and Restated Intercreditor Agreement dated as of the date hereof by and among the agent under the Subordinated Lien Credit Agreement, International Paper and the Agent.

"Real Estate" means all Leases and all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by any Loan Party, including all easements, rights-of-way, and similar rights relating thereto and all leases, tenancies, and occupancies thereof.

"Receipts and Collections" has the meaning specified in Section 6.13(c).

"Receivables Reserves" means such Reserves as may be established from time to time by the Agent in the Agent's Permitted Discretion with respect to the determination of the collectability in the ordinary course of Eligible Trade Receivables, including, without limitation, dilution reserves.

"Register" has the meaning specified in Section 10.06(c).

"Registered Public Accounting Firm" has the meaning specified by the Securities Laws and shall be independent of the Lead Borrower and its Subsidiaries as prescribed by the Securities Laws.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty (30) day notice period has been waived.

"Reports" has the meaning provided in Section 9.12(b).

"Request for Credit Extension" means with respect to a Committed Borrowing, a Committed Loan Notice.

<div style="text-align:center">-38-</div>

"Required Lenders" means, as of any date of determination, Lenders holding more than fifty percent (50%) of the sum of the Aggregate Commitments or, if the Aggregate Commitments have been terminated pursuant to Section 8.02, Lenders holding in the aggregate more than fifty percent (50%) of the Total Outstandings; provided that the Commitment of, and the portion in the aggregate of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Reserves" means all Inventory Reserves, Availability Reserves, and Receivables Reserves.

"Responsible Officer" means the chief executive officer, president, chief financial officer, treasurer or assistant treasurer of a Loan Party or any of the other individuals designated in writing to the Agent by an existing Responsible Officer of a Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder and for whom the Agent has received satisfactory background checks. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment. Without limiting the foregoing, "Restricted Payments" with respect to any Person shall also include all payments made by such Person with any proceeds of a dissolution or liquidation of such Person.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Salus" means Salus Capital Partners, LLC and its successors.

"Salus Entity" has the meaning provided in Section 10.06(i).

"Sanctioned Entity" means (a) a country or a government of a country, (b) an agency of the government of a country, (c) an organization directly or indirectly controlled by a country or its government, (d) a Person resident in or determined to be a resident in a country, in each case, that is subject to a country sanctions program administered and enforced by OFAC.

"Sanctioned Person" means a person named on the list of Specially Designated Nationals maintained by OFAC.

"Sarbanes-Oxley" means the Sarbanes-Oxley Act of 2002.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Securities Laws" means the Securities Act of 1933, the Securities Exchange Act of 1934, Sarbanes-Oxley, and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the PCAOB.

"Security Agreement" means the Security Agreement dated as of the Closing Date among the Loan Parties and the Agent, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Security Documents" means the Security Agreement, the Blocked Account Agreements, the Mortgages, the DDA Notifications, the Credit Card Notifications, and each other security agreement or other instrument or document executed and delivered to the Agent pursuant to this Agreement or any other Loan Document granting a Lien to secure any of the Obligations.

"Settlement Date" has the meaning provided in Section 2.14(a).

"Shareholders' Equity" means, as of any date of determination, consolidated shareholders' equity of the Parent and its Subsidiaries as of that date determined in accordance with GAAP.

"Shrink" means Inventory which has been lost, misplaced, stolen, or is otherwise unaccounted for.

"Solvent" and "Solvency" means, with respect to any Person on a particular date, that on such date (a) at fair valuation, all of the properties and assets of such Person are greater than the sum of the debts, including contingent liabilities, of such Person, (b) the present fair saleable value of the properties and assets of such Person is not less than the amount that would be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person is able to realize upon its properties and assets and pay its debts and other liabilities, contingent obligations and other commitments as they mature in the normal course of business, (d) such Person does not intend to, and does not believe that it will, incur debts beyond such Person's ability to pay as such debts mature, and (e) such Person is not engaged in a business or a transaction, and is not about to engage in a business or transaction, for which such Person's properties and assets would constitute unreasonably small capital after giving due consideration to the prevailing practices in the industry in which such Person is engaged. The amount of all guarantees at any time shall be computed as the amount that, in light of all the facts and circumstances existing at the time, can reasonably be expected to become an actual or matured liability.

"Spot Rate" has the meaning given to such term in Section 1.07 hereof.

"Statutory Committee" means any official committee in the Chapter 11 Case pursuant to Section 1102 of the Bankruptcy Code.

"Subordinated Indebtedness" means Indebtedness which is expressly subordinated in right of payment to the prior payment in full of the Obligations and which is in form and on terms approved in writing by the Agent.

"Subordinated Lien Credit Agreement" means the Credit Agreement, dated as of September 7, 2010, among Parent, the Lead Borrower, the Persons from time to time party thereto as lenders, and Galactic Holdings, LLC, as agent (as successor in such capacity to General Electric Capital Corporation), as amended, restated, supplemented or otherwise modified, replaced or refinanced from time to time in accordance with the terms of this Agreement.

"Subordinated Lien Loans" means the "Loans" as defined in the Subordinated Lien Credit Agreement.

"Subordinated Lien Loan Documents" means the Subordinated Lien Credit Agreement and the other documents, instruments and agreements entered into or delivered by any of the Loan Parties in connection therewith.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the Equity Interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of a Loan Party.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-

-41-

market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" means the earliest to occur of (i) the Maturity Date, (ii) the date on which the maturity of the Obligations is accelerated (or deemed accelerated) and the Commitments are irrevocably terminated (or deemed terminated) in accordance with Article VIII, or (iii) the termination of the Commitments in accordance with the provisions of Section 2.06(a) hereof.

"Total Outstandings" means the Total Revolving Outstandings plus the aggregate Outstanding Amount of all Tranche B Loans.

"Total Revolving Outstandings" means the aggregate Outstanding Amount of all Tranche A Loans and all Tranche A-1 Loans.

"Trading with the Enemy Act" has the meaning set forth in Section 10.18.

"Tranche A Applicable Percentage" means with respect to any Tranche A Lender at any time, the percentage (carried out to the fourth decimal place) of the Aggregate Tranche A Commitments represented by such Tranche A Lender's Tranche A Commitment at such time. If the commitment of each Tranche A Lender to make Tranche A Loans has been terminated pursuant to Section 2.06 or Article VIII or if the Aggregate Tranche A Commitments have expired, then the Tranche A Applicable Percentage of each Lender shall be determined based on the Tranche A Applicable Percentage of such Tranche A Lender most recently in effect, giving effect to any subsequent assignments. The initial Tranche A Applicable Percentage of each Tranche A Lender is set forth opposite the name of such Tranche A Lender on Schedule 2.01 or in the Assignment and Acceptance pursuant to which such Tranche A Lender becomes a party hereto, as applicable.

"Tranche A Borrowing Base" means, at any time of calculation, an amount equal to without duplication:

(a)      the face amount of Eligible Trade Receivables, net of Receivables Reserves, multiplied by ninety-five percent (95%);

plus

-42-

(b)      the Cost of Eligible Inventory, net of Inventory Reserves, multiplied by the product of the Appraisal Percentage multiplied by the Appraised Value of Eligible Inventory;

minus

(c)      the Availability Block;

minus

(d)      the Tranche A-1 Reserve;

minus

(e)      the then amount of all other Availability Reserves.

"Tranche A Commitment" means, with respect to each Tranche A Lender, the commitment of such Lender hereunder set forth as its Tranche A Commitment opposite its name on Schedule 2.01 hereto or as may subsequently be set forth in the Register from time to time, as the same may be adjusted from time to time pursuant to the terms of this Agreement. As of the Closing Date the aggregate Tranche A Commitments were in the amount of $47,500,000.

"Tranche A Lender" means each Lender having a Tranche A Commitment as set forth on Schedule 2.01 hereto or in the Assignment and Acceptance by which it becomes a Tranche A Lender.

"Tranche A Loan Cap" means, at any time of determination, the lesser of (a) the Aggregate Tranche A Commitments or (b) the Tranche A Borrowing Base.

"Tranche A Loans" has the meaning set forth in Section 2.01.

"Tranche A Note" means a promissory note made by the Borrowers in favor of a Tranche A Lender evidencing the Tranche A Loans made by such Tranche A Lender, substantially in the form of Exhibit B-1.

"Tranche A-1 Applicable Percentage" means with respect to any Tranche A-1 Lender at any time, the percentage (carried out to the fourth decimal place) of the Aggregate Tranche A-1 Commitments represented by such Tranche A-1 Lender's Tranche A-1 Commitment at such time. If the commitment of each Tranche A-1 Lender to make Tranche A-1 Loans has been terminated pursuant to Section 2.06 or Article VIII or if the Aggregate Tranche A-1 Commitments have expired, then the Tranche A-1 Applicable Percentage of each Lender shall be determined based on the Tranche A-1 Applicable Percentage of such Tranche A-1 Lender most recently in effect, giving effect to any subsequent assignments. The initial Tranche A-1 Applicable Percentage of each Tranche A-1 Lender is set forth opposite the name of such Tranche A-1 Lender on Schedule 2.01 or in the Assignment and Acceptance pursuant to which such Tranche A-1 Lender becomes a party hereto, as applicable.

-43-

"Tranche A-1 Borrowing Base" means at any time of calculation, an amount equal to the lesser of (i) the Appraised Value of the Eligible Equipment, net of Availability Reserves with respect thereto, multiplied by eighty percent (80%), and (ii) the Aggregate Tranche A-1 Commitments at such time.

"Tranche A-1 Commitment" shall mean, with respect to each Tranche A-1 Lender, the commitment of such Tranche A-1 Lender hereunder set forth as its Tranche A-1 Commitment opposite its name on Schedule 2.01 hereto or as may subsequently be set forth in the Register from time to time, as the same may be adjusted from time to time pursuant to this Agreement. As of the Closing Date the Tranche A-1 Commitments were in the aggregate amount of $17,500,000.

"Tranche A-1 Lender" means each Lender having a Tranche A-1 Commitment as set forth on Schedule 2.01 hereto or in the Assignment and Acceptance by which it becomes a Tranche A-1 Lender.

"Tranche A-1 Loan Cap" means the least of (a) the Aggregate Tranche A-1 Commitments, (b) the Tranche A-1 Borrowing Base and (c) thirty percent (30)% of the lesser of the Combined Borrowing Base and the Aggregate Revolving Commitments.

"Tranche A-1 Loans" has the meaning set forth in Section 2.01.

"Tranche A-1 Note" means a promissory note made by the Borrowers in favor of a Tranche A-1 Lender evidencing the Tranche A-1 Loans made by such Tranche A-1 Lender, substantially in the form of Exhibit B-2.

"Tranche A-1 Reserve" means the amount, if any, by which the aggregate Outstanding Amount of the Tranche A-1 Loans exceeds the lesser of (a) the Tranche A-1 Borrowing Base and (b) thirty percent (30%) of the lesser of the Combined Borrowing Base and the Aggregate Revolving Commitments.

"Tranche B Action Notice" has the meaning set forth in Section 8.02(b).

"Tranche B Advances" has the meaning set forth in Section 2.03.

"Tranche B Advance Request" has the meaning set forth in Section 2.03.

"Tranche B Commitment" shall mean, with respect to the Tranche B Lender, the commitment of such Tranche B Lender hereunder set forth as its Tranche B Commitment opposite its name on Schedule 2.01 hereto or as may subsequently be set forth in the Register from time to time, as the same may be adjusted from time to time pursuant to this Agreement. As of the Closing Date the Tranche B Commitment is $2,500,000.

"Tranche B Lender" means the Lender having the Tranche B Commitment as set forth on Schedule 2.01 hereto.

"Tranche B Note" means a promissory note made by the Borrowers in favor of the Tranche B Lender evidencing the Tranche B Advances made by the Tranche B Lender, substantially in the form of Exhibit B-3.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9 of the Uniform Commercial Code; provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"UFCA" has the meaning specified in Section 10.22(d).

"UFTA" has the meaning specified in Section 10.22(d).

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"Unintentional Overadvance" means an Overadvance which, to the Agent's knowledge, did not constitute an Overadvance when made but which has become an Overadvance resulting from changed circumstances beyond the control of the Credit Parties, including, without limitation, a reduction in the Appraised Value of property or assets included in the Tranche A Borrowing Base or the Tranche A-1 Borrowing Base or misrepresentation by the Loan Parties.

"United States" and "U.S." mean the United States of America.

"Wage Order" means the order of the Bankruptcy Court entered in the Chapter 11 Case, together with all extensions, modifications and amendments that are in form and substance acceptable to the Agent in its Permitted Discretion, which, among other matters, authorizes and directs the Loan Parties to pay certain Pre-Petition wages, benefits and other amounts owing to employees.

**1.02    Other Interpretive Provisions.** With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such

-45-

agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)  Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)  Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in Dollars in full in cash or immediately available funds (or, in the case of contingent reimbursement obligations with respect to Bank Products (other than Swap Contracts) and any other contingent Obligations, providing cash collateralization or other collateral as may be requested by the Agent) of all of the Obligations (including the payment of any termination amount then applicable (or which would or could become applicable as a result of the repayment of the other Obligations) under Swap Contracts) other than (i) unasserted contingent indemnification Obligations, (ii) any Obligations relating to Bank Products (other than Swap Contracts) that, at such time, are allowed by the applicable Bank Product provider to remain outstanding without being required to be repaid or cash collateralized or otherwise collateralized as may be requested by the Agent, and (iii) any Obligations relating to Swap Contracts that, at such time, are allowed by the applicable provider of such Swap Contracts to remain outstanding without being required to be repaid.

### 1.03  Accounting Terms Generally.

(a)  _Generally_.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with GAAP, applied on a consistent basis, as in effect from time to time, except as otherwise specifically prescribed herein.

(b)    Changes in GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Lead Borrower or the Required Lenders shall so request, the Agent, the Lenders and the Lead Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Lead Borrower shall provide to the Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

**1.04    Rounding.**  Any financial ratios required to be maintained by the Borrowers pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**1.05    Times of Day.**  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**1.06    Reserved.**

**1.07    Currency Equivalents Generally.**  Any amount specified in this Agreement (other than in Article II, Article IX and Article X) or any of the other Loan Documents to be in Dollars shall also include the equivalent of such amount in any currency other than Dollars, such equivalent amount thereof in the applicable currency to be determined by the Agent at such time on the basis of the Spot Rate (as defined below) for the purchase of such currency with Dollars. For purposes of this Section 1.07, the "Spot Rate" for a currency means the rate determined by the Agent to be the rate quoted by the Person acting in such capacity as the spot rate for the purchase by such Person of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two Business Days prior to the date of such determination; provided that the Agent may obtain such spot rate from another financial institution designated by the Agent if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency.

## ARTICLE II
## THE COMMITMENTS AND CREDIT EXTENSIONS

**2.01    Committed Loans; Reserves.**

(a)    Subject to the terms and conditions set forth herein, (i) each Tranche A Lender severally agrees to make loans (each such loan, a "Tranche A Loan") to the Borrowers from time to time, on any Business Day during the Availability Period on which the Agent's offices are open to conduct business, in an aggregate amount not to exceed at any time outstanding the lesser of (x) the amount of such Lender's Tranche A Commitment, or (y) such Lender's Tranche A Applicable Percentage of the Tranche A Borrowing Base and (ii) each

-47-

Tranche A-1 Lender severally agrees to make loans (each such loan, a "Tranche A-1 Loan") to the Borrowers from time to time, on any Business Day during the Availability Period, in an aggregate amount not to exceed at any time outstanding the lesser of (x) the amount of such Lender's Tranche A-1 Commitment, or (y) such Lender's Tranche A-1 Applicable Percentage of the Tranche A-1 Borrowing Base, subject in each case to the following limitations:

(i)    after giving effect to any Committed Borrowing, (x) the Total Revolving Outstandings shall not exceed the sum of the Tranche A Loan Cap and the Tranche A-1 Loan Cap, (y) the aggregate Outstanding Amount of Tranche A Loans shall not exceed the Tranche A Loan Cap, and (z) the aggregate Outstanding Amount of Tranche A-1 Loans shall not exceed the Tranche A-1 Loan Cap;

(ii)    after giving effect to any Borrowing of Tranche A Loans, the aggregate Outstanding Amount of the Tranche A Loans of any Tranche A Lender shall not exceed the lesser of (x) such Tranche A Lender's Tranche A Commitment and (y) such Tranche A Lender's Tranche A Applicable Percentage of the Tranche A Borrowing Base;

(iii)    the aggregate outstanding principal amount of Tranche A Loans shall not at any time exceed the Aggregate Tranche A Commitments;

(iv)    after giving effect to any Committed Borrowing of Tranche A-1 Loans, the aggregate Outstanding Amount of the Tranche A-1 Loans of any Tranche A-1 Lender, shall not exceed the lesser of (x) such Tranche A-1 Lender's Tranche A-1 Commitment and (y) such Tranche A-1 Lender's Tranche A-1 Applicable Percentage of the Tranche A-1 Borrowing Base;

(v)    the aggregate outstanding principal amount of the Tranche A-1 Loans shall not exceed the Aggregate Tranche A-1 Commitments;

(vi)    after giving effect to any Committed Borrowing, the Total Revolving Outstandings shall not exceed the Maximum Loan Amount; and

(vii)    notwithstanding anything to the contrary set forth in this Agreement or any other Loan Document, during the period commencing on the Closing Date until the date on which the Bankruptcy Court enters the Financial Financing Order, the Total Revolving Outstandings shall not exceed $60,000,000.

Within the limits of each Lender's Commitment, and subject to the other terms and conditions hereof, the Borrowers may borrow under this Section 2.01, prepay under Section 2.05, and reborrow Committed Loans under this Section 2.01.

(b)    The Inventory Reserves, Availability Reserves, and Receivables Reserves as of the Closing Date are set forth in the Borrowing Base Certificate delivered pursuant to Section 4.01(c) hereof.

(c)    The Agent shall have the right, at any time and from time to time after the Closing Date in its Permitted Discretion to establish, modify or eliminate Reserves.

-48-

**2.02    Borrowings of Committed Loans.**

(a)    The Committed Loans shall be Loans and Obligations for all purposes of this Agreement and the other Loan Documents. Notwithstanding anything to the contrary contained in this Agreement, the Borrowers shall not request, and the Tranche A Lenders shall be under no obligation to fund, any Tranche A Loan unless the Borrowers have borrowed the full amount available under the Tranche A-1 Loan Cap. If any Tranche A-1 Loan is prepaid in whole or part pursuant to Section 2.05, any Committed Loans to the Borrowers thereafter requested shall automatically be Tranche A-1 Loans until the maximum principal amount of Tranche A-1 Loans outstanding equals the Tranche A-1 Loan Cap in effect at such time.

(b)    Each Committed Loan shall be made upon the Lead Borrower's irrevocable notice to the Agent, which notice must be received by the Agent not later than 12:00 p.m. on the same Business Day of the requested date of any Committed Borrowing, and must be made by delivery to the Agent of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Lead Borrower. Each Committed Borrowing shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof. Each Committed Loan Notice shall specify (i) the requested date of the Committed Borrowing (which shall be a Business Day), and (ii) the principal amount of Committed Loans to be borrowed.

(c)    Following receipt of a Request for Credit Extension, the Agent shall promptly notify each Appropriate Lender of the amount of its Applicable Percentage of the applicable Committed Loans. In the case of a Committed Borrowing, each Lender shall make the amount of its Committed Loan available to the Agent in immediately available funds at the Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Committed Loan Notice. Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Committed Borrowing is the initial Credit Extension, Section 4.01), the Agent shall use reasonable efforts to make all funds so received available to the Borrowers in like funds by no later than 4:00 p.m. on the day of receipt by the Agent by wire transfer of such funds, in accordance with instructions provided to (and reasonably acceptable to) the Agent by the Lead Borrower.

(d)    The Agent, without the request of the Lead Borrower, may advance as a Loan any interest, fee, service charge (including direct wire fees), Credit Party Expenses, or other payment to which any Credit Party is entitled from the Loan Parties pursuant hereto or any other Loan Document and may charge the same to the Loan Account notwithstanding that an Overadvance may result thereby. The Agent shall advise the Lead Borrower of any such advance or charge promptly after the making thereof. Such action on the part of the Agent shall not constitute a waiver of the Agent's rights and the Borrowers' obligations under Section 2.05(c). Any amount which is added to the principal balance of the Loan Account as provided in this Section 2.02(d) shall bear interest at the interest rate then and thereafter applicable to the Tranche A Loans.

