IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

_____
)
In re:                                     ) Chapter 11
)
NE OPCO, INC., *et al.*,                    ) Case No. 13-11483 (CSS)
)
) Jointly Administered
)
            Debtors.                        ) Re:  Docket Nos. 7, 34
)
) Obj. Deadline: 6/26/13, 4:00 p.m.
) Hearing Date: 7/1/13, 10:00 a.m.
_____)

OBJECTION OF CERTAIN UTILITY COMPANIES TO THE
MOTION OF THE DEBTORS FOR ORDER UNDER 11 U.S.C. §§ 105(a)
and 366 (I) PROHIBITING UTILITY COMPANIES FROM ALTERING
OR DISCONTINUING SERVICE ON ACCOUNT OF PREPETITION INVOICES,
(II) APPROVING DEPOSIT AS ADEQUATE ASSURANCE OF PAYMENT
AND (III) ESTABLISHING PROCEDURES FOR RESOLVING REQUESTS
BY UTILITY COMPANIES FOR ADDITIONAL ASSURANCE OF PAYMENT

PECO Energy Company, Georgia Power Company and Southern

California Edison Company (collectively, the "Utilities"), by

counsel, hereby object to the *Motion of Debtors For Order Under*

*11 U.S.C. §§ 105(a) and 366 (I) Prohibiting Utility Companies*

*From Altering or Discontinuing Service on Account of Prepetition*

*Invoices, (II) Approving Deposit As Adequate Assurance of Payment*

*and (III) Establishing Procedures For Resolving Requests By*

*Utility Companies For Additional Assurance of Payment* (the

"Utility Motion"), and set forth the following:

## Introduction

In 2005, Congress amended Section 366 of the Bankruptcy Code to add, among other things, Section 366(c) to address adequate assurance of payment requests in Chapter 11 cases.  Prior to 2005, Section 366(b) governed adequate assurance of payment determinations in all bankruptcy cases. Section 366(b), which has not been modified, provides, in pertinent part:

> On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment.

As set forth above, courts had the authority under Section 366(b) to modify the amount of the deposit or other security that was necessary to provide adequate assurance of payment, which is significantly broader than the legal standard established in Sections 366(c)(2) and (3).

Sections 366(c)(2) and (3) of the Bankruptcy Code provide:

> (2) Subject to paragraphs (3) and (4), with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor or the trustee adequate assurance of payment for utility service that is satisfactory to the utility;

> (3)(A) On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment under paragraph (2).

The significant difference between the two provisions is the pre-2005 standard required a court to focus on whether or not to "order reasonable modification of the amount of the deposit or

2

other security necessary to provide adequate assurance of

payment" and Section 366(c) now requires a court to focus on

whether or not to "order modification of the amount of an

assurance of payment under paragraph (2)."  The amount of

assurance of payment under paragraph (2) (Section 366(c)(2)) in

these cases is the two-month deposits requested by the Utilities

herein.  Accordingly, under the foregoing legal standard, it is

the Debtors' burden to present evidence to demonstrate, why, if

at all, the amounts of the Utilities' deposit requests should be

modified.  *See In re Stagecoach Enterprises, Inc.*, 1 B.R. 732,

734 (Bankr. M.D. Fla. 1979) (holding that the debtor, as the

petitioning party at a Section 366 hearing, bears the burden of

proof); *see also Great Atlantic & Pacific Tea Company, Inc.*, 2011

WL 5546954 at page 5 (Bankr. S.D.N.Y. 2011). Courts that have

found that the courts retain the same discretion as under Section

366(b), or allow the debtor to pick the form and/or amount of

security, simply refuse to follow the plain language of the

statute.

In addition to changing the legal standard, Section 366(c)

also changes the adequate assurance of payment determination as

follows:  (1) The statute provides the Debtors with 30 days to

provide adequate assurance of payment instead of 20 days; (2)

Section 366(c)(1) defines the forms of adequate assurance of

payment, which was not included in Section 366(b); and (3)

3

Section 366(c)(1)(B) and (c)(3)(B) limit what the Court can consider.

