# EXHIBIT 1

**Settlement**

# NE OPCO, INC.
## SUMMARY OF DIP SETTLEMENT TERMS

*This following Summary of DIP Settlement Terms (the "<u>Term Sheet</u>") provides an outline of proposed changes to the Final Debtor in Possession Financing Order (the "Final DIP Order"). Until expressed in a Final DIP Order entered by the court this Term Sheet is non-binding on the parties hereto. Until reflected in a document publicly filed on the docket the information contained herein is strictly confidential and may not be shared with any person or entity.*

| I. Process | ▪ The Debtors, the Committee, International Paper ("IP"), Galactic, and Salus agree to the terms set forth herein. The terms will be set forth in the Final DIP Order. |
|---|---|
| II. Final DIP Order Changes | ▪ DIP budget will include an additional $250,000 in Committee professional fees.<br><br>▪ The DIP budget variance shall be increased from 5% to 10%.<br><br>▪ DIP budget will include $25,000 per week for 10 weeks ($250,000 total) to be irrevocably paid into a segregated escrow account (the "503(b)(9) Account") to be used to pay allowed 503(b)(9) claims other than those of IP (if any). Upon formation of the General Unsecured Creditors Trust (the "GUC Trust"), which shall occur as soon as practicable after entry of the Final DIP Order, all funds in the 503(b)(9) Account shall be transferred to the GUC Trust. The res of the GUC Trust and the GUC Trust itself shall not be property of the Debtors' estates. If the DIP loan is repaid in less than 10 weeks, the unfunded portion of this $250,000 will be funded when the DIP is repaid in full in cash.<br><br>▪ Upon the Debtors' receipt of a signed asset purchase agreement that includes cash consideration sufficient to repay the DIP loan in full and/or which is otherwise reasonably satisfactory to the DIP Agent, Salus will reduce the availability block in the DIP by and additional $500,000. The Debtors shall immediately use such additional availability to fund $500,000 into the 503(b)(9) Account (or the GUC Trust, as the case may be) to be used to pay allowed 503(b)(9) claims other than those of IP (if any).<br><br>▪ The fee set forth in the definition of "Availability Block" in the DIP Credit Agreement shall be reduced from $100,000 to $50,000. |

RLF1 8901883v.5

|  | <ul><li>The Final DIP Order will not grant a superpriority lien on avoidance actions or superpriority administrative claim that may be satisfied from any avoidance actions or any proceeds thereto, to any of Salus, Galactic or IP.</li><li>The asserted liens and claims of Salus, Galactic and IP shall be allowed upon entry of the Final DIP Order in the amounts and priorities set forth therein, shall be deemed to be properly perfected, and shall not be subject to offset, counterclaim or any other deduction.</li><li>In the case of a going concern sale (which shall mean a sale of substantially all of the Debtors' assets substantially for the purpose of continuing the Debtors' business as a going concern and not for the purpose of liquidating a material portion of the Debtors' assets), the unsecured deficiency claims of Galactic and IP shall not be beneficiaries of the GUC Trust. However, in all other scenarios and if the Trustee of the GUC Trust determines (in his or her sole and absolute discretion) to prosecute preference actions, then the unsecured deficiency claims of Galactic and IP shall be allowed prepetition general unsecured claims entitled to share in the avoidance action recoveries of the GUC Trust.</li><li>Notwithstanding the foregoing, in all scenarios, the deficiency claims of Galactic and IP shall be entitled to share pro rata in any recoveries by the estates or the GUC Trust from any secured creditor not released herein.</li><li>Avoidance actions not otherwise purchased by the buyer or released shall be transferred to the GUC Trust immediately after the closing of the sale.</li><li>The Debtors will use good faith efforts to require any purchaser to assume all 503(b)(9) claims.</li><li>Subject to availability under the DIP Credit Agreement, budgeted amounts for pre-event of default professional fees shall be funded on a weekly basis into a professional fee escrow account (the "Fee Escrow") at the beginning of each week and such amounts shall not reduce the Carve Out. Any amounts funded into the Fee Escrow shall be available to pay allowed professional fees and disbursements incurred pre-default regardless of whether allowance occurs prior or subsequent to the occurrence of any default under, or payoff of, the DIP Loan. All amounts funded into the Fee Escrow that remain after the payment of all allowed</li></ul> |
|---|---|

