## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---

| | |
|---|---|
| ----------------------------------------------------- x | |
| In re: | : Chapter 11 |
| | : |
| NE OPCO, INC., et al., | : Case No. 13-11483 (CSS) |
| | : |
| Debtors.[1] | : Jointly Administered |
| | : |
| | : (Proposed) Hearing Date: Sept. 9, 2013 at 2:00 p.m. |
| ----------------------------------------------------- x | (Proposed) Obj. Deadline: Sept. 3, 2013 at 4:00 p.m. |

### DEBTORS' MOTION PURSUANT TO SECTIONS 105(a), 363(b), (f), AND (m), AND 365 OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2002, 6004, AND 6006, AND LOCAL RULE 6004-1 (I) FOR AUTHORIZATION TO (A) SELL SUBSTANTIALLY ALL OF THEIR ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS AND (B) ASSUME AND ASSIGN CONTRACTS AND LEASES AND (II) FOR APPROVAL OF PROCEDURES FOR DETERMINING CURE AMOUNTS

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), by and through their undersigned counsel, hereby file this motion (this "**Motion**") pursuant to sections 105(a), 363(b), (f), and (m), and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**") for entry of an order (i) approving certain procedures (the "**Assumption Procedures**") for the assumption and assignment of executory contracts (collectively, the "**Contracts**") and unexpired leases (collectively, the "**Leases**") and the determination of the amount of cure obligations (the "**Cure Amounts**"), if any, related thereto and (ii) authorizing (a) the sale of the Acquired Assets (as defined below) to the Purchasers (as defined below) free and

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are NE Opco, Inc. (9830) and NEV Credit Holdings, Inc. (9596). The above-captioned Debtors' mailing address is c/o NE Opco, Inc., 3211 Internet Boulevard, Suite 200, Frisco, Texas 75034.

clear of all liens, claims, encumbrances, and other interests in accordance with the terms of the Purchase Agreements (the "**Sales**") and (b) the Debtors to assume and assign certain Contracts in accordance with the Assumption Procedures set forth herein.  In support of this Motion, the Debtors respectfully state as follows:

**Jurisdiction and Venue**

1.      The Court has jurisdiction over this Motion under 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  Venue of these proceedings and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

2.      The statutory bases for the relief requested herein are sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

**Background**[2]

A.      **General Background**

3.      On June 10, 2013 (the "**Petition Date**"), each of the Debtors filed a voluntary petition with this Court for relief under Chapter 11 of the Bankruptcy Code, thereby commencing the Chapter 11 Cases.

4.      On June 21, 2013, the Office of the United States Trustee (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (the "**Committee**") in the Chapter 11

---

[2] Additional factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of these chapter 11 cases (the "**Chapter 11 Cases**"), is set forth in detail in the *Declaration of James Pinto in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 3] (the "**Pinto Declaration**") filed with the Court on the Petition Date (as defined below).

2

Cases.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**B.**      **The Debtors' Prepetition Secured Debt and DIP Facility**

5.      As of the Petition Date, the Debtors had secured debt in the amount of approximately $148,380,700.  A detailed discussion of the Debtors' capital structure and the various tranches of secured debt is set forth below.

(i)      *Revolving Loan Facility and the Term A Loan*

6.      Certain of the Debtors are party to the First Lien Credit Agreement[3] with, among others, the First Lien Agent and the First Lien Lenders.  Under the First Lien Credit Agreement, the First Lien Lenders provided the Debtors with the Revolving Loan Facility and the Term A Loan.  All amounts outstanding under the Revolving Loan Facility and the Term A Loan are secured by a first priority security interest in substantially all of the Debtors' assets to the extent set forth in the First Lien Credit Agreement and related loan documents.  As of the Petition Date, there was approximately $34,861,406 outstanding under the Revolving Loan Facility and $15,644,032 under the Term A Loan.

(ii)      *Subordinated Term B Loan Facility*

7.      Certain of the Debtors are party to the Second Lien Credit Agreement with, among others, Galactic, as agent, and the lenders from time to time party thereto (the "**Second Lien Lenders**").  Under the Second Lien Credit Agreement, the Second Lien Lenders provided the Debtors with the Term B Loan.  All amounts outstanding under the Term B Loan are secured by a second lien security interest in substantially all of the Debtors' assets to the extent set forth in the Second Lien Credit Agreement and related loan documents.  As of the Petition Date, the

---

[3] Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Pinto Declaration.

RLF1 9133928v.6

aggregate amount outstanding under the Term B Loan (exclusive of the IP Term B Loan (as defined below)) was approximately $55,717,953.

### (iii)  *International Paper Note*

8.      On September 7, 2010, the Debtors issued the International Paper Note to International Paper.  The International Paper Note is secured by a third priority security interest in substantially all of Debtors' assets.  As of the Petition Date, there was approximately $9,535,028 outstanding under the International Paper Note.

### (iv)  *International Paper Supply Agreement and IP Term B Loan*

9.      Pursuant to the Supply Agreement, International Paper agreed to supply products to the Debtors upon the terms set forth therein.  To induce International Paper to provide products in accordance with the terms of the Supply Agreement, the Debtors agreed to grant International Paper a security interest in and to substantially all of the Debtors' assets.  The Supply Agreement provides that the first $24 million in accounts payable outstanding under the Supply Agreement (the "**Supply Agreement A/P**") shall be secured by a third priority security interest in substantially all of the Debtors' assets.  In the event that the Supply Agreement A/P exceeds $24 million in the aggregate, the next $5 million in Supply Agreement A/P (the "**Second Lien Supply Agreement A/P**") is secured by a second priority security interest in substantially all of the Debtors' assets and therefore treated *pari passu* with the Debtors' obligations under the Term B Loan (in the event that Supply Agreement A/P does not exceed $24 million on a given date, then the amount of Second Lien Supply Agreement A/P on such date equals zero).  The outstanding Supply Agreement A/P owed to International Paper under the Supply Agreement was approximately $20.5 million as of the Petition Date.

10. On February 5, 2013, certain of the Debtors entered into the Second Amendment. Pursuant to the Second Amendment, the parties agreed to convert an aggregate amount of $10 million of the oldest outstanding Supply Agreement A/P (the "**Converted Accounts Payable**") into a term loan under the Second Lien Credit Agreement. Accordingly, the Converted Accounts Payable were immediately deemed to be Term Loans (as defined in the Second Lien Credit Agreement) (the "**IP Term B Loan**") extended by International Paper to the Debtors under the Second Lien Credit Agreement and ceased being Supply Agreement A/P under the Supply Agreement. As of the Petition Date, the outstanding amount of the IP Term B Loan was approximately $10,122,281. The IP Term B Loan is secured by a second lien security interest in substantially all of the Debtors' assets and is *pari passu* with the rest of the Term B Loan under the Second Lien Credit Agreement.

