IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NE OPCO, INC., et al., | ) | Case No. 13-11483 (CSS) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | Related D.I. 273 |

## OPINION[1]

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins
John H. Knight
Michael J. Merchant
Paul N. Heath
Tyler D. Semmelman
920 N. King Street
Wilmington, DE 19801

Counsel for Debtors and
Debtors in Possession

MONTGOMERY, McCRACKEN
WALKER & RHOADS, LLP
Richard G. Placey
1105 North Market Street
Suite 1500
Wilmington, DE 19801
  - and-
WELCH & BARBA, P.C.
John W. Welch
1380 Main Street, Suite 201
Springfield, MA 01103

Counsel for the City of Westfield Gas
& Electric Light Department

Date: November 1, 2013

Sontchi, J. _____

## INTRODUCTION

Before the Court is a request for an administrative expense claim under

section 503(b)(9) of the Bankruptcy Code. The movant, Westfield Gas & Electric Light

Department ("Westfield"), a utility provider, seeks an administrative expense for the

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of
Bankruptcy Procedure 7052.

electricity and natural gas it provided to the debtors (the "Debtors") in the 20-days prior to the Debtors' bankruptcy.

Section 503(b)(9) claims are only available to vendors of "goods" and not to service providers. While this Court has previously adopted the definition of goods in the Uniform Commercial Code ("U.C.C."), it has not addressed whether electricity is a good. Indeed, courts are not in agreement on the issue. Here the Court weighs into the debate on whether electricity is considered a good – and finds that it is not.

However, it is undisputed that natural gas is a good. As such, the Court is called upon to determine whether all of the costs associated with the sale and delivery of natural gas are entitled to administrative priority. In making that determination, the Court must apply either (i) the "predominate purpose" test in which the Court looks to the "primary" purpose of the transaction to decide whether the utility provided goods or services – if the primary purpose of the transaction is to provide goods then Westfield would have an administrative priority claim for all of the billed items; and if the primary purpose was to provide services, Westfield would not have an administrative claim; or (ii) the "apportionment" test in which the amount attributable to the goods is provided administrative priority status and the amount attributable to services is not. This Court adopts the apportionment test. As such, the Court will examine each portion of the bill to determine whether the line item was for a good or a service. The Court will then consider whether Westfield has provided sufficient evidence of the value of its claim and whether the Court, in its discretion, should order the immediate payment of the claim.

At the end of the day, the Court will grant Westfield an administrative expense claim, pursuant to section 503(b)(9), in the amount of $78.08 for the value of the natural gas (with sufficient detail) supplied to the Debtors in the 20-days prior to the Petition Date.  However, the Court will not require immediate payment of the claim.

## JURISDICTION

The Court has jurisdiction over the motions pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a "core" proceeding as that term is defined in 28 U.S.C. § 157(b).  This Court has the judicial power to enter a final order.

## BACKROUND

### A.  Procedural Background

On June 10, 2013 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On August 21, 2013, the Debtors filed a motion seeking to sell all of the Debtors' assets through three separate asset purchase agreements.[2]  On September 12th, the Court entered an order approving the sale, which closed on September 16, 2013 (the "Closing

---

[2] D.I. 249 *(Debtors Motion Pursuant to Sections 105(a), 363(b), (f), and (m), and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rule 6004-1 (I) for Authorization to (A) Sell Substantially All of Their Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests and (B) Assume and Assign Contracts and Leases and (II) for Approval of Procedures for Determining Cure Amounts).*

Date")[3]  As of the Closing Date, the Debtors ceased all operations and their purpose going forward is to liquidate their remaining assets and to distribute funds to their creditors.

In the meantime, on August 28, 2013, Westfield filed the instant motion, seeking allowance and payment of an administrative claim under section 503(b)(9) in the amount of $93,262.55 for electricity and natural gas supplied to the Debtors.[4]  The Debtors objected to the motion and Westfield filed a reply.  On September 18, 2013, the Court heard oral argument on the motion and took the matter under advisement.[5]  The issues are now ripe for adjudication.

### B.  Factual Background

Westfield is a municipal lighting plant created by Massachusetts law.[6]  Prior to the Petition Date, Westfield provided natural gas and electricity to residents of the City of Westfield, including the Debtors for its use in the ordinary course of the Debtors' business.  Prior to the Petition Date, the Debtors were billed between $130,000 to $180,000 per month by Westfield for its electric and natural gas consumption, or over $1.7 million a year (approximately 3% of Westfield's annual revenues).  As of the

---

[3] D.I. 353 (*Findings of Fact, Conclusions of Law and Order Authorizing (A) The Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (B) The Debtor's Entry Into and Performance of its Obligations Under the Asset Purchase Agreements, (C) The Debtor's Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (D) Related Relief*).

[4] D.I. 273 (*Motion of the City of Westfield Gas & Electric Light Department for Allowance and Payment of its Administrative Expense Claim Pursuant to 11 U.S.C. §503(b)(9))*.

[5] *See* D.I. 371 (Transcript of hearing on September 18, 2013).

[6] *See* Mass. Gen. Laws Ann. ch. 164, § 34 (West).

Petition Date, Westfield claims that the Debtors owed $346,146.85 for seventy-four (74) days of unpaid services.[7]

| Service Period | Invoice Date | Amount Due |
|---|---|---|
| 3/28/2013 to 4/29/2013 | 5/8/2013 | $137,921.36 |
| 4/29/2013 to 5/28/2013 | 6/7/2013 | $127,181.22 |
| 5/28/2013 to 6/10/2013 | 6/17/2013 | $81,044.27 |
| | Total | $346,146.85 |

In the 20-day period prior to the Petition Date (May 22, 2013 to June 10, 2013), Westfield alleges that it supplied 631,483 KWH of electric and 591 CCF of natural gas to the Debtors.  The total charges in the 20-day period are alleged to be $93,262.55.  In support of its Motion, Westfield submitted the Banas Declaration.[8]  Westfield's billing cycle for the Debtors does not correspond with the section 503(b)(9) 20-day window.  As such, Westfield cobbled together its claim from two separate billings.  First, Westfield asserts, through the Banas Declaration, that the electric and natural gas charges for the period between May 22, 2013 and May 28, 2013 are as follows:

Electric
    KWH: Peak 111,586; Off Peak 57,000

    Charges
        Supply Charge              $6,755.24
        Peak Transmission          $2,305.37
        Peak Distribution          $2,250.69
        Off Peak Distribution      $538.65
            Total Charges          $11,849.95

---

[7] *See* D.I. 273 (*Declaration in Support of the Motion of the City of Westfield Gas & Electric Light Department for Allowance and Payment of its Administrative Expense Claims Pursuant to 11 U.S.C. § 503(b)(9)* (hereinafter the "Banas Declaration") at ¶ 4.)

[8] *Id*.

Natural Gas

CCF: 463

Charges

| | |
|---|---|
| Supply Charge | $282.43 |
| Transportation CCF | $125.52 |
| Distribution CCF | $116.91 |
| Total Charges | $524.86 |

Although, these amounts may be included in the bill attached to the Banas Declaration as Exhibit B, there is no further explanation or calculation for how these amounts were derived. Second, Westfield submitted the bill for May 28, 2013 to June 10, 2013, attached to the Banas Declaration as Exhibit C; this bill contains meter readings and quantities consumed during this period. As no additional information concerning these charges was provided, the Court looked to Westfield's website for additional information. Westfield describes its charges as follows:

**Electric Rate Definitions**

| Charges | Description[9] |
|---|---|
| Customer Charge | The **Customer Charge** is a monthly fixed charge which applies to all customers. It is designed to recover costs related to *metering, meter reading, billing and other administrative costs*. |
| Transmission Charge | The **Transmission Charge** is a variable charge that recovers the cost to *transport* electricity from remote generating facilities where it is produced, to the WG&E service territory. |
| Distribution Charge | The **Distribution Charge** is a variable charge that recovers the cost of *delivering* electric power over WG&E's local distribution systems to the customer's location. |

---

[9] *See* www.citywestfield.org; www.wgeld.org/index/aspx?nid=126 (bold emphasis supplied; italic emphasis added). Although only some of these charges are listed in the May 22, 2013 to May 28, 2013 summary of charges (noted *supra*), all of these categories are included in the bill attached to the Banas Declaration as Exhibit C.

| | |
|---|---|
| Demand Charge | The **Demand Charge** is a variable charge that recovers a portion of the cost of WG&E's *local infrastructure* that is needed to meet the customer's peak electricity needs. |
| Electric Supply Charge | The **Electric Supply Charge** is a variable charge that recovers the *cost of electricity purchased* for our customers. |

### Natural Gas Rate Definitions

| Charges | Description[10] |
|---|---|
| Customer Charge | The **Customer Charge** is a monthly fixed charge which applies to all customers.  It is designed to recover costs related to *metering, meter reading, billing and other administrative costs*. |
| Transportation Charge | The **Transportation Charge** is a variable Charge that recovers the cost of *delivering* natural gas over WG&E's local distribution system to the customer location. |
| Distribution Charge | The **Distribution Charge** is a variable charge that recovers *environmental response costs incurred* due to changing regulatory requirements and adjustments necessitated by unforeseen occurrences such as unreasonable weather. |
| Gas Supply Charge | The **Gas Supply Charge** is a variable charge that recovers the *cost of natural gas* purchased for our customers. |

In general, the Debtors do not dispute that Westfield delivered electricity and natural gas to the Debtors in the ordinary course of the business within the 20-day period.  The initial dispute centers on whether electricity and natural gas are goods.  The details of the billings is relevant to the Court's application of the apportionment test.