(e)    Each Committed Borrowing shall be made by the Lenders pro rata in accordance with their respective Applicable Percentage. The failure of any Lender to make any Loan shall neither relieve any other Lender of its obligation to fund its Loan in accordance with the provisions of this Agreement nor increase the obligation of any such other Lender.

-49-

(f)      Each Committed Borrowing of Tranche A Loans shall be made by the Tranche A Lenders pro rata in accordance with their respective Tranche A Applicable Percentage and each Committed Borrowing of Tranche A-1 Loans shall be made by the Tranche A-1 Lenders pro rata in accordance with their respective Tranche A-1 Applicable Percentage. The failure of any Lender to make any Loan shall neither relieve any other Lender of its obligation to fund its Loan in accordance with the provisions of this Agreement nor increase the obligation of any such other Lender.

(g)      At any time that any Loans are outstanding, the Agent shall notify the Lead Borrower and the Lenders of any change in Salus' prime rate used in determining the Base Rate.

(h)      [Reserved].

(i)      The Agent and the Lenders shall have no obligation to make any Loan if an Overadvance would result. The Agent may, in its Permitted Discretion, make Permitted Overadvances without the consent of the Borrowers and the Lenders, and the Borrowers and each Lender shall be bound thereby. A Permitted Overadvance is for the account of the Borrowers and shall constitute a Loan and an Obligation and shall be repaid by the Borrowers in accordance with the provisions of Section 2.05(c). The making of any such Permitted Overadvance on any one occasion shall not obligate the Agent or any Lender to make or permit any Permitted Overadvance on any other occasion or to permit such Permitted Overadvances to remain outstanding. The Agent shall have no liability for, and no Loan Party or Credit Party shall have the right to, or shall, bring any claim of any kind whatsoever against the Agent with respect to Unintentional Overadvances regardless of the amount of any such Overadvance(s).

**2.03**      **Tranche B Advances.**

(a)      Subject to the terms and conditions set forth herein, the Tranche B Lender agrees to extend trade credit (each such extension of credit, a "Tranche B Advance") to the Borrowers from time to time, on any Business Day during the Availability Period on which the Agent's and such Tranche B Lender's offices are open to conduct business, in an aggregate amount not to exceed at any time outstanding the amount of the Tranche B Lender's remaining Tranche B Commitment, subject in each case to the limitation that, after giving effect to any Tranche B Advance, the aggregate Outstanding Amount of the Tranche B Advances shall not exceed the Tranche B Lender's Tranche B Commitment. Within the limits of the Tranche B Lender's Tranche B Commitment, and subject to the other terms and conditions hereof, the Borrowers may borrow under this Section 2.03, and, once repaid in accordance with Section 2.07(b), reborrow Tranche B Advances under this Section 2.03. The Tranche B Advances shall be Obligations for all purposes of this Agreement and the other Loan Documents.

(b)      Each Tranche B Advance shall be made upon the Lead Borrower's delivery to the Agent and the Tranche B Lender of an invoice, in a form reasonably satisfactory to the Agent, designating the "Products" (as defined in the Paper Supply Agreement) purchased by the Lead Borrower to which such Tranche B Advance shall apply (a "Tranche B Advance Request"). If such invoice is received not later than 2:00 p.m. on any Business Day, then the undisputed amount of such invoice shall be deemed a Tranche B Advance hereunder on such

-50-

Business Day. Each Tranche B Advance shall be in a principal amount of up to $150,000. The first Tranche B Advance shall be made on the Closing Date.

2.04   **[Reserved]**.

2.05   **Prepayments**.

(a)   The Borrowers shall not prepay the Tranche B Advances at any time.

(b)   Subject to <u>Section 2.09</u>, the Borrowers may, upon irrevocable notice from the Lead Borrower to the Agent, at any time or from time to time voluntarily prepay Loans in whole or in part without premium or penalty; <u>provided</u> that (i) such notice must be received by the Agent not later than 11:00 a.m. three Business Days prior to any date of prepayment; and (ii) any prepayment shall be in a principal amount of $100,000 or a whole multiple of $100,000 in excess thereof or, if less, the entire principal amount thereof then outstanding; <u>provided</u> that prepayments applied to the Obligations pursuant to <u>Section 6.13(d)</u> shall not be subject to any prepayment minimums or notice requirements. Except as provided in Section 2.05(c)(z) below or in connection with a permanent reduction in the Aggregate Tranche A-1 Commitment permitted hereunder, all payments shall be first applied to Tranche A Loans, and upon payment of Tranche A Loans in full, to Tranche A-1 Loans. Each such notice shall specify the date and amount of such prepayment. The Agent will promptly notify each Appropriate Lender of its receipt of each such notice, and of the amount of such Lender's Applicable Percentage of such prepayment. If such notice is given by the Lead Borrower and is not later revoked, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment shall be accompanied by all accrued interest on the amount prepaid. Each such prepayment shall be applied to the Committed Loans of the Lenders in accordance with their respective Applicable Percentages.

(c)   (x) If for any reason the Total Revolving Outstandings at any time exceed the sum of the Tranche A Loan Cap plus the Tranche A-1 Loan Cap, each as then in effect, the Borrowers shall immediately prepay in an aggregate amount necessary to eliminate such excess, (i) first, the Tranche A Loans, and (ii) second, if there remains an excess after the payments made under clause (i) above, the Tranche A-1 Loans; (y) if for any reason the sum of the aggregate Outstanding Amount of the Tranche A Loans at any time exceeds the Tranche A Loan Cap as then in effect, the Borrowers shall immediately prepay the Tranche A Loans in an aggregate amount equal to such excess and (z) if for any reason the aggregate Outstanding Amount of the Tranche A-1 Loans of the Tranche A-1 Lenders at any time exceeds the Aggregate Tranche A-1 Commitments as then in effect, the Borrowers shall, after making any payments required pursuant to clauses (x) and (y) above, immediately prepay Tranche A-1 Loans in an aggregate amount equal to such excess.

(d)   The Borrowers shall prepay the Loans with proceeds and collections received by the Loan Parties to the extent so required under the provisions of <u>Section 6.13</u> hereof.

(e)   The Borrowers shall prepay the Loans in an amount equal to the Net Cash Proceeds received by a Loan Party on account of a Prepayment Event;

-51-

(f)    [Reserved].

(g)    Prepayments made pursuant to Section (d) and (e) above, first, shall be applied ratably to the outstanding Tranche A Loans, second, shall be applied to the outstanding Tranche A-1 Loans, and third, the amount remaining, if any, may be retained by the Borrowers for use in the ordinary course of their business.

### 2.06    Termination or Reduction of Commitments.

(a)    Subject to Section 2.09, the Borrowers may, upon irrevocable notice from the Lead Borrower to the Agent, terminate the Aggregate Tranche A Commitments or the Aggregate Tranche A-1 Commitments or from time to time permanently reduce the Aggregate Tranche A Commitments or the Aggregate Tranche A-1 Commitments; provided, that (i) any such notice shall be received by the Agent not later than 11:00 a.m. three Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $1,000,000 or any whole multiple of $500,000 in excess thereof, (iii) the Borrowers shall not terminate or reduce (A) the Tranche A Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the aggregate Outstanding Amount of the Tranche A Loans would exceed the Aggregate Tranche A Commitments and (B) the Tranche A-1 Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the aggregate Outstanding Amount of the Tranche A-1 Loans would exceed the Aggregate Tranche A-1 Commitments, and (iv) the Borrowers shall not reduce the Aggregate Tranche A-1 Commitments at any time while the Tranche A Commitments remain outstanding.

(b)    In the event that the Tranche A Commitments are terminated or are reduced to zero, the Tranche A-1 Commitments and the Tranche B Commitment shall be automatically terminated. Except as set forth in this Section 2.06(b), the Borrowers may not terminate or permanently reduce the Tranche B Commitment at any time.

(c)    The Agent will promptly notify the Lenders of any termination or reduction of the Aggregate Tranche A Commitments, the Aggregate Tranche A-1 Commitments or the Tranche B Commitment under this Section 2.06. Upon any reduction of the Aggregate Tranche A Commitments, the Tranche A Commitment of each Tranche A Lender shall be reduced by such Tranche A Lender's Applicable Percentage of such reduction amount. Upon any reduction of the Aggregate Tranche A-1 Commitments, the Tranche A-1 Commitment of each Tranche A-1 Lender shall be reduced by such Tranche A-1 Lender's Applicable Percentage of such reduction amount. All fees (including, without limitation, commitment fees) and interest in respect of the Aggregate Tranche A Commitments, Aggregate Tranche A-1 Commitments or Tranche B Commitment, as applicable, accrued until the effective date of any termination of the Aggregate Commitments shall be paid on the effective date of such termination.

### 2.07    Repayment of Loans.

(a)    The Borrowers shall repay to the Lenders on the Termination Date the aggregate principal amount of Committed Loans outstanding on such date.

(b)    The Borrowers shall repay to the Tranche B Lender (i) the principal amount of each Tranche B Advance on the thirtieth (30th) day (or, if such day is not a Business

-52-

Day, on the next succeeding Business Day) following the date on which such Tranche B Advance was deemed made hereunder and (ii) on the Termination Date, the aggregate principal amount of Tranche B Advances outstanding on such date.

## 2.08 Interest.

(a) Subject to the provisions of Section 2.08(b) below, (i) each Committed Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Applicable Interest Rate, and (ii) each Tranche B Advance shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Applicable Interest Rate.

(b) (i) If any amount payable under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(ii) If any other Event of Default exists, then the Agent may, and upon the request of the Required Lenders shall, notify the Lead Borrower that all outstanding Obligations shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate and thereafter such Obligations shall bear interest at the Default Rate to the fullest extent permitted by applicable Laws.

(iii) Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c) Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein, and shall be paid in cash on each Interest Payment Date applicable thereto. Interest on each Term B Advance shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein, and shall be paid on each Interest Payment Date by the additional of such accrued interest as of such date to the outstanding principal amount of such Term B Advance. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

## 2.09 Fees.

(a) Tranche A Commitment Fee. The Borrowers shall pay to the Agent, for the ratable benefit of the Tranche A Lenders, a commitment fee, calculated on a per annum basis equal to three-quarters of one percent (0.75%) times the average daily amount by which the Tranche A Commitments exceeds the Outstanding Amount of the Tranche A Loans. The commitment fee shall accrue at all times during the Availability Period, including at any time during which one or more of the conditions in Section 4.02 is not met, and shall be due and payable monthly in arrears on the first day after the end of each month, commencing with the first such date to occur after the Closing Date, and on the last day of the Availability Period. The commitment fee shall be calculated monthly in arrears.

-53-

(b)    Collateral Monitoring Fee. The Borrowers shall pay the Agent a collateral monitoring fee of $300,000 payable in monthly installments of $25,000 through the Maturity Date (the "Collateral Monitoring Fee"). The entire Collateral Monitoring Fee shall be fully earned on the Closing Date and shall not be refundable for any reason whatsoever. The monthly installments shall be paid in cash on the first day of each calendar month commencing on July 1, 2013; provided that on the Closing Date, the Borrower shall pay to the Lender an amount equal to $833 multiplied by the number of days in the month remaining as of such date. Any unpaid balance of the Collateral Monitoring Fee outstanding on the Termination Date shall be paid on the Termination Date.

(c)    Tranche A Closing Fee. The Borrowers shall pay to the Agent, for its own account, a closing fee in an amount equal to $475,000, which shall be a fee fully earned on the Closing Date and shall not be refundable for any reason whatsoever.

(d)    Tranche A-1 Closing Fee. The Borrowers shall pay to the Agent, for its own account, a closing fee in an amount equal to $437,500, which shall be a fee fully earned on the Closing Date and shall not be refundable for any reason whatsoever.

(e)    DIP Exit Fee. On the earliest to occur of (i) a sale of a material portion of any Borrower's assets, (ii) the confirmation in the Chapter 11 Case of a plan of reorganization or a liquidation, or (iii) the Termination Date (whether in connection with a refinancing of the Obligations or otherwise), Borrowers shall pay the Agent, for its own account, a fee in an amount equal to $275,000 (the "DIP Exit Fee").

**2.10    Computation of Interest and Fees.** All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed. Interest shall accrue on each Loan and each Tranche B Advance for the day on which the Loan and Tranche B Advance is made. For purposes of the calculation of interest on the Loans and Tranche B Advances and the Outstanding Amount thereof, all payments made by or on account of the Borrowers shall be deemed to have been applied to the Loans and Tranche B Advances two (2) Business Days after receipt of such payments by the Agent (as such receipt is determined pursuant to Section 2.12). Each determination by the Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**2.11    Evidence of Debt.**

(a)    The Credit Extensions and Tranche B Advances made by each Lender shall be evidenced by one or more accounts or records maintained by the Agent (the "Loan Account") in the ordinary course of business. In addition, each Lender may record in such Lender's internal records, an appropriate notation evidencing the date and amount of each Loan and each Tranche B Advance from such Lender, each payment and prepayment of principal of any such Loan and any such Tranche B Advance, and each payment of interest, fees and other amounts due in connection with the Obligations due to such Lender. The accounts or records maintained by the Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions and Tranche B Advances made by the Lenders to the Borrowers and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any

-54-

amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Agent in respect of such matters, the accounts and records of the Agent shall control in the absence of manifest error. Upon the request of any Lender made through the Agent, the Borrowers shall execute and deliver to such Lender (through the Agent) a Note, which shall evidence such Lender's Committed Loans or Tranche B Advances, as applicable, in addition to such accounts or records. Each Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its Loans and Tranche B Advances and payments with respect thereto. Upon receipt of an affidavit of a Lender as to the loss, theft, destruction or mutilation of such Lender's Note and upon cancellation of such Note, the Borrowers will issue, in lieu thereof, a replacement Note in favor of such Lender, in the same principal amount thereof and otherwise of like tenor.

(b)    [Reserved].

(c)    Agent shall render monthly statements regarding the Loan Account to the Lead Borrower including principal, interest, fees, and including an itemization of all charges and expenses constituting Credit Party Expenses owing, and such statements, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between Borrowers and the Credit Parties unless, within thirty (30) days after receipt thereof by the Lead Borrower, the Lead Borrower shall deliver to Agent written objection thereto describing the error or errors contained in any such statements.

### 2.12    Payments Generally; Agent's Clawback.

(a)    General. All payments to be made by the Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Agent, for the account of the respective Lenders to which such payment is owed, at the Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein. The Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue and shall be calculated pursuant to Section 2.10. If any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)    (i)    Funding by Lenders; Presumption by Agent. Unless the Agent shall have received notice from a Lender prior to 12:00 noon on the date of such Committed Borrowing that such Lender will not make available to the Agent such Lender's share of such Committed Borrowing, the Agent may assume that such Lender has made such share available on such date in accordance with and at the time required by Section 2.02 and may, in reliance upon such assumption, make available to the Borrowers a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Committed Borrowing available to the Agent, then the applicable Lender and the Borrowers severally agree to pay to the Agent forthwith on demand such corresponding amount in immediately available funds with interest

-55-

thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative processing or similar fees customarily charged by the Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrowers, the interest rate applicable to Committed Loans. If the Borrowers and such Lender shall pay such interest to the Agent for the same or an overlapping period, the Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period. If such Lender pays its share of the applicable Committed Borrowing to the Agent, then the amount so paid shall constitute such Lender's Committed Loan included in such Committed Borrowing. Any payment by the Borrowers shall be without prejudice to any claim the Borrowers may have against a Lender that shall have failed to make such payment to the Agent.

          (ii)     Payments by Borrowers; Presumptions by Agent. Unless the Agent shall have received notice from the Lead Borrower prior to the time at which any payment is due to the Agent for the account of the Lenders hereunder that the Borrowers will not make such payment, the Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrowers have not in fact made such payment, then each of the Lenders severally agrees to repay to the Agent forthwith on demand the amount so distributed to such Lender in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Agent, at the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation.

        A notice of the Agent to any Lender or the Lead Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

        (c)     Failure to Satisfy Conditions Precedent. If any Lender makes available to the Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrowers by the Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof (subject to the provisions of the last paragraph of Section 4.02 hereof), the Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

        (d)     Obligations of Lenders Several. The obligations of the Lenders hereunder to make Committed Loans and Tranche B Advances and to make payments hereunder are several and not joint. The failure of any Lender to make any Committed Loan or Tranche B Advance or to make any payment hereunder on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its portion of its Committed Loan or Tranche B Advance or to make its payment hereunder.

(e)     Funding Source.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

**2.13     Sharing of Payments by Lenders.**  If any Credit Party shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of, interest on, or other amounts with respect to, any of the Obligations resulting in any Lender's receiving payment of a proportion of the aggregate amount of Obligations in respect of Committed Loans and Tranche B Advances greater than its pro rata share thereof as provided herein, (including, in each case, as in contravention of the priorities of payment set forth in Section 8.03), then the Credit Party receiving such greater proportion shall (a) notify the Agent of such fact, and (b) purchase (for cash at face value) participations in the Obligations of the other Lenders or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Credit Parties ratably and in the priorities set forth in Section 8.03, provided that:

(i)     if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)     the provisions of this Section shall not be construed to apply to (x) any payment made by the Loan Parties pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its portion of its Committed Loans and Tranche B Advances to any assignee or participant, other than to the Borrowers or any Subsidiary thereof (as to which the provisions of this Section shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

**2.14     Settlement Amongst Lenders.**

(a)     The amount of each Lender's Applicable Percentage of outstanding Committed Loans and Tranche B Advances and shall be adjusted upward or downward based on all Committed Loans and Tranche B Advances and repayments of Committed Loans and Tranche B Advances received by the Agent as of 3:00 p.m. on the first Business Day (such date, the "Settlement Date") following the end of the period specified by the Agent.

(b)     The Agent shall deliver to each of the Lenders promptly after a Settlement Date a summary statement of the amount of outstanding Committed Loans and Tranche B Advances for the period and the amount of repayments received for the period. As reflected on

-57-

the summary statement, (i) the Agent shall transfer to each Lender its Applicable Percentage of repayments, and (ii) each Lender shall transfer to the Agent (as provided below) or the Agent shall transfer to each Lender, such amounts as are necessary to insure that, after giving effect to all such transfers, the amount of Committed Loans and Tranche B Advances made by each Lender shall be equal to such Lender's Applicable Percentage of all Committed Loans and Tranche B Advances outstanding as of such Settlement Date. If the summary statement requires transfers to be made to the Agent by the Lenders and is received prior to 1:00 p.m. on a Business Day, such transfers shall be made in immediately available funds no later than 3:00 p.m. that day; and, if received after 1:00 p.m., then no later than 3:00 p.m. on the next Business Day. The obligation of each Lender to transfer such funds is irrevocable, unconditional and without recourse to or warranty by the Agent. If and to the extent any Lender shall not have so made its transfer to the Agent, such Lender agrees to pay to the Agent, forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Agent, equal to the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative, processing, or similar fees customarily charged by the Agent in connection with the foregoing.

**2.15   [Reserved].**

**2.16   Defaulting Lenders.**

(a)   Adjustments. Notwithstanding anything to the contrary contained in this Agreement, if any Tranche A Lender or any Tranche A-1 Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)   Waivers and Amendments. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and Section 10.01.

(ii)   Defaulting Lender Waterfall. Any payment of principal, interest, fees or other amounts received by the Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise) or received by the Agent from a Defaulting Lender pursuant to Section 10.08 shall be applied at such time or times as may be determined by the Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Agent hereunder; second, as the Lead Borrower may request (so long as no Default or Event of Default exists), to the funding of any Committed Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Agent; third, if so determined by the Agent and the Lead Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Committed Loans under this Agreement; fourth, to the payment of any amounts owing to the Non-Defaulting Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Non-Defaulting Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrowers as a result of any

-58-

judgment of a court of competent jurisdiction obtained by the Borrowers against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Committed Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Committed Loans were made at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Committed Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Committed Loans of such Defaulting Lender until such time as all Committed Loans are held by the Lenders pro rata in accordance with the Commitments hereunder. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    Certain Fees. No Defaulting Lender shall be entitled to receive any fee payable under the Loan Documents for any period during which that Lender is a Defaulting Lender (and the Borrowers shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(b)    Defaulting Lender Cure. If the Lead Borrower and the Agent agree in writing that a Tranche A Lender or Tranche A-1 Lender, as applicable, is no longer a Defaulting Lender, the Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any cash collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Committed Loans of the other Lenders or take such other actions as the Agent may determine to be necessary to cause the Committed Loans to be held on a pro rata basis by the Lenders in accordance with their Applicable Percentages, whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender having been a Defaulting Lender.