The post-petition deposits sought by the Utilities in this case are as follows: (A) PECO Energy Company ("PECO") – two-month deposit of $45,600; (B) Georgia Power Company ("Georgia Power") – two-month deposit of $86,850; and (C) Southern California Edison Company ("SCE") – two-month deposit of $235,853.

As set forth herein, this Court should deny the Utility Motion because the amounts of the post-petition deposit requests of the Utilities are reasonable and should not be modified.

## Facts

### Procedural Facts

1.   On June 10, 2013 (the "Petition Date"), the Debtors commenced their cases under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") that are now pending with this Court.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

2.   The Debtors' cases are being jointly administered.

### The Utility Motion

3.   On the Petition Date, the Debtors filed the Utility Motion.

4.   Proper notice of the Utility Motion was not provided to the Utilities prior to the Court entering the *Interim Order Under*

4

*11 U.S.C. §§ 105(a) and 366 (I) Prohibiting Utility Companies From Altering or Discontinuing Service on Account of Prepetition Invoices, (II) Approving Deposit As Adequate Assurance of Payment, and (III) Establishing Procedures For Resolving Requests By Utility Companies For Additional Assurance of Payment* (the "Interim Utility Order") on June 11, 2013.

5.   Because the Utilities were not served with the Utility Motion and the Debtors never attempted to contact the Utilities regarding their adequate assurance requests prior to the filing of the Utility Motion, the Utilities had no opportunity to respond to the Utility Motion or otherwise be heard at the *ex parte* hearing on the Utility Motion that took place on June 11, 2013, despite the fact that Section 366(c)(3) (presuming this was the statutory basis for the relief sought by the Debtors) requires that there be "notice and a hearing" to the Utilities.

6.   In the Utility Motion, the Debtors seek to avoid the applicable legal standards under Sections 366(c)(2) and (3) by seeking Court approval for their own form of adequate assurance of payment, which is a newly-created segregated account (the "Bank Account") in the amount of $568,987.35 that purportedly represents 50% of the Debtors' estimated monthly utility charges. Utility Motion at ¶¶ 4, 7.  The foregoing proposal is unacceptable to the Utilities and should not be considered relevant by this Court because Sections 366(c)(2) and (3) do not

allow the Debtors to establish the form or amount of adequate assurance of payment. Under Sections 366(c)(2) and (3), this Court and the Debtors are limited to modifying, if at all, the amount of the security sought by the Utilities under Section 366(c)(2).

7.    The Debtors' proposed Final Utility Order provides that the Debtors' obligation to maintain the Bank Account would terminate upon the Effective Date of a plan.  (Proposed Final Utility Order at ¶ 4).  However, the Utilities will likely continue to provide post-petition utility goods/services to the Debtors through the Effective Date of the Plan, and would bill the Debtors for services to the Effective Date in arrears, i.e. after the Effective Date.  As such, it does not make sense that any funds remaining in the Bank Account on a plan Effective Date should be returned to the Debtors when utility service through the Effective Date would be billed subsequent to the Effective Date.

8.    The proposed Final Utility Order also provides that notwithstanding the relief granted through the Final Utility Order, no action by any Debtor would be permitted to the extent that it would be inconsistent with any postpetition financing or cash collateral order entered by this Court.  Proposed Final Utility Order at ¶ 11.  It is not clear if the Debtors and their secured lenders are trying to subordinate all of the post-

6

petition payments made to the Utilities to the secured lenders' liens or just the proposed amount contained in the Bank Account. At a minimum, all post-petition payments made by the Debtors to the Utilities, including any post-petition security, should not be subordinated to the lenders' liens or subject to subsequent disgorgement by the secured lenders. If the Debtors want the Utilities to provide post-petition utility goods/services, any and all post-petition payments made to the Utilities should be free and clear of any and all liens, otherwise all of the relief sought in the Utility Motion is nothing more than a subterfuge.

9.    The Utility Motion also does not address why the Bank Account would be undercapitalized at a two-week deposit amount when the Debtors know that the Utilities are required by applicable state laws, regulations and/or tariffs to bill the Debtors monthly.

10.    Furthermore, the Utility Motion does not address why this Court should consider modifying, if at all, the amount of the Utilities' adequate assurance requests pursuant to Section 366(c)(2).