| | |
|---|---|
| | fees and disbursements pursuant to a final order or orders granting professionals' final fee applications shall be returned to the Debtors' estates and subject to the liens of any secured creditors. |
| **III. 363 Sale; Sharing of Cash Sale Proceeds; GUC Trust; Avoidance Action** | ▪ The first cash sale proceeds repay the DIP loans in full in cash.<br><br>▪ After the DIP loans are repaid in full, the next $4 million in cash sale proceeds shall be shared as follows: 75% payable pro rata to the holders of the next in priority secured claims (the "Second Lien Debt"), and 25% payable to the GUC Trust.<br><br>▪ Additional cash sale proceeds shall be shared as follows: 97% payable to the Second Lien Debt (until paid in full) and 3% payable to the GUC Trust, then 97% payable to the secured debt junior in priority to the Second Lien Debt (the "Third Lien Debt") until paid in full and 3% payable to the GUC Trust.<br><br>▪ Secured creditors shall be entitled to credit bid in any sale of estate assets; *provided, however*, that any secured creditor making a credit bid shall be required to pay in cash the amounts set forth herein to the GUC Trust as if the portion of the credit bid in excess of the DIP Loan amount was an all cash bid.<br><br>▪ For any non-cash sale proceeds (such as equity or debt) to be subject to the sharing formula herein, all parties hereto must agree on the value ascribed to such sale proceeds or submit the valuation issue to the Bankruptcy Court or other agreed-upon alternative dispute resolution to the extent necessary to calculate the sharing. For the avoidance of any doubt, any assumed liabilities including, without limitation, cure costs, or any agreement reached between a buyer and IP (whether a supply contract, or otherwise) shall not be considered non-cash sale proceeds and shall not be subject to the sharing formula herein.<br><br>▪ No consideration received from any sale of assets, including, without limitation, avoidance actions, shall be attributable to unencumbered assets. Instead all cash proceeds shall be distributed as set forth herein.<br><br>▪ Nothing herein shall waive the right of any party to object to any particular sale of assets or the terms of any relief requested in connection therewith. |
| **IV. Estate Releases** | ▪ Upon entry of the Final DIP Order, the Debtors' estates (and the Committee) shall release all claims and causes of action against the following entities: Salus, The Gores Group and its affiliates |

| | |
|---|---|
| | (including without limitation NEV Parent Holdings, Inc., NEV RE Holdings, Inc., and Galactic Holdings, LLC), IP and its affiliates; and the Debtors' present and former directors and officers (collectively the "Releases"). The language providing such releases shall be agreed upon in the Final DIP Order. |
| **V. Wind Down** | - The funded and unused post event of default professional fee carve out and other deposits (currently totaling approximately $789,000) presently held in Debtors' counsel's trust account, which are funds that would otherwise be collateral of the secured lenders, may be used by the Debtors' estate to pay the costs and expenses to wind down the chapter 11 cases (the "Wind Down Fund"). Any amounts remaining in the Wind Down Fund after paying such costs and expenses shall go to the GUC Trust. Under no circumstances shall the Debtors or the Committee seek to use or support anyone seeking to use (by filing motion papers with the Court or otherwise) additional cash collateral of the secured lenders for the period following the consummation of the initial 363 sale without the secured lenders' express consent in their sole discretion. For the avoidance of any doubt, nothing herein shall be construed as an obligation or requirement of the secured lenders to provide use of the secured lenders' cash collateral for the period following the consummation of the initial 363 sale.<br><br>- If the Wind Down Fund becomes insufficient to liquidate assets remaining in the estate after the sale, nothing herein shall require the Debtors or Committee to wind down the chapter 11 cases on an administratively insolvent basis.<br><br>- All professional fees of the Committee and the GUC Trust relating to resolving general unsecured or 503(b)(9) claims (other than those 503(b)(9) claims that are the subject of and resolved by the 503(b)(9) protocol motion described below), pursuing avoidance actions, or otherwise administering the GUC Trust shall be paid solely out of the GUC Trust (or funds allocated thereto) and not out of the estates. For the avoidance of doubt, professionals' ongoing services in connection with the chapter 11 case, other than those activities specified above, shall not be payable out of the GUC Trust, but rather, shall be payable from the Fee Escrow, the Carve Out, the Wind Down Budget or as otherwise provided in any subsequent order of the Court.<br><br>- The Debtors shall file a motion reasonably satisfactory to the Committee, Galactic, IP and DIP Agent to establish a protocol for the payment of allowed 503(b)(9) claims  The funds for the |

|  | payment of any allowed 503(b)(9) claims shall come from the 503(b)(9) account or the GUC Trust. |
|---|---|