(v) *DIP Facility*

11. On the Petition Date, the Debtors filed a motion [Docket No. 12] (the "**DIP Motion**") seeking authority to enter into and borrow under the DIP Credit Agreement with Salus, as the DIP Agent, and the DIP Lenders. Under the DIP Credit Agreement, the DIP Lenders are providing the Debtors with a $67.5 million facility which has been used to pay down the amounts outstanding under the First Lien Credit Agreement and provide the Debtors with the necessary runway to maximize value for all creditors, vendors, employees and other stakeholders in the Chapter 11 Cases.

12. On June 11, 2013, the Court conducted an interim hearing on the DIP Motion as part of the first day hearing (the "**First Day Hearing**"). At the conclusion of the First Day Hearing, the Court entered an interim order [Docket No. 39] (the "**Interim DIP Order**") approving the DIP Motion on an interim basis to the extent set forth therein. The Interim DIP

Order deferred a number of contested issues relating to the DIP Motion to a final hearing on the DIP Motion, which was originally scheduled for July 12, 2013 (the "**July 12 Hearing**").

13.      After the First Day Hearing, the key parties to the Chapter 11 Cases, including (i) the Debtors, (ii) the Committee, (iii) Salus, (iv) International Paper and (v) Galactic (collectively, the "**Parties**") engaged in extensive negotiations to resolve certain significant inter-creditor issues that otherwise would have been an impediment to the Debtors obtaining debtor in possession financing on a final basis.

**C.      The Settlement**

14.      At the July 12 Hearing, counsel to the Debtors, among others, announced in open court that (i) the Parties had reached an agreement (the "**Settlement**") that would allow the Debtors to obtain postpetition financing so that the Debtors could continue to focus their efforts on marketing and selling the Debtors' assets and (ii) the Debtors intended to file a motion to approve the Settlement (the "**Settlement Motion**") later that day.  As a result of such agreement, counsel to the Debtors noted that it wished to adjourn the final hearing on the DIP Motion so that both the DIP Motion and the Settlement Motion could be heard on the same date.  The Court, after finding cause, shortened the notice periods with respect to the Settlement Motion and scheduled the hearing on the Settlement Motion and the DIP Motion for July 19, 2013 (the "**July 19 Hearing**").  On July 12, 2013, the Debtors filed the Settlement Motion.  See Docket No. 157.

15.      At the July 19 Hearing, the Court, after, among other things, overruling the objections of the U.S. Trustee and FC Meyer Packaging LLC ("**FC Meyer**"), entered an order approving the DIP Motion [Docket No. 180] (the "**Final DIP Order**") and an order approving the Settlement Motion [Docket No. 181] (the "**Settlement Order**").[4]

---

[4] The Settlement Order and the Final DIP Order are currently subject to a pending motion to reconsider filed by FC Meyer [Docket No. 200] (the "**Reconsideration Motion**").  The Debtors believe that such motion is

16. Pursuant to the Settlement, which was approved by the Settlement Order, the cash proceeds and non-cash proceeds (such as equity or debt) from the Sales of the Acquired Assets shall be distributed as follows:

    i. The first sale proceeds shall be used to repay the DIP Facility in full in cash;

    ii. After the DIP Facility is repaid in full, the next $4 million in sale proceeds shall be shared as follows: 75% payable pro rata to the holders of the next in priority secured claims (the "**Second Lien Debt**"), and 25% payable to the GUC Trust; and

    iii. Additional sale proceeds shall be shared as follows: 97% payable to the Second Lien Debt (until paid in full) and 3% payable to the GUC Trust, then 97% payable to the secured debt junior in priority to the Second Lien Debt until paid in full and 3% payable to the GUC Trust.

**D.    The Sale Milestones**

17. Section 6.26(b) of the DIP Credit Agreement (as amended) contains, among other things, the following milestones if the Debtors elect to conduct a sale (such as the Sales) pursuant to section 363 of the Bankruptcy Code (collectively, the "**Sale Milestones**"): (i) the Court must enter an order approving such sale and the proposed buyer within 100 days after the Petition Date (*i.e.*, September 18, 2013) and (ii) the sale must be consummated and the obligations under the DIP Facility must be paid in full in cash, and all commitments to lend shall be terminated, within 105 days of the Petition Date (*i.e.,* September 23, 2013).

**E.    Sale Process**

18. As was set forth more fully in the Pinto Declaration, the commencement of the Chapter 11 Cases was precipitated by, among other things, a decrease in sales volume and liquidity issues due to borrowing restrictions under the Revolving Credit Facility. As a result of such decrease in sales volume and liquidity issues, the Debtors, on May 14, 2013, retained

---

meritless and Salus, the Debtors and the Committee each separately objected to such motion. See Docket Nos. 228, 229 & 230, respectively. The hearing on the Reconsideration Motion is currently scheduled for August 23, 2013.

RLF1 9133928v.6

PricewaterhouseCoopers LLP ("**PwC**") as financial advisor to advise and assist the Debtors in, among other things, pursuing both out-of-court and in-court restructuring alternatives, including a potential sale of the Debtors' assets or other proposed transactions.

19.     Immediately upon being retained, PwC facilitated a sales process for the Debtors and identified financial and strategic buyers to garner interest in pursuing a sale transaction. Prior to the Petition Date alone, (i) PwC distributed teasers to 163 parties, (ii) the Debtors established an electronic data room whereby interested parties could perform due diligence, subject to execution of an acceptable form of non-disclosure agreement (an "**NDA**") with the Debtors, and (iii) the Debtors executed more than seventeen (17) NDA's with interested parties.

20.     As of the Petition Date, the Debtors were unable to reach a formal stalking horse agreement with a proposed purchaser of the Debtors' assets.  However, since that date, the Debtors, facilitated by the funding provided under the DIP Facility and with the assistance of PwC and the Debtors' other advisors, continued to market the Debtors' assets and, to that end, distributed teasers to an additional forty-one (41) parties and executed NDAs with an additional thirty-six (36) parties.

**F.**     **The Proposed Sales**

21.     As a result of this thorough marketing process that spanned over several months, the Debtors have entered into three (3) asset purchase agreements with three (3) separate purchasers for three (3) subsets of the Debtors' assets.  As is described in some detail below, it is a condition to the consummation of the Sales that the Purchase Agreements (as defined below) close simultaneously.