### LEGAL DISCUSSION

Facing the Court are essentially three issues: (i) whether electricity and natural gas are "goods" under section 503(b)(9); (ii) are the details of the bills adequate under the apportionment test to establish the amount of any allowed section 503(b)(9) claim; and (iii) should the Court require immediate payment of any section 503(b)(9) claim.

---

[10]  *See*  www.citywestfield.org;  www.wgeld.org/index/aspx?nid=126  (bold emphasis supplied; italic emphasis added).  Although only some of these charges are listed in the May 22, 2013 to May 28, 2013 summary of charges (noted *supra*), all of these categories are included in the bill attached to the Banas Declaration as Exhibit C.

**A. Section 503(b)(9)**

Section 503 of the Bankruptcy Code provides:

(b)  After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including . . .

> (9)  the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business.[11]

"The language of the statute provides for the allowance of an administrative claim provided the claimant establishes: (1) the vendor sold "goods" to the debtor; (2) the goods were received by the debtor within twenty days prior to filing; and (3) the goods were sold to the debtor in the ordinary course of business."[12]

An administrative priority claim under section 503(b)(9) is limited to the provision of goods.[13]  The Bankruptcy Code, however, does not define the term.  This Court previously resolved this ambiguity by adopting for section 503(b)(9) purposes the definition of "goods" set forth in Article 2 of the U.C.C.,[14] which states:

> "Goods" means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (chapter 8 of this title) and things in action. "Goods" also includes the unborn young of animals and growing crops and other

---

[11] 11 U.S.C. § 503(b)(9).

[12] *In re Goody's Family Clothing Inc.*, 401 B.R. 131, 133 (Bankr. D. Del. 2009) (citations omitted).

[13] *Id.* at 135. "([A] claim for an administrative expense under § 503(b)(9) cannot be a claim for services provided.").

[14] U.C.C. § 2–101 (short title of Article 2 is "Sales"); § 2–102 (scope of Article 2 covers "transactions in goods").

identified things attached to realty as described in the section on goods to be severed from realty (§ 47–2–107).[15]

As claimant, Westfield, bears the burden of establishing that its claim qualifies for administrative priority status.[16]

In this case, the Debtors have argued that the electricity provided by Westfield does not constitute a good within the meaning of section 503(b)(9) and, therefore, that portion of Westfield's claim is not entitled to administrative priority status.  The Court agrees.  There does not appear to be a dispute concerning whether natural gas is a good – it is specifically enumerated as such under the U.C.C.

## B.  Is Electricity a "Good"?

There is a split among courts regarding whether electricity is a good under section 503(b)(9) and/or section 2-105 of the U.C.C.  As such, this Court will summarize the key cases on both sides of the issue.

### 1.  *Courts holding that electricity is a good*

In order for electricity to be a good under the U.C.C. and, thus, section 503(b)(9), it must be a "thing," which is "moveable at the time of identification to the contract for sale."[17]   The bankruptcy court in the case of *In re Erving Industries, Inc.*[18] began its analysis of whether electricity is a good by providing a rudimentary explanation of

---

[15] U.C.C. § 2-105(1); *Goody's Family Clothing*, 401 B.R. at 134. *See also* 4 Collier on Bankruptcy ¶ 503.16[1] (15th ed. rev. 2008) ("Goods is not defined in the Code and so the definition used in Article 2 of the Uniform Commercial Code is likely to be used").

[16] *Goody's Family Clothing*, 401 B.R. at 136 (citations omitted); *In re Insilco Technologies, Inc.*, 309 B.R. 111, 114 (Bankr. D. Del. 2004) (citations omitted); *In re Unidigital, Inc.*, 262 B.R. 283, 288 (Bankr. D. Del. 2001) (citations omitted).

[17] U.C.C. § 2-105(1).

[18] *In re Erving Indus., Inc.*, 432 B.R. 354 (Bankr. D. Mass. 2010).

electricity focused on the "basic processes of electrical energy generation and its

mechanics."[19]

> We begin with the most basic concept, the idea that "all things are made of atoms—little particles that move around in perpetual motion."  These atoms, in turn, are comprised of "a nucleus that has a positive electrical charge . . . together with a number of electrons, all having the same negative charge and mass, which move at distances from the nucleus." Electrons moving around the nucleus on the outermost plane (or "shell") can be knocked out of orbit and move from one atom to another, taking their charge with them. It is the energy produced by this movement of electrons from atom to atom that we call "electricity."
>
> Power plants use these basic principles to create electricity by applying a force to push electrons out of their orbits and cause them to "flow" from atom to atom.  For example, the force of a spinning electromagnetic rotor will move electrons out of orbit in a nearby copper wire.  This creates the electricity and electrical currents that move through various transmission and distribution lines and are ultimately diverted to homes and business where the electricity is put to use.[20]

The court then discussed the movement of electricity:

> "An electric current is a group of charges moving in the same direction through a wire or other conductor.  Voltage is the difference in electric potential that causes the charges to flow through the wire . . . and is measured in volts (V) or, in the case of power lines, in thousands of volts or kilovolts (kV).  Current is the rate at which the charges flow through the wire . . . and is measured in amperes.  The quantity of power (in watts) that a conducting wire transmits is thus the product of its voltage and its current.  Power systems are designed to hold the voltage relatively constant but to meet fluctuating demand by allowing the current to rise and fall."[21]

---

[19] *Id.* at 367.

[20] *Id.* at 367 (citations and footnotes omitted).

[21] *Id.* (quoting *San Diego Gas & Elec. Co. v. Superior Court*, 920 P.2d 669, 674-75 (1996)).

Finally, the court noted that electric current moves through a network of transmission and distribution systems before reaching the customer[22] where it is measured by a meter as it is utilized or consumed.[23]

Having set the ground work, the *Erving Industries* court began its application of the governing standard by asserting electricity is a "thing."

> [A]lthough . . . [electricity's] ultimate nature may be mystifying to most, electricity is tangible and does possess physical properties.  It is not simply an "idea" akin to intellectual property.  Although perhaps lacking in corporeal shape and not easily observed, electricity really is some thing, something that can be felt (although we are loathe to) and something that can be created, measured and stored.[24]

The court then argued that electricity is "moveable" as it travels through transmission lines from its creation at the power plant, windmill, solar panel, etc. to the ultimate user. Moreover, electricity is "identifiable" as it is measured on a meter when it is delivered to the customer.  The more perplexing question, however, is whether electricity is moveable *at the time* it is identified to the contract, i.e., when it passes through the meter?  The *Erving Industries* court said "yes" because "electricity does not reach a customer's meter and simultaneous cease to exist.  Instead, it passes through the meter."[25]  The court went on to conclude that "logic dictates" that some period of time, however imperceptible, must pass between the measurement of the electricity at the meter and the use of it at the vacuum cleaner.  Thus, since electricity is identifiable prior to its consumption, it meets the definition of a good.

---

[22] *Id.* at 369.

[23] *Id.* at 370.

[24] *Id.* at 369.

[25] *Id.* at 370.

The *Erving Industries* court went on to address a related issue, i.e., are goods under section 503(b)(9) limited to those that can be stockpiled and, as such, reclaimed under section 546(c) of the Bankruptcy Code.[26]  Section 546(c) provides that a trustee's power to avoid liens or transfers is subject to a seller's right to reclaim goods.  The section further provides that if a seller chooses not to reclaim its goods it can assert its rights under section 503(b)(9).  Thus, the debtor in *Erving Industries* argued that goods must be reclaimable under 546(c) to qualify for administrative expense treatment under section 503(b)(9).  The court rejected the argument as being contrary to the plain meaning of the statute.  Section 546(c) does not limit the scope of section 503(b)(9).  Rather, it clarifies that section 503(b)(9) is available for, among others, creditors with reclamation rights.