**2.17    Super Priority Nature of Obligations and Agent's Liens.**

(a)    The priority of Agent's Liens on the Collateral owned by the Loan Parties shall be set forth in the Interim Financing Order and the Final Financing Order.

(b)    All Obligations shall constitute administrative expenses of the Loan Parties in the Chapter 11 Case, with administrative priority and senior secured status under Sections 364(c) and 364(d) of the Bankruptcy Code. Subject only to the Carve-Out up to the Carve-Out Amount, such administrative claim shall have priority over any and all administrative expense claims, unsecured claims and costs and expenses against the Loan Parties or their estates in the Chapter 11 Case (or any subsequent proceeding or case under the Bankruptcy Code), at any time existing or arising, of any kind or nature whatsoever, including, without limitation,

administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise and shall at all times be senior to the rights of the Loan Parties, the Loan Parties' estates and any successor trustee or estate representative in the Chapter 11 Case or any subsequent proceeding or case under the Bankruptcy Code subject to the priorities set forth in the Interim Financing Order or Final Financing Order (as applicable). The Liens granted to the Agent on the Collateral owned by the Loan Parties, and the priorities accorded to the Obligations shall have the priority and senior secured status afforded by Sections 364(c) and 364(d) of the Bankruptcy Code (all as more fully set forth in the Interim Financing Order and the Final Financing Order) senior to all claims and interests other than the Carve-Out up to the Carve-Out Amount and Permitted Encumbrances.

(c)    No other Lien having a priority superior to or pari passu with that granted to the Agent shall be granted or approved while any Obligations under this Agreement remain outstanding.

(d)    Except for the Carve-Out up to the Carve-Out Amount, as set forth in the Interim Financing Order and the Final Financing Order, no costs or expenses of administration shall be imposed against the Agent, any other Credit Party or any of the Collateral under Sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, and each Loan Party hereby waives for itself and on behalf of its estate in bankruptcy, any and all rights under Sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against the Agent or any other Credit Party.

**2.18    Payment of Obligations.** On the Termination Date, the Credit Parties shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

**2.19    No Discharge; Survival of Claims.** Each Loan Party agrees that (i) the Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization in the Chapter 11 Case (and each Loan Party pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the super-priority administrative claim granted to the Agent pursuant to the Interim Financing Order and the Final Financing Order and described in Section 2.17 shall not be affected in any manner by the entry of an order confirming a plan of reorganization in the Chapter 11 Case.

**2.20    Release.** Each Loan Party hereby acknowledges effective upon entry of the Interim Financing Order, that no Loan Party has any defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Loan Parties' liability to repay the Credit Parties as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from any Credit Party. Each Loan Party, on behalf of itself and its bankruptcy estate, and on behalf of all its successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "Releasing Parties"), hereby fully, finally and forever releases and discharges each Credit Party and its respective past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, participants, and each Person acting for or on behalf of any of them (collectively, the "Released Parties") of and from

-60-

any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Interim Financing Order, the Final Financing Order and the transactions contemplated hereby or thereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.

**2.21    Waiver of any Priming Rights.**  Upon the Closing Date, and on behalf of itself and its estate, and for so long as any Obligations shall be outstanding, each Loan Party hereby irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations (other than the Carve-Out up to the Carve-Out Amount).

<div align="center">

**ARTICLE III**
**TAXES, YIELD PROTECTION AND ILLEGALITY;**
**APPOINTMENT OF LEAD BORROWER**

</div>

**3.01    Taxes.**

(a)    <u>Payments Free of Taxes</u>.  Any and all payments by or on account of any obligation of the Borrowers hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, provided that if the Borrowers shall be required by applicable law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Agent or the Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrowers shall make such deductions and (iii) the Borrowers shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)    <u>Payment of Other Taxes by the Borrowers</u>.  Without limiting the provisions of subsection (a) above, the Borrowers shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

5775719v4

(c)     Indemnification by the Loan Parties. The Loan Parties shall indemnify the Agent and each Lender, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid by the Agent or such Lender, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Lead Borrower by a Lender (with a copy to the Agent), or by the Agent on its own behalf or on behalf of the Agent or a Lender, shall be conclusive absent manifest error.

(d)     Evidence of Payments. As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrowers to a Governmental Authority, the Lead Borrower shall deliver to the Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agent.

(e)     Status of Lenders. Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which any Borrower is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Loan Document shall deliver to the Lead Borrower (with a copy to the Agent), at the time or times prescribed by applicable law or reasonably requested by the Lead Borrower or the Agent, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate of withholding. Such delivery shall be provided on the Closing Date and on or before such documentation expires or becomes obsolete or after the occurrence of an event requiring a change in the documentation most recently delivered. In addition, any Lender, if requested by the Lead Borrower or the Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Lead Borrower or the Agent as will enable the Lead Borrower or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

Without limiting the generality of the foregoing, in the event that any Borrower is resident for tax purposes in the United States, any Foreign Lender shall deliver to the Lead Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Lead Borrower or the Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(i)     duly completed copies of Internal Revenue Service Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States is a party,

(ii)     duly completed copies of Internal Revenue Service Form W-8ECI,

(iii)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the

-62-

effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrowers within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN, or

(iv)     any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Lead Borrower to determine the withholding or deduction required to be made.

(f)     Treatment of Certain Refunds.  If the Agent or any Lender determines, in its Permitted Discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrowers or with respect to which the Borrowers have paid additional amounts pursuant to this Section, it shall pay to the Borrowers an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrowers under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Borrowers, upon the request of the Agent or such Lender, agree to repay the amount paid over to the Borrowers (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Agent or such Lender in the event the Agent or such Lender is required to repay such refund to such Governmental Authority.  This subsection shall not be construed to require the Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrowers or any other Person.

3.02     **Reserved.**

3.03     **Reserved.**

3.04     **Increased Costs.**

(a)     Increased Costs Generally.  If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)     subject any Lender to any tax of any kind whatsoever with respect to this Agreement or change the basis of taxation of payments to such Lender in respect thereof (except for Indemnified Taxes or Other Taxes covered by Section 3.01 and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender); or

(iii)     impose on any Lender any other condition, cost or expense affecting this Agreement or Loans made by such Lender;

-63-

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Loan (or of maintaining its obligation to make any such Loan), or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

      (b)    <u>Capital Requirements</u>.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

      (c)    <u>Certificates for Reimbursement</u>.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Lead Borrower shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

      (d)    <u>Delay in Requests</u>.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrowers shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Lead Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

**3.05**    **Reserved.**

**3.06**    **Mitigation Obligations; Replacement of Lenders.**

      (a)    <u>Designation of a Different Lending Office</u>.  If any Lender requests compensation under <u>Section 3.04</u>, or the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to <u>Section 3.01</u> or <u>3.04</u>, as the case may be, in the future, and (ii) in each case, would not subject

-64-

such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    Replacement of Lenders.  If any Lender requests compensation under Section 3.04, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, the Borrowers may replace such Lender in accordance with Section 10.13.

3.07    **Survival.**  All of the Borrowers' obligations under this Article III shall survive termination of the Aggregate Commitments and repayment of the Committed Loans and all other Obligations hereunder.

3.08    **Designation of Lead Borrower as Borrowers' Agent.**

(a)    Each Borrower hereby irrevocably designates and appoints the Lead Borrower as such Borrower's agent to obtain Credit Extensions, the proceeds of which shall be available to each Borrower for such uses as are permitted under this Agreement.  As the disclosed principal for its agent, each Borrower shall be obligated to each Credit Party on account of Credit Extensions so made as if made directly by the applicable Credit Party to such Borrower, notwithstanding the manner by which such Credit Extensions are recorded on the books and records of the Lead Borrower and of any other Borrower.  In addition, each Loan Party other than the Borrowers hereby irrevocably designates and appoints the Lead Borrower as such Loan Party's agent to represent such Loan Party in all respects under this Agreement and the other Loan Documents.

(b)    Each Borrower recognizes that credit available to it hereunder is in excess of and on better terms than it otherwise could obtain on and for its own account and that one of the reasons therefor is its joining in the credit facility contemplated herein with all other Borrowers.  Consequently, each Borrower hereby assumes and agrees to discharge all Obligations of each of the other Borrowers.

(c)    The Lead Borrower shall act as a conduit for each Borrower (including itself, as a "Borrower") on whose behalf the Lead Borrower has requested a Credit Extension.  Neither the Agent nor any other Credit Party shall have any obligation to see to the application of such proceeds therefrom.

## ARTICLE IV
## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

4.01    **Conditions of Initial Credit Extension.**  The obligation of the each Lender to make its initial Credit Extension and initial Tranche B Advance hereunder is subject to satisfaction of the following conditions precedent:

(a)    The Agent's receipt of the following, each of which shall be originals, telecopies or other electronic image scan transmission (e.g., "pdf" or "tif" via e-mail) (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party or the Lenders, as applicable, each dated the Closing Date (or,

5775719v4

in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to the Agent:

(i)     executed counterparts of this Agreement sufficient in number for distribution to the Agent, each Lender and the Lead Borrower;

(ii)     a Note executed by the Borrowers in favor of each Lender requesting a Note;

(iii)     such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Agent may require evidencing (A) the authority of each Loan Party to enter into this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party and (B) the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party;

(iv)     copies of each Loan Party's Organization Documents and such other documents and certifications as the Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing, in good standing and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to so qualify in such jurisdiction could not reasonably be expected to have a Material Adverse Effect;

(v)     a favorable opinion of Richards, Layton & Finger, P.A., counsel to the Loan Parties, in each case, addressed to the Agent and each Lender, as to such matters concerning the Loan Parties and the Loan Documents as the Agent may reasonably request;

(vi)     a certificate signed by a Responsible Officer of the Lead Borrower certifying (A) that the conditions specified in Sections 4.02(a) and 4.02(b) have been satisfied, (B) that there has been no event or circumstance since the date of the Audited Financial Statements that has had or could be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect, and (C) either that (1) no consents, licenses or approvals are required in connection with the execution, delivery and performance by such Loan Party and the validity against such Loan Party of the Loan Documents to which it is a party, or (2) that all such consents, licenses and approvals have been obtained and are in full force and effect;

(vii)     [Reserved;]

(viii)     evidence that all insurance required to be maintained pursuant to the Loan Documents and all endorsements in favor of the Agent required under the Loan Documents have been obtained and are in effect;

(ix)     a payoff letter from the agent for the lenders under the Pre-Petition Facility satisfactory in form and substance to the Agent evidencing that the Pre-Petition

Facility has been or concurrently with the Closing Date is being terminated, all obligations thereunder are being paid in full, and all Liens securing obligations under the Pre-Petition Facility have been or concurrently with the Closing Date are being released;

(x)    the Security Documents (including, without limitation, the Mortgages, if any) and certificates evidencing any stock being pledged thereunder, together with undated stock powers executed in blank, each duly executed by the applicable Loan Parties;

(xi)    the International Paper Purchase Agreement, duly executed by each of the parties thereto;

(xii)    all other Loan Documents, each duly executed by the applicable Loan Parties;

(xiii)    (A) appraisals (based on net liquidation value) by a third party appraiser acceptable to the Agent of all Inventory and Equipment of the Borrowers, the results of which are satisfactory to the Agent and (B) a written report regarding the results of a commercial finance examination of the Loan Parties, which shall be satisfactory to the Agent;

(xiv)    results of searches or other evidence reasonably satisfactory to the Agent (in each case dated as of a date reasonably satisfactory to the Agent) indicating the absence of Liens on the assets of the Loan Parties, except for Permitted Encumbrances and Liens for which termination statements and releases, satisfactions and discharges of any mortgages, and releases or subordination agreements satisfactory to the Agent are being tendered concurrently with such extension of credit or other arrangements satisfactory to the Agent for the delivery of such termination statements and releases, satisfactions and discharges have been made;

(xv)    (A)    all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Agent to be filed, registered or recorded to create or perfect the first priority Liens intended to be created under the Loan Documents and all such documents and instruments shall have been so filed, registered or recorded to the satisfaction of the Agent, (B) the DDA Notifications, Credit Card Notifications, and Blocked Account Agreements required pursuant to Section 6.13 hereof, (C) control agreements with respect to the Loan Parties' securities and investment accounts, and (D) Collateral Access Agreements as required by the Agent; and

(xvi)    such other assurances, certificates, documents, consents or opinions as the Agent or its counsel reasonably may require.

(b)    After giving effect to (i) the first funding under the Loans and (ii) any charges to the Loan Account made in connection with the establishment of the credit facility contemplated hereby, Availability shall be not less than $7,500,000.

(c)     The Agent shall have received a Borrowing Base Certificate dated the Closing Date, relating to the week ended on June 7, 2013, and executed by a Responsible Officer of the Lead Borrower.

(d)     The Agent shall be reasonably satisfied that any financial statements delivered to it fairly present the business and financial condition of the Loan Parties and that there has been no Material Adverse Effect since the date of the Audited Financial Statements.

(e)     The Carve-Out Amount shall be fully funded into escrow in accordance with the Interim Financing Order.

(f)     [Reserved.]

(g)     There shall not be pending any litigation or other proceeding, the result of which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(h)     There shall not have occurred any default of any Material Contract of any Loan Party that could reasonably be expected to have a Material Adverse Effect.

(i)     The Agent shall have received evidence that the Loan Parties filed a "first day" motion on the Petition Day seeking to retain the Consultant on terms reasonably satisfactory to the Agent.

(j)     The consummation of the transactions contemplated hereby shall not violate any applicable Law or any Organization Document.

(k)     All fees and expenses required to be paid to the Agent on or before the Closing Date shall have been paid in full, and all fees and expenses required to be paid to the Lenders on or before the Closing Date shall have been paid in full.

(l)     The Borrowers shall have paid all fees, charges and disbursements of counsel to the Agent and the Tranche B Lender (in its capacity as such) to the extent invoiced prior to or on the Closing Date, plus such additional amounts of such fees, charges and disbursements as in each case shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the Closing Date (provided that such estimate shall not thereafter preclude a final settling of accounts between the Borrowers and the Agent and the Borrowers and the Tranche B Lender).

(m)     The Agent and the Lenders shall have completed satisfactory background checks of the Loan Parties' owners, shareholders and management and shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act.

(n)     No material changes in governmental regulations or policies affecting any Loan Party or any Credit Party shall have occurred prior to the Closing Date.

-68-

(o) The Agent shall have reviewed and shall be reasonably satisfied with all available contemplated arrangements and agreements among the Loan Parties and their trade creditors and landlords.

(p) The Bankruptcy Court shall have entered the Interim Financing Order, the Cash Management Order and the Wage Order (and all Pre-Petition amounts set forth on Schedule 5.18(a), the payment of which has been authorized by the Wage Order, shall have been paid).

(q) The Agent shall have received and approved the initial Approved Budget.

(r) The Agent shall have a valid and enforceable Lien on all Real Estate, free and clear of all defects, encumbrances and Liens (other than Liens securing Permitted Indebtedness with respect to such Real Estate).

(s) There shall not have occurred any disruption or material adverse change in the United States financial or capital markets in general that has had, in the reasonable opinion of the Agent, a material adverse effect on the market for loan syndications or adversely affecting the syndication of the Loans.

Without limiting the generality of the provisions of Section 9.04, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have Consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be Consented to or approved by or acceptable or satisfactory to a Lender unless the Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**4.02 Conditions to all Credit Extensions.** The obligation of each Lender to honor any Request for Credit Extension or any request for a Tranche B Advance is subject to the following conditions precedent:

(a) The representations and warranties of each Loan Party contained in Article V or in any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct on and as of the date of such Credit Extension, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date;

(b) No Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof;

(c) The Agent shall have received a Request for Credit Extension or Tranche B Advance Request, as applicable, in accordance with the requirements hereof;

(d) No event or circumstance which could reasonably be expected to result in a Material Adverse Effect shall have occurred; and

(e) No Overadvance shall result from such Credit Extension.

-69-

Each Request for Credit Extension submitted by the Borrowers shall be deemed to be a representation and warranty by the Borrowers that the conditions specified in Sections 4.02(a) and (b) have been satisfied on and as of the date of the applicable Credit Extension. The conditions set forth in this Section 4.02 are for the sole benefit of the Credit Parties but until the Required Lenders otherwise direct the Agent to cease making Committed Loans, the Lenders will fund their Applicable Percentage of all Committed Loans whenever made, which are requested by the Lead Borrower and which, notwithstanding the failure of the Loan Parties to comply with the provisions of this Article IV, agreed to by the Agent, provided, however, the making of any such Loans shall not be deemed a modification or waiver by any Credit Party of the provisions of this Article IV on any future occasion or a waiver of any rights or the Credit Parties as a result of any such failure to comply.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

To induce the Credit Parties to enter into this Agreement and to make Loans and Tranche B Advances hereunder, each Loan Party represents and warrants to the Agent and the other Credit Parties that:

**5.01    Existence, Qualification and Power.**  Each Loan Party and each Subsidiary thereof (a) is a corporation, limited liability company, partnership or limited partnership, duly incorporated, organized or formed, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its incorporation, organization, or formation, (b) has all requisite power and authority and all requisite governmental licenses, permits, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, where applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect. Schedule 5.01 annexed hereto sets forth, as of the Closing Date, each Loan Party's name as it appears in official filings in its state of incorporation or organization, its state of incorporation or organization, organization type, organization number, if any, issued by its state of incorporation or organization, and its federal employer identification number.

**5.02    Authorization; No Contravention.**  The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is or is to be a party has been duly authorized by all necessary corporate or other organizational action, and does not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach, termination, or contravention of, or constitute a default under, or require any payment to be made under (i) any Material Contract or any Material Indebtedness to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; (c) result in or require the creation of any Lien upon any asset of any Loan Party (other than Liens in favor of the Agent under the Security Documents); or (d) violate any Law.

-70-

**5.03    Governmental Authorization; Other Consents.**   No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for (a) the perfection or maintenance of the Liens created under the Security Documents (including the first priority nature thereof) or (b) such as have been obtained or made and are in full force and effect.

**5.04    Binding Effect.** This Agreement has been, and each other Loan Document, when delivered, will have been, duly executed and delivered by each Loan Party that is party thereto. This Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**5.05    Financial Statements; No Material Adverse Effect.**

(a)    The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present the financial condition of the Parent and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) show all Material Indebtedness and other liabilities, direct or contingent, of the Parent and its Subsidiaries as of the date thereof, including liabilities for taxes, material commitments and Indebtedness.

(b)    The unaudited Consolidated balance sheet of the Parent and its Subsidiaries dated April 30, 2013, and the related Consolidated statements of income or operations, Shareholders' Equity and cash flows for the Fiscal Quarter ended on that date (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present the financial condition of the Parent and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

(c)    Since the date of the Audited Financial Statements, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(d)    To the best knowledge of the Borrowers, no Internal Control Event exists or has occurred since the date of the Audited Financial Statements that has resulted in or could reasonably be expected to result in a misstatement in any material respect, (i) in any financial information delivered or to be delivered to the Agent or the Lenders, (ii) of the Borrowing Base, (iii) of covenant compliance calculations provided hereunder or (iv) of the assets, liabilities, financial condition or results of operations of the Parent and its Subsidiaries on a Consolidated basis.

-71-

**5.06 Litigation**. There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties after due and diligent investigation, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of its Subsidiaries or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, or (b) except as specifically disclosed in Schedule 5.06, either individually or in the aggregate, if determined adversely, could reasonably be expected to have a Material Adverse Effect, and since the Closing Date, there has been no adverse change in the status, or financial effect on any Loan Party or any Subsidiary thereof, of the matters described on Schedule 5.06.

**5.07 No Default**. Except as set forth on Schedule 5.07, no Loan Party or any Subsidiary is in default under or with respect to, or party to, any Material Contract or any Material Indebtedness. No Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

**5.08 Ownership of Property; Liens.**

(a) Each of the Loan Parties and each Subsidiary thereof has good record and marketable title in fee simple to or valid leasehold interests in, all Real Estate necessary or used in the ordinary conduct of its business. Each of the Loan Parties and each Subsidiary has good and marketable title to, valid leasehold interests in, or valid licenses to use all personal property and assets material to the ordinary conduct of its business.

(b) Schedule 5.08(b)(1) sets forth the address (including street address, county and state) of all Real Estate that is owned by the Loan Parties and each of their Subsidiaries, together with a list of the holders of any mortgage or other Lien thereon as of the Closing Date. Schedule 5.08(b)(2) sets forth the address (including street address, county and state) of all Leases of the Loan Parties, together with a list of the lessor and its contact information with respect to each such Lease as of the Closing Date. Each of such Leases is in full force and effect and the Loan Parties are not in default of the terms thereof.