## Facts Regarding the Debtors

11.    The Debtors are a privately-held manufacturer of envelopes. *Declaration of James Pinto In Support of Chapter 11 Petitions and First Day Motions* at ¶ 7 (hereinafter "Pinto Dec. at ¶__").

06/21/2013 SL1 1242493v1 000000.00000

12.   Debtor NE Opco, Inc. ("NE Opco") is a wholly-owned subsidiary of Debtor NEV Credit Holdings, Inc. ("NEV Credit") (NE Opco and NEV Credit collectively referred to as the "Debtors" or the "Company"). NEV Credit is a direct subsidiary of NEV Parent Holdings, Inc. ("NEV Parent"), which is a wholly-owned subsidiary of NEV Holdings, LLC ("NEV Holdings").   Pinto Dec. at ¶ 9.

8

**The 2010 Chapter 11 Cases**

13.   On June 10, 2010, NEC Holdings Corp. and certain of its affiliates, including National Envelope Corporation (the "2010 Debtors") commenced cases (the "2010 Chapter 11 Cases") under Chapter 11 of the Bankruptcy Code in this Court.   Pinto Dec. at ¶ 12.

14.   On September 7, 2010, NEV Holdings acquired substantially all of the assets of the 2010 Debtors for approximately $150 million, along with a $37.7 million note (which would become part of the Term B Loan under the Second Lien Credit Agreement) and the assumption of approximately $20 million in accounts payable owed to International Paper Company "International Paper").   Pinto Dec. at ¶ 13.

**The Debtors' Capital Structure**

15.   As of the Petition Date, the Debtors had secured debt in the amount of approximately $148,380,700 and unsecured debt, consisting mostly of outstanding trade obligations, in the amount of approximately $20.3 million (exclusive of amounts owed to International Paper).   Pinto Dec. at ¶ 14.

16.   On September 7, 2010, NEV Holdings, as parent, NE Opco along with NEV Holdings' other subsidiaries, as borrowers (collectively, the "NEV Borrowers") entered into a credit agreement (as amended or restated, the "First Lien Credit Agreement") which provided the NEV Borrowers with a revolving

9

loan facility (the "Revolving Loan Facility") in an aggregate principal amount of up to the lesser of (i) $100 million or (ii) the lesser of (a) the maximum borrowing amount permitted under the Revolving Loan Facility less the sum of (1) the value of certain issued letters of credit, plus certain required reserves for rental payments, plus certain required term loan reserves, and (b) the Borrowing Base (as defined in the First Lien Credit Agreement) at such time, less the value of certain issued letters of credit.  The First Lien Credit Agreement also provided a term loan facility in the amount of $23,879,000 (the "Term A Loan"). The First Lien Credit Agreement also provided a letter of credit sub-facility in an aggregate principal amount of up to $10 million.  The maturity date for the borrowings under the First Lien Credit Agreement is September 7, 2014.  All amounts outstanding under the Revolving Loan Facility and the Term A Loan are secured by a first priority security interest in substantially all of the NEV Borrowers' assets.  Pinto Dec. at ¶ 15.

17.  On October 31, 2011, the parties amended the First Lien Credit Agreement to reduce the maximum amount available under the Revolving Credit Facility to $80 million.  The parties further amended the First Lien Credit Agreement on December 24, 2012 to provide for an additional term loan in the amount of $6 million. Pinto Dec. at ¶ 16.

18.  As of the Petition Date, there was approximately $34,861,406 outstanding under the Revolving Loan Facility and $15,644,032 under the Term A Loan.  Pinto Dec. at ¶ 17.

19.  On September 7, 2010, NEV Holdings, as Parent, and the NEV Borrowers entered into the Credit Agreement (as amended or restated, the "Second Lien Credit Agreement") which provided the NEV Borrowers with a five-year term loan in the amount of $37,686,928.74 million (the "Term B Loan") with a maturity date of September 7, 2015.  The Second Lien Credit Agreement was subsequently amended on October 31, 2012 to increase the amount of the available borrowings thereunder to $67,686,928.74.  All amounts outstanding are secured by a second lien security interest in substantially all of the NEV Borrowers' assets. Pinto Dec. at ¶ 18.