22.     Pursuant to the Asset Purchase Agreement (the "**Assets APA**"), between NE OPCO, Inc. ("**NE OPCO**"), Cenveo Corporation (the "**Assets Purchaser**") and Cenveo, Inc.,

(the "**Issuer**"), the Debtors are seeking to sell substantially all of the Debtors' assets to the Assets Purchaser (the "**Cenveo Assets**").

23.     Pursuant to the Receivables Purchase Agreement (the "**Receivables APA**"), between NE OPCO and HRV NE, LLC (the "**Receivables Purchaser**"), the Debtors are seeking to sell all of NE OPCO's accounts receivables to the Receivables Purchaser (collectively, the "**Receivables Assets**").

24.     Pursuant to the Asset Purchase Agreement (the "**Inventory APA**" and together with the Assets APA and the Receivables APA, the "**Purchase Agreements**"),[5] between NE OPCO and Southern Paper, LLC (the "**Inventory Purchaser**" and together with the Assets Purchaser and the Receivables Purchaser, the "**Purchasers**"), the Debtors are seeking to sell certain inventory to the Inventory Purchaser (the "**Inventory Assets**" and together with the Cenveo Assets and the Receivables Assets, the "**Acquired Assets**").

25.     In light of the Debtors' extensive marketing efforts to date, the Debtors, in consultation with the Committee, Salus, International Paper and Galactic (who comprise all of the key stakeholders in the Chapter 11 Cases (and all of the Parties to the Settlement)), believe that no further marketing efforts are necessary and that the costs of engaging in any further marketing of the Acquired Assets would outweigh any benefit that might be derived from such marketing.  Moreover, the Debtors submit that it would be extremely difficult to comply with the Sale Milestones if the Debtors further marketed the Acquired Assets and/or held an auction for the Acquired Assets.  If the Debtors fail to comply with the Sale Milestones, such failure will result in an event of default under the DIP Credit Agreement, which would allow Salus (on

---

[5] A copy of the Assets APA, the Receivables APA and the Inventory APA are attached to the Sale Order (as defined below) as Exhibits 1, 2 and 3, respectively.  The Debtors are not filing the schedules to the Purchase Agreements with this Motion.  However, such schedules may be obtained by contacting Debtors' counsel.

behalf of the DIP Lenders) to exercise its remedies thereunder, including terminating its obligation to lend.

## Relief Requested

26.    Pursuant to sections 105(a), 363(b), (f), and (m), and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rule 6004-1, the Debtors seek entry of an order, to be deemed effective immediately upon entry by waiving the fourteen-day stay under Bankruptcy Rules 6004(h) and 6006(d), substantially in the form annexed hereto as **Exhibit A** (the "**Sale Order**"): (i) approving the Assumption Procedures and (ii) authorizing (a) the Sales of the Acquired Assets to the Purchasers free and clear of all liens, claims, encumbrances, and other interests in accordance with the terms of the Purchase Agreements and (b) the Debtors to assume and assign certain Contracts in accordance with the Assumption Procedures set forth herein.

## Sale of the Acquired Assets

### A.    Salient Terms of the Purchase Agreements Pursuant to Local Rule 6004-1[6]

27.    As described in more detail above, the Debtors have engaged in extensive, arm's length negotiations with the Purchasers regarding the terms of the Sales.   In accordance with Local Rule 6004-1, certain terms of the Assets APA, the Receivables APA and the Inventory APA are described, in turn, below.

        **(i)**    *Generally*

        a.    <u>Private Sale/No Competitive Bidding</u>.  As set forth herein in greater detail, the Debtors have solicited competing proposals over the past several months and submit that the terms memorialized in the Purchase

---

[6] Capitalized terms used but not otherwise defined in this section shall have the meanings ascribed to such terms in the applicable Purchase Agreement.

    Further, the following description of the Purchase Agreements is only a summary of the terms set forth therein and is qualified in its entirety by reference to the actual provisions of such agreements. In the event of any inconsistencies between the provisions of the Purchase Agreement and the terms herein, the terms of the Purchase Agreements shall control.

Agreements constitute the highest and otherwise best offer for the Acquired Assets. The Debtors do not believe that further marketing or conducting an auction with respect to such assets would procure a higher or better offer. Further, all of the Parties have approved of the Debtors' sale of the Acquired Assets through a private sale to the Purchasers. Accordingly, the Debtors intend to sell the Acquired Assets without conducting an auction.

b.    <u>Closing Deadline</u>.    Pursuant to section 6.26(b) of the DIP Credit Agreement, the Sales must be consummated and the obligations under the DIP Facility must be paid in full in cash, and all commitments to lend shall be terminated, within 105 days of the Petition Date (*i.e.,* September 23, 2013).

c.    <u>Use of Sales Proceeds</u>.    The cash proceeds from the Sales shall be distributed in accordance with the Settlement Order.

d.    <u>Requested Findings as to Successor Liability</u>.    In paragraph I of the proposed Sale Order, the Debtors seek a finding that the Purchasers shall not be deemed to (i) be the successor to any of the Debtors, (ii) have *de facto* or otherwise, merged with or into any of the Debtors, or (iii) be a continuation of any of the Debtors.

In paragraph N of the Sale Order, the Debtors seek a finding that the Purchasers and their affiliates, successors and assigns are not "successor employers" of the Debtors' employees as defined by 26 C.F.R. § 54.4980B-9, as a result of Purchasers' acquisition of the Acquired Assets.

e.    <u>Releases</u>.    In paragraph 13 of the Sale Order, the Debtors seek to release, to the extent set forth therein, the Purchasers and certain related parties, among others, from, among other things, all claims relating to, or involving, the Excluded Liabilities, Purchased Assets, the sale thereof to the Purchasers or the Purchasers' quiet use and enjoyment of the Purchased Assets that arose up to the Closing Date.

f.    <u>Relief from Bankruptcy Rules 6004(h) and 6006(d)</u>.    Pursuant to paragraph 21 of the Sale Order, the Debtors seek a waiver of the fourteen-day stays imposed by Bankruptcy Rules 6004(h) and 6006(d).

**(ii)    *The Assets APA***

a.    <u>Assets</u> (Section 2.1 of the Assets APA). On the terms and subject to the conditions set forth in the Agreement, at the Closing (or on the date of entry of the Order of the Bankruptcy Court approving the assumption of the Real Property Leases which are Purchased Contracts), Purchaser shall purchase, acquire and accept from Seller, and Seller shall sell, transfer,

11

assign, convey and deliver to Purchaser, the Purchased Assets, free and clear of all Liens, other than Permitted Exceptions.