In *GFI Wisconsin, Inc. v. Reedsburg Utility Com'n*,[27] the district court held on appeal that electricity is a good under section 503(b)(9).  By agreement of the parties, the factual record before the bankruptcy court below (and, thus, the district court on appeal) was very limited.  Included in that record was an affidavit submitted by the debtor that took issue with the *Erving Industries* court's conclusion that "logic dictates" that some period of time, however imperceptible, must pass between the measurement of the electricity at the meter and its use.[28]

---

[26] *Id*. at 372-73.

[27] *GFI Wisconsin, Inc. v. Reedsburg Util. Comm'n*, 440 B.R. 791 (W.D. Wis. 2010).

[28] The affidavit was submitted in concert with debtor's reply brief.  Although the bankruptcy court noted that there were issues with the affidavit, including whether the affiant qualified as an expert, the bankruptcy court denied the utility's motion to strike and considered the affidavit on its merits. *Id*. at 798.

[N]o movement of electrons will occur until the customer's load is connected and a circuit is completed. When the load is connected, the electrons begin to flow and create electric energy, and simultaneously, the electric energy is 'consumed.' With no customer load, no electrons move and no electric current is measured. In addition, the movement of electricity (electric energy current) is virtually instantaneous from one end of the conductor to the other end ... Therefore, when it is consumed, it is simultaneously measured. Movement does not take place after measurement by the meter. The court's conclusion [in *Erving Industries*] that electricity 'passes through' the meter and continues to the customer for use thereafter does not match the actual physics. Electric energy is not like natural gas or water where those materials physically pass through the meter and then to the consumptive use ... The electric energy is not 'movable' after metering; it does not 'move' to some other final consumptive use after metering. Instead, the consumptive use is simultaneous with the metering.[29]

Notwithstanding that the sole evidence before the court on the issue appeared to support a finding that electricity is not a good, the bankruptcy court ruled otherwise. It "found that the electricity at issue was movable when it entered the meter and moved from the power source to the meter to appellant's facilities. Because the electricity was moving, even if the movement was so fast as to be 'nonexistent,' it qualified as a good."[30] The bankruptcy court further stated "that under the [U.C.C.], water and natural gas are considered movable goods, and 'there is no principled distinction to be made between natural gas, water, or electricity.'"[31]

The district court affirmed the bankruptcy court's decision, albeit on slightly different grounds. The district court started by taking a step back from a complex inquiry into the physical nature of electricity, which "requires an understanding of the

---

[29] *Id.* at 795-96.

[30] *Id.* at 796.

[31] *Id.* at 799.

13

nature of electrons and a grasp of quantum physics and special relativity."[32]  Rather, the

district court held:

> For the purpose of determining administrative priority under the Bankruptcy Code, the meaning of "goods" under the [U.C.C.] should not depend on quantum physics, how fast electrons are moving at a particular time or even where a debtor's meter is located on an electrical circuit. Rather, determining whether a particular thing qualifies as a good and deserves administrative priority should be a straightforward assessment, taking into consideration the nature and common understanding of the thing, but also considering its similarities to goods that fall undisputedly under the [U.C.C.] and would receive administrative priority under [section] 503(b)(9).[33]

The proper inquiry the court held is the consideration of "the general movability of

electricity, common perceptions of electricity and the exchange of electricity as a

commodity in the marketplace."[34]  The court further noted that, despite the lengthy

description of the nature of electricity, the *Erving Industries* court ultimately based its

ruling on logic rather than scientific principle.[35]

The court concluded that "electricity is movable, tangible and consumable, that it

has physical properties, that it is bought and sold in the marketplace and thus, that it

qualifies as a good for purposes of the [U.C.C.] and the Bankruptcy Code. . . .

[E]lectricity begins flowing through power lines when a circuit is formed and continues

moving at least until it is metered.  The metering satisfies the identification requirement

---

[32] *Id.*

[33] *Id.* at 799-80.

[34] *Id.* at 800.

[35] *Id.*

of the [U.C.C.] and the movement is sufficient to satisfy the movability requirement, even if it reaches the speed of light."[36]

The *GFI Wisconsin* court also addressed two related issues.  First, the debtor argued that section 366 of the Bankruptcy Code, which is entitled "Utility service" and provides for the provision of "utility services" after a debtor has filed for bankruptcy, leads to the conclusion that "an interpretation of 'goods' under [section] 503(b)(9) that includes utility services would be inconsistent with the use of the word 'services' in [section] 366."[37]  The district court rejected this argument, finding that

> "[j]ust because a seller of goods may also be a utility that is entitled to the protection of [section] 366 for the sale of utility services post-petition to a debtor does not mean it is prohibited from allowance of a [section] 503(b)(9) administrative expense claim to the extent that it has sold goods to the debtor that qualify under [section] 503(b)(9).  Section 503(b)(9) addresses the sale of goods pre-petition and [section] 366 addresses the provision of utility services postpetition. The sections are not mutually exclusive.  A utility provider may provide both goods and services within the meaning of each section. In sum, the rights afforded by [section] 503(b)(9) to a seller of goods are not dependent either explicitly or implicitly upon the availability of other remedies under the Code for the seller."[38]

Second, the *GFI Wisconsin* court, like the court in *Erving Industries*, rejected the argument that the goods must be reclaimable under 546(c) to qualify for administrative expense treatment under section 503(b)(9).[39]    The court held that while "[s]ection 503(b)(9) gives a creditor the opportunity to receive payment for goods delivered within the 20–day period before the bankruptcy filing . . . it does not allow a creditor to claim a

---

[36] *Id.* at 800-01 (citation omitted).

[37] *Id.* at 801.

[38] *Id.* (citations omitted).

[39] *Id.* at 801-02.

lien or otherwise repossess those delivered goods. In other words, it is not a reclamation claim."[40]

In sum, the *GFI Wisconsin* court, "taking into consideration the physical properties of electricity as noted by appellant's expert and the bankruptcy court, including the fact that electricity is movable, and the parties' agreement under which the energy usage and consumption were determined by meter readings, [concluded] that electricity is a good under the [U.C.C.] definition and also under the Bankruptcy Code."[41]

Recently, in the case of *In re Great Atlantic & Pacific Tea Co., Inc.*,[42] the district court for the Southern District of New York recognized the split in authority in the determination of whether electricity is a good.

> Despite consensus on using the [U.C.C.] definition, however, the applicability of [s]ection 503(b)(9) to the sale of electricity is an open question. Although the majority of cases hold that electricity is a good under [U.C.C.] Section 2–105(1), a strong minority—led by decisions of the New York Court of Appeals, the Second Circuit, and this Court—disagrees. In the [s]ection 503(b)(9) context, courts are in essence evenly split on whether electricity is a good—a conflict driven in part by the divergent underlying [U.C.C.] case law.[43]

The district court, however, did not decide the issue. Rather, it remanded the matter for an evidentiary hearing because the bankruptcy court's conclusions that electricity "'disappears into use at th[e] moment' it reaches the meter and is 'simply a stream of

---

[40] *Id.* at 802.

[41] *Id. See also In re S. Montana Elec. Generation & Transmission Co-op., Inc.*, 11-62031-11, 2013 WL 85162 (Bankr. D. Mont. Jan. 8, 2013) (adopting the holding in *GFI Wisconsin*).

[42] *In re Great Atl. & Pac. Tea Co., Inc.*, 12-CV-7629 CS, 2013 WL 5212141 (S.D.N.Y. Sept. 16, 2013).

[43] *Id.* at *2.

electrical energy . . . identified . . . at the point of delivery,' [were] insufficient" for appellate review.[44]  That said, the court made two observations.

> First, if—as Hudson argues and as the *Erving [Industries]* case held— electricity passes through the meter at the customer's location and is at that moment identified and thereafter consumed, it seems to me that it would meet the [U.C.C.'s] definition of a good, for the reasons set forth by the *Erving [Industries]* Court.  The record below does not allow me to conclude that electricity works that way, but it also does not allow me to conclude that it does not. Thus, further factual development is necessary.

The *Great Atlantic & Pacific Tea Co.* court indicated that it agreed with the *Erving Industries* court's holding that the determinative factor is whether the electricity is metered and consumed at the same time or, as logic dictates, there is a delay between identification and consumption.  If the record on remand would support a finding that electricity is identified at the meter and *thereafter consumed*, the court stated that it would almost certainly find electricity to be a good.