(c) Schedule 7.01 sets forth a complete and accurate list of all Liens on the property or assets of each Loan Party and each of its Subsidiaries, showing as of the Closing Date the lienholder thereof, the principal amount of the obligations secured thereby and the property or assets of such Loan Party or such Subsidiary subject thereto. The property of each Loan Party and each of its Subsidiaries is subject to no Liens, other than Permitted Encumbrances.

(d) Schedule 7.02 sets forth a complete and accurate list of all Investments held by any Loan Party or any Subsidiary of a Loan Party on the Closing Date, showing as of the Closing Date the amount, obligor or issuer and maturity, if any, thereof.

(e) Schedule 7.03 sets forth a complete and accurate list of all Indebtedness of each Loan Party or any Subsidiary of a Loan Party on the Closing Date, showing as of the Closing Date the amount, obligor or issuer and maturity thereof.

**5.09    Environmental Compliance.**

(a)    No Loan Party or any Subsidiary thereof (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability, except, in each case, as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    None of the properties currently or formerly owned or operated by any Loan Party or any Subsidiary thereof is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or is adjacent to any such property; there are no and never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by any Loan Party or any Subsidiary thereof or, to the best of the knowledge of the Loan Parties, on any property formerly owned or operated by any Loan Party or Subsidiary thereof; there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or Subsidiary thereof; and Hazardous Materials have not been released, discharged or disposed of on any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof.

(c)    No Loan Party or any Subsidiary thereof is undertaking, and no Loan Party or any Subsidiary thereof has completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law; and all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof have been disposed of in a manner not reasonably expected to result in material liability to any Loan Party or any Subsidiary thereof.

**5.10    Insurance.**  The properties of the Loan Parties and their Subsidiaries are insured with financially sound and reputable insurance companies which are not Affiliates of the Loan Parties, in such amounts, with such deductibles and covering such risks (including, without limitation, workmen's compensation, public liability, business interruption and property damage insurance) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Loan Parties or the applicable Subsidiary operates. Schedule 5.10 sets forth a description of all insurance maintained by or on behalf of the Loan Parties and their Subsidiaries as of the Closing Date. Each insurance policy listed on Schedule 5.10 is in full force and effect and all premiums in respect thereof that are due and payable (other than premiums with respect to the period prior to the Petition Date) have been paid.

**5.11    Taxes.**  Except as set forth on Schedule 5.11, the Loan Parties and their Subsidiaries have filed all Federal, state and other material tax returns and reports required to be filed, and have paid all Federal, state and other material taxes, assessments, fees and other

5775719v4

governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings being diligently conducted, for which adequate reserves have been provided in accordance with GAAP, as to which Taxes no Lien has been filed and which contest effectively suspends the collection of the contested obligation and the enforcement of any Lien securing such obligation. There is no proposed tax assessment against any Loan Party or any Subsidiary that would, if made, have a Material Adverse Effect. Except as set forth on Schedule 5.11, no Loan Party or any Subsidiary thereof is a party to any tax sharing agreement.

**5.12    ERISA Compliance**.

(a)    The Lead Borrower, each of its ERISA Affiliates and each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state Laws. Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the best knowledge of the Lead Borrower, nothing has occurred which would prevent, or cause the loss of, such qualification. The Loan Parties and each ERISA Affiliate have made all required contributions to each Plan subject to Sections 412 or 430 of the Code and to each Multiemployer Plan, and no application for a funding waiver or an extension of any amortization period pursuant to Sections 412 or 430 of the Code has been made with respect to any Plan. No Lien imposed under the Code or ERISA exists or is likely to arise on account of any Plan or any Multiemployer Plan.

(b)    There are no pending or, to the best knowledge of the Lead Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)    (i)    No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Sections 4069 or 4212(c) of ERISA.

**5.13    Subsidiaries; Equity Interests**. The Loan Parties have no Subsidiaries other than those specifically disclosed in Part (a) of Schedule 5.13, which Schedule sets forth the legal name, jurisdiction of incorporation or formation and authorized Equity Interests of each such Subsidiary. All of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by a Loan Party (or a Subsidiary of a Loan Party) in the amounts specified on Part (a) of Schedule 5.13 free and clear of all Liens except for those created under the Security Documents. Except as set forth in Schedule 5.13, there are no

-74-

outstanding rights to purchase any Equity Interests in any Subsidiary. The Loan Parties have no equity investments in any other corporation or entity other than those specifically disclosed in Part(b) of Schedule 5.13. All of the outstanding Equity Interests in the Loan Parties have been validly issued, and are fully paid and non-assessable and are owned in the amounts specified on Part (c) of Schedule 5.13 free and clear of all Liens except for those created under the Security Documents. The copies of the Organization Documents of each Loan Party and each amendment thereto provided pursuant to Section 4.01 are true and correct copies of each such document, each of which is valid and in full force and effect.

**5.14    Margin Regulations; Investment Company Act.**

(a)    No Loan Party is engaged or will be engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock. None of the proceeds of the Credit Extensions shall be used directly or indirectly for the purpose of purchasing or carrying any margin stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any margin stock or for any other purpose that might cause any of the Credit Extensions to be considered a "purpose credit" within the meaning of Regulations T, U, or X issued by the FRB.

(b)    None of the Loan Parties, any Person Controlling any Loan Party, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

**5.15    Disclosure.** Each Loan Party has disclosed to the Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of any Loan Party to the Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

**5.16    Compliance with Laws.** Each of the Loan Parties and each Subsidiary is in compliance (a) in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (i) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (ii) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, and (b) with Sections 10.17 and 10.18 hereof.

**5.17** **Intellectual Property; Licenses, Etc.** The Loan Parties and their Subsidiaries own, or possess the right to use, all of the Intellectual Property, licenses, permits and other authorizations that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person. To the best knowledge of the Lead Borrower, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party or any Subsidiary infringes upon any rights held by any other Person. Except as specifically disclosed in Schedule 5.17, no claim or litigation regarding any of the foregoing is pending or, to the best knowledge of the Lead Borrower, threatened, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.18** **Labor Matters.** There are no strikes, lockouts, slowdowns or other material labor disputes against any Loan Party or any Subsidiary thereof pending or, to the knowledge of any Loan Party, threatened. The hours worked by and payments made to employees of the Loan Parties comply with the Fair Labor Standards Act and any other applicable federal, state, local or foreign Law dealing with such matters. No Loan Party or any of its Subsidiaries has incurred any liability or obligation under the Worker Adjustment and Retraining Act or similar state Law. Except as set forth on Schedule 5.18(a), all payments due from any Loan Party and its Subsidiaries, or for which any claim may be made against any Loan Party or any of its Subsidiaries, on account of wages and employee health and welfare insurance and other benefits, have been paid or properly accrued in accordance with GAAP as a liability on the books of such Loan Party. Except as set forth on Schedule 5.18(b), no Loan Party or any Subsidiary is a party to or bound by any collective bargaining agreement, management agreement, employment agreement, bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement. There are no representation proceedings pending or, to any Loan Party's knowledge, threatened to be filed with the National Labor Relations Board, and no labor organization or group of employees of any Loan Party or any Subsidiary has made a pending demand for recognition. There are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints against any Loan Party or any Subsidiary pending or, to the knowledge of any Loan Party, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party or any of its Subsidiaries. The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any of its Subsidiaries is bound.

**5.19** **Security Documents**.

(a) The Security Agreement creates in favor of the Agent, for the benefit of the Secured Parties referred to therein, a legal, valid, continuing and enforceable security interest in the Collateral (as defined in the Security Agreement), the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law. The financing statements, releases and other filings are in appropriate form and have been or will be filed in the offices specified in Schedule II of the Security Agreement. Upon such filings and/or the obtaining of "control" (as defined in the

-76-

UCC), the Agent will have a perfected Lien on, and security interest in, to and under all right, title and interest of the grantors thereunder in all Collateral that may be perfected by filing, recording or registering a financing statement or analogous document (including without limitation the proceeds of such Collateral subject to the limitations relating to such proceeds in the UCC) or by obtaining control, under the UCC (in effect on the date this representation is made) in each case prior and superior in right to any other Person.

(b)    When the Security Agreement (or a short form thereof) is filed in the United States Patent and Trademark Office and the United States Copyright Office and when financing statements, releases and other filings in appropriate form are filed in the offices specified in Schedule II of the Security Agreement, the Agent shall have a fully perfected Lien on, and security interest in, all right, title and interest of the applicable Loan Parties in the Intellectual Property (as defined in the Security Agreement) in which a security interest may be perfected by filing, recording or registering a security agreement, financing statement or analogous document in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, in each case prior and superior in right to any other Person (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a Lien on registered trademarks, trademark applications and copyrights acquired by the Loan Parties after the Closing Date).

5.20    [Reserved].

5.21    **Deposit Accounts; Credit Card Arrangements**.

(a)    Annexed hereto as Schedule 5.21(a) is a list of all DDAs maintained by the Loan Parties as of the Closing Date, which Schedule includes, with respect to each DDA (i) the name and address of the depository; (ii) the account number(s) maintained with such depository; (iii) a contact person at such depository, and (iv) the identification of each Blocked Account Bank.

(b)    Annexed hereto as Schedule 5.21(b) is a list describing all arrangements as of the Closing Date to which any Loan Party is a party with respect to the processing and/or payment to such Loan Party of the proceeds of any credit card charges and debit card charges for sales made by such Loan Party.

5.22    **Brokers**.  No broker or finder brought about the obtaining, making or closing of the Loans or transactions contemplated by the Loan Documents, and no Loan Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

5.23    **Customer and Trade Relations**.  There exists no actual or, to the knowledge of any Loan Party, threatened, termination or cancellation of, or any material adverse modification or change in the business relationship of any Loan Party with any supplier material to its operations.

5.24    **Material Contracts**.  Schedule 5.24 sets forth all Material Contracts to which any Loan Party is a party or is bound as of the Closing Date.  The Loan Parties have delivered true,

-77-

correct and complete copies of such Material Contracts to the Agent on or before the Closing Date. Except as set forth on Schedule 5.07, the Loan Parties are not in breach or in default in any material respect of or under any Material Contract and have not received any notice of default under, or of the intention of any other party thereto to terminate, any Material Contract.

5.25    **Casualty**. Neither the businesses nor the properties of any Loan Party or any of its Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

5.26    **Bankruptcy Matters**.

(a)    The Chapter 11 Case was commenced on the Petition Date in accordance with applicable law and proper notice of (i) the motion seeking approval of the Loan Documents and the Interim Financing Order and Final Financing Order, (ii) the hearing for the entry of the Interim Financing Order, and (iii) the hearing for the entry of the Final Financing Order has been or will be given. The Borrowers shall give, on a timely basis as specified in the Interim Financing Order or the Final Financing Order, as applicable, all notices required to be given to all parties specified in the Interim Financing Order or Final Financing Order, as applicable.

(b)    After the entry of the Interim Financing Order, and pursuant to and to the extent permitted in the Interim Financing Order and the Final Financing Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Case having priority over all administrative expense claims (other than the Carve-Out up to the Carve-Out Amount) and unsecured claims against the Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to the priorities set forth in the Interim Financing Order or the Final Financing Order, as applicable.

(c)    After the entry of the Interim Financing Order and pursuant to and to the extent provided in the Interim Financing Order and the Final Financing Order, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral subject, as to priority only, to the Carve-Out up to the Carve-Out Amount.

(d)    The Interim Financing Order (with respect to the period on and after entry of the Interim Financing Order and prior to entry of the Final Financing Order) or the Final Financing Order (with respect to the period on and after entry of the Final Financing Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), modified or amended.

(e)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Financing Order or Final Financing Order, as the case may be, upon the maturity (whether by acceleration or otherwise) of any of the Indebtedness, the Credit Parties shall be entitled to immediate payment of such Indebtedness and

to enforce the remedies provided for hereunder or under applicable law, without further application to or order by the Bankruptcy Court.

**5.27    Personally Identifiable Information**.    Borrowers maintain a policy for the treatment, handling and storage of consumer information and personally identifiable information in accordance with applicable Laws and a true, accurate and complete copy of the current version thereof has been provided to the Agent.

## ARTICLE VI
## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder or any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations for which a claim has not been asserted), the Loan Parties shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02, and 6.03) cause each Subsidiary to:

**6.01    Financial Statements**. Deliver to the Agent and each Lender, in form and detail satisfactory to the Agent:

(a)    as soon as available, but in any event within 30 days after the end of each of the Fiscal Months of each Fiscal Year of the Parent (commencing with the Fiscal Month ended June 30, 2013), a consolidated balance sheet of the Parent and its Subsidiaries as at the end of such Fiscal Month, and the related consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Month, and for the portion of the Parent's Fiscal Year then ended, setting forth in each case in comparative form the figures for (A) such period set forth in the Approved Budget most recently delivered pursuant to Section 6.01(b) hereof and accepted by the Agent in its Permitted Discretion,  (B) the corresponding Fiscal Month of the previous Fiscal Year and (C) the corresponding portion of the previous Fiscal Year, all in reasonable detail, such consolidated statements to be certified by a Responsible Officer of the Lead Borrower as fairly presenting the financial condition, results of operations, Shareholders' Equity and cash flows of the Parent and its Subsidiaries as of the end of such Fiscal Month in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

(b)    Approved Budget; Approved Budget Variance Reports.

(i)    Any Committed Borrowing by the Borrowers under this Agreement and the other Loan Documents shall be limited in accordance with the Approved Budget (subject to any variances permitted under this Agreement or the Financing Orders, as applicable).  The initial Approved Budget shall depict, on a weekly basis, cash revenues, receipts, expenses and disbursements, professional fees (other than counsel to the Agent), Availability and other information for the first 13-week period from the Closing Date and such initial Approved Budget shall be approved by, and in form and substance satisfactory to, the Agent in its Permitted Discretion.  The Approved Budget shall be updated, modified or supplemented (with the consent and/or at the reasonable request of the Agent) from time to time, but in any event not less than on a weekly basis (with the delivery to the Agent on or before Wednesday of each week), and

each such updated, modified or supplemented budget shall be approved by, and in form and substance satisfactory to, the Agent in its Permitted Discretion and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed an Approved Budget; provided, however, that in the event that the Agent, on the one hand, and the Borrowers, on the other hand, cannot, while acting in good faith, agree as to an updated, modified or supplemented budget, such disagreement shall give rise to an Event of Default hereunder once the period covered by the most recent Approved Budget has terminated. Each Approved Budget delivered to the Agent shall be accompanied by such supporting documentation as reasonably requested by the Agent. Each Approved Budget shall be prepared in good faith based upon assumptions which the Borrowers believe to be reasonable and are satisfactory to the Agent in its Permitted Discretion.

(ii)     Simultaneously with delivery by the Borrowers to the Agent of each updated proposed amendment to the then applicable Approved Budget in accordance with this Section 6.01(b), commencing with the first such updated proposed amendment following the Closing Date, the Borrowers shall also deliver to the Agent the current Approved Budget Variance Report. In all events, however, the Borrowers shall deliver an Approved Budget Variance Report to the Agent on a weekly basis, to be delivered on Wednesday of each week.

**6.02    Certificates; Other Information.** Deliver to the Agent and each Lender, in form and detail satisfactory to the Agent:

(a)     [Reserved];

(b)     concurrently with the delivery of the financial statements referred to in Section 6.01(a), a duly completed Compliance Certificate signed by a Responsible Officer of the Lead Borrower, and in the event of any change in generally accepted accounting principles used in the preparation of such financial statements, the Lead Borrower shall also provide a statement of reconciliation conforming such financial statements to GAAP;

(c)     on the Wednesday of each week (or, if such day is not a Business Day, on the next succeeding Business Day), a Borrowing Base Certificate showing the Tranche A Borrowing Base and the Tranche A-1 Borrowing Base as of the close of business as of the last day of the immediately preceding week (provided that the Appraised Value percentage applied to the Eligible Inventory and Eligible Equipment set forth in each Borrowing Base Certificate shall be the percentage set forth in the most recent appraisal obtained by the Agent pursuant to Section 6.10 hereof for the applicable month in which such Borrowing Base Certificate is delivered), each Borrowing Base Certificate to be certified as complete and correct by a Responsible Officer of the Lead Borrower and accompanied by all applicable system generated documentation supporting the information contained within the Borrowing Base Certificate, including but not limited to inventory reporting inclusive of inventory mix by category and/or department and, where applicable, accounts receivable detail documentation and any additional documentation reasonably requested by the Agent; provided, that (i) such Borrowing Base Certificate shall be delivered on the requested date of each Committed Borrowing as and when required pursuant to Section 2.01 hereof, and (ii) such Borrowing Base Certificate shall be

-80-

delivered daily, as of the close of business on the immediately preceding day at any time that an Event of Default has occurred and is continuing, at the election of the Agent;

    (d)    promptly upon receipt, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Loan Party by its Registered Public Accounting Firm in connection with the accounts or books of the Loan Parties or any Subsidiary, or any audit of any of them, including, without limitation, specifying any Internal Control Event;

    (e)    promptly after the same are available, copies of each annual report, proxy or financial statement or other report or communication sent to the stockholders of the Loan Parties, and copies of all annual, regular, periodic and special reports and registration statements which any Loan Party may file or be required to file with the SEC under Section 13 or 15(d) of the Securities Exchange Act of 1934 or with any national securities exchange, and in any case not otherwise required to be delivered to the Agent pursuant hereto;

    (f)    on the Wednesday of each week (or, if such day is not a Business Day, on the next succeeding Business Day), evidence of payment of all Taxes by the Loan Parties;

    (g)    The financial and collateral reports described on Schedule 6.02 hereto, at the times set forth in such Schedule;

    (h)    promptly after the furnishing thereof, copies of any statement or report furnished to any holder of debt securities of any Loan Party or any Subsidiary thereof pursuant to the terms of any indenture, loan or credit or similar agreement and not otherwise required to be furnished to the Lenders pursuant to Section 6.01 or any other clause of this Section 6.02;

    (i)    as soon as available, but in any event within 30 days after the end of each Fiscal Year of the Loan Parties, a report summarizing the insurance coverage (specifying type, amount and carrier) in effect for each Loan Party and its Subsidiaries and containing such additional information as the Agent, or any Lender through the Agent, may reasonably specify;

    (j)    promptly after the Agent's request therefor, copies of all Material Contracts and documents evidencing Material Indebtedness;

    (k)    promptly, and in any event within five Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of each notice or other correspondence received from any Governmental Authority (including, without limitation, the SEC (or comparable agency in any applicable non-U.S. jurisdiction)) concerning any proceeding with, or investigation or possible investigation or other inquiry by such Governmental Authority regarding financial or other operational results of any Loan Party or any Subsidiary thereof or any other matter which, if adversely determined, could reasonably expected to have a Material Adverse Effect;

    (l)    promptly, and in any event within one Business Day after receipt thereof by any Loan Party or any Subsidiary thereof, copies of any reclamation claim or demand; and

-81-

(m)    promptly, such additional information regarding the business affairs, financial condition or operations of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the Agent or any Lender may from time to time reasonably request.