20.  As of the Petition Date, the aggregate amount outstanding under the Term B Loan (exclusive of the IB Term B Loan discussed below) was approximately $55,717,953.  Pinto Dec. at ¶ 20.

21.  On September 7, 2010, NE Opco entered into a non-interest bearing five-year promissory note (as amended and restated, the "International Paper Note") with International Paper for $17.5 million.  The International Paper Note was repayable at a rate of $296,610 per month with the final payment being due on September 30, 2015.  On February 5, 2013, the

11

parties entered into an amendment and restatement of the
International Paper Note which had an original principal amount
of $9,491,525 and extended the maturity date of the International
Paper Note to February 5, 2016.  NEV Credit is a guarantor of NE
Opco's obligations under the International Paper Note  The
International Paper Note is secured by a third priority security
interest in substantially all of the Debtors' assets.  As of the
Petition Date, there was approximately $9,535,028 outstanding
under the International Paper Note.  Pinto Dec. at ¶ 21.

22.   Pursuant to the Paper Supply Agreement dated September
7, 2010 (as amended, the "Supply Agreement") between
International Paper and NE Opco, International Paper agreed to
supply products to the Company pursuant to the terms set forth
therein.  NE Opco's obligations under the Supply Agreement are
guaranteed by NEV Credit.  International Paper has a security
interest in substantially all of the Debtors' assets.  The Supply
Agreement provides that the first $24 million in accounts payable
outstanding under the Supply Agreement (the "Supply Agreement
A/P") is secured by a third priority security interest in
substantially all of the Debtors' assets.  The outstanding Supply
Agreement A/P owed to International Paper under the Supply
Agreement was approximately $20.5 million as of the Petition
Date.  Pinto Dec. at ¶ 22.

23.   On February 5, 2013, NE Opco and International Paper

entered into the Second Amendment to the Paper Supply Agreement between International Paper and NE Opco (the "Second Amendment"). Pursuant to the Second Amendment, the parties agreed to convert an aggregate of $10 million of the oldest outstanding Supply Agreement A/P (the "Converted Accounts Payable") into a term loan under the Second Lien Credit Agreement.  The Converted Accounts Payable were immediately deemed to be Term Loans (as defined in the Second Lien Credit Agreement) (the "IP Term B Loan") extended by International Paper to NE Opco under the Second Lien Credit Agreement, and ceased being Supply Agreement A/P under the Supply Agreement.  As of the Petition Date, the outstanding amount of the IP Term B Loan was approximately $10,122,281.  The IP Term Loan is secured by a second lien security interest in substantially all of the Debtors' assets.  Pinto Dec. at ¶ 23.

### Events Leading to the Debtors Chapter 11 Cases

24.  Following the 2010 Transaction, the Company's sales volume continued to decrease on a year-to-year basis by almost twenty percent.  The Company's net sales for the year ending on December 31, 2012 were approximately $427 million, down from approximately $510 million for the previous year.  Pinto Dec. at ¶ 28.

25.  Approximately sixty percent of the Company's production costs relate to paper provided by International Paper (the Debtors' sole source provider, except in limited circumstances)

13

pursuant to the Supply Agreement.  The pricing under the Supply
Agreement is locked in, thereby giving the Debtors little
flexibility in reducing their overall costs.  The Company has
experienced net losses since 2007 and has continued to do so
following the 2010 Transaction.  The Company's consolidated net
income was a loss of approximately $60.1 million in 2012 and
$44.1 million in 2011.  Pinto Dec. at ¶ 29.

### The Debtors' Post-Petition Financing

26.  On the Petition Date, the Debtors filed the *Debtors'*
*Motion For Interim and Final Orders (I) Authorizing Debtors To*
*Obtain Post-Petition Secured Financing Pursuant To 11 U.S.C. §§*
*105, 361, 362, 363, 364 and 507; (II) Authorizing Use of Cash*
*Collateral; (III) Granting Liens and Super-Priority Claims; (IV)*
*Granting Adequate Protection; (V) Modifying Automatic Stay; and*
*(VI) Scheduling a Final Hearing Pursuant To Bankruptcy Rule 4001*
(the "Financing Motion").  Through the Financing Motion, the
Debtors are seeking authority to obtain loans under the DIP
Facility, with $60 million available on an interim basis and
$67.5 million available on a final basis.  Financing Motion at ¶
6.