Purchased Assets means all of the assets, properties, privileges, claims and rights of Seller (but excluding the Excluded Assets and the assets being sold pursuant to the Hilco Purchase Agreement or the Inventory Purchase Agreement), whether such assets, properties, privileges, claims or rights are real, personal or mixed, tangible or intangible, wherever located, whether or not any of such assets, properties, privileges, claims or rights have any value for accounting purposes or are carried or reflected on or specifically referred to in Seller's books or financial statements, including, without limitation all of the following (but excluding the Excluded Assets and the assets being sold pursuant to the Hilco Purchase Agreement or the Inventory Purchase Agreement):

    i.  all deposits (including customer deposits and security deposits for rent or otherwise) and prepaid charges and expenses of Seller related to the Purchased Assets other than (i) Utility Deposits, (ii) the Prepetition Agent Security, (iii) the Professional Fee Carve-Out, (iv) the deposits listed on Schedule 2.2 of the Agreement, and (v) other deposits, prepaid charges and expenses to the extent paid in connection with, or relating to, any Excluded Assets;

    ii.  all of the Real Property Leases which are Purchased Contracts, together with all improvements, fixtures and other appurtenances thereto and rights in respect thereof;

    iii.  the Furniture and Equipment;

    iv.  the Purchased Intellectual Property;

    v.  the Purchased Contracts and all rights of Seller thereunder;

    vi.  all Documents to the extent relating to the Purchased Assets or the Assumed Liabilities, including any Documents relating to Products, services, marketing, advertising, promotional materials, Purchased Intellectual Property, personnel files for Transferred Employees, all files, customer files and documents (including credit information), supplier lists, records, literature and correspondence, whether or not physically located on any of the premises referred to in clause (a)(ii) above;

    vii.  all Permits held by Seller and owned, used or held for use in connection with the Purchased Assets to the extent assignable;

viii.   all supplies owned by Seller and owned, used or held for use in connection with the Purchased Assets;

ix.   all rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with Employees and agents of Seller or with third parties;

x.   all rights of Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to the Purchased Assets, or services provided to Seller in connection with the Purchased Assets, to the extent assignable;

xi.   goodwill and other intangible assets associated with Seller or the Purchased Assets, including customer and supplier lists and the goodwill associated with the Marks included in the Purchased Intellectual Property; and

xii.   any and all causes of action against any Person that is not an Insider arising under Section 547 of the Bankruptcy Code; provided, however, Purchaser agrees that it shall not prosecute or assert any such cause of action against such Person for any reason whatsoever or sell, transfer or convey any such cause of action to any other Person.

b.   Consideration (Section 3.1 of the Assets APA) (a) An amount in cash equal to the sum of (i) (i) the aggregate amount of principal and interest outstanding as of the Closing Date under the Tranche A-1 Note (as defined in the DIP Credit Agreement and, in the case of such Tranche A-1 Note and the DIP Credit Agreement, as in effect on the date of the Agreement), such amount shall not in any event exceed $17,500,000; plus (ii) the 503(b)(9) Claim Amount ($500,000), plus (iii) the Post-Closing Wind-Down Amount ($500,000), plus (iv) the Post-petition Trade Payables Amount[7] (such amount not to exceed $1,000,000), plus (v) 25% of the DIP Savings Amount,[8] if any; and minus (vi) (A) the amount by which the aggregate gross proceeds received by Seller pursuant to the Hilco Purchase Agreement and Inventory Purchase Agreement exceeds the aggregate amount of principal and interest outstanding as of the Closing Date under the Tranche A Revolver (as defined in the DIP Credit Agreement and, in the case of such Tranche A Revolver and the DIP Credit Agreement, as in effect on the date of this Agreement) or plus (B) any shortfall of the amount referred to in subclause (A); (b) the Common

---

[7] Post-petition Trade Payables means Seller's trade payables incurred after the Petition Date and prior to the Closing Date.

[8] The DIP Savings Amount is calculated in accordance with section 3.3 of the Agreement.

Stock Shares[9] issued to Galactic Holdings, LLC, IP (or its designee who is an Accredited Investor and delivers a representation letter addressed to Purchaser and Issuer on the Closing Date making the representations set forth in Section 5.18(a) of the Agreement and (b) as to itself rather than the Seller) and Seller (the "**Share Recipients**"), allocated amongst the Share Recipients in accordance with Schedule 3.1(b) of the Agreement; [10] (c) the Purchaser Note;[11] and (d) the assumption of the Assumed Liabilities.

c.    Purchase Price Deposit (Section 3.2 of the Assets APA). Upon the execution of the Agreement, pursuant to the terms of the Escrow Agreement, Purchaser shall immediately deposit with the Escrow Holder, Three Millions Dollars ($3,000,000) (the "**Escrowed Funds**") by wire transfer of immediately available funds, to be released by the Escrow Holder and delivered to either Purchaser or Seller, in accordance with the provisions of the Escrow Agreement.

Pursuant to the Escrow Agreement, the Escrowed Funds (together with all accrued investment income thereon) shall be distributed as follows:

i.    if the Closing shall occur, the Escrowed Funds and all accrued investment income thereon shall be applied towards the Cash Purchase Price payable by Purchaser to Seller in accordance with Section 4.3(a) of the Agreement;

ii.    (ii) if (A) all of the conditions precedent set forth in Section 10.1 of the Agreement (other than Section 10.1(e) of the Agreement) and Section 10.3 of the Agreement are satisfied, (B) Seller has provided irrevocable notice to Purchaser of its intention to immediately consummate the transactions contemplated by the Agreement (such notice and intention not

---

[9] The Common Stock Shares will be issued to the Share Recipients by the Issuer. The Purchaser is a direct wholly-owned subsidiary of the Issuer.

[10] Schedule 3.1 of the Agreement contains an example of the Purchase Price calculation for illustrative purposes. For purposes of the allocation of the Common Stock Shares to the Share Recipients in accordance with Schedule 3.1(b) of the Agreement, on the Closing Date Seller shall provide Purchaser with written instructions specifying the number of Common Stock Shares to be allocated to each Share Recipient.

[11] Purchaser Note means that certain promissory note, made by Purchaser in favor of Seller, in the principal amount not to exceed the sum of the principal and interest due and owing under the Tranche B Note (as defined in the DIP Credit Agreement) at the Closing, such amount not to exceed $2.6 million.