The court went on to state that, if all else fails, it might look to the parties' business relationship to determine whether the electricity in the case before the court is a good.

> Second, while the physics of electricity may be constant, the instant case demonstrates that the economic or business arrangements for its delivery are not. Electricity can be provided by integrated utilities that generate, sell, deliver and service, or by entities like Hudson, which in today's deregulated market makes money simply by buying electricity from

---

[44] *Id.* at *7 ("Because the factual record on which the Bankruptcy Court relied in making determinations about the nature of electricity consisted only of counsel's assertions—which were not corroborated by sworn testimony or evidence and were disputed—its conclusions that electricity "disappears into use at th[e] moment" it reaches the meter and is "simply a stream of electrical energy ... identified ... at the point of delivery" are insufficient for me to agree upon *de novo* or clearly erroneous review.  I simply need to know more about the delivery of electricity in this case to determine whether the electricity supplied by Hudson meets the [U.C.C.] definition of goods either at the generator's meter, at the customer's, or within the grid. Thus, I vacate the Bankruptcy Court's denial of Hudson's [s]ection 503(b)(9) claim and remand to the Bankruptcy Court to conduct an evidentiary hearing.") (internal citations omitted).

generators at a lower price than that at which it sells to customers but is otherwise "hands-off," or by entities that are somewhere in between. Each may have different arrangements with others in the supply chain from generator to consumer. If Hudson's theory that electricity is always identified at the customer's meter does not hold up, individualized assessment of these arrangements may be necessary to determine whether the electricity sold in a given case is a "good."

Thus, the court indicated that if the nature of electricity is not sufficiently uniform to support a rule applicable in all cases, it might look to the facts and circumstances of each case to decide whether electricity is a good.

### 2.   *Courts holding that electricity is not a good*

Recently, in the case of *In re PMC Marketing Corp.*,[45] the bankruptcy court for the District of Puerto Rico held that in order to determine whether electricity constitutes a good under section 503(b)(9) the court "must carry out an inquiry into the unique facts of each case and thus this analysis cannot be determined without taking into consideration the totality of circumstances of all the relevant facts."[46]  The focus of the *PMC Marketing Corp.* court's inquiry was not whether electricity is, in and of itself, a good.  Rather, the court considered the relationship between the provider of electricity, Puerto Rico Electric Power Authority (PREPA), and its customer, the debtor.   That relationship was governed under section 366 of the Bankruptcy Code.

"[Section 366] gives debtors protection from a cut-off of service by a utility because of the filing of a bankruptcy case.  This section is intended to cover utilities that have some special position with respect to the debtor, such as an electric company, gas supplier, or telephone company that is a

---

[45] *In re PMC Mktg. Corp.*, 09-02048, 2013 WL 4735736 (Bankr. D.P.R. Sept. 4, 2013).

[46] *Id.* at *5.  *See also In re Samaritan Alliance, LLC*, 07-50735, 2008 WL 2520107, *4 (Bankr. E.D. Ky. June 20, 2008) (holding that "the court agrees . . .  that section 503(b)(9) is not applicable here and that the electricity provided is more properly characterized as a 'service.'").

> monopoly in the area so that the debtor cannot easily obtain comparable
> service from another utility."[47]

The court concluded that PREPA is a utility provider because: "(1) it is subject to governmental regulation as are traditional utilities; (2) PREPA does fit the ordinary definition of a utility as it does enjoy a 'special relationship' with the Debtor (PREPA is the sole provider of electricity in Puerto Rico) and it does have a monopoly; and (3) PREPA is a government owned corporation of Puerto Rico."[48]  Applying section 366, the *PMC Marketing* court concluded that PREPA was providing "utility service" rather than a good under the U.C.C. and section 503(b)(9).[49]  As such, PREPA was not entitled to an administrative priority claim.[50]

In the case of *In re Pilgrim's Pride Corp.*,[51] the Texas bankruptcy court held that electricity was not a good.  The court ultimately relied on the plain meaning of the U.C.C. and the Bankruptcy Code; but, it started its analysis by rejecting three arguments made by the local utility cooperative, which the court defined as the "Electricity Provider," in favor of considering electricity to be a good.

First, the Electricity Provider asserted that electricity is a good because the United States Supreme Court has ruled that "electric energy thus produced,

---

[47] *Id*. at *6 (*quoting* H.R.Rep. No. 95–595, at 350 (1977), as reprinted in 1978 U.S.C.C.A.N. 5963, 6306; S.Rep. No. 95–989, at 60 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5846).

[48] *Id*.

[49] *Id*.

[50] *Id*.

[51] *In re Pilgrim's Pride Corp.*, 421 B.R. 231 (Bankr. N.D. Tex. 2009).

constitute[s] property."[52]   The court rejected the argument on the basis that everything that is property is not a good.   "For example, one can have property rights in trademarks, patents, and copyrights, but no one would argue that intellectual property falls under the [U.C.C.] definition of 'goods.'"[53]

Second, the Electricity Provider cited to a number of cases finding electricity to be a "product," which Black's Law Dictionary defines as "something that is distributed commercially for use or consumption."[54]   As above, the court rejected the argument because there are "many things that are distributed commercially for use or consumption that would not qualify as "goods" under the UCC."[55]   The court cited to the example of a television program that is broadcast commercially and consumed through viewing as not constituting a good.   "The television show itself has no identifiable form; it is merely intellectual property. It can only be "moved" physically if it is encoded in a digital or analog form. The mere fact that something is a product does not mean that it falls within the term "goods" under the [U.C.C.] or Code [section] 503(b)(9) ."[56]

Third, the Electricity Provider cited to a number of cases finding that electricity is a good.   The court describes the holdings of those cases to be based on the conclusion that "*once it passes the customer's meter*, it can be measured and is in the stream of

---

[52] *Id.* at 238 (quoting  *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 330, 56 S.Ct. 466, 80 L.Ed. 688 (1936)).

[53] *Id.*

[54] *Id*. at 238-39.

[55] *Id.*

[56] *Id*. at 239.

commerce."[57]   The court rejected the argument, holding that the fact electricity is

metered does not, in and of itself, make it a good.

> It then turned to an analysis of the plain meaning of section 2-105(1) of the U.C.C.

> [Section 2–105] does not suggest that the provision's drafters had intended that "goods" would include things which cannot be packaged and handled. The reference to "specially manufactured goods" implies a reading too narrow to cover electricity, as does the specific inclusion in the definition of unborn animals and crops—things that, like manufactured goods, clearly occupy space and can be moved about; that [section] 2–105 excludes specifically from the definition of "goods" money and investment securities—items that have extension and can be picked up and moved—but not most intangibles, despite the fact that intangibles are generally not considered goods, further persuades the court that the [U.C.C.'s] authors did not intend things like electricity, radio waves, or piped music to be within the scope of section 2–105.[58]

The court further noted that a number of other courts have ruled that electricity is a

good.[59]   Finally, the court held that narrowly defining good so as not to include

electricity for purposes of section 503(b)(9) is consistent with public policy under the

Bankruptcy Code that "provisions of the Code granting claims priority are to be

narrowly construed."[60]   Thus, the *Pilgrim's Pride* court ruled that electricity is not a

good.[61]

---

[57] *Id*. (emphasis added).

[58] *Pilgrim's Pride*, 421 B.R. at 239.

[59] *Id*.

[60] *Id*. at 240. *See also In re Unidigital, Inc.*, 262 B.R. 283, 288 (Bankr. D. Del. 2001) ("Priority claims affect two important bankruptcy concerns: minimizing administrative costs during Chapter 11 to preserve the debtor's scarce resources and thus encourage rehabilitation, and obtaining maximum and equitable distribution of estate assets to creditors.") (internal citations omitted); *In re Smurfit-Stone Container Corp.*, 425 B.R. 735, 740 (Bankr. D. Del. 2010); and *In re DBSI, Inc.*, 407 B.R. 159, 165 (Bankr. D. Del. 2009).