Documents required to be delivered pursuant to Sections 6.01(a) or Section 6.02(d) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Lead Borrower posts such documents, or provides a link thereto on the Lead Borrower's website on the Internet at the website address listed on Schedule 10.02; or (ii) on which such documents are posted on the Lead Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Agent have access (whether a commercial, third-party website or whether sponsored by the Agent); provided that: (i) the Lead Borrower shall deliver paper copies of such documents to the Agent or any Lender that requests the Lead Borrower to deliver such paper copies until a written request to cease delivering paper copies is given by the Agent or such Lender and (ii) the Lead Borrower shall notify the Agent and each Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Notwithstanding anything contained herein, in every instance the Lead Borrower shall be required to provide paper copies of the Compliance Certificates required by Section 6.02(b) to the Agent. The Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Loan Parties with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

6.03    **Notices.** Promptly notify the Agent and each Lender:

(a)    of the occurrence of any Default or Event of Default;

(b)    of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(c)    of any breach or non-performance of, or any default under, a Material Contract or with respect to Material Indebtedness of any Loan Party or any Subsidiary thereof;

(d)    of any dispute, litigation, investigation, proceeding or suspension between any Loan Party or any Subsidiary thereof and any Governmental Authority or the commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary thereof, including pursuant to any applicable Environmental Laws;

(e)    of the occurrence of any ERISA Event;

(f)    of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof;

(g)    of any change in any Loan Party's senior executive officers;

-82-

(h)    of the discharge by any Loan Party of its present Registered Public Accounting Firm or any withdrawal or resignation by such Registered Public Accounting Firm;

(i)    of any collective bargaining agreement or other labor contract to which a Loan Party becomes a party, or the application for the certification of a collective bargaining agent;

(j)    of the filing of any Lien for unpaid Taxes against any Loan Party;

(k)    of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any interest in a material portion of the Collateral under power of eminent domain or by condemnation or similar proceeding or if any material portion of the Collateral is damaged or destroyed;

(l)    of (i) the entry by a Loan Party into a Material Contract, (ii) the incurrence by a Loan Party of Material Indebtedness, or (iii) the voluntary or involuntary grant of any Lien upon any property of a Loan Party;

(m)    of any transaction of the nature contained in Article VII hereof;

(n)    of receipt of any notices outside the ordinary course of business received from International Paper, or from any other Person, in connection with the Paper Supply Agreement (including, without limitation, any notices of default, dispute, litigation, or otherwise);

(o)    of (1) any failure by any Loan Party to pay rent that are Post-Petition Obligations at (i) any distribution center or warehouse of a Loan Party, or (ii) any other location of a Loan Party if such failure could reasonably be expected to result in a Material Adverse Effect; or (2) any action taken by a landlord or trade creditor to enforce legal rights or remedies against the Lead Borrower or any other Loan Party;

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of the Lead Borrower setting forth details of the occurrence referred to therein and stating what action the Lead Borrower has taken and proposes to take with respect thereto. Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

**6.04    Payment of Obligations.** Pay and discharge as the same shall become due and payable, all its Post-Petition Obligations and liabilities, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, (b) all lawful claims (including, without limitation, claims of landlords, warehousemen, customs brokers, freight forwarders, consolidators and carriers) which, if unpaid, would by law become a Lien upon its property; and (c) all Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness, except, in each case, where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) such Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (c) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, (d)

no Lien has been filed with respect thereto and (e) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect. Nothing contained herein shall be deemed to limit the rights of the Agent with respect to determining Reserves pursuant to this Agreement.

**6.05    Preservation of Existence, Etc.**  Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization or formation except in a transaction permitted by Section 7.04 or 7.05; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its Intellectual Property, except to the extent such Intellectual Property is no longer used or useful in the conduct of the business of the Loan Parties.

**6.06    Maintenance of Properties.**  (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; and (b) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**6.07    Maintenance of Insurance.**

(a)    Maintain with financially sound and reputable insurance companies reasonably acceptable to the Agent not Affiliates of the Loan Parties, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business and operating in the same or similar locations or as is required by applicable Law, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons and as are reasonably acceptable to the Agent.

(b)    Cause fire and extended coverage policies maintained with respect to any Collateral to be endorsed or otherwise amended to include (i) a non-contributing mortgage clause (regarding improvements to Real Estate) and lenders' loss payable clause (regarding personal property), in form and substance satisfactory to the Agent, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, Credit Parties or any other Person shall be a co-insurer and (iii) such other provisions as the Agent may reasonably require from time to time to protect the interests of the Credit Parties.

(c)    Cause commercial general liability policies to be endorsed to name the Agent as an additional insured.

(d)    Cause business interruption policies to name the Agent as a loss payee and to be endorsed or amended to include (i) a provision that, from and after the Closing Date, the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, the Agent, any Lender or any other Credit Party shall be a co-insurer and (iii) such other provisions as the Agent may reasonably require from time to time to protect the interests of the Credit Parties.

-84-

(e)    Cause each such policy referred to in this Section 6.07 to also provide that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium except upon not less than ten (10) days' prior written notice thereof by the insurer to the Agent (giving the Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason except upon not less than thirty (30) days' prior written notice thereof by the insurer to the Agent.

(f)    Deliver to the Agent, prior to the cancellation, modification or non-renewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Agent, including an insurance binder) together with evidence satisfactory to the Agent of payment of the premium therefor.

(g)    [Reserved].

(h)    Maintain for themselves and their Subsidiaries, a Directors and Officers insurance policy, and a "Blanket Crime" policy including employee dishonesty, forgery or alteration, theft, disappearance and destruction, robbery and safe burglary, property, and computer fraud coverage with responsible companies in such amounts as are customarily carried by business entities engaged in similar businesses similarly situated, and will upon request by the Agent furnish the Agent certificates evidencing renewal of each such policy.

(i)    Permit any representatives that are designated by the Agent to inspect the insurance policies maintained by or on behalf of the Loan Parties and to inspect books and records related thereto and any properties covered thereby.

(j)    None of the Credit Parties, or their agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 6.07. Each Loan Party shall look solely to its insurance companies or any other parties other than the Credit Parties for the recovery of such loss or damage and such insurance companies shall have no rights of subrogation against any Credit Party or its agents or employees. If, however, the insurance policies do not provide waiver of subrogation rights against such parties, as required above, then the Loan Parties hereby agree, to the extent permitted by law, to waive their right of recovery, if any, against the Credit Parties and their agents and employees. The designation of any form, type or amount of insurance coverage by any Credit Party under this Section 6.07 shall in no event be deemed a representation, warranty or advice by such Credit Party that such insurance is adequate for the purposes of the business of the Loan Parties or the protection of their properties.

**6.08    Compliance with Laws.** Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been set aside and maintained by the Loan Parties in accordance with GAAP; (b) such contest effectively suspends enforcement of the contested Laws, and (c) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

-85-

**6.09    Books and Records; Accountants.**

(a)    (i)  Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Loan Parties or such Subsidiary, as the case may be; and (ii) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Loan Parties or such Subsidiary, as the case may be.

(b)    At all times retain a Registered Public Accounting Firm which is reasonably satisfactory to the Agent and shall instruct such Registered Public Accounting Firm to cooperate with, and be available to, the Agent or its representatives to discuss the Loan Parties' financial performance, financial condition, operating results, controls, and such other matters, within the scope of the retention of such Registered Public Accounting Firm, as may be raised by the Agent.

**6.10    Inspection Rights.**

(a)    Permit representatives and independent contractors of the Agent to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and Registered Public Accounting Firm, and permit the Agent or professionals (including investment bankers, consultants, accountants, and lawyers) retained by the Agent to conduct evaluations of the business plan, forecasts and cash flows, all at the expense of the Loan Parties and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Lead Borrower; provided, however, that when a Default or Event of Default exists the Agent (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Loan Parties at any time during normal business hours and without advance notice.

(b)    Upon the request of the Agent after reasonable prior notice, permit the Agent or professionals (including investment bankers, consultants, accountants, and lawyers) retained by the Agent to conduct commercial finance examinations and other evaluations, including, without limitation, of (i) the Lead Borrower's practices in the computation of the Tranche A Borrowing Base and the Tranche A-1 Borrowing Base and (ii) the assets included in the Tranche A Borrowing Base and the Tranche A-1 Borrowing Base and related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves, and (ii) the Loan Parties' business plan and cash flows. The Loan Parties shall pay the fees and expenses of the Agent and such professionals with respect to such examinations and evaluations. Without limiting the foregoing, the Loan Parties acknowledge and agree that within 90 days of the Closing Date, and every 90 days thereafter, a commercial finance examination must be completed by an examiner reasonably acceptable to the Agent and that the results of such examination must be satisfactory to the Agent.

(c)    Upon the request of the Agent after reasonable prior notice, permit the Agent or professionals (including appraisers) retained by the Agent to conduct appraisals of the Collateral, including, without limitation, the assets included in the Tranche A Borrowing Base

and the Tranche A-1 Borrowing Base. The Loan Parties shall pay the fees and expenses of the Agent and such professionals with respect to such appraisals. Without limiting the foregoing, the Loan Parties acknowledge and agree that within 90 days of the Closing Date, and every 90 days thereafter, an appraisal of the Inventory of the Loan Parties must be completed by Great American or another third party appraiser reasonably acceptable to the Agent and that the results of each such appraisal must be satisfactory to the Agent.

(d)     Upon the request of Salus after reasonable prior notice, use commercially reasonable efforts to assist Salus and any other Salus Entity (and any of their lending or funding sources) in obtaining ratings for the credit facilities provided for herein from one or more national rating agencies. Without limiting the foregoing, senior management members of the Loan Parties shall attend or host one or more meetings with such rating agencies and Salus upon reasonable prior notice.

**6.11     Use of Proceeds.** Use the proceeds of the Credit Extensions (a) to refinance the Indebtedness owing under the Pre-Petition Facility on the Closing Date, (b) to finance the acquisition of working capital assets of the Borrowers, including the purchase of inventory, in each case in the ordinary course of business, and (c) for general corporate purposes of the Loan Parties, in each case to the extent expressly permitted under applicable Law, the Approved Budget and the Loan Documents, including post-petition operating expenses set forth in the Approved Budget and other expenses arising in the Chapter 11 Case as may be approved by the Bankruptcy Court and the Agent.

**6.12     Additional Loan Parties.** Notify the Agent at the time that any Person becomes a Subsidiary, and promptly thereafter (and in any event within fifteen (15) days), cause any such Person (a) which is not a CFC, to (i) become a Loan Party by executing and delivering to the Agent a Joinder to this Agreement or a Joinder to the Facility Guaranty or such other documents as the Agent shall deem appropriate for such purpose, (ii) grant a Lien to the Agent on such Person's assets of the same type that constitute Collateral to secure the Obligations, and (iii) deliver to the Agent documents of the types referred to in clauses (iii) and (iv) of Section 4.01(a) and favorable opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in clause (a)), and (b) if any Equity Interests or Indebtedness of such Person are owned by or on behalf of any Loan Party, to pledge such Equity Interests and promissory notes evidencing such Indebtedness (except that, if such Subsidiary is a CFC, the Equity Interests of such Subsidiary to be pledged may be limited to sixty-five percent (65%) of the outstanding voting Equity Interests of such Subsidiary and one hundred percent (100%) of the non-voting Equity Interests of such Subsidiary), in each case in form, content and scope reasonably satisfactory to the Agent. In no event shall compliance with this Section 6.12 waive or be deemed a waiver or Consent to any transaction giving rise to the need to comply with this Section 6.12 if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute, with respect to any Subsidiary, an approval of such Person as a Borrower or permit the inclusion of any acquired assets in the computation of the Tranche A Borrowing Base or the Tranche A-1 Borrowing Base.

-87-

**6.13    Cash Management.**

(a)    On or prior to the Closing Date:

(i)    deliver to the Agent copies of notifications (each, a "Credit Card Notification") substantially in the form attached hereto as Exhibit F which have been executed on behalf of such Loan Party and delivered to such Loan Party's Credit Card Issuers and Credit Card Processors listed on Schedule 5.21(b); and

(ii)    enter into a Blocked Account Agreement satisfactory in form and substance to the Agent with each Blocked Account Bank (collectively, together with the Concentration Account, the "Blocked Accounts"); and

(iii)    at the request of the Agent, deliver to the Agent copies of notifications (each, a "DDA Notification") substantially in the form attached hereto as Exhibit G which have been executed on behalf of such Loan Party and delivered to each depository institution listed on Schedule 5.21(a).

(b)    From and after the Closing Date, the Loan Parties shall ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) to a Blocked Account all of the following:

(i)    all amounts on deposit in each DDA (net of any minimum balance, not to exceed $2,500, as may be required to be kept in the subject DDA by the depository institution at which such DDA is maintained);

(ii)    all payments due from Credit Card Processors and Credit Card Issuers and proceeds of all credit card charges;

(iii)    all cash receipts from the Disposition of Inventory and other assets (whether or not constituting Collateral);

(iv)    all proceeds of Accounts; and

(v)    all Net Proceeds, and all other cash payments received by a Loan Party from any Person or from any source or on account of any Disposition or other transaction or event, including, without limitation, any Prepayment Event.

(c)    Each Blocked Account Agreement shall require the ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) to the concentration account controlled by the Agent at a depository bank reasonably acceptable to Agent (the "Concentration Account"), of all cash receipts and collections received by each Loan Party from all sources (the "Receipts and Collections"), including, without limitation, the following:

(i)    then entire ledger balance of each Blocked Account (net of any minimum balance, not to exceed $2,500, as may be required to be kept in the subject Blocked Account by the Blocked Account Bank);

-88-

(ii)    all amounts required to be deposited into the Blocked Accounts pursuant to clause (b) above; and

(iii)    any other cash amounts received by any Loan Party from any other source, on account of any type of transaction or event;

provided, however, the Agent may, in its sole discretion, permit the Loan Parties to have one or more "intermediate" Blocked Account Agreements, whereby such agreements would provide, upon notice from the Agent, the ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) all Receipts and Collections to another Blocked Account, as opposed to the Concentration Account.

(d)    The Concentration Account shall at all times be under the sole dominion and control of the Agent and all funds therein shall be wired to an account specified by Agent no less frequently than daily.  The Agent shall cause all funds on deposit in the Concentration Account to be applied to the Obligations, which amounts shall be applied to the Obligations in the order proscribed in either Section 2.05(f) or Section 8.03 of this Agreement, as applicable. The Loan Parties hereby acknowledge and agree that (i) the Loan Parties have no right of withdrawal from the Concentration Account, and (ii) the funds on deposit in the Concentration Account shall at all times be collateral security for all of the Obligations.  In the event that, notwithstanding the provisions of this Section 6.13, any Loan Party receives or otherwise has dominion and control of any such cash receipts or collections, such receipts and collections shall be held in trust by such Loan Party for the Agent, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into the Concentration Account or dealt with in such other fashion as such Loan Party may be instructed by the Agent.

(e)    Upon the request of the Agent, the Loan Parties shall cause bank statements and/or other reports to be delivered to the Agent not less often than monthly, accurately setting forth all amounts deposited in each Blocked Account to ensure the proper transfer of funds as set forth above.

(f)    If the Agent does not require DDA Notifications to be delivered on the Closing Date in accordance with Section 6.13(a) above, then the Loan Parties shall, upon the request of the Agent at any time after the Closing Date, deliver to the Agent copies of DDA Notifications, which have been executed on behalf of the applicable Loan Party and delivered to each depository institution listed on Schedule 5.21(a).

### 6.14    Information Regarding the Collateral.

(a)    Furnish to the Agent at least thirty (30) days prior written notice of any change in: (i) any Loan Party's name or in any trade name used to identify it in the conduct of its business or in the ownership of its properties; (ii) the location of any Loan Party's chief executive office, its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility); (iii) any Loan Party's organizational structure or jurisdiction of incorporation or formation; or (iv) any Loan Party's

-89-

Federal Taxpayer Identification Number or organizational identification number assigned to it by its state of organization. The Loan Parties agree not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for the Agent to continue at all times following such change to have a valid, legal and perfected first priority security interest in all the Collateral for its own benefit and the benefit of the other Credit Parties.

(b)     Should any of the information on any of the Schedules hereto become inaccurate or misleading in any material respect as a result of changes after the Closing Date, the Lead Borrower shall advise the Agent in writing of such revisions or updates as may be necessary or appropriate to update or correct the same.  From time to time as may be reasonably requested by the Agent, the Lead Borrower shall supplement each Schedule hereto, or any representation herein or in any other Loan Document, with respect to any matter arising after the Closing Date that, if existing or occurring on the Closing Date, would have been required to be set forth or described in such Schedule or as an exception to such representation or that is necessary to correct any information in such Schedule or representation which has been rendered inaccurate thereby (and, in the case of any supplements to any Schedule, such Schedule shall be appropriately marked to show the changes made therein).  Notwithstanding the foregoing, no supplement or revision to any Schedule or representation shall be deemed the Credit Parties' consent to the matters reflected in such updated Schedules or revised representations nor permit the Loan Parties to undertake any actions otherwise prohibited hereunder or fail to undertake any action required hereunder from the restrictions and requirements in existence prior to the delivery of such updated Schedules or such revision of a representation; nor shall any such supplement or revision to any Schedule or representation be deemed the Credit Parties' waiver of any Default or Event of Default resulting from the matters disclosed therein.

### 6.15   Physical Inventories.

(a)     Cause not less than one (1) physical inventory to be undertaken, at the expense of the Loan Parties, no later than January 31, 2014 and annually thereafter, and periodic cycle counts, in each case consistent with past practices, conducted by such inventory takers as are satisfactory to the Agent and following such methodology as is consistent with the methodology used in the immediately preceding inventory or as otherwise may be satisfactory to the Agent. The Agent, at the expense of the Loan Parties, may participate in and/or observe each scheduled physical count of Inventory which is undertaken on behalf of any Loan Party.   The Lead Borrower, within ten (10) days following the completion of such inventory, shall provide the Agent with a reconciliation of the results of such inventory (as well as of any other physical inventory or cycle counts undertaken by a Loan Party) and shall post such results to the Loan Parties' stock ledgers and general ledgers, as applicable.

(b)     Permit the Agent, in its Permitted Discretion, if any Default or Event of Default exists, to cause additional such inventories to be taken as the Agent determines (each, at the expense of the Loan Parties).

### 6.16   Environmental Laws.   (a) Conduct its operations and keep and maintain its Real Estate in material compliance with all Environmental Laws; (b) obtain and renew all environmental permits necessary for its operations and properties; and (c) implement any and all

investigation, remediation, removal and response actions that are appropriate or necessary to maintain the value and marketability of the Real Estate or to otherwise comply with Environmental Laws pertaining to the presence, generation, treatment, storage, use, disposal, transportation or release of any Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate, provided, however, that neither a Loan Party nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and adequate reserves have been set aside and are being maintained by the Loan Parties with respect to such circumstances in accordance with GAAP.

### 6.17    Further Assurances.

(a)    Execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), that may be required under any applicable Law, or which the Agent may request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Lien, all at the expense of the Loan Parties. The Loan Parties also agree to provide to the Agent, from time to time upon request, evidence satisfactory to the Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(b)    If any material assets are acquired by any Loan Party after the Closing Date (other than assets constituting Collateral under the Security Documents that become subject to the perfected first-priority Lien under the Security Documents upon acquisition thereof), notify the Agent thereof, and the Loan Parties will cause such assets to be subjected to a Lien securing the Obligations and will take such actions as shall be necessary or shall be requested by the Agent to grant and perfect such Liens, including actions described in paragraph (a) of this Section 6.17, all at the expense of the Loan Parties. In no event shall compliance with this Section 6.17 waive or be deemed a waiver or Consent to any transaction giving rise to the need to comply with this Section 6.17 if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute Consent to the inclusion of any acquired assets in the computation of the Tranche A Borrowing Base or the Tranche A-1 Borrowing Base.

(c)    Use, and cause each of the Subsidiaries to use, their commercially reasonable efforts to obtain lease terms in any Lease entered into by any Loan Party after the Closing Date not expressly prohibiting the recording in the relevant real estate filing office of an appropriate memorandum of lease and the encumbrancing of the leasehold interest of such Loan Party in the property that is the subject of such Lease.

(d)    Upon the request of the Agent, cause each of its customs brokers, freight forwarders, consolidators and/or carriers to deliver an agreement (including, without limitation, a Customs Broker/Carrier Agreement) to the Agent covering such matters and in such form as the Agent may reasonably require.

(e)    Upon the request of the Agent, cause any of its landlords to deliver a Collateral Access Agreement to the Agent in such form as the Agent may reasonably require.

-91-

**6.18 Compliance with Terms of Leaseholds.** Except as otherwise expressly permitted hereunder, (a) make in accordance with the Approved Budget all payments and otherwise perform all obligations, in each case that are Post-Petition Obligations, in respect of all Leases to which any Loan Party or any of its Subsidiaries is a party, (b) not allow such Leases to lapse or be terminated or any rights to renew such Leases to be forfeited or cancelled, (c) notify the Agent of any default by any party with respect to such Leases and cooperate with the Agent in all respects to cure any such default, and (d) cause each of its Subsidiaries to do the foregoing.

**6.19 Material Contracts.** (a) Perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, (b) maintain each such Material Contract in full force and effect, (c) enforce each such Material Contract in accordance with its terms, (d) take all such action to such end as may be from time to time requested by the Agent, (e) upon request of the Agent, make to each other party to each such Material Contract such demands and requests for information and reports or for action as any Loan Party or any of its Subsidiaries is entitled to make under such Material Contract, and (f) cause each of its Subsidiaries to do the foregoing.

**6.20 [Reserved].**

**6.21 Approved Budget.** Each Loan Party shall conduct its business in a manner consistent with the Approved Budget most recently delivered pursuant to this Agreement and accepted by the Agent in its Permitted Discretion.