27.  Through the Financing Motion, the Debtors also seek a
carve-out of $500,000 for the payment of fees and expenses of the
Debtors' professionals.  Financing Motion at p. 23.

28.  On June 11, 2013, the Court entered the Interim

14

Financing Order.  Attached as Exhibit "A" to the Interim
Financing Order is a 13-week budget (the "Budget").  It is
unclear from the Budget whether the Debtors have budgeted
sufficient funds for the timely payment of their post-petition
utility charges.

## Facts Concerning the Utilities

29.  Each of the Utilities provided the Debtors with
prepetition utility goods and/or services and have continued to
provide the Debtors with utility goods and/or services since the
Petition Date.

30.  Under the Utilities' billing cycles, the Debtors
receive approximately one month of utility goods and/or services
before the Utility issues a bill for such charges.  Once a bill
is issued, the Debtors have approximately 15 to 30 days to pay
the applicable bill. If the Debtors fail to timely pay the bill,
a past due notice is issued and, in most instances, a late fee
may be subsequently imposed on the account. If the Debtors fail
to pay the bill after the issuance of the past due notice, the
Utilities issue a notice that informs the Debtors that they must
cure the arrearage within a certain period of time or their
service will be disconnected.  Accordingly, under the Utilities'
billing cycles, the Debtors could receive at least two months of
unpaid charges before the utility could cease the supply of goods
and/or services for a post-petition payment default.

15

31.    In order to avoid the need to bring witnesses and have lengthy testimony regarding the Utilities regulated billing cycles, the Utilities request that this Court, pursuant to Rule 201 of the Federal Rules of Evidence, take judicial notice of the Utilities' billing cycles.  Pursuant to the foregoing request and based on the voluminous size of the applicable documents, the Utilities are providing the following web site links to the tariffs and/or state laws, regulations and/or ordinances:

> PECO:
> https://www.peco.com/CustomerService/RatesandPricing/RateInformation/Pages/CurrentElectric.aspx

> Georgia Power:
> http://www.georgiapower.com/pricing/gpc_rates.asp

> SCE:
> http://www.sce.com/AboutSCE/Regulatory/tariffbooks/rules.htm

32.    Subject to a reservation of the Utilities' right to supplement their post-petition deposit requests if additional accounts belonging to the Debtors are subsequently identified, the Utilities' post-petition deposit requests are as follows:

| Utility | No. of Accts. | Est. Prepet. Debt | Dep. Request |
| --- | --- | --- | --- |
| PECO | 2 | $35,384.34 | $45,600 (2-month) |
| Georgia Power | 2 | $184,731.81 | $86,850 (2-month) |
| SCE | 1 | $166,723.76 | $235,853 (2-month) |

16

33.   PECO held a prepetition deposit in the amount of $16,506.03 that it will recoup against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.   No prepetition deposit credit will remain after recoupment.

34.   SCE held a prepetition deposit in the amount of $232,000 that it will recoup against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code. Any prepetition deposit credit after recoupment can be applied to SCE's post-petition deposit request.

## Discussion

### A.    THE UTILITY MOTION SHOULD BE DENIED AS TO THE UTILITIES.

Sections 366(c)(2) and (3) of the Bankruptcy Code provide:

(2) Subject to paragraphs (3) and (4), with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor or the trustee adequate assurance of payment for utility service that is satisfactory to the utility;

(3)(A) On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment under paragraph (2).

As set forth by the United States Supreme Court, "[i]t is well-established that 'when the statute's language is plain, the sole function of the courts--at least where the disposition required by the text is not absurd--is to enforce it according to its terms.'" *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004) (*quoting Hartford*

17

*Underwriters Ins. Co.* v. *Union Planters Bank, N. A.,* 530 U.S. 1, 6, 120 S. Ct., 1942, 147 L. Ed. 2d 1 (2000)). *Rogers v. Laurain (In re Laurain)*, 113 F.3d 595, 597 (6th Cir. 1997) ("Statutes . . . must be read in a 'straightforward' and 'commonsense' manner.").  A plain reading of Section 366(c)(2) makes clear that a debtor is required to provide adequate assurance of payment satisfactory to its utilities on or within thirty (30) days of the filing of the petition.  If a debtor believes the **amount** of the utility's request needs to be modified, then the debtor can file a motion under Section 366(c)(3) requesting the court to modify the **amount** of the utility's request under Section 366(c)(2).