Immediately upon the Closing, the Debtors are assigning the Purchaser Note to International Paper pursuant to the terms of the Assignment between NE Opco (as assignor) and International Paper (as assignee) in the form attached to the Sale Order as Exhibit 4 thereto (the "**IP Assignment**"). By this Motion, the Debtors are also seeking the authority and direction to enter in the IP Assignment and consummate the transactions thereunder.

being revoked prior to the Termination Date), (C) Purchaser fails to consummate the transactions contemplated by the Agreement by the Termination Date, and (D) Seller or Purchaser terminates the Agreement pursuant to Section 4.4(a) of the Agreement, the Escrowed Funds, together with all accrued investment income thereon, shall be delivered to Seller; or

    iii.  if the Agreement is terminated other than in accordance with Section 3.2(b)(ii) of the Agreement, the Escrowed Funds, together with all accrued investment income thereon, shall in each case be returned to Purchaser.

d.    <u>Closing and Other Deadlines</u> (Sections 4.1 and 4.4 of the Assets APA). The Closing shall take place on the date that is four (4) Business Days following the satisfaction or waiver of the conditions precedent set forth in Article X of the Agreement (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by Seller and Purchaser.

The Closing must occur by the close of business on September 13, 2013 or the Agreement may be terminated by the Seller or Purchaser.

e.    <u>Interim Arrangements with Proposed Buyer</u> (Section 8.2 of the Assets APA). The Agreement requires the Debtors to use the Purchased Assets in the ordinary course until the Closing Date subject to those limitations and exceptions set forth in section 8.2 of the Assets APA.

f.    <u>Records Retention</u> (Section 8.7 of the Assets APA). Each of Seller and Purchaser agree to preserve and keep the records, or in the case of Seller, arrange for the preservation and keeping of the records, held by it or their Affiliates relating to the Purchased Assets for a period of six (6) years from the Closing Date, and shall make such records and personnel available to the other Party and the GUC Trust as may be reasonably required by such Party or the GUC Trust in connection with, among other things, any insurance claims, Legal Proceedings or Tax audits against or governmental investigations of Seller or Purchaser or any of their Affiliates or in order to enable Seller or Purchaser or the GUC Trust to comply with its obligations under the Agreement or the GUC Trust Agreement, as applicable and each other agreement, document or instrument contemplated hereby or thereby.

(iii)     *The Receivables APA*

a.     <u>Assets</u> (Section 2.a. of the Receivables APA). On the terms and conditions set forth in the Agreement, on the Closing Date, Seller shall sell, transfer, convey, and assign to Purchaser, and Purchaser agrees to purchase from Seller, all of Seller's rights, title, and interest in and to (i) the Receivables as of the Cut-Off Date and (ii) any and all claims Seller may have against the Account Debtors and any and all credit insurance (including Seller's rights to make claims thereunder) Seller may have, in each case in respect of such Receivables.  The Receivables and Related Assets are being sold, transferred, conveyed, and assigned to Purchaser free and clear of all Encumbrances

b.     <u>Consideration</u> (Section 3.a. of the Receivables APA). The Purchase Price is calculated in accordance with section 3 of the Receivables APA and is estimated to be approximately $25,000,000.

c.     <u>Purchase Price Deposit</u> (Section 3.b. of the Receivables APA).  Upon the execution of the Agreement and the Escrow Agreement, pursuant to the terms of the Escrow Agreement, Purchaser shall immediately deposit with the Escrow Holder, Two Millions Dollars ($2,000,000) (the "**Escrowed Funds**") by wire transfer of immediately available funds, to be released by the Escrow Holder and delivered to either Purchaser or Seller, in accordance with the provisions of the Escrow Agreement. Pursuant to the Escrow Agreement, the Escrowed Funds (together with all accrued investment income thereon) shall be distributed as follows:

i.     if the Closing shall occur, the Escrowed Funds and all accrued investment income thereon shall be applied towards the Purchase Price in accordance with Section 3(a)(i) of the Agreement;

ii.     if (1) all of the conditions precedent set forth in Section 9(b) of the Agreement are satisfied, (2) Seller has provided irrevocable notice to Purchaser of its intention to immediately consummate the transactions contemplated by the Agreement (such notice not being revoked prior to the Termination Date), and (3) Purchaser fails to consummate the transactions contemplated by the Agreement by the Termination Date, the Escrowed Funds, together with all accrued investment income thereon, shall be delivered to Seller;

iii.     if the Agreement is terminated by Seller in accordance with Section 11(a)(iii), the Escrowed Funds, together with all accrued investment income thereon, shall be delivered to Seller; or

iv.  if the Agreement is terminated other than as contemplated by Section 3(a)(iv) or 3(a)(v) thereof, the Escrowed Funds, together with all accrued investment income thereon, shall in each case be returned to Purchaser.

d.  <u>Closing and Other Deadlines</u> (Section 4 of the Receivables APA). The Closing shall take place on the first Business Day after all the conditions to each party's obligations under the Agreement that are capable of satisfaction prior to the Closing have been satisfied or waived, or at such other date, place or time as the parties may agree, but in no event later than September 13, 2013 unless a later date is mutually agreed upon by the Parties in writing.

e.  <u>Interim Arrangements with Proposed Buyer</u> (Sections 7(a) and 10(e) of the Receivables APA). The Purchase Agreement requires the Debtors to hold, maintain and collect the Receivables in the ordinary course of business until the Closing Date subject to those limitations set forth in section 7(a) of the Receivables APA.

For a period of thirty (30) days following the Closing Date, Seller shall provide, or cause to be provided, those transitional and other services set forth on Exhibit E to the Agreement.

**(iv)  *The Inventory APA***

a.  <u>Assets</u> (Section 2.1 of the Inventory APA). On the terms and subject to the conditions set forth in the Agreement, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Purchaser, the Purchased Assets, free and clear of all Liens, other than Permitted Exceptions.

Purchased Assets means the Inventory and Documents of the Seller relating to the Business.

b.  <u>Consideration</u> (Section 3.1 of the Inventory APA). The aggregate consideration for the Purchased Assets shall be an amount in cash equal to the lesser of (a) $15,000,000 and (b) the product of (i) 0.75 and (ii) the book value of such Purchased Assets (determined in accordance with GAAP applied on a consistent basis).

c.  <u>Closing and Other Deadlines</u> (Sections 4.1 and 4.4 of the Inventory APA). The Closing shall take place on the date that is four (4) Business Days following the satisfaction or waiver of the conditions precedent set forth in Article X of the Agreement (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of

such conditions), unless another time or date, or both, are agreed to in writing by Seller and Purchaser.

The Closing must occur by the close of business on September 13, 2013 or the Agreement may be terminated by the Seller or Purchaser.

d.    Interim Arrangements with Proposed Buyer (Section 8.2 of the Inventory APA).  The Agreement requires the Debtors to use the Purchased Assets in the ordinary course until the Closing Date subject to those limitations and exceptions set forth in section 8.2 of the Assets APA.

e.    Records Retention (Section 8.7 of the Assets APA). Each of Seller and Purchaser agree to preserve and keep the records, or in the case of Seller, arrange for the preservation and keeping of the records, held by it or their Affiliates relating to the Purchased Assets for a period of six (6) years from the Closing Date, and shall make such records and personnel available to the other Party and the GUC Trust as may be reasonably required by such Party or the GUC Trust in connection with, among other things, any insurance claims, Legal Proceedings or Tax audits against or governmental investigations of Seller or Purchaser or any of their Affiliates or in order to enable Seller or Purchaser or the GUC Trust to comply with its obligations under the Agreement or the GUC Trust Agreement, as applicable and each other agreement, document or instrument contemplated hereby or thereby.