[61] A number of other state and federal courts have concluded that electricity is not a good. *See United States v. Con. Edison Co.*, 590 F. Supp. 266, 269 (S.D.N.Y.1984) (Under New York law, electricity does not fall under the heading of goods); *New Balance Ath. Shoe v. Boston Edison Co.*, 95-5321-E, 1996 WL 406673 (Mass. Super. Ct. Mar. 26, 1996) (holding that "this court finds that electricity is not a 'good' as defined in

### 3.  *This Court's Analysis*

Where does this leave the Court?  As discussed at length above, several courts have addressed the question of whether electricity is a good and they have reached disparate conclusions.  Indeed, they have considered disparate factors.  More specifically, each court has considered one or more of the following:

a.    Is electricity moveable at the time it is identified by passing through the meter or is it consumed simultaneously with identification?

b.    Is electricity "comparable" with other things that are goods under the U.C.C.?

c.    Does section 546(c) governing reclamation of goods control whether electricity is a good or a service?

d.    Does section 366 of the Bankruptcy Code governing "utility services" control whether electricity is a good or a service?

e.    Should the nature of the parties' relationship, e.g., is the claimant acting as a "public utility," determine whether electricity is a good or a service?

the Uniform Commercial Code."); *Rural Elec. Convenience Co-op. Co. v. Soyland Power Co-op., Inc.*, 606 N.E.2d 1269, 1275-76 (1992)  ("We do not deem section 2–210 of the Code to be applicable to the present case, because the sale of electricity, which is the subject of the 1963 contract, is not a sale to the ultimate consumer even if the voltage has been reduced by a transformer before it enters RECC's lines and even though it goes through a meter as RECC receives it."); *Farina v. Niagara Mohawk Power Corp.*, 438 N.Y.S.2d 645 (N.Y.App.Div.3d Dep't 1981); *Williams v. Detroit Edison Co.*, 234 N.W.2d 702 (Mich. Ct. App. 1975); *Buckeye Union Fire Ins. Co. v. Detroit Edison Co.*, 196 N.W.2d 316, 317 (Mich. Ct. App. 1972); and *Cincinnati Gas & Elec. Co. v. Goebel*, 502 N.E.2d 713 (Ohio Mun. 1986).

There are no written opinions on this topic within the Third Circuit.  There is, however, a transcript ruling from 2011 in which Judge Walsh "considered" this issue.  *In re NEC Holdings Corp.*, 10-11890, D.I. 1205 (Transcript of hearing on Mar. 30, 2011). Judge Walsh stated, without analysis, that he was "prepared to hold that electricity is a good;" however, he then continued the hearing as to the amount of the administrative priority claim because the utility had not "proven the value of the goods supplied within the twenty-day period." *Id.* at 28:9-10.  As such, the ruling was *dicta*.  Moreover, Judge Walsh's comments were made on the record at a hearing and, by definition, are not precedential.

f.    Should section 503(b)(9) be strictly construed because it provides an otherwise unsecured creditor with an administrative expense claim and, if so, to what extent?

> ### a.    *Is electricity moveable at the time it is identified by passing through the meter or is it consumed simultaneously with identification?*

The *Erving Industries* court started its analysis with the text of the U.C.C. – goods means all things, which are movable at the time of identification to the contract for sale.[62]    The court then went through the definition item by item applying its understanding of the scientific principles of electricity.  The court found that "electricity really is some thing, something that can be felt (although we are loathe to) and something that can be created, measured and stored;" it is "moveable" as it travels through transmission lines from its creation to the ultimate user; and it  is "identifiable" as it is measured on a meter when it is delivered to the customer.  It then attempted to tackle the thorny question of whether electricity is moveable *at the time it is identified to the contract*, i.e., when it passes through the meter.

The court based its conclusion that electricity is a good on the fact that electricity is not identified on the meter and consumed by the customer simultaneously.  "Logic dictates" that some period of time, however imperceptible, must pass between the measurement of the electricity at the meter and its use.  Thus, the court held, it is that infinitesimal period of time between identification and use that makes electricity a good.

---

[62] U.C.C. § 2-105(1).

The *GFI Wisconsin* and the *Great Atlantic & Pacific Tea Co.* courts both agreed with the *Erving Industries* court's approach. In *GFI Wisconsin*, the court held that "[t]he metering [of electricity] satisfies the identification requirement of the [U.C.C.] and the movement is sufficient to satisfy the movability requirement, *even if it reaches the speed of light.*"[63] Similarly, the *Great Atlantic & Pacific Tea Co.* court remanded the case to the bankruptcy court for development of a more complete record but also stated that if that record on remand established that "electricity passes through the meter at the customer's location and is at that moment identified and thereafter consumed, it seems to me that it would meet the [U.C.C.'s] definition of a good, for the reasons set forth by the *Erving* [*Industries* court]."[64]

There are two problems with these cases. First, it is not necessarily true that there is a period, infinitesimal or not, between identification and use.[65] Second, and more importantly, it is simply the wrong approach.

We start with the proposition that every element of the definition of a good matters, including that it must be movable at the time of identification. The inclusion of movability as an element in the definition of a good goes back to the inception of the term almost 1,000 years ago.[66] The distinction between a good and service is readily

---

[63] *GFI Wisconsin, supra* at 800-01 (citation omitted, emphasis added).

[64] *Great Atlantic & Pacific Tea Co., supra* at *7.

[65] *GFI Wisconsin, supra* at 795-96.

[66] The understanding that "goods" are "property or possessions; esp. movable property" originated in Old English, i.e., prior to 1149. I OXFORD SHORTER ENGLISH DICTIONARY 1132 (6TH ed. 2007). And, its more specific reference to "saleable commodities; merchandise, wares" dates to Middle English, i.e., 1150–1349. *Id. See also* BLACK'S LAW DICTIONARY 762 (9TH ed. 2009) (indicating origination of term goods as "bef. 12c").

illustrated.  A service is not movable property but, rather, it is performed and consumed simultaneously.  If I wash your car I am providing a service.  The act of washing the car cannot be identified, packaged and sold.  Also, it cannot be saved or resold.[67]  The car, however, is a good.  The car is moveable, readily identifiable and can be bought and sold.  Both exist but the service exists only in the moment while the car continues to exist over time.  If I promise to sell you a car and wash it prior to delivery I will be providing you with both a good (the car) and a service (washing the car).

Thus, in order for electricity to be a good, there must be a period between when electricity is identifiable and consumed.  But, in order to do justice to the term as it has developed over 1,000 years, *the period between identification and consumption must* be *meaningful*.  This is not the case with electricity.

The speed at which electricity travels is actually the speed of the electromagnetic wave, not the movement of electrons. This measurement is known as the velocity of propagation, wave propagation speed or velocity factor ("VF").  It is the speed at which a wave front (of an acoustic signal, for example, or an electromagnetic signal, a radio signal, a light pulse in a fiber channel or a change of the electrical voltage on a copper wire) passes through the medium of transmission, relative to the speed of light.  In a vacuum, electricity travels at the speed of light and so the VF is 1.0 or 100%. In electrical cables, the velocity factor mainly depends on the insulating material.  For

---

[67] The act of washing the car is separate from a contract where I promise to wash your car.  The first is a service where the latter is a contract for services.  The contract is something, although not a good, the rights under which may (depending on the terms of the contract) be bought and sold.

example, in an unshielded copper conductor, the VF ranges between 95% to 97%, while in a typical coaxial cable it is about 67%.[68]

The speed of light is 299,792.458 kilometers per second or approximately 186,000 miles per second. Assuming electricity is travelling through coaxial cable at two-thirds, or 67% the speed of light, the electricity will travel one kilometer in 4.978 microseconds or, put more starkly, 0.000004978 seconds.[69] A difference of approximately $1/60^{th}$ of $1/60^{th}$ of $1/60^{th}$ of a second[70] between identification and consumption renders the separation between the two meaningless. Electricity cannot be shoehorned into the definition of a good based on such an infinitesimal delay. Thus, under the plain meaning of section 503(b)(9) of the Bankruptcy Code, electricity is not moveable at identification and, thus, is not a good because there is not a meaningful delay between identification and consumption.

Having decided the issue on the plain meaning of the statute, the Court need not proceed further. Nonetheless, the Court considers below the other approaches that courts have identified as relevant to determining whether electricity is a good. All of these factors are either neutral or support the Court's holding that electricity is not a good.

---

[68] Peter Markos & Costas Soukoulis, Wave Propagation: From Electrons To Photonic Crystals And Left-Handed Materials (2008).

[69] At that speed, electricity will travel 1 mile in 8.024 microseconds or 0.000008024 seconds.

[70] This is a "fifth" and equals 4.63 microseconds.