**6.22 Employee Benefit Plans.**

(a) Maintain, and cause each ERISA Affiliate to maintain, each Pension Plan in substantial compliance with all applicable Laws.

(b) Make, and cause each ERISA Affiliate to make, on a timely basis, all required contributions to any Multiemployer Plan.

(c) Not, and not permit any ERISA Affiliate to (i) seek a waiver of the minimum funding standards of ERISA, (ii) terminate or withdraw from any Pension Plan or Multiemployer Plan or (iii) take any other action with respect to any Pension Plan that would, or could reasonably be expected to, entitle the PBGC to terminate, impose liability in respect of, or cause a trustee to be appointed to administer, any Pension Plan, unless the actions or events described in clauses (i), (ii) and (iii) above individually or in the aggregate would not have or could not reasonably be expected to have a Material Adverse Effect.

**6.23 Retention.** At all times until the Obligations have been paid in full in cash and all Commitments have been terminated, retain and employ PricewaterhouseCooper LLP as a consultant (the "Consultant"). The terms and scope of the engagement of and responsibilities of the Consultant shall be acceptable to the Agent in its Permitted Discretion and, without limiting the foregoing, the engagement shall grant the Agent the right to communicate directly with the Consultant and authorize the Consultant to communicate directly with the Agent and to furnish the Agent with such information as the Agent may reasonably request, together with copies of all material written materials provided to the board of directors of the Loan Parties by such Consultant, subject to mutually acceptable exceptions. If requested by the Agent, the Consultant

-92-

shall provide the Agent with a weekly update regarding the status of its efforts on behalf of the Loan Parties.

### 6.24    Sale Pleadings; Notices to Agent.

(a)    Notwithstanding anything to the contrary contained in this Agreement, if any Loan Party or any other Person file any (i) sale motion pursuant to Section 363 and 365 of the Bankruptcy Code seeking authority to sell all or substantially all of any Borrower's assets to a "stalking horse bidder", subject to the receipt of higher and better offers, pursuant to an asset purchase agreement or similar agreement, the sale motion, stalking horse bidder, and asset purchase agreement shall, in each case, be satisfactory in form and substance to the Agent in its Permitted Discretion, or (ii) motion or series of motions seeking approval by the Bankruptcy Court of bidding procedures related to any such proposed sale, such motion shall be satisfactory in form and substance to the Agent in its Permitted Discretion and shall include a requirement that the Loan Parties and their professional advisors consult with the Agent on all material aspects of any such sale process.

(b)    To the extent any Loan Party commences or seeks to commence any sale process, the Loan Parties shall promptly, upon any such information becoming available to the Loan Parties, provide the Agent copies of any informational packages provided to potential bidders in accordance with the any motions of the type described in clause (a) above, and any order approving same, draft agency or sale agreements, the deadlines established as to receipt of bids and, upon request of the Agent, a status report and updated information relating to such motions and permitted store closings, and copies of any bids received from any proposed bidder for all or any portion of the Loan Parties' assets and any updates, modifications or supplements to such information and materials.

(c)    If an Event of Default has occurred and is continuing and the Agent has accelerated the repayment of the Obligations pursuant to Section 8.02, at the request of the Agent, the Loan Parties shall promptly engage an Approved Liquidator on terms and conditions acceptable to the Agent in its Permitted Discretion.

### 6.25    Leases.
The Loan Parties shall pay all Post-Petition Obligations under the leases listed on Schedule 6.23 and licenses of Intellectual Property, if any, as required by the Bankruptcy Code or the Bankruptcy Court, except to the extent (i) any Loan Party is contesting any such obligations in good faith by appropriate proceedings, (ii) such Loan Party has established proper reserves as required under GAAP, and (iii) the nonpayment of which does not result in the imposition of a Lien. No Loan Party may assume or reject any of its leases without the prior written consent of the Agent (such consent not to be unreasonably withheld or delayed). The assumption or rejection of any lease shall be conducted in a manner consistent with a maximization of the value of the assets of the Loan Parties.

### 6.26    Bankruptcy Milestones.

(a)    Reorganization. The Loan Parties shall file a plan of reorganization and disclosure statement no later than 60 days after the Petition Date, which shall be in form and substance acceptable to the Agent in its Permitted Discretion. The Bankruptcy Court must enter

-93-

an order approving the disclosure statement no later than 75 days after the Petition Date. The Bankruptcy Court must enter an order confirming the plan of reorganization no later than 100 days after the Petition Date. The plan must be consummated and the Obligations paid in full in cash, and all commitments to lend shall be terminated, within 105 days after the Petition Date.

(b)    Sale Process.  In lieu of filing a plan of reorganization as described in (a) above, the Loan Parties may elect to conduct a sale pursuant to Section 363 of the Bankruptcy Code.  If the Loan Parties make such election, they shall file a sale and bidding procedures motion under Section 363 of the Bankruptcy Code no later than 60 days after the Petition Date, which shall be in form and substance acceptable to the Agent. The Loan Parties shall solicit bids pursuant to bidding procedures approved by the Bankruptcy Court and acceptable to the Agent no later than 75 days after the Petition Date. The Loan Parties shall chose a winning bidder no later than 90 days after the Petition Date. The Bankruptcy Court must enter an order approving such sale and the winning bidder within 100 days after the Petition Date. The sale must be consummated and the Obligations paid in full in cash, and all commitments to lend shall be terminated, within 105 days of the Petition Date.

Notwithstanding anything to the contrary herein, each of the deadlines set forth in (a) and (b) above may be extended by 45 days (such determination to be made on each deadline date), provided, that as of such deadline date (i) no Event of Default has occurred and is continuing, (ii) the Total Revolving Outstandings as of the immediately preceding Friday are 20% less than the projected Total Revolving Outstandings for such date as set forth in the most-recent Approved Budget, and (iii) Availability as of the immediately preceding Friday is 20% greater than the projected Availability for such date as set forth in the most-recent Approved Budget.

**6.27    Financing Orders.**  The Loan Parties shall comply with the Financing Orders, as then in effect, in all respects.

## ARTICLE VII
## NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder or any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations for which a claim has not been asserted), no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

**7.01    Liens.**  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired or sign or file or suffer to exist under the UCC or any similar Law or statute of any jurisdiction a financing statement that names any Loan Party or any Subsidiary thereof as debtor; sign or suffer to exist any security agreement authorizing any Person thereunder to file such financing statement; sell any of its property or assets subject to an understanding or agreement (contingent or otherwise) to repurchase such property or assets with recourse to it or any of its Subsidiaries; or assign or otherwise transfer any accounts or other rights to receive income, other than, as to all of the above, Permitted Encumbrances.

-94-

**7.02    Investments.**  Make any Investments, except Permitted Investments.

**7.03    Indebtedness; Disqualified Stock.**  (a) Create, incur, assume, guarantee, suffer to exist or otherwise become or remain liable with respect to, any Indebtedness, except Permitted Indebtedness; (b) issue Disqualified Stock, or (c) issue and sell any other Equity Interests unless (i) such Equity Interests shall be issued solely by the Parent and not by a Subsidiary of a Loan Party, (ii) such Equity Interests provide that all dividends and other Restricted Payments) in respect thereof shall be made solely in additional shares of such Equity Interests, in lieu of cash, (iii) such Equity Interests shall not be subject to redemption other than redemption at the option of the Loan Party issuing such Equity Interests and in accordance with the limitations contained in this Agreement, and (iv) all Restricted Payments in respect of such Equity Interests are expressly subordinated to the Obligations.

**7.04    Fundamental Changes.**  Merge, dissolve, liquidate, consolidate with or into another Person, (or agree to do any of the foregoing), except that, so long as no Default or Event of Default shall have occurred and be continuing prior to or immediately after giving effect to any action described below or would result therefrom:

(a)    any Subsidiary which is not a Loan Party may merge with (i) a Loan Party, provided that the Loan Party shall be the continuing or surviving Person, or (ii) any one or more other Subsidiaries which are not Loan Parties, provided that when any wholly-owned Subsidiary is merging with another Subsidiary, the wholly-owned Subsidiary shall be the continuing or surviving Person;

(b)    any Subsidiary which is a Loan Party may merge into any Subsidiary which is a Loan Party or into a Borrower, provided that in any merger involving a Borrower, such Borrower shall be the continuing or surviving Person;

(c)    any Subsidiary of a Loan Party may wind up into a Loan Party; and

(d)    any CFC that is not a Loan Party may merge into any CFC that is not a Loan Party.

**7.05    Dispositions.**  Make any Disposition or enter into any agreement to make any Disposition, except Permitted Dispositions.

**7.06    Restricted Payments.**  Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, or issue or sell any Equity Interests or accept any capital contribution, except that, (A) so long as no Default or Event of Default shall have occurred and be continuing prior to or immediately after giving effect to any action described below or would result therefrom, (B) such Restricted Payment is contemplated in the Approved Budget most recently delivered pursuant to Section 6.01(b) hereof and accepted by the Agent in its Permitted Discretion, and (C) the board of directors of the issuer of the applicable Equity Interests has approved the making of such Restricted Payment:

(a)    each Subsidiary of a Loan Party may make Restricted Payments to any Loan Party;

-95-

(b)    the Loan Parties and each Subsidiary may declare and make dividend payments or other distributions payable solely in the common stock or other common Equity Interests of such Person; and

(c)    the Parent may make dividend payments to its shareholders on a quarterly basis in an amount not to exceed the aggregate amount of federal, state and local taxes payable by such shareholders attributable to the income of the Parent and its Subsidiaries with respect to such Fiscal Quarter.

**7.07    Prepayments of Indebtedness.** Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Indebtedness, or make any payment in violation of any subordination terms of any Subordinated Indebtedness, except (subject to Section 7.19) (a) as long as no Default or Event of Default then exists, regularly scheduled or mandatory repayments, repurchases, redemptions or defeasances of (i) Permitted Indebtedness (other than Subordinated Indebtedness), and (ii) Subordinated Indebtedness in accordance with the subordination terms thereof or the applicable subordination agreement relating thereto, and (b) Permitted Refinancings of any such Indebtedness.

**7.08    Change in Nature of Business.** In the case of each of the Loan Parties, engage in any line of business substantially different from the Business conducted by the Loan Parties and their Subsidiaries on the Closing Date or any business substantially related or incidental thereto.

**7.09    Transactions with Affiliates.** Enter into, renew, extend or be a party to any transaction of any kind with any Affiliate of any Loan Party, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Loan Parties or such Subsidiary as would be obtainable by the Loan Parties or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate, provided that the foregoing restriction shall not apply to (a) a transaction between or among the Loan Parties and (b) transactions described on Schedule 7.09 hereto.

**7.10    Burdensome Agreements.** Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that (a) limits the ability (i) of any Subsidiary to make Restricted Payments or other distributions to any Loan Party or to otherwise transfer property to or invest in a Loan Party, (ii) of any Subsidiary to Guarantee the Obligations, (iii) of any Subsidiary to make or repay loans to a Loan Party, or (iv) of the Loan Parties or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person in favor of the Agent; provided, however, that this clause (iv) shall not prohibit any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under clauses (c) or (f) of the definition of Permitted Indebtedness solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness; or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person.

**7.11    Use of Proceeds.** Use the proceeds of any Credit Extension, whether directly or indirectly, and whether immediately, incidentally or ultimately, (a) to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the

-96-

purpose of purchasing or carrying margin stock or to refund Indebtedness originally incurred for such purpose; or (b) for purposes other than those permitted under this Agreement.

**7.12    Amendment of Material Documents.** Amend, modify or waive any of a Loan Party's rights under (a) its Organization Documents in a manner adverse to the Credit Parties, (b) any Material Contract or Material Indebtedness (other than on account of any refinancing thereof otherwise permitted hereunder), in each case to the extent that such amendment, modification or waiver would result in a Default or Event of Default under any of the Loan Documents, would be materially adverse to the Credit Parties or otherwise would be reasonably likely to have a Material Adverse Effect, (c) any of the Subordinated Lien Loan Documents, other than any amendment, modification or change permitted pursuant to the terms of the Intercreditor Agreement.

**7.13    Fiscal Year.** Change the Fiscal Year of any Loan Party, or the accounting policies or reporting practices of the Loan Parties, except as required by GAAP.

**7.14    Deposit Accounts; Credit Card Processors.** Open new DDAs or Blocked Accounts unless the Loan Parties shall have delivered to the Agent appropriate DDA Notifications (to the extent requested by Agent pursuant to the provisions of Section 6.13(a)(iii) hereof) or Blocked Account Agreements consistent with the provisions of Section 6.13 and otherwise satisfactory to the Agent. No Loan Party shall maintain any bank accounts or enter into any agreements with Credit Card Issuers or Credit Card Processors other than the ones expressly contemplated herein or in Section 6.13 hereof.

**7.15    Financial Covenant.** Permit the following results in the Approved Budget Variance Report to vary by more than five percent (5%) from the applicable results projected in the applicable Approved Budget with respect to the Cumulative Four Week Period and the Cumulative Period (except to the extent such actual results are more favorable): receipts, disbursements, cash-on-hand, professional fees (excluding the Agent's professional fees) and expenses, Availability and aggregate Outstanding Amount of the Loans and the Tranche B Advances.

**7.16    Designation of Senior Lien Debt.** Designate any Indebtedness (other than the Indebtedness under the Loan Documents) of any Loan Party or any of its Subsidiaries as "Senior Lien Debt" (or any similar term) under, and as defined in, the Subordinated Lien Loan Documents.

**7.17    Credit Card Agreements.** Enter into a material amendment or supplement to any Credit Card Agreement that could reasonably be expected to be adverse to the Agent's interests, unless it has provided the Agent with five (5) days' prior written notice (or such lesser notice acceptable to the Agent in Permitted Discretion).

**7.18    Foreign Inventory.** Permit Inventory with a fair market value in excess of $250,000 to be located outside of the continental United States at any time.

**7.19    Repayment of Indebtedness.** Without limiting any other provision hereof, except pursuant to the Approved Budget, without the express prior written consent of the Agent and pursuant to an order of the Bankruptcy Court after notice and hearing, make any payment or

transfer of assets with respect to any Lien or Indebtedness incurred or arising prior to the Petition Date that is subject to the automatic stay provisions of the Bankruptcy Code whether by way of "adequate protection" under the Bankruptcy Code or otherwise.

**7.20    Reclamation Claims.** Enter into any agreement to return any of its Inventory to any of its creditors for application against any Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims under Section 546(c) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims based upon any such return pursuant to Section 553(b)(l) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount applied to Pre-Petition Indebtedness, Pre-Petition trade payables and other Pre-Petition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $10,000.

**7.21    Chapter 11 Claims.** Incur, create, assume, suffer to exist or permit any other super-priority administrative claim which is pari passu with or senior to the claims of the Agent against the Loan Parties.

**7.22    Bankruptcy Actions.** Seek, consent to, or permit to exist, without the prior written consent of the Agent, any order granting authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents.

### ARTICLE VIII
### EVENTS OF DEFAULT AND REMEDIES

**8.01    Events of Default.** Any of the following shall constitute an Event of Default:

(a)    Non-Payment. The Borrowers or any other Loan Party fails to pay when and as required to be paid herein, (i) any amount of principal of any Loan or any Tranche B Advance, or (ii) any interest on any Loan or any Tranche B Advance or any fee due hereunder, or (iii) any other amount payable hereunder or under any other Loan Document; or

(b)    Specific Covenants. (i) Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Section 6.01, 6.02, 6.03, 6.05, 6.07, 6.10, 6.11, 6.12, 6.13, 6.14, 6.21, 6.23, 6.24, 6.25, 6.26, 6.27 or Article VII; or (ii) any Guarantor fails to perform or observe any term, covenant or agreement contained in the Facility Guaranty; or (iii) any of the Loan Parties fails to perform or observe any term, covenant or agreement contained in the Security Agreement or the Mortgages to which it is a party; or

(c)    Other Defaults. Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for ten (10) days; or

(d)    Representations and Warranties.    Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in

-98-

connection herewith or therewith (including, without limitation, any Borrowing Base Certificate) shall be incorrect or misleading in any material respect when made or deemed made; or

(e)    Cross-Default. (i) Any Loan Party or any Subsidiary thereof (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Material Indebtedness (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement), or (B) fails to observe or perform any other agreement or condition relating to any such Material Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Material Indebtedness or the beneficiary or beneficiaries of any Guarantee thereof (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; (ii) there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which a Loan Party or any Subsidiary thereof is the Defaulting Party (as defined in such Swap Contract) or (B) any Termination Event (as so defined) under such Swap Contract as to which a Loan Party or any Subsidiary thereof is an Affected Party (as so defined) and, in either event, the Swap Termination Value owed by the Loan Party or such Subsidiary as a result thereof is greater than $250,000; (iii) there is a default by any Loan Party in the observance or performance of any agreement contained in any Subordinated Lien Loan Document and such default is not cured or waived within any applicable grace period; or (iv) there is a default by any Loan Party in the observance or performance of any agreement contained in the International Paper Note and such default is not cured or waived within any applicable grace period; or

(f)    Chapter 11 Case. The occurrence of any of the following in the Chapter 11 Case:

(i)    any Loan Party, without the Agent's prior written consent, files a motion with the Bankruptcy Court seeking the authority to liquidate all or substantially all of any Loan Party's assets or capital stock unless the transactions that are the subject of the motion will result in payment in full in cash of the Obligations;

(ii)    other than in connection with the payment in full or refinancing of the Obligations hereunder, the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by or on behalf of any Loan Party in the Chapter 11 Case: (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral; (C) except as provided in the Interim Financing Order or Final Financing Order, as the case may be, to use cash collateral under Section 363(c) of the Bankruptcy Code without the prior written consent of the Agent; (D) that seeks to prohibit the Agent from credit bidding on any or all of the Loan Parties' assets during the pendency of the

-99-

Chapter 11 Case; or (E) any other action or actions materially adverse to the Agent or its rights and remedies hereunder or its interest in the Collateral;

(iii)    other than in connection with the payment in full or refinancing of the Obligations hereunder, (A) the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by any Loan Party or any other Person to which the Agent does not consent or otherwise agree to treatment of its claims, (B) the entry of any order terminating the Loan Parties' exclusive right to file a plan of reorganization, or (C) the expiration of the Loan Parties' exclusive right to file a plan of reorganization;

(iv)    the entry of an order in any of the Chapter 11 Case confirming a plan of reorganization that (A) is not acceptable to the Agent in its Permitted Discretion or (B) does not contain a provision for termination of the commitments and repayment in full in cash of all of the Obligations under this Agreement on or before the effective date of such plan or plans;

(v)    the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents or the Interim Financing Order, the Final Financing Order or the Cash Management Order without the written consent of the Agent or the filing of a motion for reconsideration with respect to the Interim Financing Order or the Final Financing Order or the Interim Financing Order, the Final Financing Order or the Cash Management Order are otherwise not in full force and effect;

(vi)    the Final Financing Order is not entered prior to the expiration of the Interim Financing Order, and in any event within 35 days of the Petition Date;

(vii)    except as set forth in the "first day" motions which have been reviewed by the Agent, the payment of, or application for authority to pay, any Pre-Petition Indebtedness or Pre-Petition claim without the Agent's prior written consent unless otherwise permitted under this Agreement or as requested in the "first day" motions;

(viii)    the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Agent, any other Credit Party or any of the Collateral;

(ix)    the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of a receiver or an examiner in the Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties; or the sale without the Agent's consent, of all or substantially all of the Loan Parties' assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Case, or otherwise that does not provide for payment in full in cash of the Obligations and termination of the Aggregate Commitments;

(x)    the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case from Chapter 11 to Chapter 7 of the Bankruptcy Code, or any Loan

Party files a motion or other pleading seeking the dismissal of the Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise;

(xi) the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (1) to allow any creditor to execute upon or enforce a Lien on any Collateral having a value of $100,000 or more, or (2) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority;

(xii) the commencement of a suit or action against the Agent or any other Credit Party by or on behalf of any Loan Party, or its bankruptcy estates;

(xiii) the entry of an order in the Chapter 11 Case avoiding or permitting recovery of any portion of the payments made on account of the Indebtedness owing under this Agreement or the other Loan Documents;

(xiv) the failure of any Loan Party to perform any of its obligations under the Interim Financing Order, the Final Financing Order or the Cash Management Order or any of its material obligations under the any other order of the Bankruptcy Court, which is not cured within two (2) Business Days of written notice to the Lead Borrower of same;