In this case, the Debtors filed the Utility Motion to improperly shift the focus of their obligations under Section 366(c)(3) from modifying the amount of the adequate assurance of payment requested under Section 366(c)(2) to setting the form and amount of the adequate assurance of payment acceptable to the Debtors.  Accordingly, this Court should not reward the Debtors for their failure to comply with the requirements of Section 366(c) and deny the Utility Motion as to the Utilities.  *See In re Viking Offshore (USA), Inc.*, 2008 WL 782449 at *3 (Bankr. S.D. Tex. Mar. 20, 2008) ("The relief requested by Debtors would reverse the burden, by making an advance determination that the proposed assurance was adequate. . . . the court lacks the power

18

to reverse the statutory framework for provision of adequate assurance of payment."); *see also In re Pilgrim's Pride Corporation*, Case No. 08-45664 (DML)(Docket No. 447), United States Bankruptcy Court For the Northern District of Texas, *Memorandum Order* entered on January 5, 2009 (Denying debtors' motion seeking to establish adequate assurance of payment); *see also In re Ramsey Holdings, Inc.*, Case No. 09-13998-M (TLM).

### 1. The Debtors' Proposed Bank Account Is Not Relevant And Even If It Is Considered, It Is Unsatisfactory Because It Does Not Provide the Utilities With Adequate Assurance of Payment.

This Court should not even consider the Bank Account as a form of adequate assurance of payment because: (1) It is not relevant because Section 366(c)(3) provides that a debtor can only modify "the amount of an assurance of payment under paragraph (2)"; and (2) The Bank Account is not a form of adequate assurance of payment recognized by Section 366(c)(1)(A). Although the cases cited by the Debtors in the Utility Motion approved a bank account as adequate assurance, they only did so by improperly ignoring the plain language of Section 366(c)(3) and Section 366(1)(A). Moreover, even if the Court were to consider the Bank Account, the Bank Account is an improper and otherwise unreliable form of adequate assurance of future payment for the following reasons:

    i.    It is underfunded from the outset because the Utilities issue monthly bills;

19

ii.  The Debtors are not required to replenish the Bank Account following pay-outs; and

iii. Unlike the Debtors' professionals' Carve-Out, the Bank Account would not remain if the Debtors default on their post-petition financing.

Accordingly, the Court should not approve the Bank Account as adequate assurance to the Utilities because the Bank Account is: (a) not the **form** of adequate assurance requested by the Utilities; (b) not a form recognized by Section 366(c)(1)(A); and (c) an otherwise unreliable form of adequate assurance.

**2.    The Utility Motion Should Be Denied As To the Utilities Because the Debtors Have Not Set Forth Any Basis For Modifying the Utilities' Requested Deposits.**

In the Utility Motion, the Debtors fail to address why this Court should modify the amount of the Utilities' requests for adequate assurance of payment.  Under Section 366(c)(3), the Debtors have the burden of proof as to whether the amounts of the Utilities' adequate assurance of payment requests should be modified.  *See In re Stagecoach Enterprises, Inc.*, 1 B.R. 732, 734 (Bankr. M.D. Fla. 1979) (holding that the debtor, as the petitioning party at a Section 366 hearing, bears the burden of proof).  However, the Debtors do not provide the Court with any evidence or factually supported documentation to explain why the amount of the Utilities' adequate assurance requests should be modified.  Accordingly, the Court should deny the relief

20

requested by Debtors in the Utility Motion and require the Debtors to comply with the requirements of Section 366(c) with respect to the Utilities.