**B.    Sale of the Acquired Assets is Appropriate**

28.    Ample authority exists for the approval of the Sales pursuant to sections 363(b)(1) and 105(a) of the Bankruptcy Code.  Section 363(b)(1) of the Bankruptcy Code provides, in pertinent part, that the "trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Section 105(a) of the Bankruptcy Code, which confers broad powers on bankruptcy courts, provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

29.    The decision to use and sell property of the estate outside the ordinary course of business is entrusted to the sound business judgment of the debtor. *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re*

*Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (holding that to obtain court approval to sell property under section 363(b), a debtor must show a "sound business reason" for the proposed action); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (affirming decision permitting debtor to sell assets where sound business reasons supported the sale); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (same).

30.     Where the "debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  If a valid business justification exists, there is a strong presumption that a debtor acted "in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). The burden of rebutting this presumption falls to parties opposing the proposed exercise of a debtor's business judgment.  *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).  A section 363 sale should be approved if the Court is satisfied that the debtor has (a) exercised its sound business judgment; (b) the debtor has provided adequate notice; (c) the purchaser has proceeded in good faith; and (d) the purchase price is fair.  *See In re Del. & Hudson Ry. Co.*, 124 B.R. at 176.  The sales proposed herein satisfy each condition.

31.     The Debtors' decision to sell the Acquired Assets is based upon the exercise of their sound business judgment.  The Debtors believe that such sale pursuant to the Purchase Agreements is in the best interest of the Debtors and their creditors because it provides for sufficient cash and other consideration to, among other things, pay off the DIP Facility, wind

down the Debtors' post-Closing Date estates and provide a meaningful recovery to the Debtors' creditors.

32.     The Debtors have marketed the Purchased Assets, evaluated bidder proposals, and negotiated with the Purchasers and other potential purchasers in good faith. The Purchase Agreements and terms of the Sales have been heavily negotiated at arm's length over the course of several months and the Debtors strongly believe that the Purchase Agreements represent the highest and otherwise best offer for the Purchased Assets.

33.     Based on the foregoing, the Debtors submit that the Sales are in the best interest of the Debtors' estates and the Debtors' creditors.

**C.      Sale Free and Clear of Liens, Claims and Encumbrances is Appropriate**

34.     The Debtors further submit that it is appropriate that the Acquired Assets be sold free and clear of all liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code.  Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property under Bankruptcy Code section 363(b) free and clear of any liens, claims, encumbrances, and other interests of an entity other than the estate if one of the following conditions is satisfied:

(1)     applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Because section 363(f) is stated in the disjunctive, when selling property of the estate, it is only necessary to meet one of the five conditions listed in that section.  *See Folger Adam Sec. Inc. v. De Matteis/MacGregor, JV*, 209 F.3d 252, 257 (3d Cir. 2000) (noting that a debtor is authorized to sell property free and clear of "any interest" if any one of the five prescribed conditions under section 363(f) is met); *In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.") (citing *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988)); *In re DVI, Inc.*, 306 B.R. 496, 504 (Bankr. D. Del. 2004) (approving sale free and clear of interests where debtors met only the conditions of 363(f)(4)).

35.    To facilitate the Sales for the benefit of all creditors, it is necessary to authorize the sale of the Acquired Assets free and clear of any and all liens, claims, encumbrances, or other interests, including rights or claims based on any successor or transferee liability, other than the liabilities assumed by the Purchasers, with any such liens, claims, encumbrances, or other interests to transfer to and attach to the proceeds of the Sale with the same rights and priorities therein.

36.    The Sale of the Acquired Assets will satisfy section 363(f) of the Bankruptcy Code because any known entities holding liens, claims, encumbrances, or other interests on the Acquired Assets will have received notice of this Motion.  All known parties in interest will be given sufficient opportunity to object to the relief requested in this Motion, and any such entity that does not object to the Sale should be deemed to have consented.  *See Futuresource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those

conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent.  It could not be otherwise; transaction costs would be prohibitive if everyone who *might* have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted) (emphasis in original); *Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *In re Elliot*, 94 B.R. at 345 (same).  As such, to the extent that no party holding liens, claims, encumbrances, or other interests objects to the relief requested in the Sale Order, the sale of the Acquired Assets free and clear of all liens, claims, encumbrances, or other interests (to the extent set forth in the Purchase Agreements), satisfies section 363(f)(2) of the Bankruptcy Code.

37.     Accordingly, the Debtors request that the Acquired Assets be transferred to the Purchasers, free and clear of all liens, claims, encumbrances and other interests (to the extent set forth in the Purchase Agreements), with such liens, claims, encumbrances, and other interests to attach to the sale proceeds of the Acquired Assets.

### D.       Auction of the Acquired Assets is Not Required

38.     Bankruptcy Rule 6004(f)(1) permits private sales or sales conducted without an auction.  Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction.").  Further, courts have generally held that a debtor has broad discretion in determining the manner in which assets are sold.  *Berg v. Scanlon (In re Alisa P'ship)*, 15 B.R. 802, 802 (Bankr. D. Del. 1981) ("[T]he manner of sale is within the discretion of the trustee . . . .");  *In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) (noting that a trustee has "'ample discretion to administer the estate, including authority to conduct public or private sales of estate property.'") (citing *In re WPRV-TV, Inc.*, 143 B.R. 315, 319 (D.P.R.

1991)).  As long as a debtor maximizes the return to its estate, a court should defer to a debtor's business judgment regarding how to structure an asset sale.  *Bakalis*, 220 B.R. at 532 (recognizing that although a trustee's business judgment enjoys great judicial deference, a duty is imposed on the trustee to maximize the value obtained from a sale); *In re NEPSCO, Inc.*, 36 B.R. 25, 26 (Bankr. D. Me. 1983) ("Clearly, the thrust of th[e] statutory scheme [governing 363 sales] is to provide maximum flexibility to the trustee, subject to the oversight of those for whose benefit he acts, *i.e.*, the creditors of the estate.").  Accordingly, if the Debtors conclude that conducting a private sale, as opposed to a public auction, is in the best interests of their estates, the Debtors should be permitted to do so.  *See Penn Mut. Life Ins. Co. v. Woodscape Ltd. P'ship (In re Woodscape Ltd. P'ship)*, 134 B.R. 165, 174 (Bankr. D. Md. 1991) (noting that, with respect to sales of estate property, "[t]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction.").