### b.    Is electricity "comparable" with other things that are goods under the U.C.C.?

Several courts have decided whether electricity is a good based, in part, on its comparability to other things that are goods under the U.C.C.   For example, the *GFI Wisconsin* court held that "determining whether a particular thing qualifies as a good and deserves administrative priority should be a straightforward assessment, taking into consideration the nature and common understanding of the thing, but also considering its similarities to goods that fall undisputedly under the [U.C.C.] and would receive administrative priority under [section] 503(b)(9)."[71]   In addition, the court stated "that under the [U.C.C.], water and natural gas are considered movable goods, and 'there is no principled distinction to be made between natural gas, water, or electricity.'"[72]

This Court disagrees with the *GFI Wisconsin* court – electricity is different from water and natural gas for purposes of whether it is a good under section 503(b)(9).   For a start, both are clearly goods under the plain meaning of the U.C.C.   As for water, section 2-107 of the U.C.C. provides that a "contract for the sale of minerals or the like (including oil and gas) or a structure or its materials to be removed from realty is a contract for the sale of goods within this Article." [73]   Black's Law Dictionary defines

---

[71] *GFI Wisconsin, supra* at 800.

[72] *Id*. at 799.

[73] Section 2-107(1) of the UCC states:

> A contract for the sale of minerals or the like (including oil and gas) or a structure or its materials to be removed from realty is a contract for the sale of goods within this Article if they are to be severed by the seller but until severance a purported present sale thereof which is not effective as a transfer of an interest in land is effective only as a contract to sell.

"mineral" as "any natural inorganic matter that has a definite chemical composition and specific physical properties that give it value...."[74]    Water is a natural inorganic substance with a definite chemical composition and, as the basis for all life on the planet, has value.  As for natural gas, it is specifically included in the definition of goods in section 2-107 of the U.C.C. once it has been removed from realty, i.e., pumped from the ground.

But the differences between electricity, on the one hand, and water and natural gas, on the other, is not limited to the definitions in the U.C.C.  Unlike electricity, both water and natural gas can be identified well before consumption.  Water that passes through a meter may be stored either in a tank or in the pipes for an indefinite period of time.  Indeed, that water could be bled from the tanks and pipes, transferred to another location and used or sold.  Theoretically, it could even be returned to the water company.  The same is true of natural gas.  Natural gas can be stored in a tank for an indefinite period before being transported, used, sold or returned to the gas company.

This is simply not the case with electricity.  While electricity can be stored in a number of ways, its storage is fundamentally different from storage of water or natural gas.  Most commonly, storage of electricity involves using the electric current to charge a battery.

> Batteries generally are divided into two categories-primary or voltaic batteries, and secondary or storage batteries. Each type converts chemical energy which had been stored in the battery when it was charged into electrical energy. During this process, known as "discharge," chemical reactions occur within the battery which release electrons on the negative

---

[74] BLACK'S LAW DICTIONARY, *supra* at 1084.

electrode. A primary battery is simply discarded after the reactants are
exhausted. A secondary or storage battery, on the other hand, converts
chemical energy into electrical energy by reactions that are essentially
reversible; the battery may be recharged by passing a current through it in
the opposite direction to that of its discharge.[75]

While water and natural gas stored in a tank are still water and natural gas, electricity

stored in a battery is no longer electricity.  It has become potential energy stored in

materials or chemicals that will produce electricity when they react with each other.

While the battery itself is a good, the electricity used to charge it and that will flow from

it is not.

> **c.**    ***Does section 546(c) governing reclamation of goods control***
> ***whether electricity is a good or a service?***

While the Court looks to the U.C.C. to define goods under section 503(b)(9), it

cannot ignore the fact that there is an ongoing bankruptcy where other provisions of the

Bankruptcy Code may influence or control the Court's conclusion.  The first of these is

section 546(c) of the Bankruptcy Code governing the reclamation of goods.  The

question is whether goods under section 503(b)(9) are limited to those that can be

stockpiled and, as such, reclaimed under section 546(c) of the Bankruptcy Code.  If so,

by definition, electricity is a service not a good because it cannot be reclaimed under

section 546(c).

The *Erving Industries* and *GFI Wisconsin* courts both rejected the argument that

the goods must be reclaimable under 546(c) to qualify for administrative expense

treatment under section 503(b)(9).  In *Erving Industries*, the court argued that section

546(c) does not limit the scope of section 503(b)(9).  Rather, it clarifies that section

---

[75] *General Battery Corp. v. Gould, Inc.*, 535 F. Supp. 731, 735 (D. Del. 1982).

503(b)(9) is available for, *among others*, creditors with reclamation rights.    The *GFI Wisconsin* court held that while "[s]ection 503(b)(9) gives a creditor the opportunity to receive payment for goods delivered within the 20–day period before the bankruptcy filing . . . it does not allow a creditor to claim a lien or otherwise repossess those delivered goods. In other words, it is not a reclamation claim."[76]

Sections 503(b)(9) and 546(c) have a special kinship.    Congress amended section 546(c) and added section 503(b)(9) to the Bankruptcy Code as part of section 1227 of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, entitled "Reclamation," which would seem to support that the sections should be treated in concert.[77]    Moreover, "[t]here is no reason why the words in one section in a code should have any different meaning ascribed to them than nearly identical words appearing in other sections of the same code.    Indeed, they are to be interpreted consistently."[78]    "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."[79]    Notwithstanding the foregoing, however, sections 546(c) and 503(b)(9) are not on equal footing.

---

[76] *GFI Wisconsin, supra* at 802.

[77] Pub.L. 109–8, 119 Stat. 23 (enacted April 20, 2005).

[78] *In re Rhein*, 73 B.R. 285, 288 (Bankr. E.D. Mich. 1987).  *See also In re Idalski*, 123 B.R. 222, 231 (Bankr. E.D. Mich. 1991) (holding there was a "well-established rule which requires that the court consistently interpret words or phrases that appear in various provisions within a particular legislative act.").

[79] *Perrin v. U. S.*, 444 U.S. 37, 42, 100 S. Ct. 311, 314, 62 L. Ed. 2d 199 (1979) (citations omitted).

Section 546(c) serves as a limitation on the trustee's avoiding powers.  It provides that those powers are subject to the right of a seller of goods to reclaim those goods if:

(a)      the seller sold goods to the debtor in the ordinary course of the seller's business;

(b)      the debtor received the goods while insolvent;

(c)      the debtor received the goods within 45 days before the date of the commencement of the bankruptcy case; and

(d)      the seller demands in writing the reclamation of the goods within:

(i)      45 days after the date of receipt of such goods by the debtor; or

(ii)      20 days after the date of commencement of the bankruptcy case, if the 45-day period expires after the commencement of the case.

The statute further provides that the reclamation right is subject to the "prior rights of a holder of a security interest in such goods or the proceeds thereof."  Finally, and perhaps most importantly, the statute provides that if the seller of goods fails to provide notice in the manner described above, the seller still may assert the rights contained in section 503(b)(9).

To argue that section 546(c) defines the limit of what constitutes a good under section 503(b)(9) or the Bankruptcy Code as a whole turns the statute on its head.  Section 546(c) provides a seller of goods with a choice.  The seller can pursue a narrowly tailored *in rem* remedy by reclaiming the goods it sold to the debtor and, if the seller complies with the statute, the transfer of those goods back to the seller, i.e., reclamation, will not be avoidable by the trustee.  But, if the seller fails to meet the criteria in the statute or the reclaimed goods were subject to a security interest, the trustee would be entitled to recover the property.  In addition, the reclamation remedy may not be available for a number of reasons, such as the goods to be reclaimed have been

31

comingled with other similar goods and cannot be traced, the goods have been sold, the goods were inherently not reclaimable, etc.

In the alternative, the seller can assert an administrative expense claim for the value of the goods transferred to the debtor in the 20 days prior to the bankruptcy case. This alternative eliminates the need to meet all the elements of the reclamation test, avoids the expense of reclamation and gets around any security interest in the goods.[80] This "alternative" approach to seek an administrative expense claim is broadly written – all one has to do to be eligible for an administrative expense claim for otherwise reclaimable goods is not issue a written demand for reclamation.  Indeed, this applies to any good that might not ultimately be reclaimable under section 546(c) for whatever reason – section 503(b)(9) is available if you do not provide written notice of a reclamation demand.  As such, is a rare seller that would chose to pursue a reclamation remedy.

As the statute is written, section 546(c) establishes a narrowly tailored *in rem* remedy for reclamation of goods sold to the debtor that is subject to a number of contingencies and defenses.  The broader, "default" provision is section 503(b)(9) of the Bankruptcy Code.  Goods under section 503(b)(9) cannot and are not defined by the exception to the rule.  While certain goods are subject to reclamation, other non-

---

[80] While an administrative claim under section 503(b)(9), like all administrative claims, would be junior to any secured claim to the extent of the collateral, the non-reclaiming seller would be sharing that risk with all other administrative expense claimants.  Faced with the prospect of an administratively insolvent estate, the secured creditor is more likely to allow part of its collateral to pay administrative claims as a whole then to permit one creditor to reclaim its unique goods.

reclaimable goods are also entitled to an administrative expense claim. [81]   Thus, section 546(c) is irrelevant for purposes of determining whether electricity is a good under section 503(b)(9).