(xv) (1) the failure of the Bankruptcy Court to, within sixty (60) days after the Petition Date (or such later date to which the Lender may otherwise agree), grant an order extending the time period of the Loan Parties to assume or reject unexpired leases of real property to a date that is 210 days from the Petition Date, or, (2) if such date has been extended by order of the Bankruptcy Court, the failure of the Bankruptcy Court to, within sixty (60) days prior to such extended deadline (or such later date to which the Agent may otherwise agree), grant an order further extending the time period of the Loan Parties to assume or reject leases; or

(xvi) the entry of an order in the Chapter 11 Case granting any other super-priority administrative claim or Lien equal or superior to that granted to the Agent; or

(xvii) the failure of the Loan Parties to deliver Collateral Access Agreements, in form and substance satisfactory to the Agent and with respect to each location set forth on Schedule 5.08(b)(2), prior to the entry of the Final Financing Order; or

(g)    Judgments. There is entered against any Loan Party or any Subsidiary thereof (i) one or more judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $250,000 (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a

-101-

period of 10 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, is not in effect; or

(h)     ERISA. (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Loan Party or any ERISA Affiliate under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $500,000 or which would reasonably likely result in a Material Adverse Effect, or (ii) a Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $500,000 or which would reasonably likely result in a Material Adverse Effect; or

(i)     Invalidity of Loan Documents. (i) Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any Security Document; or (ii) any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party or any other Person not to be, a valid and perfected Lien on any Collateral, with the priority required by the applicable Security Document; or

(j)     Change of Control. There occurs any Change of Control; or

(k)     Cessation of Business.     Except as otherwise expressly permitted hereunder, any Loan Party shall take any action to suspend the operation of its business in the ordinary course, liquidate all or a material portion of its assets, or employ an agent or other third party to conduct a program of closings, liquidations or "Going-Out-Of-Business" sales of any material portion of its business; or

(l)     Loss of Collateral.     There occurs any uninsured loss to any material portion of the Collateral; or

(m)     Breach of Contractual Obligation. (i) Any Loan Party or any Subsidiary thereof fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of the Paper Supply Agreement or fails to observe or perform any other agreement or condition relating to the Paper Supply Agreement or contained in any instrument or agreement evidencing, securing or relating thereto, or any default occurs thereunder, or the Paper Supply Agreement is rejected pursuant to Section 365 of the Bankruptcy Code, (ii) any event occurs, the effect of which event is to cause, or to permit International Paper or any other Person to terminate the Paper Supply Agreement, or (iii) any Loan Party or any Subsidiary thereof fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any other Material Contract or fails to observe or perform any other agreement or condition relating

-102-

to any such Material Contract or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the counterparty to such Material Contract to terminate such Material Contract; or

(n)     Indictment.  The indictment or institution of any legal process or proceeding against, any Loan Party or any Subsidiary thereof, under any federal, state, municipal, and other criminal statute, rule, regulation, order, or other requirement having the force of law for a felony;

(o)     Death or Incapacity.  Any Loan Party that is an individual dies or is declared incompetent by a court of competent jurisdiction;

(p)     Guaranty.  The termination or attempted termination of any Facility Guaranty except as expressly permitted hereunder or under any other Loan Document;

(q)     Subordination.  (i)  The subordination provisions of the documents evidencing or governing any Subordinated Indebtedness (the "Subordinated Provisions") shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Subordinated Indebtedness; or (ii) any Borrower or any other Loan Party shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of any of the Subordination Provisions, (B) that the Subordination Provisions exist for the benefit of the Credit Parties, or (C) that all payments of principal of or premium and interest on the applicable Subordinated Indebtedness, or realized from the liquidation of any property of any Loan Party, shall be subject to any of the Subordination Provisions; or

(r)     Material Adverse Effect.  A Material Adverse Effect shall occur.

**8.02    Remedies Upon Event of Default.**

(a)     If any Event of Default occurs and is continuing, the Agent may, or, at the request of the Required Lenders shall, take any or all of the following actions:

(i)     declare the Commitments of each Lender to make Committed Loans and Tranche B Advances to be terminated, whereupon such Commitments and obligation shall be terminated (provided that the Agent shall, upon the written request of the Tranche B Lender following the occurrence and during the continuance of any Event of Default under Section 8.01(m)(i) or (ii), declare the Tranche B Commitment of the Tranche B Lender to make Tranche B Advances to be terminated);

(ii)     declare the unpaid principal amount of all outstanding Loans and Tranche B Advances, all interest accrued and unpaid thereon, and all other Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties;

(iii)     [Reserved];

-103-

(iv)     capitalize any accrued and unpaid interest by adding such amount to the outstanding principal balance of the Loans and Tranche B Advances, at which time such capitalized amount shall bear interest at the Default Rate;

(v)     whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, proceed to protect, enforce and exercise all rights and remedies of the Credit Parties under this Agreement, any of the other Loan Documents or applicable Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Credit Parties;

provided, however, that upon the occurrence of any Event of Default with respect to any Loan Party or any Subsidiary thereof under Section 8.01(f), the obligation of each Lender to make Loans and Tranche B Advances shall automatically terminate and the unpaid principal amount of all outstanding Loans and Tranche B Advances and all interest and other amounts as aforesaid shall automatically become due and payable, in each case without further act of the Agent or any Lender.

(b)     Notwithstanding anything to the contrary in this Agreement, the Agent shall commence and pursue such Enforcement Actions as the Agent in its Permitted Discretion deems appropriate with respect to any Event of Default under Section 8.01(m)(i) or (ii) within ten (10) days after the date of the receipt by the Agent of written notice executed and delivered by the Tranche B Lender requesting that the Agent commence Enforcement Actions (a "Tranche B Action Notice"); provided, that in each case, (1) the Required Lenders shall not have instructed the Agent to commence an Enforcement Action prior to the expiration of such ten (10) day period, (2) such Event of Default has not been waived by the Tranche B Lender prior to the Agent's receipt of the Tranche B Action Notice, (3) such Event of Default has not been waived or such Tranche B Action Notice has not been rescinded, in each case by the Tranche B Lender, after the Agent's receipt of the Tranche B Action Notice, (4) in the good faith determination of the Agent, taking an Enforcement Action is permitted under the terms of the Loan Documents and applicable law, (5) taking an Enforcement Action shall not result in any liability of the Agent or the Lenders to any Loan Party or any other person, (6) the Agent shall be entitled to all of the benefits of Sections 9.03, 9.04 and 9.14 hereof, and (7) the Agent shall not be required to take an Enforcement Action so long as, within the period provided above, the Agent shall, at its option, either (a) appoint the Tranche B Lender as an agent of the Agent for purposes of exercising the rights of the Agent to take an Enforcement Action, subject to the terms hereof or (b) resign as Agent, and the Tranche B Lender shall automatically be deemed to be the successor Agent hereunder and under the other Loan Documents for purposes hereof or thereof, except with respect to the provisions of Article II hereof and in connection with all matters relating to the determination of the Tranche A Borrowing Base, the Tranche A-1 Borrowing Base and each of their respective components, which shall be taken at the direction of the Required Lenders until a new Agent is appointed at the direction of the Required Lenders.

-104-

(c)     The Agent, any Tranche A Lender or any Tranche A-1 Lender may purchase, in any public or private sale conducted under the provision of the UCC (including pursuant section 9-610 and 9-620 of the UCC), the provisions of the Bankruptcy Code (including pursuant to section 363 of the Bankruptcy Code) or at any sale or foreclosure conducted by the Agent (whether by judicial action or otherwise) in accordance with Applicable Law, all or any portion of the Collateral. The Lenders hereby irrevocably authorize the Agent, upon written consent of the Required Lenders, to credit bid (in an amount and on such terms as may be directed by the Required Lenders) and purchase at any such sale (either directly or through one or more acquisition vehicles) all or any portion of the Collateral on behalf of and for the benefit of the Lenders.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

**8.03     Application of Funds.**     After the exercise of remedies provided for in Section 8.02 (or after the Loans and Tranche B Advances have automatically become immediately due and payable as set forth in the proviso to Section 8.02), any amounts received on account of the Obligations shall be applied by the Agent in the following order, in each case whether or not such Obligations are allowed or allowable in any bankruptcy or insolvency proceeding or under any Debtor Relief Law:

First, to payment of that portion of the Obligations (excluding the Other Liabilities) constituting fees, indemnities, Credit Party Expenses and other amounts (including fees, charges and disbursements of counsel to the Agent and amounts payable under Article III) payable to the Agent;

Second, to payment of that portion of the Obligations (excluding the Other Liabilities) constituting indemnities, Credit Party Expenses, and other amounts (other than principal, interest and fees) payable to the Tranche A Lenders (including fees, charges and disbursements of counsel to the respective Tranche A Lenders and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Second payable to them;

Third, to the extent not previously reimbursed by the Lenders, to payment to the Agent of that portion of the Obligations constituting principal and accrued and unpaid interest on any Permitted Overadvances;

Fourth, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Tranche A Loans and other Obligations (other than Obligations owing to the Tranche A-1 Lenders and the Tranche B Lender), and fees, ratably among the Tranche A Lenders in proportion to the respective amounts described in this clause Fourth payable to them;

Fifth, to payment of that portion of the Obligations constituting unpaid principal of the Tranche A Loans, ratably among the Tranche A Lenders in proportion to the respective amounts described in this clause Fifth held by them;

-105-

Sixth, to payment of that portion of the Obligations (excluding the Other Liabilities) constituting indemnities, expenses, and other amounts (other than principal, interest and fees) payable to the Tranche A-1 Lenders (including fees, charges and disbursements of counsel to the respective Tranche A-1 Lenders and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Sixth;

Seventh, ratably to pay any fees then due to the Tranche A-1 Lenders until paid in full;

Eighth, ratably to pay interest accrued in respect of the Tranche A-1 Loans until paid in full;

Ninth, ratably to pay principal due in respect of Tranche A-1 Loans ratably among the Tranche A-1 Lenders, in proportion to the respective amounts described in this clause Ninth held by them until paid in full;

Tenth, to payment of that portion of the Obligations (excluding the Other Liabilities) constituting indemnities, expenses, and other amounts (other than principal, interest and fees) payable to the Tranche B Lender (including fees, charges and disbursements of counsel to the Tranche B Lender), ratably among them in proportion to the amounts described in this clause Tenth;

Eleventh, ratably to pay interest accrued in respect of the Tranche B Advances until paid in full;

Twelfth, ratably to pay principal due in respect of Tranche B Advances until paid in full;

Thirteenth, to payment of all other Obligations (including without limitation the cash collateralization of unliquidated indemnification obligations, but excluding any Other Liabilities), ratably among the Credit Parties in proportion to the respective amounts described in this clause Thirteenth held by them;

Fourteenth, to payment of that portion of the Obligations arising from Cash Management Services to the extent secured under the Security Documents, ratably among the Credit Parties in proportion to the respective amounts described in this clause Fourteenth held by them;

Fifteenth, to payment of all other Obligations arising from Bank Products to the extent secured under the Security Documents, ratably among the Credit Parties in proportion to the respective amounts described in this clause Fifteenth held by them; and

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Loan Parties or as otherwise required by Law.

## ARTICLE IX
## THE AGENT

**9.01   Appointment and Authority.** Each of the Lenders hereby irrevocably appoints Salus to act on its behalf as the Agent hereunder and under the other Loan Documents and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof (including, without limitation, acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations and appearing in the Chapter 11 Case on behalf of the Lenders), together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Agent and the Lenders, and no Loan Party or any Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions. It is understood and agreed that the use of the terms "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

**9.02   Rights as a Lender.** The Person serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though they were not the Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Loan Parties or any Subsidiary or other Affiliate thereof as if such Person were not the hereunder and without any duty to account therefor to the Lenders.

**9.03   Exculpatory Provisions.** The Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, the Agent:

(a)     shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(b)     shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may affect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

-107-

(c)        shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Loan Parties or any of its Affiliates that is communicated to or obtained by the Person serving as the Agent or any of its Affiliates in any capacity.

The Agent shall not be liable for any action taken or not taken by it (i) with the Consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

The Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Agent by the Loan Parties or a Lender. Upon the occurrence of a Default or Event of Default, the Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Applicable Lenders or as directed by the Tranche B Lender in accordance with Section 8.02(b). Unless and until the Agent shall have received such direction, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as it shall deem advisable in the best interest of the Credit Parties. In no event shall the Agent be required to comply with any such directions to the extent that the Agent believes that its compliance with such directions would be unlawful.

The Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.

**9.04    Reliance by Agent.** The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including, but not limited to, any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan or a Tranche B Advance that by its terms must be fulfilled to the satisfaction of a Lender, the Agent may presume that such condition is satisfactory to such Lender unless the Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan or such Tranche B Advance, as applicable. The Agent may consult with legal counsel (who may be counsel for any Loan Party),

-108-

independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**9.05    Delegation of Duties.**  The Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub agents appointed by the Agent. The Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub agent and to the Related Parties of the Agent and any such sub agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Agent. The Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

**9.06    Resignation of Agent.**  The Agent may at any time give written notice of its resignation to the Lenders and the Lead Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Lead Borrower, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders appoint a successor Agent meeting the qualifications set forth above; provided that if the Agent shall notify the Lead Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by the Agent on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this Section. Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Borrowers to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Lead Borrower and such successor. After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 10.04 shall continue in effect for the benefit of such retiring Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent hereunder.

**9.07    Non-Reliance on Agent and Other Lenders.**  Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender or any of their

-109-

Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender and also acknowledges that it will, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder. Except as provided in Section 9.12, the Agent shall not have any duty or responsibility to provide any Credit Party with any other credit or other information concerning the affairs, financial condition or business of any Loan Party that may come into the possession of the Agent.

9.08    **[Reserved].**

9.09    **Agent May File Proofs of Claim.**  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Agent (irrespective of whether the principal of any Loan or Tranche B Advance shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Loan Parties) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Agent and the other Credit Parties (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Agent, such Credit Parties and their respective agents and counsel and all other amounts due the Lenders, the Agent and such Credit Parties under Sections 2.09 and 10.04 of this Agreement) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Agent and, if the Agent shall consent to the making of such payments directly to the Lenders, to pay to the Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, and any other amounts due the Agent under Sections 2.09 and 10.04 of this Agreement.

Nothing contained herein shall be deemed to authorize the Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Agent to vote in respect of the claim of any Lender in any such proceeding. Nothing contained herein shall prohibit the Tranche B Lender, in its capacity as such, from making any claims or appearances, including, without limitation, filing, objecting to and being heard with respect to any motion in the Chapter 11 Case, any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, in each case with respect to the Tranche B

-110-

Advances and its Tranche B Commitment (it being acknowledged and agreed that nothing herein shall in any way modify the rights of International Paper, in its capacities as Second Lien IP Agent, a Second Lien Claimholder, Third Lien Agent and a Third Lien Claimholder (as such terms are defined in the Intercreditor Agreement), under the Intercreditor Agreement).

**9.10 Collateral and Guaranty Matters.** The Credit Parties irrevocably authorize the Agent, at its option and in its Permitted Discretion,

(a) to release any Lien on any property granted to or held by the Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than contingent indemnification obligations for which no claim has been asserted), (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing by the Applicable Lenders in accordance with Section 10.01;

(b) to subordinate any Lien on any property granted to or held by the Agent under any Loan Document to the holder of any Lien on such property that is permitted by clause (h) of the definition of Permitted Encumbrances; and

(c) to release any Guarantor from its obligations under the Facility Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder.

Upon request by the Agent at any time, the Applicable Lenders will confirm in writing the Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Facility Guaranty pursuant to this Section 9.10. In each case as specified in this Section 9.10, the Agent will, at the Loan Parties' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Facility Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.10.

**9.11 Notice of Transfer.** The Agent may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and until, and except to the extent, an Assignment and Assumption shall have become effective as set forth in Section 10.06.

**9.12 Reports and Financial Statements.** By signing this Agreement, each Lender:

(a) agrees to furnish the Agent (and thereafter at such frequency as the Agent may reasonably request) with a summary of all Other Liabilities due or to become due to such Lender. In connection with any distributions to be made hereunder, the Agent shall be entitled to assume that no amounts are due to any Lender on account of Other Liabilities unless the Agent has received written notice thereof from such Lender and, if such notice is received, the Agent shall be entitled to assume that the only amounts due to such Lender on account of Other Liabilities is the amount set forth in such notice;

-111-

(b) is deemed to have requested that the Agent furnish such Lender, promptly after they become available, copies of all Borrowing Base Certificates, financial statements and other Borrower Materials required to be delivered by the Lead Borrower hereunder and all commercial finance examinations and appraisals of the Collateral received by the Agent (collectively, the "Reports");

(c) expressly agrees and acknowledges that the Agent makes no representation or warranty as to the accuracy or completeness of any Borrower Materials, and shall not be liable for any information contained in any Borrower Materials (including any Report);

(d) expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agent or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

(e) agrees to keep all Reports and other Borrower Materials confidential in accordance with the provisions of Section 10.07 hereof; and

(f) without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report and other Borrower Materials in connection with any Credit Extensions or Tranche B Advance that the indemnifying Lender has made or may make to the Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a Loan or Loans or Tranche B Advance or Tranche B Advances; and (ii) to pay and protect, and indemnify, defend, and hold the Agent and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

**9.13   Agency for Perfection.** Each Lender hereby appoints each other Lender as agent for the purpose of perfecting Liens for the benefit of the Agent and the Lenders in assets which, in accordance with Article 9 of the UCC or any other applicable Law of the United States, can be perfected only by possession. Should any Lender (other than the Agent) obtain possession of any such Collateral, such Lender shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such Collateral to the Agent or otherwise deal with such Collateral in accordance with the Agent's instructions.

**9.14   Indemnification of Agent.** Without limiting the obligations of the Loan Parties hereunder, the Lenders (other than the Tranche B Lender) hereby agree to indemnify the Agent and any Related Party, as the case may be, ratably according to their Applicable Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Agent and its Related Parties in any way relating

-112-

to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by the Agent and its Related Parties in connection therewith; provided, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's and its Related Parties' gross negligence or willful misconduct as determined by a final and nonappealable judgment of a court of competent jurisdiction; provided, further, that, notwithstanding the foregoing, the Tranche B Lender hereby agrees to indemnify the Agent and any Related Party, as the case may be, solely from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Agent and its Related Parties in any way relating to or arising out of any action taken or omitted to be taken by the Tranche B Lender in connection with this Agreement and the other Loan Documents; provided, further, that the Tranche B Lender shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's and its Related Parties' gross negligence or willful misconduct as determined by a final and nonappealable judgment of a court of competent jurisdiction.

**9.15    Relation among Lenders.** The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Agent) authorized to act for, any other Lender.

<div align="center">

**ARTICLE X**
**MISCELLANEOUS**

</div>

**10.01    Amendments, Etc.** No amendment or waiver of any provision of this Agreement or any other Loan Document, and no Consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Agent, with the Consent of the Required Lenders, and the Lead Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Agent, and each such waiver or Consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

(a)    increase any Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.02) without the written Consent of such Lender; provided, that in no event shall the Aggregate Commitments be increased above $72,500,000 without the written Consent of the Tranche B Lender;

(b)    as to any Lender, postpone any date fixed by this Agreement or any other Loan Document for (i) any scheduled payment (including the Maturity Date) or mandatory prepayment of principal, interest, fees or other amounts due hereunder or under any of the other Loan Documents without the written Consent of such Lender entitled to such payment, or (ii) any scheduled or mandatory reduction or termination of the Aggregate Commitments hereunder or under any other Loan Document without the written Consent of such Lender;

(c)    as to any Lender, reduce the principal of, or the rate of interest specified herein on, any Loan or Tranche B Advance held by such Lender, or any fees or other amounts

-113-

payable hereunder or under any other Loan Document to or for the account of such Lender, without the written Consent of each Lender entitled to such amount; provided, however, that only the Consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrowers to pay interest at the Default Rate;

(d)     as to any Lender, change Section 2.13 or Section 8.03 in a manner that would alter the pro rata sharing of payments required thereby without the written Consent of such Lender;

(e)     change any provision of this Section or the definition of "Applicable Lenders", "Required Lenders", or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written Consent of each Lender;

(f)     except as expressly permitted hereunder or under any other Loan Document, release, or limit the liability of, any Loan Party without the written Consent of each Lender;

(g)     except for Permitted Dispositions, release all or substantially all of the Collateral from the Liens of the Security Documents without the written Consent of each Lender;

(h)     increase the Aggregate Commitments without the written Consent of each Lender;

(i)     change the definition of the terms "Tranche A Borrowing Base" or "Tranche A-1 Borrowing Base" or any component definition thereof if as a result thereof the amounts available to be borrowed by the Borrowers would be increased without the written Consent of each Lender, provided that the foregoing shall not limit the Permitted Discretion of the Agent to change, establish or eliminate any Reserves;

(j)     modify the definition of Permitted Overadvance so as to increase the amount thereof or, except as provided in such definition, the time period for which a Permitted Overadvance may remain outstanding without the written Consent of each Lender;

(k)     modify Section 8.02(b) without the consent of the Tranche B Lender; and

(l)     except as expressly permitted herein or in any other Loan Document, subordinate the Obligations hereunder or the Liens granted hereunder or under the other Loan Documents, to any other Indebtedness or Lien, as the case may be without the written Consent of each Lender;

and, provided further, that no amendment, waiver or Consent shall, unless in writing and signed by the Agent in addition to the Lenders required above, affect the rights or duties of the Agent under this Agreement or any other Loan Document. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the

-114-

5775719v4

applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender disproportionately adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

Notwithstanding anything to the contrary in this Agreement or any other Loan Document, (x) no provider or holder of any Bank Products or Cash Management Services shall have any voting or approval rights hereunder (or be deemed a Lender) solely by virtue of its status as the provider or holder of such agreements or products or the Obligations owing thereunder, nor shall the consent of any such provider or holder be required (other than in their capacities as Lenders, to the extent applicable) for any matter hereunder or under any of the other Loan Documents, including as to any matter relating to the Collateral or the release of Collateral or any Loan Party and (y) any Loan Document may be amended and waived with the written consent of the Agent at the request of the Borrowers without the need to obtain the consent of any Lender if such amendment or waiver is delivered in order (i) to comply with local law or advice of local counsel, (ii) to cure ambiguities or defects or (iii) to cause any Loan Document to be consistent with this Agreement and the other Loan Documents.