**B.    THE COURT SHOULD ORDER THE DEBTORS TO PROVIDE THE ADEQUATE ASSURANCE OF PAYMENT REQUESTED BY THE UTILITIES PURSUANT TO SECTION 366 OF THE BANKRUPTCY CODE.**

Section 366(c) was amended to overturn decisions such as *Virginia Electric and Power Company v. Caldor, Inc.*, 117 F.3d 646 (2d Cir. 1997), that held that an administrative expense, without more, could constitute adequate assurance of payment in certain cases.  Section 366(c)(1)(A) specifically defines the forms that assurance of payment may take as follows:

> (i) a cash deposit;
> (ii) a letter of credit;
> (iii) a certificate of deposit;
> (iv) a surety bond;
> (v) a prepayment of utility consumption; or
> (vi) another form of security that is mutually agreed upon between the utility and the debtor or the trustee.

Section 366 of the Bankruptcy Code was enacted to balance a debtor's need for utility services from a provider that holds a monopoly on such services, with the need of the utility to ensure for itself and its rate payers that it receives payment for providing these essential services. *See In re Hanratty*, 907 F.2d 1418, 1424 (3d Cir. 1990).  The deposit or other security "should bear a reasonable relationship to expected or anticipated utility consumption by a debtor."  *In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879, 883 (Bankr. E.D.N.Y. 1986).  In making such a

21

determination, it is appropriate for the Court to consider "the length of time necessary for the utility to effect termination once one billing cycle is missed." *In re Begley*, 760 F.2d 46, 49 (3d Cir. 1985).  Based on the Debtors' anticipated utility consumption, the minimum period of time the Debtors could receive service from the Utilities before termination of service for non-payment of bills is approximately two (2) months or more. Moreover, even if the Debtors timely pay their post-petition utility bills, the Utilities still have potential exposure of 45 to 60 days based on their Tariff-mandated billing cycles. Furthermore, the amounts of the Utilities' deposit requests are the amounts that the applicable public service commission, which is a neutral third-party entity, permits the Utilities to request from their customers.  Although the Utilities recognize that this Court is not bound by the applicable Tariffs, the Tariffs are extremely relevant information of a determination made by an independent entity on the appropriate amount of adequate assurance that should be paid to the Utilities.  Accordingly, the amounts of the deposits requested by the Utilities are reasonable and should not be modified.  *See In re Stagecoach*, 1 B.R. 732, 735-36 (Bankr. M.D. Fla. 1979) (holding that a two month deposit is appropriate where the debtor could receive sixty (60) days of service before termination of services because of the utilities'

22

billing cycle.); *see also In the Matter of Robmac, Inc.*, 8 B.R. 1, 3-4 (Bankr. N.D. Ga. 1979).

In contrast, the Debtors fail to address in the Utility Motion why this Court should modify, if at all, the amounts of the Utilities' adequate assurance of payment requests, which is the Debtors' statutory burden.  Instead, the Debtors merely ask this Court to approve their proposed form of adequate assurance of payment in the form of the two-week Bank Account.  As set forth in Section A.1. above, the proposed Bank Account does not provide adequate assurance of payment to the Debtors' utility providers.

Furthermore, Debtors' counsel, who have access to inside information regarding the Debtors' operations, are not taking any chances regarding the payment of their post-petition charges because they are seeking to secure the payment of their fees through a $500,000 carve-out.  Accordingly, based on the foregoing, the Debtors should be required to tender the deposits sought by the Utilities.

WHEREFORE, the Utilities respectfully request that this Court enter an order:

1. Denying the Utility Motion as to the Utilities;

2. Awarding the Utilities the post-petition adequate assurance of payment pursuant to Section 366 in the amount and form satisfactory to the Utilities; and

23

3.    Providing such other and further relief as the Court

deems just and appropriate.

Dated:      June 21, 2013          STEVENS & LEE, P.C.

/s/ John D. Demmy_____
John D. Demmy (Bar No. 2802)
1105 North Market Street, 7th Floor
Wilmington, Delaware 19801
Telephone:  (302) 425-3308
E-mail:   jdd@stevenslee.com

and

Russell R. Johnson III
John M. Craig
Law Firm of Russell R. Johnson III, PLC
2258 Wheatlands Drive
Manakin-Sabot, Virginia  23103
Telephone: (804) 749-8861
Facsimile: (804) 749-8862
E-mail:  russj4478@aol.com

*Counsel for PECO Energy Company,
Georgia Power Company, and Southern
California Edison Company*

24