39.    The Debtors' decision to pursue a sale without an auction is supported by the fact that the Debtors have fully explored potential sales of all or some of the Acquired Assets with a wide range of interested parties.  The time, effort, and expense associated with further marketing of the Acquired Assets for sale at a public auction is unlikely to produce additional bids, would needlessly duplicate the previous efforts expended by the Debtors and their advisors and would likely diminish recoveries to be realized by the Debtors' creditors as a result of the Sales. Additionally, the Debtors do not believe they would be able to continue to market the Acquired Assets and/or hold a public auction and (i) still be able to comply with the Sale Milestones and (ii) remain in chapter 11 given the Debtors' liquidity constraints.  As this Court has recognized, selling assets in the Debtors' business sector is a difficult task.   The Debtors and their professionals have exhausted every effort negotiating and finalizing the Purchase Agreements

23

and the Debtors, in the sound exercise of their business judgment, firmly believe that they have identified the highest and best bid for their assets. Accordingly, the Debtors' decision to sell the Acquired Assets to the Purchasers pursuant to the Purchase Agreements is supported by the Debtors' business judgment and should be approved.

### E.      Purchasers Entitled to Good Faith Protections

40.      The Purchasers are purchasing the Acquired Assets in good faith and are entitled to the full protections of section 363(m) of the Bankruptcy Code. Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor, notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) of the Bankruptcy Code states that:

> The reversal or modification on appeal of an authorization under [section 363(b) of the Bankruptcy Code] of a sale . . . of property does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

41.      Section 363(m) fosters the "policy of not only affording finality to the judgment of the bankruptcy court, but . . . give[s] finality to those orders and judgments upon which third parties rely." *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *Hoese Corp. v. Vetter Corp. (In re Vetter Corp.)*, 724 F.2d 52, 55 (7th Cir. 1983)); *see Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal."); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. §363(m), good faith

purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

42.    The Debtors request a finding that the Purchasers are good faith purchasers entitled to the protections of section 363(m).   The terms and conditions of the Purchase Agreements have been negotiated by the Debtors and the Purchasers at arm's length and in good faith.   The Purchasers were represented by qualified counsel and the Debtors believe that the Purchasers have not engaged in any conduct that would indicate or constitute a lack of good faith.  *See In re Gucci*, 126 F.3d 380, 392 (2d Cir. 1997) ("Good faith of a purchaser is shown by the integrity of his conduct during the course of sale proceedings . . . ."); *In re Tempo Tech. Corp.*, 202 B.R. 363, 367 (D. Del. 1996) (stating that a purchaser's good faith status would be destroyed only by conduct involving "'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'") (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).   Accordingly, the Debtors believe that the Purchasers are entitled to the protections that section 363(m) of the Bankruptcy Code provides to good faith purchasers.

## Assumption of Contracts and Leases

43.    In order to facilitate the Debtors' assumption and assignment of certain Contracts and Leases to the Purchasers in an expeditious fashion, while simultaneously ensuring to all Contract and Lease counterparties adequate notice and an opportunity to object, the Debtors propose to establish certain Assumption Procedures for assuming and assigning prepetition Contracts and Leases to the Purchasers pursuant to section 365 of the Bankruptcy Code.   The Assumption Procedures are reasonably calculated to provide all counterparties to the Contracts and the Leases with proper notice of the potential assumption and assignment of the Contracts and the Leases, adequate assurance of future performance by the applicable Purchaser with

25

respect to the Contracts and Leases, Cure Amounts, if any, and the deadline to object to Cure Amounts.

      A.      **Determination of Assumable Contracts**

      44.      On or before the date that is not less than seventeen (17) days prior to the hearing to consider the relief requested in this Motion (the "**Sale Hearing**"), the Debtors shall file a notice of assumption (the "**Initial Assumption Notice**") with the Court and serve such notice via first class mail on each counterparty to a Contract listed thereon.  The Initial Assumption Notice will (i) list all Contracts of the Debtors related to the Acquired Assets that the Debtors and the Purchasers believe may be assumed and assigned in connection with the Sales (the "**Designated Contracts**"), and (ii) include a good faith estimate of the Cure Amount applicable to each such Designated Contract (and if no Cure Amount is estimated to be applicable with respect to any particular Designated Contract, the Cure Amount for such Designated Contract is listed as $0.00).  Further, the Purchasers shall have the right to add Contracts to, or remove Contracts from, the list of Designated Contracts at any time on or before the date that is thirteen (13) days prior to the Sale Hearing (the "**Contract Designation Deadline**").  On or before the Contract Designation Deadline, the Purchasers shall provide to the Debtors a list of those Contracts that it either elects to designate to have assigned to it on the Closing Date or elects to remove from the list of Designated Contracts.  Accordingly, the Debtors reserve the right to (a) supplement the list of Designated Contracts and to provide additional notices of assumption (each such notice being referred to hereafter as a "**Supplemental Assumption Notice**" and together, with the Initial Assumption Notice, the "**Assumption Notices**"), and (b) remove Contracts from the list of Designated Contracts and provide written notice to a Contract counterparty in the event that the counterparty's Contract is no longer identified as a Designated Contract.

45.     Notwithstanding the foregoing, only those Contracts that remain identified as Designated Contracts as of five (5) business days prior to the Closing Date and for which (i) the Cure Amount is agreed upon by the Purchaser and the non-Debtor Contract counterparty as of the Assumption Hearing (as defined below) or (ii) the Cure Amount is determined by an order of the Court (collectively, the "**Assigned Contracts**"), will be assumed by the applicable Debtor and assigned to the applicable Purchaser on the Closing Date.  Non-Debtor counterparties to Designated Contracts which the applicable Purchaser has determined are not Assigned Contracts shall receive notice of such determination, which notice may be after the Closing Date.

B.     **Contract Assumption Objection Procedures**

46.     Any objections to the assumption and/or assignment of any Contract identified as a Designated Contract, including to the Cure Amount set forth on the applicable Assumption Notice, must be in writing, filed with the Court, and actually received by the relevant notice parties set forth in the applicable Assumption Notice no later than ten (10) days after the date on which the Debtors file and mail the Initial Assumption Notice or Supplemental Assumption Notice, as applicable (together, the "**Assumption and Cure Objection Deadlines**").