### d.    Does section 366 of the Bankruptcy Code governing "utility services" control whether electricity is a good or a service?

The other Bankruptcy Code provision that may influence or control the Court's conclusion as to what constitutes a good is section 366 of the Code, entitled "Utility service."   The question here is the flip side of the issue as to whether goods under section 503(b)(9) are limited to those that can be reclaimed under section 546(c).  In the case of section 366, the question is whether the use of the terms "service" and "utility service" in section 366 means that, by definition, electricity is a service and not a good for purposes of section 503(b)(9).

The *GFI Wisconsin* court answered the question in the negative, finding that section 503(b)(9) addresses the sale of goods pre-petition while section 366 addresses the provision of utility services post-petition.  The court stated that the terms are not mutually exclusive.  "A utility provider may provide both goods and services within the meaning of each section. In sum, the rights afforded by [section] 503(b)(9) to a seller

---

[81] *See In re Plastech Engineered Products, Inc.*, 397 B.R. 828, 838 (Bankr. E.D. Mich. 2008):

> there is no basis to import a requirement that the goods be reclaimable, as argued by the Debtor.   Congress added [section] 503(b)(9) to the Bankruptcy Code as part of [section] 1227 of BAPCPA, entitled "Reclamation."  Most of BAPCPA [section] 1227 is devoted to amending [section] 546 of the Bankruptcy Code, which provides relief to sellers of goods who failed to give an effective notice for reclamation.   The Debtor reads this scant legislative history as an indication that [section] 503(b)(9) is a reclamation concept, and suggests that goods must be reclaimable in order for a seller to have a [section] 503(b)(9) claim.  However, there is nothing in [section] 503(b)(9) that requires a claimant to also be entitled to a reclamation right under [section] 546.  Section 546 does not limit or control in any way the rights that a claimant has under [section] 503(b)(9).

of goods are not dependent either explicitly or implicitly upon the availability of other remedies under the Code for the seller."[82]

This Court agrees. Section 366 of the Bankruptcy Code cannot control whether something is a good under the U.C.C. and, by extension, section 503(b)(9). Indeed, there are things such as natural gas that are specifically identified in the U.C.C. as goods but which are services under section 366. The filing of a bankruptcy petition does not change the nature of what the utility is selling. Electricity is electricity. Its qualification for administrative expense treatment under section 503(b)(9) is a completely separate issue from its treatment under section 366 of the Bankruptcy Code. Thus, as with section 546(c), section 366 is irrelevant for purposes of determining whether electricity is a good under section 503(b)(9).

>    *e.   Should the nature of the parties' relationship, e.g., is the claimant acting as a "public utility," determine whether electricity is a good or a service?*

The *PMC Marketing Corp.* court approached the question whether electricity is a good from a different angle. It held that the relationship between the debtor and Puerto Rico Electric Power Authority (PREPA), which was clearly one between a customer and a utility, was governed as a service by section 366 of the Code. As a service under section 366, the court held that electricity could not be a good under section 503(b)(9). In addition, the *Great Atlantic & Pacific Tea Co.* court held that if the record after remand was insufficient to support a rule applicable in all cases, individualized assessment of

---

[82] *GFI Wisconsin, supra* at 801.

the parties' business arrangements may be necessary to determine whether the electricity sold in a given case is a good.

But, consider that electricity can be bought and sold at a wholesale level.[83]  The buyer is not an end user but, rather, sells the electricity to another wholesaler or a consumer.   If one makes the good/service determination based on the parties' relationship, then the electric current could travel from origination to use, starting as a good and ending as a service.  Indeed, since section 366 is unique to the Bankruptcy Code, whether the wholesaler providing electricity to the consumer is delivering a good or a service might depend on whether the consumer is in bankruptcy.  The problems with this approach are self evident.   The proper course is to determine whether electricity, in and of itself, is a good.

### f.  Should section 503(b)(9) be strictly construed because it provides an otherwise unsecured creditor with an administrative claim and, if so, to what extent?

The *Pilgrim's Pride* court held that finding electricity is a service and not a good under section 503(b)(9) is consistent with public policy under the Bankruptcy Code that "provisions of the Code granting claims priority are to be narrowly construed."   In addition, the *Great Atlantic & Pacific Tea Co.* court noted that the lower court had made

---

[83] *See Great Atlantic & Pacific Tea Co., supra* at *7:

> Second, while the physics of electricity may be constant, the instant case demonstrates that the economic or business arrangements for its delivery are not. Electricity can be provided by integrated utilities that generate, sell, deliver and service, or by entities like Hudson, which in today's deregulated market makes money simply by buying electricity from generators at a lower price than that at which it sells to customers but is otherwise "hands-off," or by entities that are somewhere in between. Each may have different arrangements with others in the supply chain from generator to consumer. If Hudson's theory that electricity is always identified at the customer's meter does not hold up, individualized assessment of these arrangements may be necessary to determine whether the electricity sold in a given case is a "good."

its determination that electricity is not a good based, in part, on the principle that administrative priorities should be construed narrowly.

The Court disagrees that section 503(b)(9) should be strictly construed.  Neither should it be loosely construed.  The court should simply apply the law as written and not put a judicially created obstacle in the path of an administrative expense claimant.

## 4.    Conclusion

Electricity is not a good under section 503(b)(9) of the Bankruptcy Code.  In order for something to be a good under the U.C.C. and, thus, section 503(b)(9) of Bankruptcy Code, it must be movable at the time of identification to the contract for sale.  Electricity is identified as it passes through a meter but it is almost immediately consumed.  Indeed, the delay between identification and use is measured in microseconds.  In order to do justice to the definition of a good, however, the separation of identification and consumption must be meaningful and, in the case of electricity, that infinitesimal "gap" is too short to establish that electricity is moveable at the time of identification.  It is not and, as such, electricity is not a good.

The failure of electricity to meet the definition of a good resolves the matter.  No further inquiry is necessary.  Nonetheless, a consideration of the factors that have been considered by other courts further support this Court's finding that electricity is not a good. For example, a comparison of electricity with things that are goods under the U.C.C., i.e., natural gas and water, leads to an identical result.  In addition, neither section 546(c) nor section 366 of the Bankruptcy Code are relevant to the Court's inquiry.  They are, in effect, neutral.  Also, the relationship of the parties to a transaction

concerning electricity does not determine whether electricity is a good.  That rises or falls on the nature of electricity, in and of itself, and not on the relationship of the parties that may be buying or selling it.  Finally, the Court did not nor should it strictly construe whether electricity is a good simply because it would give rise to an administrative expense claim.

The electricity provided by Westfield is not a good and, as such, Westfield does not qualify for an administrative expense claim under section 503(b)(9) claim with regard to its electricity claim.

### C.  Natural Gas is a "Good."

The U.C.C. specifically includes "natural gas" as a "good" in § 2-107(1):

> A contract for the sale of minerals or the like (including oil and gas) . . . .is a contract for the sale of goods within this Article if they are to be severed by the seller . . . [84]

As such, Westfield has satisfied this prong of section 503(b)(9).[85]  However, Westfield must meet the other prongs of section 503(b)(9) to determine the amount of their claim.

### D.  "Predominate Purpose" or "Apportionment"

As the U.C.C. governs the sale of goods and not the sale of services, courts have been faced with so-called "hybrid" transactions that involve both goods and services. Westfield urges this Court to adopt the "predominate purpose" test to determine if a transaction is for goods or services.  Under this approach, if the transaction involves predominately goods, then section 503(b)(9) would be applicable to the whole claim.

---

[84] UCC § 2-107(1).

[85] *Pilgrim's Pride Corp.*, 421 B.R. at 241.

On the contrary, if the transaction involves primarily services, section 503(b)(9) would

not be applicable.  The Debtors, on the other hand, assert that the Court should apply

the "apportionment" test where the Court considers each element of the bill item by

item and then awards an administrative expense claim for that portion of the

transaction relating to the sale of goods.