## 10.02  Notices; Effectiveness; Electronic Communications.

(a)  Notices Generally.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)  if to the Loan Parties or the Agent, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 10.02; and

(ii)  if to any Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

(iii)  Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)  Electronic Communications.  Notices and other communications to the Loan Parties and the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures

-115-

approved by the Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Agent that it is incapable of receiving notices under such Article by electronic communication.  The Agent may, in its Permitted Discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)    The Internet.  In no event shall the Agent or any of its Related Parties (each, an "Agent Party") have any liability to any Loan Party, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Loan Parties' or the Agent's transmission of Borrower Materials through the internet.

(d)    Change of Address, Etc.  Each of the Loan Parties and the Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Lead Borrower and the Agent.  In addition, each Lender agrees to notify the Agent from time to time to ensure that the Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)    Reliance by Agent and Lenders.  The Agent and the Lenders shall be entitled to rely and act upon any notices (including Committed Loan Notices) purportedly given by or on behalf of the Loan Parties even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Loan Parties shall indemnify the Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Loan Parties.  All telephonic communications with the Agent may be recorded by the Agent, and each of the parties hereto hereby consents to such recording.

**10.03  No Waiver; Cumulative Remedies.**  No failure by any Credit Party to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy,

5775719v4

power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges provided herein and in the other Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether any Credit Party may have had notice or knowledge of such Default or Event of Default at the time.

### 10.04    Expenses; Indemnity; Damage Waiver.

(a)    <u>Costs and Expenses</u>. The Borrowers shall pay all Credit Party Expenses.

(b)    <u>Indemnification by the Loan Parties</u>. The Loan Parties shall indemnify the Agent (and any sub-agent thereof), each other Credit Party, and each Related Party of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless (on an after tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs, and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Agent (and any sub-agents thereof) and their Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or Tranche B Advance or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to any Loan Party or any of its Subsidiaries, (iv) any claims of, or amounts paid by any Credit Party to, a Blocked Account Bank or other Person which has entered into a control agreement with any Credit Party hereunder, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower or any other Loan Party or any of the Loan Parties' directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have directly resulted from the gross negligence or willful misconduct of such Indemnitee or (y) directly result from a claim brought by a Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrowers or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

(c)    <u>Reimbursement by Lenders</u>. Without limiting their obligations under Section 9.14 hereof, to the extent that the Loan Parties for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it, each Tranche A

-117-

Lender and each Tranche A-1 Lender severally agrees to pay to the Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent (or any such sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for the Agent (or any such sub-agent) in connection with such capacity. The obligations of the Tranche A Lenders and the Tranche A-1 Lenders under this subsection (c) are subject to the provisions of Section 2.12(d).

(d)     Waiver of Consequential Damages, Etc. To the fullest extent permitted by applicable Law, the Loan Parties shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan, Tranche B Advance or the use of the proceeds thereof. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)     Payments. All amounts due under this Section shall be payable on demand therefor.

(f)     Survival. The agreements in this Section shall survive the resignation of any Agent, the assignment of any Commitment or Loan or Tranche B Advance by any Lender, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

**10.05  Payments Set Aside.** To the extent that any payment by or on behalf of the Loan Parties is made to any Credit Party, or any Credit Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Credit Party in its Permitted Discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Agent upon demand its Applicable Percentage (without duplication) of any amount so recovered from or repaid by the Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect. The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

-118-

**10.06    Successors and Assigns.**

(a)    Successors and Assigns Generally.    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written Consent of the Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of Section (b), (ii) by way of participation in accordance with the provisions of subsection Section 10.06(d), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.06(f) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Credit Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Lenders.    Any Lender may at any time assign to one or more Persons all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)    Minimum Amounts

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, no minimum amount need be assigned; and

(B)    in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $1,000,000 unless the Agent otherwise consents (each such consent not to be unreasonably withheld or delayed); provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Person will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)    Proportionate Amounts.    Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned;

-119-

(iii)    Required Consents.    No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition, the consent of the Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of any Commitment if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender.

(iv)    Assignment and Assumption. The parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, provided, however, that the Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it shall not be a Lender, shall deliver to the Agent an Administrative Questionnaire.

(v)    Certain Additional Payments. In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Lead Borrower and the Agent, the applicable pro rata share of Committed Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Agent or any Non-Defaulting Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Committed Loans in accordance with its Applicable Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(vi)    Tranche B Advances. Notwithstanding anything to the contrary set forth in this Agreement or in any other Loan Document, the Tranche B Lender may not at any time assign to any Persons all or a portion of its rights and obligations under this Agreement (including all or a portion of its Tranche B Commitment and the Tranche B Advances at the time owing to it) without the prior written consent of the Agent and the Lead Borrower; provided, that the Tranche B Lender shall be permitted to assign its rights to any payments hereunder (but not its obligations hereunder) to any credit source of the Tranche B Lender.

Subject to acceptance and recording thereof by the Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by

-120-

such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.04, and 10.04 with respect to facts and circumstances occurring prior to the effective date of such assignment; provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from the Lenders having been a Defaulting Lender. Upon request, the Borrowers (at their expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.06(d).

(c)     Register.   The Agent, acting solely for this purpose as an agent of the Borrowers (and such agency being solely for tax purposes), shall maintain at the Agent's Office a copy of each Assignment and Assumption delivered to it (or the equivalent thereof in electronic form) and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of the Loans and Tranche B Advances owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, absent manifest error, and the Loan Parties, the Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Lead Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(d)     Participations.   Any Lender (other than the Tranche B Lender) may at any time, without the consent of, or notice to, the Loan Parties or the Agent, sell participations to any Person (other than a natural person or the Loan Parties or any of the Loan Parties' Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties, the Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any Participant shall agree in writing to comply with all confidentiality obligations set forth in Section 10.07 as if such Participant was a Lender hereunder. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 that affects such Participant. Subject to subsection (e) of this Section, the Loan Parties agree that each Participant shall be entitled to the benefits of Sections 3.01 and 3.04 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.06(b). To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.13 as though it were a Lender. Each Lender, acting for this purpose as an agent of the Loan Parties, shall

-121-

maintain at its offices a record of each agreement or instrument effecting any participation and a register for the recordation of the names and addresses of its Participants and their rights with respect to principal amounts and other Obligations from time to time (each a "Participation Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participation Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in each Participation Register shall be conclusive absent manifest error and the Loan Parties, the Administrative Agent and the Lenders may treat each Person whose name is recorded in a Participant Register as a Participant for all purposes of this Agreement (including, for the avoidance of doubt, for purposes of entitlement to benefits under Section 3.01, Section 3.04 and Section 10.08). The Participation Register shall be available for inspection by the Lead Borrower, any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(e)     Limitations upon Participant Rights. A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Lead Borrower's prior written consent. A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 3.01 unless the Lead Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Loan Parties, to comply with Section 3.01(e) as though it were a Lender.

(f)     Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)     Electronic Execution of Assignments. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(h)     [Reserved].

(i)     Transactions by Salus Entity.     Notwithstanding anything in this Agreement or any other Loan Document to the contrary, (A) neither Salus nor any Affiliate thereof (each, a "Salus Entity") shall be required to comply with this Section 10.06 in connection with any transaction involving any other Salus Entity or any of its or their lenders or funding or

-122-

financing sources, and no Salus Entity shall have any obligation to disclose any such transaction to any Person, and (B) there shall be no limitation or restriction on (i) the ability of any Salus Entity to assign or otherwise transfer its rights and/or obligations under this Agreement or any other Loan Document, any Commitment, any Loan, or any other Obligation to any other Salus Entity or any lender or financing or funding source of a Salus Entity or (ii) any such lender's or funding or financing source's ability to assign or otherwise transfer its rights and/or obligations under this Agreement or any other Loan Document, any Commitment, any Loan, or any other Obligation; provided, however, that Salus shall continue to be liable as a "Lender" under this Agreement and the other Loan Documents unless such other Person complies with the provisions of this Agreement to become a "Lender".

**10.07 Treatment of Certain Information; Confidentiality.** Each of the Credit Parties agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, funding sources, attorneys, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Loan Party and its obligations, (g) with the consent of the Lead Borrower or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to any Credit Party or any of their respective Affiliates on a non-confidential basis from a source other than the Loan Parties.

For purposes of this Section, "Information" means all information received from the Loan Parties or any Subsidiary thereof relating to the Loan Parties or any Subsidiary thereof or their respective businesses, other than any such information that is available to any Credit Party on a non-confidential basis prior to disclosure by the Loan Parties or any Subsidiary thereof, provided that, in the case of information received from any Loan Party or any Subsidiary after the Closing Date, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Credit Parties acknowledges that (a) the Information may include material non-public information concerning the Loan Parties or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and

-123-

5775719v4

(c) it will handle such material non-public information in accordance with applicable Law, including Federal and state securities Laws.

**10.08 Right of Setoff.** If an Event of Default shall have occurred and be continuing or if any Lender shall have been served with a trustee process or similar attachment relating to property of a Loan Party, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Agent or the Required Lenders, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrowers or any other Loan Party against any and all of the Obligations now or hereafter existing under this Agreement or any other Loan Document to such Lender, regardless of the adequacy of the Collateral, and irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrowers or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness; provided, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Agent for further application in accordance with the provisions of Section 2.16 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Agent and the Non-Defaulting Lenders, and (y) the Defaulting Lender shall provide promptly to the Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have. Each Lender agrees to notify the Lead Borrower and the Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

**10.09 Interest Rate Limitation.** Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate"). If the Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers. In determining whether the interest contracted for, charged, or received by the Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**10.10 Counterparts; Integration; Effectiveness.** This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in

-124-

Section 4.01, this Agreement shall become effective when it shall have been executed by the Agent and when the Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by telecopy, pdf., or other electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement.

**10.11  Survival.** All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Credit Parties, regardless of any investigation made by any Credit Party or on their behalf and notwithstanding that any Credit Party may have had notice or knowledge of any Default or Event of Default at the time of any Credit Extension or Tranche B Advance, and shall continue in full force and effect as long as any Loan, Tranche B Advance or any other Obligation hereunder shall remain unpaid or unsatisfied. Further, the provisions of Sections 3.01, 3.04 and 10.04 and **Article IX** shall survive and remain in full force and effect regardless of the repayment of the Obligations, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof. In connection with the termination of this Agreement and the release and termination of the security interests in the Collateral, the Agent may require such indemnities and collateral security as it shall reasonably deem necessary or appropriate to protect the Credit Parties against (x) loss on account of credits previously applied to the Obligations that may subsequently be reversed or revoked, (y) any obligations that may thereafter arise with respect to the Other Liabilities and (z) any Obligations that may thereafter arise under Section 10.04.

**10.12  Severability.** If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section 10.12, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Agent, then such provisions shall be deemed to be in effect only to the extent not so limited.

**10.13  Replacement of Lenders.** If any Tranche A Lender or Tranche A-1 requests compensation under Section 3.04, or if the Borrowers are required to pay any additional amount to any Tranche A Lender or Tranche A-1 or any Governmental Authority for the account of any Lender pursuant to Section 3.01. or if any Tranche A Lender or Tranche A-1 is a Defaulting Lender, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.06), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

(a)    the Borrowers shall have paid to the Agent the assignment fee specified in Section 10.06(b);

(b)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(c)    in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter; and

(d)    such assignment does not conflict with applicable Laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

### 10.14  Governing Law; Jurisdiction; Etc.

(a)    GOVERNING LAW.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF, BUT INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)    SUBMISSION TO JURISDICTION.    EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT AND THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE LOAN PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE LOAN PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY CREDIT PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS

-126-

AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)    WAIVER OF VENUE. EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH OF THE LOAN PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    SERVICE OF PROCESS. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(e)    ACTIONS COMMENCED BY LOAN PARTIES. EACH LOAN PARTY AGREES THAT ANY ACTION COMMENCED BY ANY LOAN PARTY ASSERTING ANY CLAIM OR COUNTERCLAIM ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT SOLELY IN A COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR ANY FEDERAL COURT SITTING THEREIN OR THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE AS THE AGENT MAY ELECT IN ITS SOLE DISCRETION AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS WITH RESPECT TO ANY SUCH ACTION.

10.15  Waiver of Jury Trial. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.16  No Advisory or Fiduciary Responsibility. In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree that: (i) the credit facility provided for hereunder and any related arranging or other services in connection

-127-

therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties, on the one hand, and the Credit Parties, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each Credit Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) none of the Credit Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Credit Parties has advised or is currently advising any Loan Party or any of its Affiliates on other matters) and none of the Credit Parties has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Credit Parties and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Credit Parties has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Credit Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Credit Parties with respect to any breach or alleged breach of agency or fiduciary duty.

**10.17   USA PATRIOT Act Notice.** Each Lender that is subject to the Act (as hereinafter defined) and the Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Agent, as applicable, to identify each Loan Party in accordance with the Act. Each Loan Party is in compliance, in all material respects, with the Act. No part of the proceeds of the Loans or Tranche B Advances will be used by the Loan Parties, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended. The Loan Parties shall, promptly following a request by the Agent or any Lender, provide all documentation and other information that the Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know you customer" and anti-money laundering rules and regulations, including the Act.

**10.18   Foreign Asset Control Regulations.** Neither of the advance of the Loans, the Tranche B Advances nor the use of the proceeds of any thereof will violate the Trading With the

-128-

Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)). Furthermore, none of the Borrowers or their Affiliates (a) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (b) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

     **10.19** **Time of the Essence**. Time is of the essence of the Loan Documents.

     **10.20** **[Reserved]**.

     **10.21** **Press Releases**.

     (a)     Each Credit Party executing this Agreement agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure using the name of the Agent or its Affiliates or referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to the Agent and without the prior written consent of the Agent unless (and only to the extent that) such Credit Party or Affiliate is required to do so under applicable Law and then, in any event, such Credit Party or Affiliate will consult with the Agent before issuing such press release or other public disclosure.

     (b)     Each Loan Party consents to the publication by the Agent or any Lender of advertising material, including any "tombstone" or comparable advertising, on its website or in other marketing materials of Agent, relating to the financing transactions contemplated by this Agreement using any Loan Party's name, product photographs, logo, trademark or other insignia. The Agent or such Lender shall provide a draft reasonably in advance of any advertising material to the Lead Borrower for review and comment prior to the publication thereof. The Agent reserves the right to provide to industry trade organizations and loan syndication and pricing reporting services information necessary and customary for inclusion in league table measurements.

     **10.22** **Additional Waivers**.

     (a)     The Obligations are the joint and several obligation of each Loan Party. To the fullest extent permitted by Applicable Law, the obligations of each Loan Party shall not be affected by (i) the failure of any Credit Party to assert any claim or demand or to enforce or exercise any right or remedy against any other Loan Party under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Agreement or any

other Loan Document, or (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Agent or any other Credit Party.

(b)     The obligations of each Loan Party shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Obligations after the termination of the Commitments), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Loan Party hereunder shall not be discharged or impaired or otherwise affected by the failure of the Agent or any other Credit Party to assert any claim or demand or to enforce any remedy under this Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, any default, failure or delay, willful or otherwise, in the performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Loan Party or that would otherwise operate as a discharge of any Loan Party as a matter of law or equity (other than the indefeasible payment in full in cash of all the Obligations after the termination of the Commitments).

(c)     To the fullest extent permitted by applicable Law, each Loan Party waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than the indefeasible payment in full in cash of all the Obligations and the termination of the Commitments. The Agent and the other Credit Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or non-judicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Loan Party, or exercise any other right or remedy available to them against any other Loan Party, without affecting or impairing in any way the liability of any Loan Party hereunder except to the extent that all the Obligations have been indefeasibly paid in full in cash and the Commitments have been terminated. Each Loan Party waives any defense arising out of any such election even though such election operates, pursuant to applicable Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Loan Party against any other Loan Party, as the case may be, or any security.

(d)     Each Borrower is obligated to repay the Obligations as joint and several obligors under this Agreement. Upon payment by any Loan Party of any Obligations, all rights of such Loan Party against any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior indefeasible payment in full in cash of all the Obligations and the termination of the Commitments. In addition, any indebtedness of any Loan Party now or hereafter held by any other Loan Party is hereby subordinated in right of payment to the prior indefeasible payment in full of the Obligations and no Loan Party will demand, sue for or otherwise attempt to collect any such indebtedness. If any amount shall erroneously be paid to any Loan Party on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of any Loan Party, such amount shall be held in trust for the benefit of the Credit Parties and shall forthwith be paid to

-130-

the Agent to be credited against the payment of the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents. Subject to the foregoing, to the extent that any Borrower shall, under this Agreement as a joint and several obligor, repay any of the Obligations constituting Loans and Tranche B Advances made to another Borrower hereunder or other Obligations incurred directly and primarily by any other Borrower (an "Accommodation Payment"), then the Borrower making such Accommodation Payment shall be entitled to contribution and indemnification from, and be reimbursed by, each of the other Borrowers in an amount, for each of such other Borrowers, equal to a fraction of such Accommodation Payment, the numerator of which fraction is such other Borrower's Allocable Amount and the denominator of which is the sum of the Allocable Amounts of all of the Borrowers. As of any date of determination, the "Allocable Amount" of each Borrower shall be equal to the maximum amount of liability for Accommodation Payments which could be asserted against such Borrower hereunder without (a) rendering such Borrower "insolvent" within the meaning of Section 101 (31) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraudulent Conveyance Act ("UFCA"), (b) leaving such Borrower with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the UFCA, or (c) leaving such Borrower unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA, or Section 5 of the UFCA.

**10.23  No Strict Construction.**  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

**10.24  Attachments.**  The exhibits, schedules and annexes attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein, except that in the event of any conflict between any of the provisions of such exhibits and the provisions of this Agreement, the provisions of this Agreement shall prevail.

*IN WITNESS WHEREOF*, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

NE OPCO, INC., as Lead Borrower

By: _____
Name: Brian Zollinger
Title: Vice President, General Counsel & Secretary

NEV CREDIT HOLDINGS, INC.,
as a Borrower

By: _____
Name: Brian Zollinger
Title: Vice President, General Counsel & Secretary

Signature Page to Credit Agreement

**SALUS CAPITAL PARTNERS, LLC**, as
Administrative Agent and as Collateral Agent

By: _____
Name: Kyle C. Shonak, SVP
Its Authorized Signatory

**SALUS CAPITAL PARTNERS, LLC**, as a Tranche A Lender

By: _____
Name: _____
Its Authorized Signatory

**SALUS CLO 2012-1, LTD.**, as a Tranche A-1 Lender

By: _____
Name: _____
Its Authorized Signatory

Signature Page to Credit Agreement

**INTERNATIONAL PAPER COMPANY**,
as a Tranche B Lender

By: _____
Name: _____
Title: _____