47.     If no objections are received by the applicable Assumption and Cure Objection Deadline, then the proposed assumption and assignment is authorized and the Cure Amounts set forth in the applicable Assumption Notice shall be binding upon the contract counterparty for all purposes and will constitute a final determination of the total Cure Amount required to be paid to the counterparty in connection with the assumption and assignment to the applicable Purchaser. In addition, any counterparty to a Designated Contract that does not file an objection prior to the applicable Assumption and Cure Objection Deadline shall be forever barred from objecting to the Debtors' proposed assumption and assignment to the Purchaser and the Cure Amount set

forth in the applicable Assumption Notice, including, without limitation, the right to assert any additional cure or other amounts with respect to the Contract arising from or relating to any period prior to such assumption or assignment.

48.     If a timely objection is received and such objection cannot otherwise be resolved by the parties, the Court may hear such objection at the Sale Hearing or any later date set by the Court (an "**Assumption Hearing**").

### C.      Determination of Assumable Leases

49.     The Assets Purchaser shall have until the date that is the earlier of ninety (90) days after the Closing Date or the expiration of the period provided for under section 365(d)(4) of the Bankruptcy Code (as such period may be extended in accordance with such section) (the "**Lease Designation Deadline**") to make a determination whether to direct the Debtors to assume any Lease and assign such Lease to the Assets Purchaser.  Should the Assets Purchaser direct the Debtors to assume and assign one or more Leases to the Assets Purchaser prior to the Lease Designation Deadline, the Debtors shall file a motion to assume and assign any such Lease pursuant and subject to section 365 of the Bankruptcy Code.   Pending the rejection or assumption and assignment of any Lease, from and after the Closing Date through the effective date of such rejection or assumption and assignment, the Assets Purchaser shall be obligated to pay timely, and shall be liable for, any and all amounts arising under any such Lease, including any and all amounts accruing under any such Lease which have not yet come due as of the effective date of the rejection or assumption and assignment of such Lease; provided, however, that the Assets Purchaser shall not be liable for actual or pecuniary losses resulting from any breach of such Lease by the Debtors arising after the Petition Date, except for breaches which are caused by the Assets Purchaser.

28

50.    In sum, the Debtors have proposed the following timeline in connection with the

Assumption Procedures:[12]

| **Action** | **Deadline** |
| --- | --- |
| File and Serve Initial Assumption Notice | August 23, 2013 |
| File and Serve Supplemental Assumption Notice | August 27, 2013 |
| Object to Sale Motion (including Assumption Procedures) | September 3, 2013 |
| Object to Initial Assumption Notice | September 3, 2013 |
| Object to Supplemental Assumption Notice | September 6, 2013 |
| Purchaser to Notify Debtors Which Contracts to Assume | September 6, 2013 |
| Sale Hearing | September 9, 2013 |
| Closing | September 13, 2013 |
| Lease Designation Deadline | December 9, 2013 |

### D.    Assumption Procedures are Appropriate

51.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession,

"subject to the court's approval, may assume or reject any executory contract or unexpired lease

of the debtor."   11 U.S.C. § 365(a).   Upon finding that debtors have exercised their sound

business judgment in determining to assume an executory contract or unexpired lease, courts will

approve the assumption under section 365(a) of the Bankruptcy Code.  *See Nostas Assocs. v.*

*Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v.*

*Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993).

52.    Section 365(b)(1) of the Bankruptcy Code requires that a debtor in possession

meet certain additional requirements to assume a lease:

> If there has been a default in an executory contract or unexpired
> lease of the debtor, the trustee may not assume such contract or
> lease unless, at the time of assumption of such contract or lease,
> the trustee—

---

[12] The below deadlines assume (i) that the Court will approve the Debtors' request to shorten the notice periods with respect to this Motion so that it may be heard on September 9, 2013 and (ii) that the Closing Date is September 13, 2013.

> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;

> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1). These requirements do not, however, apply to a default that is a breach of a provision relating to any of the following events:

> (A) the insolvency or financial condition of the debtor at any time before the closing of the case;

> (B) the commencement of a case under [the Bankruptcy Code];

> (C) the appointment of or taking possession by a trustee in a case under [the Bankruptcy Code] or a custodian before such commencement; or

> (D) the satisfaction of any penalty rate or penalty provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.

*Id* § 365(b)(2).

53.    Accordingly, section 365(b)(1) of the Bankruptcy Code requires that the Debtors cure, or provide adequate assurance that they will promptly cure, any outstanding defaults under the Assigned Contracts.

54.    Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor in possession may assign an executory contract or lease if:

> (A) the trustee assumes such contract or lease in accordance with the provisions of [section 365 of the Bankruptcy Code]; and

RLF1 9133928v.6

(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

*Id.* § 365(f)(2).

55.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

56.     At the Assumption Hearing, to the extent necessary, the Debtors will be prepared to proffer testimony or present evidence to demonstrate the ability of the applicable Purchasers to perform under the Assigned Contracts.  The Assumption Hearing, therefore, will provide the Court and other interested parties with the opportunity to evaluate the ability of the applicable Purchasers to provide adequate assurance of future performance under the Assigned Contracts, as required by section 365(b)(1)(C) of the Bankruptcy Code.

### Request for Relief Under Bankruptcy Rules 6004(h) and 6006(d)

57.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule

31

6006(d) similarly provides that an order authorizing the assignment of an executory contract or unexpired lease under section 365(f) is stayed until the expiration of fourteen days after entry of the order, unless the court orders otherwise.  Fed. R. Bankr. P. 6006(d).  Debtors request that the Sale Order be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

## <u>Notice</u>

58.    No trustee or examiner has been appointed in these chapter 11 cases.  Notice of this Motion shall be given to:  (a) the U.S. Trustee, (b) counsel for the Committee, (c) counsel for the First Lien Agent, (d) counsel for the Second Lien Agent, (e) counsel for International Paper, (f) counsel for Salus, (g) all parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors, (h) various federal, state, county and city tax and regulatory authorities, including the Securities and Exchange Commission, (i) all parties that have expressed an interest in acquiring all, or a portion of, the Acquired Assets, and (j) all parties requesting notice pursuant to Bankruptcy Rule 2002.  The Debtors respectfully submit that no further notice of this Motion is required.

## <u>No Previous Request</u>

59.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

RLF1 9133928v.6

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: August 21, 2013
      Wilmington, Delaware

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Zachary I. Shapiro*
Mark D. Collins (No. 2981)
John H. Knight (No. 3848)
Michael J. Merchant (No. 3854)
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
920 N. King Street
Wilmington, Delaware 19801
Telephone: 302-651-7700
Facsimile: 302-651-7701
      Email:collins@rlf.com
            knight@rlf.com
            merchant@rlf.com
            heath@rlf.com
            shapiro@rlf.com.

*Counsel for Debtors*
*and Debtors in Possession*