> In applying the U.C.C., most courts follow the "predominate purpose" test. [86]
>
> Under this [predominate purpose] test, the court determines "whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e.g., contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e.g., installation of a water heater in a bathroom).[87]

In addition, at least one bankruptcy court has adopted the "predominate purpose" test

in the section 503(b)(9) context.[88]   However, this Court agrees with those courts that

have concluded that the apportionment test is more appropriate under section 503(b)(9)

context.  As set forth in the case of *In re Plastech Engineered Products, Inc.*:

> there is nothing in § 503(b)(9) that requires . . .[the predominate purpose] approach for the purposes of that section of the Bankruptcy Code. If a particular transaction provides for both a sale of goods and a sale of services, and the value of each of them can be ascertained, why shouldn't the value of the goods be entitled to the § 503(b)(9) administrative expense priority and the value of the services be relegated to an unsecured non-priority claim?   There may well be sound policy reasons for not distinguishing between the sale of goods and the sale of services to a debtor within 20 days before bankruptcy, but that is just what § 503(b)(9)

---

[86] *BMC Indus., Inc. v. Barth Indus., Inc.*, 160 F.3d 1322, 1329 (11th Cir. 1998).

[87] *Id.* at 1329-30 (citations and footnotes excluded).

[88] *In re Circuit City Stores, Inc.*, 416 B.R. 531, 532 (Bankr. E.D. Va. 2009) ("The Court . . . concludes that the "predominate purpose test," developed and applied by the majority of courts to determine whether the UCC is applicable to hybrid contracts calling for the delivery of both goods and services, should be used to determine whether a claim involves the selling of goods and is, therefore, entitled to an administrative priority under § 503(b)(9) of the Bankruptcy Code.")

does. . . . The only relevant determination under § 503(b)(9) is the value of the "goods" that were delivered, irrespective of whether the contract also called for the delivery and sale of services. The predominant purpose test does not inform the Court as to whether a particular thing that has been sold is or is not "goods." Therefore, the predominant purpose test is unnecessary. There is nothing in § 503(b)(9) that dictates the use of a "winner take all" approach.[89]

Thus, the issue before the Court is to determine which portions of Westfield's bill apply to the good at issue, i.e., natural gas. As set forth above, Westfield's natural gas bills are broken down into several categories: (i) the customer charge, (ii) the transportation charge, (iii) the distribution charge, and (iv) the gas supply charge. Based on Westfield's explanations of each charge,[90] it appears that *only* the "gas supply charge" is for goods and the three other charges are for services. As such, Westfield has not met its burden with respect to the customer charge, transportation charge and distribution charge.

### E. Adequacy of Bills

But, that is not the end of the inquiry. Next the Court must determine whether the gas supply charges are sufficiently supported by the record. As noted above, there are two different billing cycles involved:

---

[89] *Plastech Engineered Products,* 397 B.R. at 837. *See also GFI Wisconsin, Inc., supra* at 803 ("I agree with the bankruptcy courts that have rejected the application of the predominant purpose test to [section] 503(b)(9) priority status, concluding that nothing in § 503(b)(9) requires that approach. (citations omitted)); *Erving Industries, supra* at 372; and *Pilgrim's Pride, supra* at 237 ("Congress, in section 503(b)(9), did not provide any basis for excluding from the section's scope goods delivered pursuant to a contract the primary thrust of which is provision of services. Thus, while the court will look to UCC § 2–105 for the meaning of "goods," it will not limit section 503(b)(9) as do courts considering the term in construing Article 2.") (footnotes excluded).

[90] *See* www.citywestfield.org; www.wgeld.org/index/aspx?nid=126 (bold emphasis supplied; italic emphasis added).

| Service Period | Total Charges for Natural Gas | Days within the 20-day Window | Amount being sought for "Supply Charge" |
|---|---|---|---|
| April 29 to May 28, 2013 | $1,154.73 | 7<br>(May 22, 2013 to May 28, 2013) | $282.43 |
| May 28 to June 10, 2013 | $78.08 | 13<br>(May 29, 2013 to June 10, 2013) | $78.08 |

Recall that Westfield had to cobble together two bills to support its claim. The first bill was for the period of April 29 to May 28, 2013. The bills provide meter readings for the beginning (April 29) and ending (May 28) days of the entire service period; however, meter readings were not provided for the beginning of the section 503(b)(9) period, i.e., May 22, 2013. Further, there is no information provided concerning how Westfield calculated the May 22 to May 28 gas supply charge. Thus, Westfield has not met its burden in "proving the value of the goods" supplied between May 22, 2013 to May 28, 2013

The bill for the 13-day period from May 29th until the petition date of June 10th provides meter readings for the beginning and end of the period. Thus, it contains sufficient detail regarding the value of the natural gas provided to the Debtors. Westfield has met its burden as to the value of the natural gas provided between May 29, 2013 and June 10, 2013, which results in an allowed administrative expense claim, pursuant to section 503(b)(9), in the amount of $78.08.

**F. Timing and Matter of Payment**

The last issue presented in Westfield's motion is the timing of the payment. In general, courts have discretion to determine when an administrative expense claim will

be paid.[91]  "In determining the time of payment, courts consider prejudice to the debtor, hardship to the claimant, and potential detriment to other creditors."[92]

> In making this determination, one of the chief factors courts consider is bankruptcy's goal of an orderly and equal distribution among creditors and the need to prevent a race to a debtor's assets.  Distributions to administrative claimants are generally disallowed prior to confirmation if there is a showing that the bankruptcy estate may not be able to pay all of the administrative expenses in full.  Courts will also consider the particular needs of each administrative claimant and the length and expense of the case's administration.  To qualify for exceptional immediate payment, a creditor must show that there is a necessity to pay and not merely that the Debtor has the ability to pay.[93]

Here, the only argument that Westfield makes in support of immediate payment is the *possibility* that the Debtors will not be able to pay the section 503(b)(9) claims in full.  Westfield has not presented any other argument or evidence to support the necessity of immediate payment.[94]  Moreover, Westfield has not presented any evidence that it will suffer a  hardship from the delay in payment.  Finally, the record shows that requiring immediate payment will unduly prejudice the Debtors.  Thus, the Court will not require immediate payment of the claim.

---

[91] *In re Garden Ridge Corp.*, 323 B.R. 136, 143 (Bankr. D. Del. 2005) (citations omitted).

[92] *Id.* (citations omitted).

[93] *In re Global Home Products, LLC*, 06-10340 KG, 2006 WL 3791955, *3 (Bankr. D. Del. Dec. 21, 2006) (internal quotations marks and citations omitted) (*citing In re HQ Global Holdings, Inc.*, 282 B.R. 169, 172 (Bankr. D. Del. 2002)).

[94] *See In re Bookbinders' Rest., Inc.*, BKY 06-12302ELF, 2006 WL 3858020, *1 (Bankr. E.D. Pa. Dec. 28, 2006) ("I reject the creditor's argument that it is entitled to immediate payment as a matter of law because the Debtor in this case has been paying other administrative expenses, specifically, the Debtor's postpetition trade debt, which has been paid in the ordinary course pursuant to 11 U.S.C. § 363(c)(1).").

## CONCLUSION

Every element of the definition of "good" matters, including that it must be "movable at the time of identification." In order to do justice to the definition of a good, the separation of identification and consumption must be meaningful and, in the case of electricity, that "gap" is too short to meet the definition of the term. While the foregoing is sufficient to decide the issue, a comparison of electricity with things that are goods under the U.C.C. leads to an identical result. In addition, the fact that the debtor is in bankruptcy raises the question of whether Bankruptcy Code section 546(c) (reclamation) and section 366 (utility services) are relevant to the Court's inquiry. Ultimately, they are not relevant and do not control whether electricity is or is not a good. Whether electricity is a good should rise and fall on the nature of electricity, in and of itself, and not the relationship of the parties to a transaction involving electricity. But, even if the parties' relationship is relevant, in this case, Westfield is acting as a public utility and the debtor is the ultimate consumer, which supports a finding that the electricity at issue is not a good. Finally, the Court disagrees that section 503(b)(9) should be strictly construed. The court should simply apply the law as written and not put a judicially created obstacle in the path of an administrative expense claimant.

Applying the plain meaning of section 2-105(1) of the U.C.C. supported by the factors identified above, the Court concludes that electricity is not a good under section 503(b)(9) of the Bankruptcy Code.

As to the natural gas provided by Westfield – the Court finds that natural gas is a good.  However, the Court rejects the "predominate purpose" test and will award Westfield an administrative priority claim under the "apportionment" test  for the value of the natural gas provided, but not the associated services.  In that regard, the Court will grant Westfield an administrative priority claim in the amount of $78.08 for the value of natural gas provided to the Debtors in the 20-days prior to the Petition Date that had sufficient support in the record.  The Court, however, will not order immediate payment of this administrative expense claim, as Westfield has not established the "necessity of payment," or any other evidence, to support the need for immediate payment aside from the general concern that all administrative claims will not be paid in full.

An order will be issued.